1               IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF OHIO
2                     EASTERN DIVISION

3                        - - -

4    Annette Ryan, (K.N.A. Katz), )
                                   )
5                   Plaintiff,     )
                                   )
6         vs.                      )  Case No. 1:15-CV-02384
                                   )  Dan Aaron Polster, J.
7    Robert McDonald, Secretary,   )
     Department of Veterans'       )
8    Affairs,                      )
                                   )
                    Defendant.     )
9                        - - -

10

11        Deposition of Annette M. Katz, the Plaintiff

12   herein, called by the Defendant for oral examination,

13   pursuant to the Federal Rules of Civil Procedure, taken

14   before Mary Bolas-Dietz, Court Reporter and Notary

15   Public in and for the State of Ohio, at United States

16   Attorney's Office, United States Court House, 801 West

17   Superior Avenue, Suite 400, Cleveland, Ohio 44113-1852,

18   on Thursday, March 2, 2017, commencing at 9:16 a.m.

19

20                        - - -

21

22

23

24

25

**Annette Ryan (K.N.A. Katz) v.**
**Robert McDonald, Secretary, etc.**

**Plaintiff**
**March 2, 2017**

---

Page 2

```
1                    INDEX
2  WITNESS:          CROSS   REDIRECT   RECROSS
3  Annette M. Katz
4    by Ms. Bacchus      5                265
5    by Ms. Pizzino            263
6                   - - -
7             E X H I B I T S
8  Defendant's:                      Marked
9        A                            14
         B                            16
10       C                            56
         D                            69
11       E                            70
         F                            91
12       G                           105
         H                           125
13       I                           138
         J                           147
14       K                           148
         L                           163
15       M                           166
         N                           177
16       O                           180
         P                           180
17       Q                           181
         R                           183
18       S                           189
         T                           195
19       U                           196
         V                           198
20       W                           200
         X                           205
21       Y                           205
         Z                           207
22       AA                          207
         BB                          210
23       CC                          211
         DD                          212
24       EE                          213
         FF                          213
25                   - - -
```

Page 3

```
1         E X H I B I T S  C O N T ' D
2  Defendant's:                      Marked
3        GG                          214
         HH                          214
4        II                          215
         JJ                          216
5        KK                          221
         LL                          221
6        MM                          238
         NN                          245
7        OO                          246
         PP                          247
8        QQ                          249
         RR                          249
9        SS                          250
         TT                          251
10                   - - -
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1  APPEARANCES:
2    On behalf of the Plaintiff:
3        Elisa P. Pizzino, Esq.
         Attorney at Law
4        697 W. Market Street
         Akron, Ohio 44303
5        330-603-1913
         elisa.pizzino@gmail.com
6
7    On behalf of the Defendant:
8        Renee A. Bacchus, Esq.
           and
9        Delores P. Garcia Prignitz, Esq.
         Assistant United States Attorneys
10       United States Attorney's Office
         801 West Superior Avenue, Suite 400
11       Cleveland, Ohio 44113-1852
         216-622-3707/216-622-3737
12       renee.bacchus@usdoj.gov
         delores.garcia.prignitz@usdoj.gov
13                   - - -
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
1           ANNETTE M. KATZ,
2  of lawful age, being first duly sworn, as hereinafter
3  certified, was examined and testified as follows:
4              CROSS-EXAMINATION
5  By Ms. Bacchus:
6  Q    And it's going to be hard for me to keep
7       remembering to say Ms. Katz.
8  A    Oh, that's okay.
9  Q    So if I call you Ms. Ryan, I'm seriously not
10      trying to disrespect you.  Can you state your
11      name for the record please?
12 A    Annette Marie Katz.
13 Q    And Ms. Katz, were you previously known as
14      Annette Ryan?
15 A    Yes.
16 Q    Were you known by any other names?
17 A    LaSalvia was my maiden name.
18 Q    Ms. Katz, we've met before.  I'm Renee Bacchus
19      and this is Delores Garcia Prignitz.  We
20      represent the Veterans Administration which I
21      will refer to as the VA.
22           We're here just to find out about your
23      claim, your complaint, your damages.  None of
24      the questions are meant to insult you or
25      anything, so please don't take it that way, just
```

Annette Ryan (K.N.A. Katz) v.
Robert McDonald, Secretary, etc.

**Plaintiff**
**March 2, 2017**

Page 6

1  tell us the truth.
2      If you don't know an answer, please tell
3  me you don't know it.  If I ask you a question
4  and you answer it, I'm going to assume that you
5  understood it; is that okay?
6  A    That's okay.
7  Q    I'm going to ask that you keep your voice up,
8  because it's difficult for the court reporter to
9  take down what's being said and we don't want
10  her to misinterpret what's being said.
11  A    Okay.
12  Q    If you need a break, please just let me know,
13  but I ask that you ask for a break after you've
14  answered the question.  If I ask you a question
15  that you don't understand, please just ask me to
16  rephrase it; okay?
17  A    Okay.
18  Q    Are you under the influence of any medication
19  that may affect your ability to testify
20  truthfully here today?
21  A    Uh-uh.  No, sorry.
22  Q    We'll try to remind you.  And we try to shy away
23  from uh-huhs and uh-uhs, because they don't
24  translate very well in the record.  So if I say
25  is that a yes, again, I'm just trying to confirm

Page 7

1  if you said um-hmm or uh-huh.
2      I will try to allow you to finish speaking
3  before I start and I ask that you do the same,
4  because it's difficult for the court reporter to
5  take it down if we're talking over one another;
6  okay?
7  A    Yes.
8  Q    Can you give me your current home address?
9  A    It is 20000 Grand Lake Drive and that is Estero,
10  Florida 33928.
11  Q    And where is that located?  Is that southern
12  Florida, middle Florida?
13  A    Southern.
14  Q    And who do you reside there with?
15  A    My husband.
16  Q    Anyone else?
17  A    My son.
18  Q    Your husband's name?
19  A    Steven Katz.
20  Q    And what's your son's name?
21  A    Kyle Ryan.
22  Q    Do you live with anyone else?
23  A    No.
24  Q    And how long have you and Mr. Katz and your son
25  lived in Florida?

Page 8

1  A    Since October of this year, actually 2016.
2  Q    And prior to moving to Florida, what was your
3  address?
4  A    4712 Mallard, like the bird, Pond Drive and
5  that's Akron, Ohio, 44333.
6  Q    And from what time period did you live on
7  Mallard Pond Drive?
8  A    We lived there two years.
9  Q    So that would be 2014 to 2016?
10  A    Correct.
11  Q    And you said "we."  Who's we?
12  A    Me and my husband.
13  Q    Anyone else?
14  A    No.
15  Q    Prior to living on Mallard Pond Drive, where did
16  you reside?
17  A    I lived in Tallmadge which was -- gosh, I don't
18  know that address anymore.
19  Q    Do you know the street?
20  A    Westvue.
21  Q    And how long did you live on Westvue?
22  A    About three years.
23  Q    Who did you live with on Westvue?
24  A    My two boys.
25  Q    Would that be Kyle Ryan?

Page 9

1  A    Yes.
2  Q    And?
3  A    Sean.
4  Q    When you moved to your address on Mallard Pond,
5  did your two boys stay at the address on
6  Westvue?
7  A    Yes, they did.
8  Q    You became employed at the Louis Stokes VA in
9  October 2011?
10  A    Correct.
11  Q    And what position were you hired for?
12  A    LPN, licensed practical nurse.
13  Q    What was your initial rate of pay?
14  A    $22.
15  Q    And did that change over a period of time?
16  A    Yes, it did.
17  Q    And what did it go up to?
18  A    I don't recall the final amount.  I worked a lot
19  of overtime so.
20  Q    $22 was your hourly rate of pay?
21  A    Yes.
22  Q    And did that include the shift differential?
23  A    No, that did not.
24  Q    You worked second shift; correct?
25  A    Correct.

**Annette Ryan (K.N.A. Katz) v.**
**Robert McDonald, Secretary, etc.**

**Plaintiff**
**March 2, 2017**

Page 10

1 Q     Were you hired to work second shift?
2 A     Yes.
3 Q     Were you hired into a specific unit?
4 A     Yes.
5 Q     What unit was that?
6 A     The spinal/traumatic/brain injury.
7 Q     Rather than repeat that the whole deposition,
8     can we just say the spinal cord unit?
9 A     Yes, spinal cord unit.
10 Q     We'll agree to call it the spinal cord unit.
11     When you started at the VA, did you have any
12     type of training?
13 A     Yes, I did.
14 Q     And tell me about the training you received as a
15     new employee.
16 A     We had to go through how to take care of
17     patients who were paralyzed, breathing
18     difficulties, wound difficulties, and then they
19     would train us as we went with special -- any
20     kind of special needs that we would need, we
21     would have to take further training.
22 Q     So that was training specific to the actual
23     spinal cord unit?
24 A     Correct.
25 Q     Did you receive any type of new employee

Page 11

1     training like "This is our policies.  These are
2     our procedures.  Here's where you need to go if
3     you have an issue resolved with your payroll" or
4     any of that unlike your first week at the VA?
5 A     Yes.
6 Q     Tell me about your initial new employee
7     training.
8 A     The employee training initially would be like
9     classes, going over payroll, going over their
10     policies, what they expect of us as a nurse.
11 Q     Anything else?
12 A     Not that I can recall.
13 Q     You said they went over policies.  Did they tell
14     you where to find the VA policies and procedures
15     if you needed to refer back to them?
16 A     Yes.
17 Q     Were those policies and procedures available on
18     the computer system at the VA?
19 A     Handbook.
20 Q     There was a handbook?
21 A     Yes.
22 Q     And the handbook contained the policies and
23     procedures?
24 A     Yes.
25 Q     Were you given an actual copy of the handbook?

Page 12

1 A     Yes.
2 Q     Do you still have that handbook?
3 A     Yes.
4 Q     Can you provide a copy to your attorney for us
5     please?
6 A     Yes.
7 Q     Were you given like a personal log-in number for
8     the computer system?
9 A     Not at that time until I was assigned to that
10     floor.
11 Q     And how long was it between the time that you
12     started and you were assigned to the specific
13     floor?
14 A     November 7th.
15 Q     So approximately how long did you have like new
16     employee training?
17 A     Four weeks.
18 Q     Once you were assigned to the floor, were you
19     given a personalized employee log-in?
20 A     No.
21 Q     When did you get a computer log-in?
22 A     When we were assigned to the floor.
23 Q     I'm sorry, maybe you misunderstood my question.
24     That was my question.  Once you were assigned to
25     the floor --

Page 13

1 A     Yes.
2 Q     -- did you get a computer log-in?    And was
3     that unique to you?
4 A     Yes.
5 Q     On the VA computer's system, did you have access
6     to VA information like payroll or "This is the
7     person you go see if you have a problem with
8     your paycheck, this is the person you go see if
9     you have a problem with your insurance" or
10     anything like that?
11 A     Yes.
12 Q     And did they send out like daily newsletters at
13     the VA on your e-mail?
14 A     Can you rephrase that?
15 Q     Did they send out like a daily newsletter that
16     would have like information in it, like "This is
17     nurses week, this is sexual harassment week" or
18     anything like that?
19 A     Yes.
20 Q     I believe they were called something like The
21     Daily Blast; does that help?  You don't have to
22     know the name of it.
23 A     No.
24 Q     And at some point when you were hired, you told
25     me you were hired as an LPN.  Did you receive a

Annette Ryan (K.N.A. Katz) v.
Robert McDonald, Secretary, etc.

**Plaintiff**
**March 2, 2017**

Page 14

1    job description?
2 A    Yes.
3 Q    I'm going to hand what we're going to mark as
4    Exhibit A.
5        (Government's Exhibit A was marked for
6    identification.)
7 Q    Is this the job description that you received?
8 A    Yes.
9 Q    Now is this job description particular to the
10    unit, the spinal cord unit, or was this just a
11    general job description for the LPN position?
12 A    For the LPN position.
13 Q    Do you recall receiving a training on the issue
14    of sexual harassment and discrimination?
15 A    Yes.
16 Q    Tell me about what you recall from that
17    training.
18        MS. PIZZINO: Renee, I'd like
19    to just note for the record that page three of
20    Exhibit A is an unsigned copy and it is not
21    dated.
22        MS. BACCHUS: Right.  I'm
23    sorry, let me clarify that.
24 Q    This is a job description that you received, not
25    meaning that you actually signed it and got this

Page 15

1    one?
2 A    Correct.
3 Q    Tell me what you recall about the sexual
4    harassment discrimination training you received
5    at the VA.
6 A    It was role-playing.  They would act out certain
7    conditions, certain role-playing and then you
8    would have to -- they would just role-play.
9    That's what I can take from that.
10 Q    Was this training live with people role-playing?
11 A    Yes.
12 Q    Did you receive any type of computer training?
13 A    I can't recall with us.
14 Q    When you say there was live training, were the
15    people acting out the training in front of you
16    or --
17 A    Yes.
18 Q    -- were you watching something where the people
19    where acting out different scenarios?
20 A    People were acting out in front of us.
21        MS. PIZZINO: Annette, you have
22    to wait for her to complete her question so that
23    you get the whole question before you answer.
24 Q    And was this live training that you received
25    part of the new employee orientation program

Page 16

1    during the first four weeks that you were hired
2    at the VA?
3 A    Yes.
4 Q    And after the first four weeks once you had been
5    assigned to the unit, did you receive any type
6    of sexual harassment training that you can
7    recall?
8 A    No.
9 Q    No, you can't recall it or no, you didn't
10    receive it?
11 A    No, I did not receive it.
12 Q    I'm going to hand you what we're going to mark
13    as Defendant's Exhibit B.
14        (Government's Exhibit B was marked for
15    identification.)
16 Q    This is your training record from the Department
17    of Veterans Affairs.  Have you seen this
18    document before?
19 A    Can you clarify that?  Was it a document or
20    computer?
21 Q    This is a training record and have you seen this
22    document or this information whether it was on
23    the computer or in written form before?
24        MS. PIZZINO: Renee, can you
25    give me a chance to take a look at this?  I

Page 17

1    mean, I'm going to object on foundation and
2    objection on foundation.  Are you asking her if
3    she's seen this document; is that your question?
4        MS. BACCHUS: I asked her has
5    she seen this information whether it's in
6    written form or on the computer before?
7 A    On the computer, yes.
8 Q    So you had access to your training records on
9    the VA's computer?
10 A    Yes.
11 Q    I'm going to ask you to turn to where it says
12    page five of eight and at the second entry from
13    the top, it states that on 12 -- well, it
14    doesn't state, but it indicates on 12/14/2011,
15    you received training on prevention of workplace
16    harassment/No FEAR; do you see that entry?
17 A    Yes.
18 Q    And on the number of hours, it says 1.5.  Does
19    that do anything for your recollection as to
20    whether or not you received any training on
21    discrimination or harassment?
22 A    Yes, yes.
23 Q    Do you recall that training now on the computer?
24 A    On the computer the training that we had was you
25    picked -- it wasn't like specific to sexual

**Annette Ryan (K.N.A. Katz) v.**
**Robert McDonald, Secretary, etc.**

**Plaintiff**
**March 2, 2017**

---

Page 18

1   harassment.  I mean, you had to choose -- you
2   didn't have like all of that information.  You
3   got to choose for your hours.
4 Q   And this indicates that you received this
5   training.  Are you saying you didn't choose this
6   training and undergo this training for sexual
7   harassment, workplace harassment?
8 A   I can't recall that.
9 Q   You don't deny that you may have received this
10   training; do you?
11 A   No.
12 Q   You said it was on the computer.  When you did
13   it on the computer, did you log into the
14   computer under your personal log-in?
15 A   Yes.
16 Q   And then after you would complete the training,
17   it would register on your training log?
18 A   Yes.
19       MS. PIZZINO: I would like to
20   note for the record it's harassment/No FEAR is
21   the training.
22       MS. BACCHUS: No, it says,
23   "Prevention of Workplace Harassment/No FEAR."
24       MS. PIZZINO: Okay.  It's hard
25   to read.

---

Page 19

1 Q   Did you receive any type of sexual harassment
2   training prior to joining the VA?
3 A   Can you rephrase that?
4 Q   Sure.  In any of your other employment, had you
5   received any type of sexual harassment training?
6 A   Yes.
7 Q   And tell me about the training that you
8   received.
9       MS. PIZZINO: Objection.
10   Relevancy.  You could go ahead and answer.
11 A   Specifically?
12 Q   What you recall about your training on sexual
13   harassment prior to joining the VA.
14 A   A handbook and sign that you received a
15   handbook.
16 Q   Do you recall any of the specifics of defining
17   what sexual harassment is?
18 A   Not that I recall.
19 Q   At the time that you went through the training
20   that you recall, the live training at the VA,
21   did they explain what was considered sexual
22   harassment during that training?
23 A   Yes.
24 Q   And what's your understanding of what's
25   considered sexual harassment?

---

Page 20

1       MS. PIZZINO: Objection.  Calls
2   for a legal conclusion.  You can answer.
3       MS. BACCHUS: I asked her
4   what's her understanding.
5 A   Touching, verbally, inappropriateness with other
6   employees.
7 Q   And during the training that you can recall, did
8   they tell you how to report sexual harassment at
9   the VA?
10 A   Yes.
11 Q   And what did they tell you about reporting
12   sexual harassment?
13 A   To go to your manager, the Union, and we have a
14   sexually -- the EEO.
15 Q   And during this training, did you understand
16   that in order for it to be sexual harassment, it
17   has to be unwelcomed by the person that it's
18   directed to?
19       MS. PIZZINO: Objection.  You
20   can answer.
21 A   Yes.
22 Q   When you said you can go to the Union, were you
23   a member of the Union at the VA?
24 A   Yes, I was.
25 Q   And which Union was that?

---

Page 21

1 A   The VA Union.
2 Q   Was that Local 31; do you know?
3 A   I don't.
4 Q   And did the Union represent the LPNs?
5 A   Yes, they did.
6 Q   Did they represent any other position, to your
7   knowledge?
8 A   I don't know.
9 Q   Okay.  As a member of the union, did you get a
10   copy of the master agreement, the union
11   contract?
12 A   I can't recall.
13 Q   And you said you were hired as an LPN and you
14   were assigned to the spinal cord unit.  Did you
15   ever work on any other unit at the VA?
16 A   Can you clarify that?
17 Q   Yes.  Like if you were assigned to the spinal
18   cord unit, were you ever like reassigned because
19   of a shortage to another unit?  Did you ever
20   pick up overtime hours at another unit?
21 A   I specifically was on that unit and I worked for
22   pay on that unit but have been on other units
23   without pay.
24 Q   What do you mean without pay?
25 A   Teaching.

---

Annette Ryan (K.N.A. Katz) v.
Robert McDonald, Secretary, etc.

Plaintiff
March 2, 2017

Page 22

1 Q   Teaching or as a student?
2 A   As a student.
3 Q   So you never picked up additional hours working
4     on a unit other than the spinal cord unit?
5 A   No.
6 Q   Was there ever a time where there may have been
7     a shortage on another unit and you were
8     redirected from the spinal cord unit to go
9     somewhere else?
10 A  One time I do believe I did go on to another
11    unit.
12 Q  On the spinal cord unit, who was your immediate
13    supervisor?
14 A  Lisa Herman.
15 Q  Did Lisa Herman have an assistant?
16 A  Yes.
17 Q  Who was her assistant?
18 A  Dawn Robinson.
19 Q  And what was Ms. Robinson's title, if you know?
20 A  Assistant nurse manager.
21 Q  And what was Lisa Herman's title?
22 A  Nurse manager.
23 Q  Do you know who Ms. Herman reported to?
24 A  Yes.
25 Q  Who did Ms. Herman to?

Page 23

1 A   Elizabeth Noelker.
2 Q   So if you needed time off or you wanted to pick
3     up overtime hours, who would you talk to?
4 A   Lisa.
5 Q   Who was responsible for doing your performance
6     appraisal?
7 A   Lisa Herman.
8 Q   And what shift did Ms. Herman work?
9 A   She worked first shift, but it flowed over into
10    second shift.
11 Q  And for the record, what hours were considered
12    first shift and what hours were considered
13    second shift?
14 A  First shift was 7:00 to 3:00.
15 Q  And second shift?
16 A  Was 3:00 to 11.
17 Q  You said Ms. Herman worked first shift, but it
18    flowed over into second shift?
19 A  Uh-huh.
20 Q  Does she have modified hours?
21 A  I'm unsure.
22 Q  So are you saying that she actually would be
23    working on second shift or that she would just
24    sometimes be there during second shift?
25 A  She was always there during second shift.

Page 24

1 Q   Always there?
2 A   Uh-huh.
3 Q   Would she be there for the whole shift?
4 A   Sometimes.
5 Q   What about Ms. Robinson, what shift did she
6     work?
7 A   First shift.
8 Q   Do you know what shift Ms. Noelker worked?
9 A   First shift.
10 Q  And if Ms. Herman was not present on second
11    shift when you would be working and you needed
12    to leave early or you became sick, who would you
13    speak to?
14 A  The nurse manager that was assigned to that
15    shift and it was a different nurse.
16 Q  So regardless of whether Ms. Herman was present,
17    there would always be a nurse manager who would
18    be assigned to your shift if she was not?
19 A  Yes.
20 Q  You said it would always be a different nurse
21    manager.  Do you recall the names of any of the
22    nurse managers who would have worked that shift?
23 A  Yes.
24 Q  Give me those names that you recall.
25 A  I can recall Doug Jenison, Mrs. Swails, Ebony

Page 25

1     Winters, a lot of nurses, they were all RNs.
2 Q   All RNs?
3 A   John Blackstone.
4 Q   Anyone else?
5 A   That's all that I can recall.
6 Q   Out of these four people that you just named,
7     did they work on the spinal cord unit?
8 A   Yes.
9 Q   And to your knowledge what was their title?
10 A  RN.
11 Q  You told me that they would be the nurse manager
12    assigned to the shift.  Were they hired as nurse
13    managers or were they hired as RNs, to your
14    knowledge?
15 A  I don't know what they would be hired as.  I
16    can't recall what they would be.  I don't have
17    that information.
18 Q  Of these four people that you just named, did
19    any of them have the authority to discipline
20    you?
21 A  Yes.
22 Q  So it's your belief that they could write you up
23    or propose suspension or anything like that?
24 A  Yes.
25 Q  And what is the basis of your belief?

Annette Ryan (K.N.A. Katz) v.
Robert McDonald, Secretary, etc.

**Plaintiff**
**March 2, 2017**

|  | Page 26 |
|---|---|

1 A   Can you clarify that?

2 Q   Yes.  Why do you believe that they had the
3 authority to discipline you or write you up?

4 A   They were the supervisor of the shift.  They
5 were the direction.  During my training, I was
6 always introduced that this is a nurse manager
7 and nurse supervisor of the shift.

8 Q   You need to?

9 A   Sorry.

10 Q   During your training, you were told that they
11 were the nurse managers?

12 A   Of the shift.

13 Q   And who told you that?

14 A   Lisa Herman.

15 Q   Did she specifically tell you they were the
16 nurse manager or they would be the person who
17 would be in charge if she or Dawn was not
18 around?

19 A   Can you clarify?

20 Q   Yes.  Did she specifically say, "This is the
21 nurse manager, Doug Jenison, this is the nurse
22 manager, Ms. Swails, this is the nurse manager,
23 Ms. Winters when I or Dawn are not around" or
24 did she just tell you that they would be the
25 person you would see if you need something when

|  | Page 27 |
|---|---|

1 they weren't around?

2 A   What I can recall is that when the nurse
3 managers are not on the shift in that we worked
4 second shift, they are in charge; specifically
5 the RNs would be in charge.

6 Q   The RNs would be in charge?

7 A   Whoever was assigned.

8 Q   On your shift, there were assigned RNs, assigned
9 LPNs, and assigned nurse's aides; correct?

10 A   Correct.

11 Q   Were you assigned to work specifically with one
12 RN and one nurse's aide?

13 A   Correct, yes.

14 Q   And were you usually assigned to work with the
15 same RN and nurse's aide?

16 A   No.

17 Q   Tell me how your assignments came about with the
18 RNs and the nurse's aides?

19 A   The RN who would be in charge of that shift
20 would draw up our duties before our meeting
21 before our shift started.

22 Q   So each day, it could change as to which nurse's
23 aide or RN you worked with?

24 A   Correct.

25 Q   And typically on a shift, how many RNs, nurse's

|  | Page 28 |
|---|---|

1 aides and LPNs would be working?

2 A   From what I can recall, it varied day to day.

3 Q   On average, how many nurse's aides would work on
4 a shift?

5 A   Enough for each hallway so between two to three.

6 Q   How many hallways were there?

7 A   Three.

8 Q   And did those hallways have specific
9 designations?  I mean, was it called hallway
10 one, hallway two?

11 A   Yes, it was hallway A, B or C.

12 Q   So each day that you would come to work, you
13 would be assigned to one of these three
14 hallways, A, B or C?

15 A   Correct.

16 Q   That could vary from day to day?

17 A   Correct.

18 Q   And was it the same with the nurse's aides, they
19 would be assigned to the hallway and that could
20 be varied from day to day?

21 A   Correct.

22 Q   And was there one RN assigned to each hallway
23 per shift or, at least, one?

24 A   Yes.

25 Q   And approximately how many LPNs would work on a

|  | Page 29 |
|---|---|

1 hallway?

2 A   That varied.

3 Q   On average?

4 A   On average, we were always short.

5 Q   On average, so there would be one, two, three?

6 A   I'm not sure how many would be assigned as far
7 as some days could be four, some days could be
8 ten, some days could be eight.

9 Q   Assigned to one hallway?

10 A   Uh-huh.

11 Q   You have to say for the court reporter.

12 A   Yes.

13 Q   Approximately how many patients were on each
14 hallway?

15 A   From what I can recall, about ten.

16 Q   What was the difference between your duties and
17 the nurse's aide's duties?

18 A   The nurse's aide could not pass medication.

19 Q   Anything else?

20 A   Could not make the critical decisions as far as
21 the care of the patient.

22 Q   Any other distinction between your duties and
23 the nurse's aide's duties?

24 A   We can delegate where nursing assistants cannot
25 delegate.

**Annette Ryan (K.N.A. Katz) v.**
**Robert McDonald, Secretary, etc.**

**Plaintiff**
**March 2, 2017**

---

Page 30

1 Q    And who would you be delegating to?
2 A    The nursing assistant.
3 Q    When did you begin to work with MD Garrett?
4 A    The first day out of training.
5 Q    So in November of 2011?
6 A    Correct.
7 Q    On average in a week, how many days would you be
8      assigned to work with MD Garrett?
9 A    Many days, I saw him on a day-to-day basis.
10     Working together, more days -- I don't want to
11     speculate.  I can't recall how many days.  More
12     days than not.  If I didn't, I would see him
13     too.
14 Q   I'm asking in terms of how many days were you
15     assigned to work the same hallway on average.
16     If you worked a five-day workweek on average of
17     those five days, how many days would you be
18     required to work with him?
19 A   At least, three.
20 Q   Now is there a central nursing station on the
21     unit?
22 A   Yes.
23 Q   And is that like in the center of all of the
24     various wings; A, B and C?
25 A   Yes.

---

Page 31

1 Q    Did you ever request not to be assigned to work
2      with Mr. Garrett to any of the nurses, the RNs?
3 A    Yes.
4 Q    Who did you make that request to?
5 A    Ebony Winters, Mrs. Swails, Doug Jenison, John
6      Blackstone.
7 Q    Did you ever make the request to Lisa Herman?
8 A    No.
9 Q    Did you ever make the request to Dawn Robinson?
10 A   No.
11 Q   When do you recall making the request to Ebony
12     Winters?
13 A   Can you rephrase that?
14 Q   Sure.  When's the first time you recall making
15     the request not to work with Mr. Garrett to
16     Ebony Winters?
17 A   I'm not sure of the exact date.
18 Q   Do you have any time frame or any reference of
19     time frame when you asked her?
20 A   Around the wintertime.
21 Q   Winter of 2011?
22 A   Yes.
23 Q   So this would have been within the first couple
24     of months you started working there?
25 A   I'm sorry, 2012.

---

Page 32

1 Q    What did you tell her when you asked to not be
2      assigned to work with him?
3 A    If there was another nursing assistant that
4      could work with me on my hallway.
5 Q    Anything else?
6 A    No.
7 Q    And what was Ms. Winters's response?
8 A    She would see what she could do.
9 Q    When was the first time you recall saying to
10     Doug Jenison you didn't want to work with Mr.
11     Garrett?
12 A   Around the same time frame, the winter.
13 Q   Of 2012?
14 A   Uh-huh, yes; correct.
15 Q   And what do you recall saying to Mr. Jenison?
16 A   Can I have a different nursing assistant?
17 Q   Anything else?
18 A   Not that I can recall.
19 Q   And what was Mr. Jenison's response?
20 A   He wanted to know why.
21 Q   Did you tell him why?
22 A   Not the first time that I asked for a different
23     nursing assistant.
24 Q   Did Mr. Jenison have any other response when you
25     didn't tell him why?

---

Page 33

1 A    He understood if I didn't want to share with
2      him, but if I could, I stated that I just could
3      not work with him.
4 Q    And you said "not the first time."  When is the
5      second time that you told Mr. Jenison that you
6      didn't want to work with Mr. Garrett?
7 A    When it continued to be that I was going to be
8      assigned with him.
9 Q    And do you recall when the second time was that
10     you spoke with Mr. Jenison?
11 A   I don't recall.
12 Q   What do you recall about speaking with Mr. Jenison
13     the second time in requesting not to work with
14     Mr. Garrett?
15 A   That it's uncomfortable to work with MD.
16 Q   MD is Mr. Garrett?
17 A   Yes.
18 Q   So if we refer to him as MD or Garrett, we know
19     who we're talking about.  You told him it was
20     uncomfortable to work with Mr. Garrett?
21 A   Yes.
22        MS. PIZZINO: Renee, just for
23     the record, early on you did refer to him as MD,
24     so just back in the transcript if we look at it
25     when Renee first mentioned MD, we were speaking

---

**FINCUN-MANCINI -- THE COURT REPORTERS**
**(216) 696-2272**

**Annette Ryan (K.N.A. Katz) v.**
**Robert McDonald, Secretary, etc.**

**Plaintiff**
**March 2, 2017**

---

Page 34

1     about MD Garrett.  And MD is his name.  It's not
2     a title just for clarification.  They're not
3     initials for other names, so it's M.D.  It's
4     capital M, capital D, MD Garrett, I believe.
5 Q   So you told Doug that it was uncomfortable to
6     work with Mr. Garrett.  Did you tell him
7     anything else at that time?
8 A   No.
9 Q   What was Doug's response?
10 A   He didn't push the issue.  He just listened.
11 Q   When was the first time you recall telling Ms.
12     Swails that you didn't want to work with Mr.
13     Garrett?
14 A   Around the same time.
15 Q   And what did you tell Ms. Swails?
16 A   That I did not want to work with MD.
17 Q   Anything else?
18 A   No.
19 Q   And what was Ms. Swails's response?
20 A   She would ask Lisa.
21 Q   She would ask Lisa what?
22 A   If she can change the assignments.
23 Q   Do you know if she asked Lisa?
24 A   No, I do not know.
25 Q   Did you follow up with Ms. Swails about this

---

Page 35

1     conversation?
2 A   Yes, I did.
3 Q   And what was the follow-up?
4 A   When she knew something from Lisa, she would let
5     me know.
6 Q   And did you pursue it any further?
7 A   Not with her.
8 Q   Did you pursue it with Lisa?
9 A   No.
10 Q   You said "not with her," who did you pursue it
11     further with?
12 A   Doug Jenison and John Blackstone.
13 Q   When do you recall pursuing it with Doug and Mr.
14     Blackstone?
15 A   Right around the same time.
16 Q   What did you do to pursue the conversation with
17     Mr. Blackstone?
18 A   He would ask me what my reasons were and I would
19     tell him the same.  That it was comfortable to
20     work with MD.
21 Q   Is that all you told Mr. Blackstone?
22 A   Yes.
23 Q   And what was Mr. Blackstone's response?
24 A   Did I talk to the other nurses that were in
25     charge?

---

Page 36

1 Q   So you never received a follow-up from Ms.
2     Swails as to any conversation she had with Ms.
3     Herman about whether she could not assign you to
4     work with Mr. Garrett; right?
5 A   Right, yes.
6 Q   Tell me about your friendship or working
7     relationship with Mr. Garrett when you first
8     started.
9 A   It was friendly as far as a communication work
10     relationship.  I guess that would be it.
11 Q   And in one of your written statements, you said
12     "We were friends and coworkers."  Do you mean at
13     the office or friends outside of the office?
14 A   Office.
15 Q   And would you have lunch together when you first
16     started?
17 A   When you work second shift, usually your nurses,
18     your team that you're on would have lunches
19     together on the unit.
20 Q   When you said "team," you mean like the nursing
21     assistants, the RNs --
22 A   Correct.
23 Q   -- and the LPNs?  And when would you ever talk
24     with Mr. Garrett outside of work?
25 A   He would call me on my phone, but not something

---

Page 37

1     I would initiate myself.
2 Q   And how did he get your phone number?
3 A   We have all of the employees' numbers on the
4     unit.  There's a book with all the employees'
5     numbers and addresses.
6 Q   Does it also have your cell phone number in
7     there?
8 A   Yes.
9 Q   So you never personally gave him your cell phone
10     number?
11 A   No.
12 Q   Did you ever discuss any personal information
13     with Mr. Garrett?
14 A   Can you clarify that?
15 Q   Sure.  Mr. Garrett has made representations that
16     you would discuss the fact that you needed to
17     have breast surgery, that you needed to have a
18     new car, that you needed car repairs?
19 A   No.
20 Q   Were you ever having any of these discussions
21     like when you would be having lunch where he may
22     have just been present?
23 A   That may be, yes.
24 Q   Then when you said eventually the nature of your
25     relationship with him changed, tell me at what

---

Annette Ryan (K.N.A. Katz) v.
Robert McDonald, Secretary, etc.

**Plaintiff**
**March 2, 2017**

Page 38

```
 1    point did the nature of the relationship change
 2    as near as you can recall as to the time frame
 3    and how it changed?
 4  A   When he would grab my bottom or he would make
 5    sexual comments to me.
 6  Q   When's the first instance that you recall of him
 7    either making sexual comments to you or grabbing
 8    you or anything that you thought was harassment?
 9        MS. PIZZINO:  Objection to the
10    word "harassment."  Legal term.
11  Q   All right.  Anything that you thought was
12    inappropriate?
13  A   Around the winter even before the winter months
14    of 2012.
15  Q   What do you recall happening before the winter
16    months of 2012?
17  A   He would make sexual jokes.  He would make
18    comments about his masturbating and he would use
19    me as the person that he would masturbate to.
20  Q   Do you have any time frame or reference as to
21    when this type of behavior started?  I mean,
22    maybe like if your kids were starting school or
23    you kind of related it to that or you related it
24    to you had something going on in your life where
25    we could kind of narrow down the time frame?
```

Page 39

```
 1  A   It was around the summer of 2012 or early
 2    summer.
 3  Q   Early summer?
 4  A   Uh-huh.
 5  Q   You mean like June or July?
 6  A   Yes.
 7  Q   And what happened in the early summer?
 8  A   It would just gradually progress.  It was almost
 9    a daily.
10  Q   And you say "early summer of 2012," but what was
11    the first instance; do you recall?  Was he
12    making like comments to you or was it a physical
13    touching?
14  A   Comments.
15  Q   And what leads you to believe it was around
16    summer of 2012?
17  A   I remember him walking me to my car and he would
18    -- I just remember walking to my car and not
19    having winter coats on.  That's the thing of my
20    recollection.
21  Q   I believe in one of your statements you said
22    that he had sent you a text while you were on
23    vacation asking what you were wearing.  Do you
24    recall that incident?
25  A   I don't recall that.
```

Page 40

```
 1  Q   In the year of 2012, did you go on a family
 2    vacation that you can recall?
 3  A   Yes.
 4  Q   When did you go on vacation?
 5  A   It was around the spring.  I went on a couple.
 6  Q   You got to talk up for the court reporter.
 7  A   I went on a couple.
 8  Q   Just tell me where you went on vacation and when
 9    if you can recall.
10  A   I know the vacations.  The dates are a little
11    fuzzy, Kalahari.
12  Q   Do you recall what month that was you went to
13    Kalahari?
14  A   I do not.  We went on a cruise.
15  Q   Do you recall what month it was that you went on
16    a cruise?
17  A   I know that it was warm outside here, but it was
18    warmer where we went.
19  Q   If you don't recall, just tell me you don't
20    recall.  I understand we're talking about three,
21    four, or five years ago.  Any other vacations
22    that you recall during 2012?
23  A   We went to Florida, family vacation.
24  Q   Do you recall what month that was?
25  A   That was in summer.
```

Page 41

```
 1  Q   Anywhere else that you recall?
 2  A   No.
 3  Q   Prior to March 27th, 2013, when you made the
 4    first allegation to the police department, were
 5    you aware of anyone else on this spinal cord
 6    unit besides Ms. McDevitt who alleged that MD
 7    Garrett had sexually harassed them?
 8  A   Besides Roseann?
 9  Q   Yes.
10  A   No.
11  Q   Now we're going to get to Roseann in a second,
12    so I'm going to exclude her from this question.
13        Were you aware of anyone else in the
14    hospital who alleged that they were being
15    sexually harassed by MD Garrett prior to March
16    27th, 2013?
17  A   No.
18  Q   Were you aware of anyone else on the spinal cord
19    unit who alleged sexual harassment by any other
20    employee prior to March 27th, 2013?
21  A   Yes.
22  Q   Who?
23  A   Jessica she calls her name Love, Jessica Love,
24    L-o-v-e.
25  Q   And Jessica Love, what was her title?
```

**Annette Ryan (K.N.A. Katz) v.**
**Robert McDonald, Secretary, etc.**

**Plaintiff**
**March 2, 2017**

Page 42

1  A      Nursing assistant.
2  Q      Tell me about the allegations by Ms. Love.
3  A      There was another nurse or nursing assistant --
4  this came from her so.
5  Q      Ms. Love is telling you this directly?
6  A      Yes, another employee, male employee, on the
7  floor and she reported it.
8  Q      Do you know who she reported it to?
9  A      The VA police and I only know that he was fired.
10  Q      And when did this occur, to the best of your
11  knowledge?
12  A      It came up in a discussion when we were around a
13  conference table eating lunch.
14  Q      Who else was present when this discussion was
15  happening?
16  A      I can't recall.  The only other person I can
17  recall is Roseann.
18  Q      And she told you another male employee.  Did she
19  tell you who this male employee was?
20  A      No, she did not.
21  Q      Did she tell you what position this male
22  employee held?
23  A      She may have, but I don't remember if it was a
24  nurse's or a nursing assistant.
25  Q      Did she tell you that this happened while she

Page 43

1  was working on the spinal cord unit?
2  A      Yes.
3  Q      But she didn't tell you when this happened?
4  A      No.
5  Q      Do you recall when you actually worked with Ms.
6  Love like what time period?
7  A      She worked first and second shift.
8  Q      I mean, was she working there when you started?
9  A      Yes.
10  Q      When Ms. Love told you this story about her
11  experience, had MD Garrett already started
12  harassing you or giving you uninvited or
13  unwelcomed comments or touching?
14  A      Not at that time.
15  Q      Were you aware of anyone else besides Roseann
16  who was alleged that they were sexually harassed
17  or inappropriately touched or received any other
18  comments from anybody else?
19          MS. PIZZINO: Objection.
20  Foundation.  Go ahead.
21  Q      You're not aware of anyone else?
22  A      No.
23  Q      Have you ever observed MD Garrett acting in any
24  type of inappropriate manner sexually or
25  verbally with any of the patients at the VA?

Page 44

1  A      Yes.
2  Q      Tell me about what you're aware of.
3  A      The sexual talk.  All the employees -- most of
4  the employees -- sorry, most of the patients on
5  our floor were men.  So it was talk that he
6  would talk sexually, talk with the other men
7  patients.
8  Q      Were the other male patients engaging in this
9  conversation with Mr. Garrett?
10  A      Yes.
11  Q      So did it appear to you that the conversation
12  was unwelcomed?
13  A      Unwelcomed for me, yes.  Unwelcomed for the
14  patients, I don't know.
15  Q      And when they would have these conversations and
16  it was unwelcomed to you, did you tell them that
17  this was unwelcomed and was inappropriate?
18  A      Yes.
19  Q      And what did the patients and Mr. Garrett say?
20          MS. PIZZINO: Objection.
21  Hearsay.  Go ahead and answer.
22  A      They would laugh.
23  Q      Did you ever report these inappropriate
24  conversations to Ms. Herman or Ms. Robinson?
25  A      No.

Page 45

1  Q      Did you ever report it to any of the other
2  managers at the VA?
3  A      Yes.
4  Q      Who did you report it to?
5  A      Doug Jenison.
6  Q      When did you report this to Doug Jenison?
7          MS. PIZZINO: Objection.  I
8  think you need to give her a chance to answer
9  the question.  You said who or whatever the
10  question was.
11  Q      I'm sorry, do you have another person that you
12  reported it to?
13          MS. PIZZINO: I mean, we need
14  to give her a chance to answer the question
15  completely.
16  A      And John Blackstone.
17  Q      When did you report it to Doug Jenison?
18  A      I recall after it had gone to touching on me.
19  Q      And what do you recall saying to Doug Jenison?
20  A      That I recall sitting like around the conference
21  table where we would have lunch or our breaks
22  and just that I was appalled at the talk that
23  the patients and MD talk about the sexual
24  comments as if it's accepted behavior.
25  Q      Who was sitting around the table when you had

**Annette Ryan (K.N.A. Katz) v.**
**Robert McDonald, Secretary, etc.**

**Plaintiff**
**March 2, 2017**

Page 46

1 this conversation with Mr. Jenison?
2 A  I don't recall.  I just don't that stands out.
3 Q  What was Doug Jenison's response?
4 A  He agreed with me.
5 Q  Anything else?
6 A  No.
7 Q  And tell me about you reporting the
8 conversations that MD would have with the
9 patients to Mr. Blackstone.
10 A  Again, the conversations that I would have would
11 be at lunchtime.  That he was appalled, but he
12 had witnessed it too.
13 Q  Do you recall when you reported this to Mr.
14 Blackstone?
15 A  Around the same time with Doug.
16 Q  When you say "around the same time," do you have
17 a time frame, a month?
18 A  Within this six-month span that it started
19 towards more the end where it became touching.
20 Q  In the six-month span you reported Mr. Garrett
21 to the police in March 27th, so you're saying
22 March 27th, 2013.  So when you say "six months,"
23 you mean six months would then be October or so?
24 A  Uh-huh.
25 Q  You have to say yes for the court reporter.

Page 47

1 A  Yes.
2 Q  So it would be October 2012 between October 2012
3 and March 2013?
4 A  Correct, yes.
5 Q  Have you ever witnessed Mr. Garrett do anything
6 that you believe was sexual harassment in front
7 of Ms. Herman or Ms. Robinson?
8     MS. PIZZINO: Objection.
9 Sexual harassment is a legal word.
10 Q  Let's clarify this:  What do you believe sexual
11 harassment is for purposes of discussion?
12     MS. PIZZINO: Objection.  Calls
13 for a legal conclusion.
14     MS. BACCHUS: I'm asking her
15 her belief.  You can state your objection and
16 you have.
17 Q  But please tell me what you think sexual
18 harassment is.
19 A  Unwanted conversation, unwanted texting,
20 verbiage, touching.
21 Q  So we'll use your definition for purposes of
22 today.
23     MS. PIZZINO: Well, I think you
24 need to give her a chance to finish her answer
25 again.  I think you cut her off.

Page 48

1 Q  If I cut you off, please say, "I'm not done."
2 You tend to pause and I'm not sure, so I assume
3 that you're done.
4     So if I'm cutting you off, please tell me
5 that; okay?
6 A  Okay.
7 Q  Now did you have anything else to add to that?
8 A  Yes.
9 Q  What else?
10 A  Conversation with other employees, conversation
11 with patients.
12 Q  And is that sexual -- you believe that sexual
13 harassment to you or sexual harassment to the
14 person that he's having these conversations
15 with?
16 A  It would also be to me, because I feel
17 uncomfortable with that kind of talk.
18 Q  So tell me -- I'll go back to my original
19 question.  Have you ever observed Mr. Garrett
20 engage in conduct that you believe was sexual
21 harassment to you in front of either Ms. Herman
22 or Ms. Robinson?
23 A  Yes.
24 Q  Tell me when's the first instance that you
25 recall.

Page 49

1 A  There was many incidences.  The one that stands
2 out the most for me was the charge nurse was
3 directing her assignments to us.  MD was
4 present.  The charge nurse, and I'm sorry, I'm
5 referring, because I can see everybody around
6 the table, and the charge nurse sat there.
7 Q  Who was the charge nurse?
8 A  I can see her face.  I don't know her name.
9 It'll jog my memory.  I do know she works at
10 Metro now.  She does not work at the VA, but she
11 was -- MD was making lip-smacking noises,
12 because she was pulling her shirt, this was the
13 charge nurse, to the side to show her breast,
14 like breast, bra.
15     And Lisa Herman was walking through the
16 doors and witnessed this and she said -- she got
17 angry and told both MD and I just know what she
18 looks like, brown hair, overweight, the charge
19 nurse, that that was inappropriate and she was
20 not happy with their -- what she just saw and
21 she turned around and walked out the door.
22 Q  But she told them that that was inappropriate?
23 A  Yes.
24 Q  Do you recall what time frame this was?
25 A  It was the second shift.  It was around three or

Page 50

```
 1      3:30, because that was our time frame that we --
 2 Q    I mean, date?
 3 A    No.
 4 Q    Any other instance that you can recall?
 5 A    Yes.
 6 Q    Tell me about it please.
 7 A    It was at the nurses's station and there's four
 8      computers up at the nurses's station and I was
 9      sitting at one and MD was sitting at one.  Lisa
10      Herman was in one of the seats and he had pulled
11      his chair up to me and was rubbing my legs and
12      Lisa said she doesn't want to see that again.
13 Q    Did he stop rubbing your leg when she told him
14      that?
15 A    Yes.
16 Q    Any other instance?
17 A    With Lisa Herman?
18 Q    Yes, Lisa Herman or Dawn Robinson.
19 A    Dawn Robinson's hours usually was until 3:00 or
20      3:30, so I didn't really see her a lot.  MD
21      would make a lot of sexual jokes and Lisa would
22      not add to the jokes, but she would tell him to
23      stop.
24 Q    When she told him to stop, did he stop making
25      the joke?
```

Page 51

```
 1 A    Yes.
 2 Q    At any of these times when Mr. Garrett would be
 3      either making these jokes and you would be
 4      present and Lisa would be present, did you ever
 5      tell him or Lisa Herman at that time that you
 6      found it offensive?
 7 A    I told him, yes.
 8 Q    Was Lisa present when you told him you found
 9      this offensive?
10 A    Yes.
11 Q    And she would tell him to stop?
12 A    Yes.
13 Q    Did you ever follow up with Lisa about the
14      offensive jokes or comments that he would be
15      making?
16 A    No.
17 Q    I know you said that this harassment or
18      unwelcomed conduct had spanned for about six
19      months.  When you say "six months," are you
20      talking about that's the time frame that the
21      touching started?
22 A    The touching, yes.  More where it was very
23      offensive to me.  The jokes were before that
24      too.
25 Q    So there was a period of time where he would
```

Page 52

```
 1      make, I assume, verbal statements or comments
 2      that you found offensive; correct?
 3 A    Correct.
 4 Q    And then there's a point in time where his
 5      behavior began to escalate and it also involved
 6      physical touching; is that correct?
 7 A    Correct.
 8 Q    So when we speak about six month period of time
 9      approximately, is that the point where you found
10      that he had really crossed the line, because he
11      was touching you or was that a time period
12      also --
13         MS. PIZZINO: Objection.
14         MS. BACCHUS: Let me finish.
15         MS. PIZZINO: Okay.  Go ahead.
16 Q    -- or was that a time period where you just
17      thought that it was really horrendous?
18         MS. PIZZINO: Objection to the
19      use of the word "crossing the line" and
20      mischaracterizing her previous testimony.  If
21      you understand the question, go ahead and
22      answer.  And objection also.  It's a multiple
23      question.
24 Q    Did you understand my question?
25 A    No, I did not.
```

Page 53

```
 1 Q    Then let me ask you this:  We've been talking
 2      about a six month period of time, but as we sit
 3      here, all of your statements say five to six
 4      months, but you're telling me about events that
 5      happened prior to six months.  So why did you
 6      categorize the harassment as happening for a
 7      period of time of five to six months?
 8 A    That time frame was where to me, it had
 9      escalated to the next level of assault to me.
10 Q    And when you say "assault to you," are you
11      talking about physical assault?
12 A    Yes.
13 Q    In all of this time, whether it be the comments,
14      the physically touching, any of that, did you
15      make any type of notations about this happening
16      contemporaneous with the incidents?
17 A    Can you clarify that?
18 Q    Sure.  During the period of time that you
19      believed Mr. Garrett was sexually harassing you,
20      did you make any type of notes when these
21      incidents would happen?
22 A    No.
23 Q    How did it come about that you learned that Mr.
24      Garrett was sexually harassing Roseann McDevitt?
25         MS. PIZZINO: Objection to the
```

Annette Ryan (K.N.A. Katz) v.
Robert McDonald, Secretary, etc.

Plaintiff
March 2, 2017

Page 54

1 sexual harassment definition. You can go ahead
2 and answer.
3 A   Inappropriate touching.
4 Q   Okay.
5 A   She told me the day before I reported it.
6 Q   Tell me how it came about that you were having
7 this discussion with Roseann.
8 A   She had approached me, because she noticed that
9 I was teary-eyed and asked if there was
10 something wrong and I told her. I just broke
11 down and told her and she told me that -- she
12 asked if she could share some stuff and that she
13 had been experiencing some of what I was telling
14 her that he was doing the same to her.
15 Q   Tell me what you recall that she said MD Garrett
16 was doing to her?
17 A   Touching her butt, inappropriate talk, wanting
18 to go out on a date, wanting to go out and go to
19 bed together, following her around, and just not
20 taking no for an answer from her.
21 Q   Did she tell you how long this had been going on
22 with her?
23 A   Just a while.
24 Q   And what did you share with Ms. McDevitt about
25 your experience with Mr. Garrett as to why you

Page 55

1 were teary-eyed?
2 A   I broke down and told her everything.
3 Q   What do you mean by "everything"?
4 A   What I was experiencing as far as the sexual
5 throwing me in the linen closet to forcing
6 himself on me, just everything that I could
7 recall.
8 Q   Okay. Let me kind of break that down. Before
9 when I said what caused you to be teary-eyed,
10 that particular day?
11 A   He had just pushed me in a patient's room into
12 their bathroom and tried to force himself on me
13 and that had just happened.
14 Q   And what day did this occur?
15 A   The day before I reported it.
16 Q   What date would that have been?
17 A   27th.
18       MS. PIZZINO: If you remember.
19 Q   Here's a calendar for March and April of 2013 if
20 you can recall. When you say "reported it,"
21 reported it to whom?
22 A   The VA Union.
23 Q   Okay. Let's clarify some dates, because I don't
24 want your testimony to be incorrect or
25 misconstrued. I'm going to show you -- we'll

Page 56

1 come back to this question.
2       I'm sorry, before we go there, I had asked
3 you about any other incidents that occurred with
4 MD Garrett that you considered sexual harassment
5 that occurred in front of Ms. Herman. Were
6 there any other incidents?
7 A   What I can recall now is those were the ones
8 that stand out in my mind. Can I come back to
9 that later?
10 Q   Sure. If you recall something that you couldn't
11 recall at the time, please just let me know. I
12 understand we're talking about a long period of
13 time.
14       MS. BACCHUS: I'm going to have
15 this marked as Exhibit C please.
16       (Government's Exhibit C was marked for
17 identification.)
18 Q   I've handed you what's been marked as
19 Defendant's Exhibit or Government's Exhibit C.
20 This is a police report to the VA. Have you
21 seen this document before?
22 A   Yes.
23 Q   Okay. According to the Exhibit C, this police
24 report was made on March 27th, 2013, at
25 approximately 3:22 p.m.

Page 57

1 A   Okay.
2 Q   Do you dispute that date?
3 A   No.
4 Q   So this would have been your first report of the
5 sexual harassment you were experiencing from MD
6 Garrett?
7       MS. PIZZINO: Objection as to
8 foundation. This is the date of the police
9 report. I'm not sure --
10       MS. BACCHUS: You made your
11 objection.
12       MS. PIZZINO: Objection.
13 Foundation.
14 A   This was made after the Union advised me to go
15 down and -- me and Roseann to go do this.
16 Q   So you met with the Union on the 27th of March?
17 A   Yes.
18 Q   So when you said that the incident where he
19 pushed into the patient's room happened the day
20 before you made the report, is this the report
21 you were speaking of, March 27th, 2013?
22 A   Yes.
23 Q   So tell me about the incident where he pushed
24 you into the bathroom of the patient's room.
25 A   We were assigned to the hall together and I was

**Annette Ryan (K.N.A. Katz) v.**
**Robert McDonald, Secretary, etc.**

**Plaintiff**
**March 2, 2017**

Page 58

1    in the patient's room taking care of this
2    patient and I had gone to the bathroom to empty
3    out his Foley and he came into the room and
4    pushed me against the wall.
5  Q   When you say "he," you mean MD Garrett?
6  A   Yes.
7  Q   He came into the bathroom?
8  A   Into the bathroom.
9  Q   And where was the patient?
10 A   In bed.
11 Q   And did you scream out or make any comments when
12   Mr. Garrett pushed you into the bathroom and
13   pushed you up against the wall?
14 A   Yes, but the patient couldn't hear that.  He was
15   not in that capacity.
16 Q   The patient wasn't lucid?
17 A   Right.
18 Q   Do patients have their own room?
19 A   Yes.
20 Q   And what shift did Roseann normally work?
21 A   She worked first and second.
22 Q   So she rotated shifts?
23 A   Yes.
24 Q   And Roseann was at work that particular day.
25   Was she assigned to your hall?

Page 59

1  A   No.
2  Q   So when you got away from Mr. Garrett, tell me
3    what happened.
4  A   I went to the computer in the hallway which was
5    Hallway A and I just was breaking down.
6  Q   Do you need a break?
7  A   Yeah.
8        MS. BACCHUS: We'll go off the
9    record.
10       (A short break was taken.)
11       MR. BACCHUS: We're going to go
12   back on the record.  Before we start, I'm going
13   to ask that we substitute page two of Exhibit C.
14   I didn't realize there was her social security
15   number and date of birth in there.  So we're
16   just going to take out that page and put a new
17   page in on Exhibit C.
18       MS. PIZZINO: Page two?
19       MS. BACCHUS: Yes.
20 By Ms. Bacchus:
21 Q    Before we took a break, we were talking about
22   you disclosing to Ms. McDevitt -- and let's
23   clarify this, because the police report calls it
24   Devitt with a V.  It's with an M; correct, to
25   your knowledge?

Page 60

1  A   No, it's McDevitt.
2  Q   It's McDevitt?
3  A   Yes.
4  Q   Okay.  So you were telling Ms. McDevitt about
5    your experience, because he had pushed you into
6    the bathroom.  This is the first date that you
7    recall sharing your experience with Ms.
8    McDevitt?
9  A   Yes.
10 Q   And Ms. McDevitt --
11 A   Or Roseann.
12 Q   Yeah, Roseann gave a statement to the Cleveland
13   police and she claims that you all had talked
14   about MD Garrett's behavior as early as March
15   21st, 2013.  Do you recall having any
16   conversation with her back then?
17 A   As far as his behavior, I don't recall that.
18 Q   Do you deny having any conversation with Ms.
19   McDevitt about MD touching you or her on March
20   21st, 2013?
21 A   Yes.
22 Q   Roseann also said that after you all had talked
23   about Mr. Garrett touching you, that she had
24   told Laura Anderson.  Do you recall telling
25   Laura Anderson about anything about Mr. Garrett?

Page 61

1  A   I did not talk to her, no.  Roseann did.
2  Q   Roseann talked to her.  Did you exchange any
3    text messages with Laura Anderson and Roseann
4    about MD harassing you or Roseann?
5  A   What's the time frame?
6  Q   Around March 21st through March 27th.
7  A   No.
8  Q   Did Laura Anderson accompany you and Roseann to
9    the Union's office on March 27th?
10 A   Yes, she did.
11 Q   Did you exchange any text messages with Roseann
12   between March 21st, 2013, and March 27th, 2013,
13   regarding MD Garrett?
14 A   Specifically, can you rephrase that?
15   Specifically, text messaging, yes, not about MD.
16 Q   Did you have any text messages with Roseann
17   regarding going to report these unwanted
18   touching to the police or the Union during the
19   time period of March 21st, 2013, and March 27th,
20   2013?
21 A   For herself or for me?
22 Q   Either of you.
23 A   I don't recall that conversation.
24 Q   I was asking about text messages.
25 A   That's conversation, texting.

Annette Ryan (K.N.A. Katz) v.
Robert McDonald, Secretary, etc.

**Plaintiff**
**March 2, 2017**

---

Page 62

1 Q  And who was Laura Anderson?
2 A  LPN.
3 Q  Does she work on the spinal cord unit?
4 A  She did.
5 Q  Why did she accompany you and Roseann to the
6  Union's office on March 27th, 2013?
7 A  She called me that day and said that she was
8  appalled at what she had heard and she was going
9  to go there with us as support.
10 Q  So you go to the Union's office on the 27th,
11  March 27th, 2013, and tell me who you met with.
12 A  Jamila.
13 Q  Jamila Bell?
14 A  Yes.
15 Q  Who was Jamila Bell?
16 A  The Union representative.
17 Q  Was anybody else present when you met with
18  Jamila?
19 A  Me, Roseann, Laura, and Jamila.
20 Q  Tell me what happened when you got to the
21  Union's office.
22 A  She wanted us to state everything that happened
23  and we all gave our statement to her and then
24  she wanted us to call Elizabeth Noelker and she
25  called Elizabeth Noelker while we were in the

---

Page 63

1  office.
2 Q  And what was the point of calling Elizabeth
3  Noelker?
4 A  To let her be aware of what happened and why we
5  were in her office and she wanted her to know
6  that we had video and pictures and was there a
7  possible way for us to meet that day.
8 Q  Did you meet with Elizabeth Noelker on that day,
9  March 27th, 2013?
10 A  Yes.
11 Q  Did you meet with Ms. Noelker before or after
12  you went to the VA police department?
13 A  After.
14 Q  Who went with you to the VA police department?
15 A  Me and Roseann.
16 Q  And turning back for a minute to Exhibit C,
17  according to the police department --
18      MS. BACCHUS: Go off the
19  record.
20      (A discussion was had off the record.)
21      MS. BACCHUS: Back on the
22  record.
23 Q  According to the police report, Exhibit C, when
24  you came to the VA police department, you
25  reported the incidents of lewd comments and him

---

Page 64

1  grabbing you and forcibly touching you and
2  pushing you into the storage room and a few
3  other things; such as taking pictures of you and
4  sending it to you on the cell phone?
5 A  Correct.
6 Q  And the cell phone pictures, when were those
7  pictures taken?
8 A  They're actually dated on the phone.  I can't
9  recall the actual date, but it was dated on the
10  picture itself.
11 Q  Do you still have those cell phone pictures on
12  your cell phone?
13 A  Yes.
14 Q  Can you check those dates and provide it to your
15  counsel and send it to me?
16 A  Yes.
17      MS. PIZZINO: Renee, are you
18  asking if she actually has the cell phone with
19  the photo on it or the photos from the cell
20  phone?
21      MS. BACCHUS: I'm asking her do
22  you actually have the cell phone with the photos
23  on it?
24 A  I have my cell phone.  It was transferred from
25  my computer to my new phone, yes.

---

Page 65

1 Q  So can you check that date that the pictures
2  were texted to you?
3 A  Yes.
4 Q  And you said they were texted to you.  How do
5  you know it was MD Garrett who texted it to you?
6 A  Because it had his phone number on there and he
7  said, "These are pictures I'm sending you."  I
8  had no idea he took these pictures.  It's of me
9  passing medications and he made comments about
10  me being wearing pants that I have a camel toe
11  is the word he used.
12 Q  You said he made these comments.  Did he make
13  the comments in the text message?
14 A  No, it was after he sent them.
15 Q  With the photographs, was there any text
16  accompanying the photographs?
17 A  No.
18 Q  Had he sent you cell phone photographs prior to
19  the two that you produced in discovery?
20 A  No.
21 Q  Did you save any of the text messages that he
22  sent you?
23 A  No.
24 Q  Any reason you didn't save those?
25 A  They were appalling to me.  I don't save any

---

**Annette Ryan (K.N.A. Katz) v.**
**Robert McDonald, Secretary, etc.**

**Plaintiff**
**March 2, 2017**

Page 66

1 text messages.

2 Q    Did you think it would be necessary to have

3 those text messages as evidence?

4 A    No.

5 Q    Did you show those text messages to anyone?

6 A    No.

7 Q    Then you said you had videos?

8 A    Yes.

9 Q    How many videos did you have?

10 A    Two.

11 Q    What's depicted on the videos?

12 A    Him stating that my nipples were hard and the

13 one that I had sitting on my computer when I was

14 taking notes, he states that he wanted to wrap

15 his legs around me and he actually does.

16 Q    Were those videos taken on the same day?

17 A    No.

18 Q    Do you know what date those videos were taken?

19 A    Those were also date-stamped.

20 Q    Do you still have those on your phone?

21 A    Yes.

22 Q    Can you provide the dates for each of those

23 videos to your counsel for us please?

24 A    Yes.

25 Q    Do you know approximately when the videos were

Page 67

1 taken?

2 A    I believe in the month of March.

3 Q    Do you know approximately when the photographs

4 that he texted you were taken or that you

5 received them?

6 A    No, I'd have to look at the phone.

7 Q    How did it come about that you ended up

8 videotaping these encounters with MD Garrett?

9 A    I knew that I had to do something.  That it was

10 something that it was on a day-to-day basis with

11 me and I didn't feel that anybody would believe

12 me.

13 Q    So you took the videos for proof?

14 A    Yes.

15 Q    Exhibit C, the next paragraph says, "On March

16 27th, 2013, at approximately 1440 hours, Ryan

17 went to the Union and talked with Jamal," I

18 think that's supposed to be Jamila, "and Pauline

19 Wells.  They told her to go to the police office

20 to file a report and after that to talk with

21 Andrea Freeman."  Who's Pauline Wells?

22 A    She was the president at the time of the Union.

23 Q    So was she present when you were telling Ms.

24 Bell about the alleged sexual assault?

25 A    I don't believe so.

Page 68

1 Q    The next paragraph says, "Ryan and McDevitt were

2 given statement forms to fill out and return.

3 Ryan has requested a transfer from the ward and

4 stated she does not feel safe anywhere on the

5 Wade Park campus."

6     Is that information that you provided to

7 the interviewing officer?

8 A    Yes.

9 Q    And when he says you had requested a transfer,

10 who did you request a transfer?

11 A    I requested a transfer with the Union at the

12 first initiation.

13 Q    Was that a verbal request at that time or had

14 you made that request in writing?

15 A    It was verbal and in writing.

16 Q    It was in writing as of March 27th, 2013?

17 A    Yes.

18 Q    Did you give the Union a written request on

19 March 27th, 2013, for a transfer from the unit?

20 A    She had me on a yellow legal pad write it and I

21 had also gone onto the computer and typed a

22 statement and she had it in her folder.

23 Q    When you say "she," who are you referring to?

24 A    Oh, I'm sorry, Jamila.

25 Q    Do you have a copy of the written statement or

Page 69

1 the typed statement?

2 A    I do not.

3     (Government's Exhibit D was marked for

4 identification.)

5 Q    Ms. Katz, I've handed you what's been marked as

6 Government's Exhibit D.  Can you review this

7 document and tell me if you've seen it before.

8 Have you seen this document before?

9 A    Yes.

10 Q    Is this the voluntary witness statement that was

11 given to you by the VA police?

12 A    I believe there was also an AIG officer in there

13 also.

14 Q    What I'm asking according to Exhibit C, they

15 said they gave you a voluntary witness statement

16 form to fill out and return.  Would Exhibit D be

17 the form that they gave you to fill out and

18 return?

19 A    No, the statement is what I said in the office

20 and filled out in their presence.

21 Q    Well, I notice that on your witness statement

22 form, it's dated March 28th, 2013.  So you

23 believe you completed Exhibit D the following

24 day in the office of the police department?

25 A    Yes.

**Annette Ryan (K.N.A. Katz) v.**
**Robert McDonald, Secretary, etc.**

**Plaintiff**
**March 2, 2017**

---

Page 70

1    (Government's Exhibit E was marked for
2    identification.)
3 Q   I'm handing what's been marked Defendant's
4    Exhibit E. This is entitled "Sworn Statement"
5    and dated March 28th, 2013. Have you seen this
6    document before?
7 A   Yes.
8 Q   Do you know which statement was made first,
9    Defendant's Exhibit D or Defendant's Exhibit E?
10 A   I don't recall which one was first.
11 Q   I'm not going to go through all of the
12    allegations that you have written in Exhibit D,
13    so I'm just going to ask you to the best of your
14    recollection, this was your statement on March
15    28th, 2013; correct?
16 A   Yes, it is.
17 Q   And it is quite lengthy. Were you trying to
18    include all of the facts that you could recall
19    as of March 28th, 2013?
20 A   Yes.
21 Q   I'm going to direct your attention to page four
22    of Exhibit D please.
23    MS. PIZZINO: Renee, can you
24    reference the Bates number? That might be
25    helpful.

---

Page 71

1    MS. BACCHUS: Oh, sur.
2    MS. PIZZINO: There's no four
3    on this.
4 Q   Let's start at Bates number 176 please, because
5    I think the sentence starts over there and
6    starting at the fifth line, the sentence that
7    says, "Just recently I noticed him taking
8    pictures of me sending them to my phone after
9    making comments I have a "camel toe" and my
10    pants are tight when I was passing my meds. I
11    saved them on my phone." Are those the pictures
12    that you have produced?
13 A   Yes, they are.
14 Q   And then your next statement is "Around January
15    2013 MD came into the computer room where I was
16    charting and appeared to have a hard penis and
17    took my hand and pushed it up against him."
18    Were there any witnesses to that particular
19    incident?
20 A   No.
21 Q   And then at the bottom of page 117.
22    MS. PIZZINO: 177.
23 Q   Yeah, 177, about seven lines up you state, "He
24    texted me when I was on vacation," I assume that
25    means with my family "this summer and said,

---

Page 72

1    'What are you wearing?'" Does that bring back
2    any recollection of him texting you while you
3    were on vacation?
4 A   I believe so.
5 Q   So does that help you in understanding where you
6    were on vacation when you received these text
7    messages?
8 A   No.
9 Q   And you didn't save that text message; correct?
10 A   No.
11 Q   And then on the very next page, 178, you have
12    "Five to six months," what's that in reference
13    to at the very top left-hand corner?
14 A   It could have been just -- I have no idea.
15 Q   Then right up under that, it says, "March 23rd,
16    2013, he has touched my breast and butt," were
17    you referring to March 23rd, 2013, is the date
18    that he touched you?
19 A   No, I believe this might have been the day of
20    the text messages or the pictures.
21 Q   The photographs that he sent to you?
22 A   Yes.
23 Q   At the bottom of page of 178, it has two videos
24    and two pictures. The two pictures are the text
25    message pictures?

---

Page 73

1 A   Yes. Can I go back --
2 Q   Sure.
3 A   -- about five to six months, I think that that's
4    five to six months of gradual harassment that
5    escalated.
6 Q   And then the two videos that you reference at
7    the bottom of 178 are the videos that you gave
8    to the VA police department?
9 A   Correct.
10 Q   Then next page, page 179, you list as witnesses
11    Roseann?
12 A   Uh-huh.
13 Q   A Ted H. and Desi H. Who's Ted H.?
14 A   He was a nursing assistant on the floor.
15 Q   And you say, "He saw him push me into supply
16    closet and how he talks to me," is that what
17    that says?
18 A   Correct.
19 Q   And when did you allege that Ted saw MD push you
20    into the supply closet?
21 A   I can't recall a time.
22 Q   Do you recall the incident?
23 A   Of the linen closet?
24 Q   Yes, that Ted witnessed.
25 A   I recall the incident of the linen closet, but I

---

Annette Ryan (K.N.A. Katz) v.
Robert McDonald, Secretary, etc.

**Plaintiff**
**March 2, 2017**

Page 74

1  don't recall the actual date.
2  Q  But when you say you recall the incident of the
3  linen closet, are you being general or are you
4  being specific to the incident that Ted
5  witnessed?
6  A  Yes, so Ted seen the incident and the linen
7  itself.
8  Q  Okay. So tell me about the incident at the
9  linen closet that Ted witnessed?
10  A  I was walking down the hall and the linen was
11  also our supply closet. I would go in on a
12  regular basis to get our supplies for our
13  patients, so I had gone in there. I had opened
14  the door and MD was behind me and pushed me in
15  the door and then shut it behind and put his
16  foot in front of the door, so that I couldn't
17  get out.
18  Q  Where was Ted at this time?
19  A  He was in the hallway.
20  Q  How close was he to the linen closet?
21  A  I can't recall how close he was.
22  Q  So how do you know he saw MD push you into the
23  closet?
24  A  Because when I left -- was able to get out, I
25  said something to him.

Page 75

1  Q  What did you say to Ted?
2  A  "Did you see him push me into the closet?"
3  Q  And what did Ted say?
4  A  He said yes.
5  Q  Are you aware that Ted denied seeing that when
6  he was interviewed by the police?
7  A  I was not aware of that, no.
8  Q  What other conversation did you have with Ted
9  about this incident?
10  A  Not a lot with that specific incident.
11  Q  Did you say to Ted that he tried to touch you
12  while you were in the linen closet?
13  A  I can't recall.
14  Q  What's Ted's last name?
15  A  Hunkele, H-u-n-k-e-l-e.
16  Q  And Desi Hale is Desi H. H is Hale; correct?
17  A  Yes, he's no longer living.
18  Q  You said Desi witnessed an incident of Garrett
19  pushing you into the closet?
20  A  Yes.
21  Q  Tell me what you recall about that particular
22  incident.
23  A  He is or was a maintenance worker on the floor
24  and he was in the room two doors down and he
25  asked me if I was okay when I pushed myself and

Page 76

1  got out of there.
2  Q  Did he tell you he saw MD push you into the
3  closet?
4  A  No.
5  Q  What other discussion did you have with Mr. Hale
6  about this incident?
7  A  That I was upset of his constant touching and
8  pushing himself on me. That's all that I can
9  remember.
10  Q  What was Mr. Hale's response?
11  A  That MD does that to many women and if I'm
12  bothered by that, I should say something.
13  Q  Did you say something?
14  A  It was after a couple of weeks when I did, yes.
15  Q  So you believe that this incident that Mr. Hale
16  witnessed was when?
17  A  I don't know.
18  Q  But you believe a couple of weeks after this
19  incident that Mr. Hale witnessed you reported
20  MD's behavior?
21  A  Yes.
22  Q  And who did you report it to at that time?
23  A  The Union.
24  Q  Was the incident that Mr. Hale witnessed before
25  or after the incident that Ted witnessed?

Page 77

1  A  It's the only incident of the linen closet, yes,
2  of that. I don't know what you mean.
3  Q  Let me start and let's try it again. The
4  incident of the linen closet that you said Ted
5  and Desi witnessed, was that one incident or
6  were there two separate incidents?
7  A  No, one incident.
8  Q  Had you walked into the closet or he pushed you
9  into the closet?
10  A  I was walking towards the closet, because I
11  needed to get supplies. He then shoved me in
12  there and pushed the door with his foot.
13  Q  Then on the next page, page 180 Bates-stamped,
14  Exhibit D, you have a date up here, March 23rd,
15  Friday, 2013 and this is an incident that
16  occurred in a patient's room apparently?
17  A  Uh-huh.
18  Q  You have to say yes for the court reporter.
19  A  Yes, yes.
20  Q  And is this the incident that you were telling
21  me about that you told Roseann about?
22  A  No.
23  Q  So this is a separate incident?
24  A  Correct.
25  Q  And you say, "The patient's curtain was closed"

**Annette Ryan (K.N.A. Katz) v.**
**Robert McDonald, Secretary, etc.**

**Plaintiff**
**March 2, 2017**

Page 78

1  and was this patient lucid?
2  A  Yes.
3  Q  Did you say anything to the patient and ask them
4  if they heard anything?
5  A  No.
6  Q  And further down on that page, you describe the
7  incident about a camel toe. Was this the same
8  incident that we previously talked about?
9  A  Correct.
10 Q  At page 181 you talk about an incident where he
11 would leave the unit at break and go park his
12 car next to yours. Did you always walk to your
13 car with Mr. Garrett?
14 A  We walked as a team. All of us walked, because
15 we left the building late at night, so we all
16 walked as a group.
17 Q  When you would walk to your car as a group, did
18 you ever ask the other people to wait until you
19 got in your car before they left?
20 A  No.
21 Q  Did you ever ask for a police escort as opposed
22 to walking out with Mr. Garrett?
23 A  No.
24 Q  Did any of these people who walked out to their
25 cars with you ever observe him grabbing you or

Page 79

1  trying to kiss you in the parking garage?
2  A  I don't know that.
3  Q  Page 182, you say he takes pictures of you
4  constantly. Are you aware of any other
5  photographs besides the two that you have given
6  us?
7  A  No.
8  Q  Page 183 at the top, you say "MD constantly
9  pushes me into the supply closet." How often
10 was that occurring?
11 A  A lot.
12 Q  When you say "a lot," give me a quantity
13 estimate.
14 A  We have a supply closet/linen closet where we
15 keep our beds, extra beds, extras, so I can't
16 recall. I just can say numerous times.
17 Q  But you're uncertain what numerous means in
18 terms of quantity?
19 A  Many.
20 Q  So then you say, "I know of two occasions Desi,
21 the housekeeper, has seen this." What two
22 occasions are you speaking of? You just told me
23 about one. Is there a second occasion?
24 A  I only know of the one that comes to mind.
25 Q  Directing your attention to page 186 of Exhibit

Page 80

1  D, at the top, it states, "March 26th, 2013,
2  contacted Bob Highar, (my dad's old law firm
3  partner) who advised me to tell either Human
4  Resources or the Union since I don't feel
5  comfortable telling Lisa (nurse manager) or Dawn
6  (assist. nurse manager.) He also advised me
7  that this is more than sexual harassment. This
8  is sexual assault."
9      Do you recall contacting Mr. Highar?
10 A  Yes.
11 Q  How did it come about that you contacted Mr.
12 Highar on the 26th of March?
13 A  Because he's a personal friend. He was my dad's
14 partner. I talk to him on a lot of things. I
15 wanted his advice.
16 Q  On March 26th did something happen to make you
17 call Mr. Highar?
18 A  This was around the time that everything was
19 escalating.
20 Q  I mean, was there a specific incident on March
21 26th that prompted you to call him?
22 A  Not that I recall.
23 Q  At the bottom of page 186, it says, "At work in
24 evening," were you referring to March 26th or
25 were you just relating something else that had

Page 81

1  happened?
2  A  Where are you?
3  Q  Bottom of Bates-stamp page 186.
4  A  I can't recall the date, the actual date.
5  Q  Then page 187 Bates-stamp at the bottom. At the
6  top, it says, "My attorney advised me to ask for
7  a transfer off Wade Park main campus since I
8  feel unsafe there and requested an off campus
9  facility. He also advised me to get a
10 restraining order and this is criminal. He said
11 if this doesn't happen, then I have grounds for
12 a lawsuit for not protecting me. My attorney
13 thinks I am in danger from MD especially now
14 that I have told of what has been happening to
15 me. I am filing a restraining order against him
16 in Cleveland and in my hometown of Tallmadge."
17     Did you file for a restraining order?
18 A  Yes, I did.
19 Q  Did you receive a restraining order?
20 A  I did.
21 Q  Do you have a copy of that restraining order?
22 A  I know my attorney did at the time. I don't
23 have it. I would have to look for it.
24 Q  Can you see if you have that and produce it to
25 your counsel please. Did you get a restraining

**Annette Ryan (K.N.A. Katz) v.**
**Robert McDonald, Secretary, etc.**

**Plaintiff**
**March 2, 2017**

Page 82

1   order from Cleveland?
2 A   Yes.
3 Q   And what Court issued that restraining order?
4 A   Cuyahoga County.
5 Q   When did you receive the restraining order from
6   Cuyahoga County?
7 A   I don't know the date.
8 Q   Was it around the time that you reported the
9   sexual harassment in March 27th, 2013?
10 A   I believe it would have been after that.
11 Q   Was that restraining order issued by the same
12   judge that presided over Mr. Garrett's criminal
13   case?
14 A   I don't know that answer.
15 Q   And the restraining order that you said you
16   received in Tallmadge, did you go to Court for
17   that restraining order?
18   MS. PIZZINO: Objection.  I
19   don't think she stated she got one in Tallmadge.
20   She stated she got one in Cleveland.
21   THE WITNESS: Yeah.
22 Q   At the bottom of the page, it says, "Order
23   against him in Cleveland and in my hometown in
24   Tallmadge."
25   MS. PIZZINO: But it says, "I

Page 83

1   am filing a restraining order," but she
2   testified she got one in Cleveland.  Well, I
3   guess she can clarify it.
4 Q   Did you receive a restraining order?
5 A   Did not, because they stated that I had to go
6   where the incident happened.
7 Q   Did you have to appear in court to receive that
8   restraining order?
9 A   I don't believe so.
10 Q   You don't think so?
11 A   I can't recall that.
12 Q   Did you provide a copy of the restraining order
13   to the VA?
14 A   This was after, so I am unsure of that.
15   Everything was through my attorney.
16 Q   When you say through your attorney, what
17   attorney?
18 A   I believe I was with Pam Kurt at that time.
19 Q   Okay.  I'm going to direct your attention to 189
20   of Exhibit D.  The very top, it says, "For about
21   six months until I started documenting."  Did
22   you create some documentation regarding the
23   incidents with MD Garrett?
24 A   Yes.
25 Q   And do you have that documentation?

Page 84

1   MS. PIZZINO: Objection.  To
2   the extent that it calls for attorney-client
3   privilege.
4   MS. BACCHUS: She hasn't told
5   me that she gave it to her attorney yet.
6   MS. PIZZINO: Oh, okay, but are
7   you talking about this documentation here?
8   MS. BACCHUS: No, she says,
9   "For about six months until I started
10   documenting."
11 Q   And I want to know what you started
12   documenting?
13 A   I documented after so that I would know what was
14   going to be happening when I filed what if
15   that's what you're referring to?
16 Q   And were you keeping a journal or was this on a
17   calendar?
18 A   On a journal.
19 Q   Do you still have that journal?
20 A   Yes.
21 Q   I'd ask that you produce a copy of the journal.
22   MS. PIZZINO: To the extent
23   that it is not attorney-client privilege or work
24   product privilege, we'll produce that.
25 Q   Why were you keeping this documentation?

Page 85

1 A   My attorney's request.
2 Q   And were you making this documentation to
3   document incidents that happened with MD Garrett
4   and your interactions with the VA?
5 A   This was after the fact.  This was going to
6   court, my proceedings, how I felt, not -- this
7   was after the fact.
8 Q   In that documentation, were you documenting
9   phone calls or any conversations or transactions
10   with members of the VA?
11   MS. PIZZINO: Objection, again,
12   to the extent that calls for attorney-client
13   privileged information.  So to the extent that
14   she's going to divulge anything that is work
15   product or attorney-client privilege, I'm
16   directing her not to answer.
17   MS. BACCHUS: Well, she can't
18   have work product with an attorney.  It's your
19   work product, not her work product.
20   MS. PIZZINO: If the attorney
21   directs her to prepare something that is work
22   product privileged and also attorney-client
23   privileged and I didn't direct her.
24   MS. BACCHUS: So then you don't
25   know what she was directed, so we're arguing

Annette Ryan (K.N.A. Katz) v.
Robert McDonald, Secretary, etc.

**Plaintiff**
**March 2, 2017**

Page 86

1    about nothing at this point.
2         MS. PIZZINO: So I said to the
3    extent that it is protected.
4  Q   Can you produce that to your attorney please?
5  A   Yes.
6  Q   I'm going to direct your attention to Exhibit D,
7    the last page, page 191.  It states, "Because of
8    this, I am suffering from depression and I am on
9    Wellbutrin.  I have an appointment with a
10   counselor due to this sexual harassment.  I
11   can't eat or sleep and I have lost in the last
12   couple of months 25 pounds."
13        Are those your statements?
14 A   Yes.
15 Q   And you were on medication for depression prior
16   to March 27th, 2013; correct?
17 A   Can you be specific?
18 Q   Sure.  You were on medication for depression
19   prior to March 27th, 2013?
20        MS. PIZZINO: Objection.
21   Overbroad.  Is there a time frame you're asking
22   about?
23 Q   Were you ever on medication for depression prior
24   to March 27th, 2013?
25 A   Yes.

Page 87

1  Q   Let's look at Defendant's Exhibit E please.
2    This is entitled "Sworn Statement" and is dated
3    March 28th, 2013, and it appears to be a
4    statement that you made to Jeff Maslar who is a
5    Special Agent with the Office of the Inspector
6    General, Department of Veterans Affairs,
7    Criminal Investigations Unit.
8         Do you recall making this statement?
9  A   Yes, I do.
10 Q   And you authorized Special Agent Maslar to write
11   the statement for you?
12 A   Yes.
13 Q   And did you read this statement after it was
14   written?
15 A   Yes.
16 Q   And did you agree with what was included in the
17   statement?
18 A   Yes.
19 Q   You signed the statement on each page?
20 A   Yes.
21 Q   I'm going to direct your attention to the second
22   page of the statement.  It's Bates-stamped page
23   685 about five lines up.  It starts with, "I was
24   afraid to report MD, because I was relatively
25   new and he had been working here for a while.

Page 88

1    MD was also friends with my immediate supervisor
2    and many other employees on the floor and at the
3    Cleveland VA Medical Center.  I was also afraid
4    to report him because he was a vet.  I was also
5    afraid I might lose my job."
6         Why did you believe you were going to lose
7    your job if you reported him?
8  A   Because I've seen a lot within the VA and I
9    didn't want to -- I just wanted to go to work,
10   do my job, come home.
11 Q   Had you seen anybody lose their job at the VA
12   for reporting sexual harassment?
13 A   I've seen people lose their jobs for reporting
14   other incidents.
15 Q   So my question is: Had you seen anyone lose
16   their job for reporting sexual harassment or
17   unwelcomed touching or comments or anything like
18   that?
19 A   No.
20 Q   So after you went to the VA police department on
21   the 27th, you stated that you met with Beth
22   Noelker.  Who was present when you met with
23   Beth?
24 A   Just me and Beth.  And then she then brought
25   Lisa Herman into her office.

Page 89

1  Q   And this was on the 27th of March 2013?
2  A   Yes.
3  Q   What do you recall about that meeting?
4  A   She wanted to see the videos and she wanted to
5    see the text, the pictures, and I gave them to
6    her.  She has copies of them.  And what can they
7    do for me?  How could they help?
8  Q   And what did you respond to that question?
9  A   I told her that I wanted to be transferred off
10   of that facility and was there any openings on
11   any other facilities and I needed to have some
12   time off to heal with what I just went through.
13 Q   Did you tell her how much time you needed off?
14 A   I said I needed to go to my doctor and I would
15   get back with her and she advised me to fill out
16   some FMLA papers.
17 Q   When you asked about a transfer, what was Beth's
18   response?
19 A   She told me that there was positions, but she'd
20   have to look into it and she would get back with
21   me.
22 Q   Anything else that the three of you discussed on
23   March 27th, 2013?
24        MS. PIZZINO: Objection to the
25   characterization that the three spoke.  That's

**Annette Ryan (K.N.A. Katz) v.**
**Robert McDonald, Secretary, etc.**

**Plaintiff**
**March 2, 2017**

---

Page 90

1    just a foundation question.  She testified --
2         MS. BACCHUS: All right.  We'll
3    back it up.
4 Q    You said you spoke with Beth.
5         MS. PIZZINO: That's also a
6    mischaracterization.
7         MS. BACCHUS: We're going to
8    clarify this.
9 Q    You said you spoke with Beth and she brought in
10   Lisa Herman.  At what point did she bring in
11   Lisa Herman into the meeting?
12 A   After I showed her the pictures and after I
13   showed her the video.
14 Q   And was Lisa Herman present when you told Beth
15   that you needed some time off?
16 A   Yes.
17 Q   Was Lisa Herman present at the time that you
18   told Beth that you wanted a transfer?
19 A   Yes.
20 Q   And is there anything else that was said between
21   you and Beth -- you, Beth, and Lisa Herman
22   during that meeting on March 27th?
23 A   Not that I can recall.
24 Q   So on March 27th, were you scheduled to work
25   that day?

---

Page 91

1 A   I have no idea.
2 Q   Would your time sheet records indicate if you
3    were scheduled to work?
4 A   I can't speak on that.  I don't know.
5 Q   So March 28th, you apparently went to Cleveland
6    police department; do you recall that?
7 A   Yes.
8        (Government's Exhibit F was marked for
9    identification.)
10 Q   I'm going to hand you what's been marked
11   Defendant's Exhibit F.  This is the officer's
12   incident report from the Cleveland police
13   department.  Have you seen this before?
14 A   Yes.
15 Q   How did it come about that you ended up going to
16   Cleveland police department to make a police
17   report?
18 A   I didn't feel comfortable that the VA was going
19   to do anything about it, so I went to the police
20   department.
21 Q   And did anybody accompany you to the Cleveland
22   police report?
23 A   No.
24 Q   According to the police report, you went to the
25   police department on March 28th, 2013, at 1246

---

Page 92

1    hours.  Does that comport with your
2    recollection?
3 A   Yes.
4 Q   This police report was entered for an offense of
5    gross sexual imposition and telephone
6    harassment.  Besides for texting you photographs
7    on your cell phone, was there any other type of
8    harassment?
9        MS. PIZZINO: Objection.  Calls
10   for a legal conclusion.
11 Q   You can answer.
12       MS. PIZZINO: Again, it was
13   already asked and answered.
14 A   Can you rephrase that?
15 Q   The report was made for telephone harassment.
16   Did you describe any other type of telephone
17   harassment besides receiving the text for
18   photographs from MD Garrett?
19 A   No.
20 Q   After you made the report at Cleveland police
21   department on March 28th, 2013, did you go to
22   the VA?
23 A   As far as -- can you rephrase that?
24 Q   Did you go to the VA -- physically go up to the
25   VA on March 28th, 2013?

---

Page 93

1 A   Yes.
2 Q   So tell me what happened when you went to the VA
3    on the 28th.
4 A   I guess, I don't understand what you're saying.
5    As far as working there or as far as -- I don't
6    know what you mean.
7 Q   On the 28th after you made your report at the
8    Cleveland police department, you went to the VA.
9    What was your purpose of going to the VA?
10 A   I've been back to the VA, but for what, I can't
11   recollect.
12 Q   Do you deny meeting with Beth on March 28th,
13   2013?
14 A   I could have.  I met with her a couple of times.
15   I don't know.
16 Q   Do you recall meeting with Beth and your Union
17   representative, Jamila Bell?
18 A   The two of them together?
19 Q   Uh-huh.
20 A   Separately, yes.  Together no.
21 Q   So you don't recall stating that Jamila went
22   with you to meet with Beth Noelker?
23 A   She could have.  I can't recall that far back.
24 Q   We've gone over the incidents that you have
25   alleged that Mr. Garrett took and when I say the

---

**Annette Ryan (K.N.A. Katz) v.**
**Robert McDonald, Secretary, etc.**

**Plaintiff**
**March 2, 2017**

Page 94

1     sexual harassment as you defined it, we've
2     talked about the text messages; correct?
3 A   Correct.
4 Q   And we've talked about some of the comments that
5     he's made to you; correct?
6 A   Correct.
7 Q   And we talked about him pushing you into the
8     linen closet; correct?
9 A   Correct.
10 Q   And the incidents where he tried to kiss you in
11     the parking garage; correct?
12 A   Correct.
13 Q   And the incidents in the patient's room?
14 A   Yes.
15 Q   And then we talked about the incident where he
16     rubbed your leg; correct?
17 A   Yes.
18 Q   Are there any other incidents that we have not
19     talked about?
20 A   In these reports, there's a lot of incidents.
21     It was ongoing for five or six months, so those
22     specific, there was -- it's in the report.
23     There's a lot more, but being specific?  I don't
24     know what you're -- I guess, I don't know what
25     you're asking.

Page 95

1 Q   Let's try this:  Were there any other type of
2     incidents that happened with Mr. Garrett besides
3     for him trying to kiss you at the parking
4     garage, pushing you into the patient's
5     bathrooms, him rubbing your leg, making lewd
6     comments to you?
7         MS. PIZZINO: Objection.  Asked
8     and answered.
9         MS. BACCHUS: She never
10     answered the question.
11 Q   So were there any other type of incidents that
12     you can recall?
13 A   He grabbed my hand and pushed it towards his
14     penis area, yes.
15 Q   Anything else?
16         MS. PIZZINO: Objection.
17     Again, asked and answered.
18 A   No.
19 Q   Anything else that you can recall as you sit
20     here?
21 A   No.
22 Q   Your responses to Interrogatories state that you
23     reported to John Blackstone that Garrett was
24     rubbing your back and your leg.  When did you
25     make this report to John Blackstone?

Page 96

1 A   After I reported it.
2 Q   After you reported it to whom?
3 A   The Union and the police.
4 Q   Okay.  How did the subject matter come up with
5     John Blackstone at that time?
6 A   I believe he wanted to know when I was returning
7     back to work and if I was okay.
8 Q   Okay.  Did he call you or did you call him?  Did
9     you see him in person?
10 A   He called me.
11 Q   Do you recall anything else about that
12     conversation with John Blackstone?
13 A   I don't recall.
14 Q   Are you aware that Mr. Blackstone is deceased?
15 A   Yes, I am.
16 Q   Prior to him passing away, did you have any
17     other conversations with Mr. Blackstone about MD
18     Garrett and the unwelcomed conduct during your
19     time with the VA?
20 A   Yes.
21 Q   What other conversations did you have with him
22     after you reported it to VA police?
23 A   Can you be more specific?
24 Q   Sure.  You said that you had conversations with
25     Mr. Blackstone about MD Garrett.  I want to know

Page 97

1     what conversations besides the one you just told
2     me about him calling you at home to make sure
3     you were okay?
4 A   He wanted to know if there was anything he could
5     do to help me and he would state to whoever he
6     needed to state, because he witnessed on
7     occasion.
8 Q   He witnessed what on occasion?
9 A   The lewd comments, the touching of the buttocks,
10     and that he would help me out.
11 Q   Any other conversations you had with Mr.
12     Blackstone following your disclosure to the VA
13     police department?
14 A   As far as that?
15 Q   Yes.
16 A   No.
17 Q   Your answers to Interrogatories also said that
18     you told Andrea Swails.  When did you have a
19     conversation with Andrea Swails about Mr.
20     Garrett rubbing your back and your leg?
21 A   Again, it was after I reported.
22 Q   How did the conversation with Ms. Swails come
23     about?
24 A   She called me on the phone and it was not a
25     pleasant conversation and she was a friend of

**Annette Ryan (K.N.A. Katz) v.**
**Robert McDonald, Secretary, etc.**

**Plaintiff**
**March 2, 2017**

---

Page 98

1 MD, so she was upset that I made the accusations
2 against him.
3 Q    What exactly did Ms. Swails say to you?
4 A    I can't recall the exact.  That it was a
5 negative conversation.
6 Q    Did Ms. Swails make any threats against you?
7 A    Can you be more specific on the threats?
8 Q    Did she threaten you?  Whatever you felt, did
9 she say she was going to harm you?  Did she say
10 she was going to take any type of --
11 A    No.
12 Q    Did she say she was going to try to discipline
13 you, anything like that?
14 A    No.
15 Q    When do you recall having this conversation with
16 Ms. Swails?
17 A    After I reported it.
18 Q    Was it a week after, a month after, a year
19 after?
20 A    I don't know.  I can't recall.
21 Q    Did you make any documentations of this phone
22 call with Ms. Swails?
23 A    No.
24 Q    Your responses to Interrogatories also claims
25 that Ms. Swails saw Garrett rubbing your back

---

Page 99

1 and your leg back in the fall of 2012.
2 A    Yes.
3 Q    Tell me about that incident.
4 Q    Can you be more specific?
5 Q    I just want to know what happened that day and
6 how do you know she saw it and did you talk to
7 her about it?
8 A    He did that to a lot of people, not just me,
9 including her.  So she seen it and has witnessed
10 his actions of how he treats women as far as
11 touching their bottom and his sexual talks, but
12 I can't say a specific date.
13 Q    So you can't specifically say that she saw him
14 rubbing your back and your leg at some time in
15 the fall of 2012?
16 A    I know she saw this, yes, but I don't know the
17 exact date.
18 Q    How do you know she saw it?
19 A    He was open about touching the women's bottoms.
20 During lunchtime, again, she was at the table.
21 There was always the lewd comments when he's in
22 there, so she overtook in a lot of that.
23 Q    My question, and perhaps, you didn't understand
24 my question, how do you know she saw him rubbing
25 your back and your leg?

---

Page 100

1 A    Because she was in the room.
2 Q    Okay.  Did you have a discussion with her about
3 seeing this?
4 A    No.
5 Q    So you don't know if she saw it.  You assume she
6 saw it?
7 A    She was laughing so she's -- we didn't have a
8 discussion about it, but she's laughing at him
9 touching my bottom.  Yes, she saw it.
10 Q    In your answers in your Interrogatories, you
11 said she saw him rubbing your back and your
12 legs.  You didn't say anything about your
13 bottom.  So tell me about this incident where he
14 was supposedly touching your bottom that she
15 witnessed.
16 A    He's always touched my bottom and my legs.  It
17 was an ongoing thing for five to six months.  So
18 to be specific, I can't be specific to a certain
19 day.  It was all the time.
20 Q    So you assume, because this was happening all
21 the time, that Ms. Swails saw it?
22        MS. PIZZINO: Objection.  Asked
23 and answered.
24 A    I'm not assuming it.  She laughed at the
25 incident.

---

Page 101

1 Q    So she laughed at the incident.  Tell me
2 specifically about the incident that she laughed
3 at.
4 A    He touched my bottom like a hit and she laughed.
5 Q    Okay.  So he swatted you on the bottom and she
6 laughed?
7 A    Yes.
8 Q    And when he swatted you on the bottom, did you
9 say, "Don't touch me.  Stop it.  It's
10 harassment," anything?
11 A    I didn't use the word "harassment."  I said
12 stop.
13 Q    Was there any other incident that you claim she
14 saw him touching you?
15 A    Not that I can recall.
16 Q    After you told him to stop, did he stop on that
17 particular incident or did he continue to swat
18 your bottom that day?
19 A    He continued.
20 Q    That day in front of Ms. Swails?
21 A    I can't say if it was in front of her, but he
22 continued.
23 Q    I believe in your responses to Interrogatories,
24 you stated that he said he wouldn't help you
25 unless you went out with him?

---

Annette Ryan (K.N.A. Katz) v.
Robert McDonald, Secretary, etc.

**Plaintiff**
**March 2, 2017**

Page 102

1 A    Correct.
2 Q    When he would make these kind of comments, would
3      he refuse to help you?
4 A    Yes.
5 Q    Did you report him not doing his job to anyone?
6 A    No.
7 Q    So when he would refuse to help you, would you
8      get somebody else to help you?
9 A    No.
10 Q   You'd just do it yourself?
11 A   Correct.
12 Q   You also stated that in staff meetings, he would
13     be rubbing the back of another employee in the
14     presence of a supervisor.  Tell me about in the
15     staff meetings was he rubbing your back or the
16     back of another employee?
17 A   Another employee.
18 Q   When did you have these staff meetings, were
19     they monthly, weekly?
20 A   They were weekly.
21 Q   Would it be all shifts at the staff meeting?
22 A   No.
23 Q   Who would be present at the staff meeting; would
24     it be just like second shift and the supervisor?
25 A   Correct.

Page 103

1 Q    When you say the supervisor, that would be Lisa
2      Herman and Dawn Robinson?
3 A    Dawn usually wasn't at those.  It would be Lisa
4      sometimes.  Always the nurse in charge.
5 Q    And when he would be rubbing other employees'
6      backs, were the employees complaining about him
7      touching them?
8 A    No.
9 Q    Did, to the best of your knowledge, Lisa Herman
10     ever witness him rubbing the back of other
11     employees?
12 A   Yes.
13 Q   And what did she say, if anything?
14 A   Stop the behavior.
15 Q   Did he stop?
16 A   For the time.
17 Q   Did he ever rub your back in these staff
18     meetings?
19 A   Yes.
20 Q   Did you tell him to stop?
21 A   Yes.
22 Q   Was Lisa Herman present?
23 A   Yes.
24 Q   And when you'd tell him to stop, did he stop?
25 A   For the time.

Page 104

1 Q    So why do you believe that the management at the
2      VA knew or should have known that Mr. Garrett
3      was sexually harassing you?
4 A    Because they saw it, Lisa saw it, the nurses in
5      charge saw it.
6 Q    When you say "saw it," you're talking about the
7      incidents that you have described today?
8 A    Yes.
9 Q    Any other reasons?
10 A   Can you clarify more?
11 Q   I'm just asking you is there any other reason
12     that you believe that they knew or should have
13     known he was sexually harassing you?
14 A   For witnessing it and seeing it, yes.
15 Q   Why did you wait until March 27th, 2013, to go
16     to the police department and report MD Garrett?
17 A   I didn't want to lose my job.  I was fearful.  I
18     was a single mother.  I'm trying to support my
19     family.
20 Q   Any other reason?
21 A   I didn't want to lose my job.
22 Q   And is there any reason you didn't report the
23     harassment to Lisa Herman prior to March 27th,
24     2013?
25 A   Yes.

Page 105

1 Q    Why?
2 A    Because I felt that she was friends with him.
3 Q    Any other reason?
4 A    They knew each other for the whole time since
5      they've worked together and they were friendly
6      towards each other.
7 Q    Any other reason?
8 A    No.
9 Q    Any reason you didn't report it to Dawn
10     Robinson?
11 A   I didn't work with Dawn.  She was not my
12     manager.  I didn't know her.
13 Q   Is there any reason you didn't report it to Beth
14     Noelker before March 27th, 2013?
15 A   I didn't know her and I went to the Union.
16     That's where I felt comfortable.
17 Q   Is there any reason you didn't go to the Union
18     before March 27th, 2013, besides the fact you
19     didn't want to lose your job?
20 A   That was the main reason, yes.
21         (Government's Exhibit G was marked for
22     identification.)
23 Q   Ms. Ryan, we've been talking about photographs
24     that Mr. Garrett texted to you.  I've handed you
25     Exhibit G.  Are these the photographs that you

Annette Ryan (K.N.A. Katz) v.
Robert McDonald, Secretary, etc.

**Plaintiff**
**March 2, 2017**

Page 106

1  were speaking of?
2 A  Yes.
3 Q  And is this the complete photograph as you
4  received it?
5 A  Yes.
6 Q  I believe in your responses to Interrogatories
7  you stated that Garrett has sexually harassed
8  Jessica Love?  Who's Jessica Love?
9 A  I don't believe I used that.
10      MS. PIZZINO: Renee, at some
11  point in time, it's about ten after 12, can we
12  break for lunch soon?
13      MS. BACCHUS: Well, we can
14  break for lunch after we finish this question.
15  I was hoping that we would be able to finish her
16  deposition today, so I'm hoping we're not going
17  to need a whole bunch of time for lunch.
18      MS. PIZZINO: No, just to grab
19  a little something.  You have a place on the
20  seventh floor, so it would be quick.
21      MS. BACCHUS: That's fine.
22  Let's finish this one.
23 Q  The question for Interrogatory Number One
24  states, "In paragraph 38 of the amended
25  complaint, Plaintiff alleges that VA unlawfully

Page 107

1  maintained or permitted sexual and gender
2  harassment in the workplace.  These working
3  conditions created by the VA was intolerable and
4  such that a reasonable person in Ms. Ryan's
5  circumstances would have resigned because of the
6  -- after complaints and requests were ignored."
7      It asks to, "Identify all acts and dates
8  thereof and persons involved who you allege was
9  harassed on the basis of sex or gender at the
10  VA, the name of the management official who
11  first became aware of it," over the objection,
12  there was a objection made, with a pretty
13  lengthy response, but then you list "Jessica
14  Love."
15      And you say, "She was sexually harassed by
16  another employee on our floor."  I'm sorry, I
17  apologize, you did someone else.
18 A  Yes.
19 Q  "Jessica Love, she was sexually harassed by
20  another employee on our floor."  Is that the
21  incident we talked about already?
22 A  Yes.
23 Q  And then you say Jennifer Stiles," who was
24  Jennifer Stiles?
25 A  Thank you.

Page 108

1 Q  I apologize.
2 A  No, that was the one who I described that was
3  sitting there that I couldn't recall her name.
4  That was her name.
5 Q  Jessica Love?
6 A  No, Jennifer Stiles.  She was the RN nurse in
7  charge, the one who showed her bra.
8 Q  All right.  So Jennifer Stiles, what do you
9  recall about Jennifer Stiles being harassed on
10  the basis of gender or sex?
11 A  For me, he was doing the lip smacking and she
12  was the one that was at the table and he was
13  over here, but she's the one that showed her
14  breast during that meeting.
15 Q  So you're saying that the act of her showing her
16  breast was sexual harassment or are you she was
17  actually sexually harassed?
18 A  I don't --
19      MS. PIZZINO: Objection.  Calls
20  for speculation.  Answer what you can.  It's
21  your knowledge.
22 A  Okay.  My knowledge, that was offensive to me
23  just during the meeting to see that go on
24  between a nurse in charge and an employee.
25 Q  Okay.

Page 109

1 A  To see the breast and the lip smacking.
2 Q  So you're not alleging that Ms. Stiles believes
3  she was being harassed?
4 A  Correct.
5 Q  And you also list Princess Jefferson?
6 A  Yes.
7 Q  Are you saying that the acts that were directed
8  towards her was harassment?
9      MS. PIZZINO: Objection.  Calls
10  for a legal conclusion and you're restating
11  testimony that she provided.  I think it's
12  appropriate if you provide that to her so she
13  can look at it.
14      MS. BACCHUS: I'm sorry, this
15  is her testimony.  I'm asking what she recalls.
16  She obviously recalled it.  She wrote it in her
17  answers to Interrogatories.
18 Q  So what do you recall about Princess?
19      MS. PIZZINO: Objection.  Calls
20  for a legal conclusion.
21 Q  What do you recall about Princess Jefferson?
22 A  Princess is --
23      MS. PIZZINO: Objection.
24 Q  You can answer.
25 A  She enjoyed the advances.  I was the one who was

Annette Ryan (K.N.A. Katz) v.
Robert McDonald, Secretary, etc.

Plaintiff
March 2, 2017

Page 110

1     not liking it.  I had to sit, witness it, and
2     see it.
3  Q     And you also list Angela Sims.  Do you recall
4     witnessing any incidents involving Angela Sims?
5  A     No, that's not -- she was also a nurse manager
6     on third shift and she new about MD's past
7     sexual innuendos, whatever he does, tapping on
8     people's butts that she's witnessed, because she
9     worked with him for many years.
10 Q     Did you ever have any conversations with Ms.
11     Sims about MD's behavior?
12 A     I didn't, no.
13         MS. BACCHUS: You want to take
14     a break at 12:30?
15         MS. PIZZINO: That's fine.  I
16     just want to make sure we were able to take a
17     break at some point if this is going to go for
18     more than another hour it looks like.  You're
19     the only one that can gauge that so.
20         MS. BACCHUS: We can take a
21     break at 12:30.
22 Q     So after you made the report of harassment to
23     the VA police department and met with Beth, did
24     you ever return to work on the spinal cord unit?
25 A     No, I didn't.

Page 111

1  Q     You tell me that you had spoken with John
2     Blackstone after you made the report and that
3     you'd also spoken with Andrea Swails.  Did
4     anybody else contact you from the spinal cord
5     unit?
6  A     Yes.
7  Q     Who?
8  A     Doug Jenison, who's also deceased.
9  Q     Do you recall when Doug Jenison contacted you?
10 A     Right soon after that week of my reporting.
11 Q     And what was discussed with Mr. Jenison?
12 A     Doug was my friend, so I stayed in constant
13     contact with him.  And he wanted to know what he
14     could do as far as helping me out.  He would go
15     to Lisa for me, whatever I needed, more for
16     support.
17 Q     Anything else?
18 A     Just being my friend.
19 Q     And I believe you have stated that someone
20     called you and told you Princess was
21     bad-mouthing you at work?
22 A     Yes, that was Doug.
23 Q     So was this in the same conversation or did you
24     have a number of conversations?
25 A     A number of conversations.

Page 112

1  Q     When did Mr. Jenison call you and tell you
2     Princess was bad-mouthing you?
3  A     The week after he had to -- he called me at home
4     to let me know that he crossed my number and
5     address off in the employee folder that was on
6     the nurses' station because Princess was calling
7     me at home.
8  Q     He told you Princess was calling you at home?
9  A     No, I knew she was.  She had called me at home
10     on numerous occasions.
11 Q     Did you take any of her phone calls?
12 A     Only one.
13 Q     Tell me about that phone call.
14 A     She just threatened me and said that she would
15     -- you know, how I interpreted it is that she
16     was going to -- if I went further with any of
17     the charges with MD, that she would come to my
18     house and beat me up.
19         And I did not take the next call that she
20     called.  I blocked her from my phone.
21 Q     So just this one call where she called and
22     threatened to beat you up?
23 A     Yes, I blocked her.
24 Q     Did you report this phone call to anyone?
25 A     Yes.

Page 113

1  Q     Who did you report it to?
2  A     Beth Noelker, Lisa Herman, my attorney, Doug,
3     and John.
4  Q     In your video police statement, you say that the
5     employee -- I'm sorry, let me go back.  After
6     you made your report at the Cleveland police
7     department, you then went and made a statement
8     to Detective Evans; correct?
9  A     Yes.
10 Q     Were you aware that that statement was being
11     videotaped?
12 A     Yes, she asked me.
13 Q     And according to the videotape, that statement
14     occurred on April 3rd, 2013.  Do you have any
15     reason to dispute that date?
16 A     No.
17 Q     So April 3rd, 2013, you told Detective Evans
18     that you received a threat that they were going
19     to come and beat the shit out of you; is that
20     the call that -- Princess's threat?
21 A     Yes.
22 Q     Did you receive any other threat from anyone
23     else at the spinal cord unit after March 28th,
24     2013?
25 A     Yes.

Annette Ryan (K.N.A. Katz) v.
Robert McDonald, Secretary, etc.

Plaintiff
March 2, 2017

Page 114

1 Q    Who else threatened you?
2 A    Her name was Willa and she was an older nurse
3      and friends with MD.
4 Q    Okay.  When did Willa threaten you?
5 A    Right soon after Princess.
6 Q    So was this before you met with Detective Evans?
7 A    I can't recall.
8 Q    Do you believe it was in the first week of
9      reporting the harassment to the police
10     department?
11 A   It was that month.  I don't know about the week.
12 Q   What else did Willa say to you?
13 A   I hung up on her, so I didn't give her much time
14     to talk.
15 Q   What do you recall about Willa's threat?
16 A   Just to stop.  That it was common for him to be
17     like that.  He didn't mean no harm.
18 Q   Did she threaten you with physical violence?
19 A   No, I hung up on her.
20 Q   So during the conversation that you did have
21     with her, there was no threat of physical
22     violence?
23 A   No.
24 Q   When you reported the call from Princess to Beth
25     and Lisa Herman, what was their response?

Page 115

1 A    They would take care of it.
2 Q    Do you know if they took care of it?
3 A    I didn't have any contact on that floor, so I
4      don't remember.  I can't speculate.
5 Q    And you said you had blocked her phone number
6      after that, so you didn't receive any additional
7      calls from Princess after you reported it to
8      Beth or Lisa?
9 A    No.
10 Q   Anyone else on the spinal cord unit that
11     contacted you or threatened you?
12 A   No.
13 Q   I believe that you stated that Princess
14     discriminated against you on the basis of race;
15     is that correct?
16 A   Correct.
17 Q   When is the first time you believe that Princess
18     discriminated against you on the basis of race?
19 A   I can't recall the exact date.  I just know she
20     would talk to me and say that maybe me being
21     white and her being black, that I need to stick
22     to my own race and stop, so and that was when I
23     was working on the unit so.
24 Q   So this would have occurred before March 27th,
25     2013?

Page 116

1 A    Uh-huh.
2 Q    Say yes for the court reporter.
3 A    Yes.
4 Q    So she would say things like, "You need to stay
5      with your own race"?
6 A    Correct.
7 Q    Princess, I presume, is African-American?
8 A    Correct.
9 Q    For the record you're white?
10 A   Correct.
11 Q   Did she make any other statements to you?
12 A   Not to me.
13 Q   Did you ever file a complaint with EEO about
14     Princess's discrimination on the basis of race
15     prior to March 27th, 2013?
16 A   No.
17 Q   Princess was a nurse's aide or LPN?
18 A   No, she's an RN now.
19 Q   She's an RN now?
20 A   But she was an LPN at the time.
21 Q   Is there anyone else on the spinal cord unit who
22     you believe discriminated against you on the
23     basis of your race?
24        MS. PIZZINO: Objection.  It
25     calls for a legal conclusion.  You can answer.

Page 117

1 A    I don't know, not to my knowledge.
2 Q    On or about May 10th, 2013, you went to the
3      Office of Resolution Management to file your
4      complaint.  Do you recall that day?
5 A    I recall the incident.  I don't recall the day.
6 Q    Okay.  Do you recall going to the VA between
7      March 28th and May 10th?
8 A    That could be the time frame.  I can't speculate
9      a time.  I was going to a lot of places that I
10     was directed to go to.
11 Q   But you don't recall any specific incidence of
12     visiting the VA physically between March 28th
13     and May 10th?
14 A   What I'm saying is I remember going there.  I
15     don't know the exact date.
16 Q   On the days that you would go to the VA, did you
17     see any of your co-workers from the spinal cord
18     unit?
19 A   Yes.
20 Q   Okay.  And who did you see?
21 A   I would see them in the hallway.  It wasn't a
22     big area; Swails, Andrea Swails, Princess, Ebony
23     Winters.
24 Q   Anyone else?
25 A   Not that I can remember.  Those are just the

**Annette Ryan (K.N.A. Katz) v.**
**Robert McDonald, Secretary, etc.**

**Plaintiff**
**March 2, 2017**

---

Page 118

1    ones that stand out.
2  Q    When you would see them in the hallway after you
3       made your police report, did any of those people
4       you listed, Ebony, Swails, Princess, make any
5       comments to you?
6  A    No, I got the silent treatment.
7          MS. BACCHUS: We're about
8       12:30.  You want to take 20 or 30 minutes?
9          MS. PIZZINO: Okay.
10         MS. BACCHUS: We'll be here.
11         (A 30-minute lunch break was taken.)
12         MS. BACCHUS: Back on the
13      record.
14 By Ms. Bacchus:
15 Q    Ms. Katz, I wanted to ask you about the request
16      for the transfer when you first made a report of
17      the harassment to the police department and you
18      said Beth told you she would have to get back to
19      you.
20 A    Yes.
21 Q    Were there any subsequent conversations about
22      that transfer around the time of March or April?
23 A    Just me asking her for the transfer was about
24      all that I got from her.
25 Q    Did you follow up with Beth about the transfer?

---

Page 119

1  A    Yes.
2  Q    When do you recall following up with Beth?
3  A    My attorney at the time, Pam Kurt, every time
4       when we would meet, because we had to meet to on
5       a couple of occasions with Beth, she would
6       always ask her and she then always dealt with
7       Beth.
8  Q    Your attorney did?
9  A    Yes, that's correct.
10 Q    You said you had to meet on a couple of
11      occasions with Beth.  Do you recall when those
12      occasions were?
13 A    Yes, we had to meet to discuss like any kind --
14      I'm trying to think how this was, the mediation,
15      and my attorney at the time stated that we would
16      like me to be transferred off of Wade Park.  And
17      she had a letter from my doctor at that time and
18      they did not offer.
19 Q    Was this at the mediation itself?
20 A    Yes.
21 Q    Before the mediation, did you personally have
22      any conversations with Beth or Lisa Herman about
23      a transfer?
24 A    Yes.
25 Q    Tell me about the times when you personally had

---

Page 120

1       a conversation besides the first day when you
2       met with Beth on the 27th of March.
3  A    When I would meet with Beth, and I can't recall
4       the dates, I just know the times that I would
5       meet with her, I would always ask her, "Is there
6       anything still available off of Wade Park?"
7          And she would always respond, "No, not at
8       this time.  I will let you know when we have an
9       opening."
10 Q    Do you recall any of the time frame that you
11      would meet with Beth between March and the date
12      of the mediation?
13 A    Only when I had to fill out paperwork on FMLA,
14      because I had to get her signature or Lisa
15      Herman's signature, but other than that, no.
16 Q    And to the best of your knowledge, was there any
17      other conversations with your attorney about the
18      transfer prior to the mediation?
19         MS. PIZZINO: Objection.
20      Attorney-client privilege.
21         MS. BACCHUS: I'm not asking
22      her --
23 Q    -- from what you and your attorney talked about
24      I'm asking did your attorney contact Lisa Herman
25      about a transfer?

---

Page 121

1  A    Oh, absolutely.
2  Q    Do you have any documentation of that occurring?
3  A    We have lots of documentation of that.
4  Q    So you have documentation of letters being sent
5       to Beth or Lisa regarding a transfer?
6  A    I can't recall who they were sent to.  I just
7       know that there was many letters.
8  Q    From your attorney to the VA?
9  A    Uh-huh.
10 Q    Can you produce those letters for us please?
11         MS. PIZZINO: Well, let me just
12      object.  She's not in control over what Pam Kurt
13      has, so I don't know if you're asking about --
14      is that what you're asking for if she has
15      letters of Pam Kurt?
16 Q    I'm asking do you have copies of letters sent to
17      the VA on your behalf from your counsel?
18         MS. PIZZINO: She's asking if
19      you have them in your possession?
20 A    Oh, no.
21 Q    Then how do you know there were many letters?
22 A    I've seen them.
23 Q    Okay.  Who were the letters addressed to?
24 A    I can't recall who they were addressed to.  I
25      just know Department of Veterans Affairs.

---

**Annette Ryan (K.N.A. Katz) v.**
**Robert McDonald, Secretary, etc.**

**Plaintiff**
**March 2, 2017**

Page 122

1  Q      Do you know what dates these letters were sent
2      to the VA?
3  A   I can't recall.
4  Q   Do you know if you received a response from the
5      VA to any of those letters in writing?
6  A    The only response that I can recall is when we
7      were sitting around the mediation table with my
8      attorney, the VA attorney, and Beth Noelker and
9      the statement that came to us was unless I drop
10      the charges, they weren't going to relocate me.
11  Q   When you say "the charges," you mean the EEO
12      charges?
13  A   Yes.
14  Q   Now those were made during the mediation of your
15      EEO complaint?
16  A   Yes.
17  Q   Did you have any conversations specifically with
18      Lisa Herman about a transfer?
19  A   I dealt directly with Beth Noelker.
20  Q   I believe in one of your sworn statements that
21      you stated that you had a conversation with Lisa
22      Herman around the first part of April and Ms.
23      Herman told you you would have to apply for a
24      transfer; do you recall that?
25  A   Yes.

Page 123

1  Q      What do you recall about that conversation?
2  A    That I had to fill out paperwork and have it in
3      writing and I did.
4  Q   And is that the transfer you said you made on
5      the very first day, March 27th, 2013?
6  A   Yes.
7  Q   And did you specifically give that paperwork to
8      anyone?
9  A   Union.
10  Q   Do you know what the Union did with that
11      paperwork?
12  A   I don't recall what they did with that, no.
13  Q   Do you have any knowledge that the Union gave
14      that paperwork to either Ms. Herman or Ms.
15      Noelker?
16  A   No.
17  Q    There came a point in time according to your
18      statement to the EEO investigator that you
19      learned that the Union lost your paperwork; is
20      that correct?
21  A   Correct.
22  Q   When did you learn that the Union had lost your
23      paperwork requesting a transfer?
24  A   When they had new Union members in there in the
25      office and I had asked for a copy of the

Page 124

1      paperwork that I filled out.
2  Q   And when was that?
3  A   I can't recall that date.
4  Q   After you learned that the Union had lost the
5      paperwork, did you make another request in
6      writing for a transfer?
7  A   I made many requests for transfers.
8  Q   And when you say "made many requests," were any
9      of those requests in writing?
10  A   Yes.
11  Q   And do you have copies of those requests in
12      writing that you personally made?
13          MS. PIZZINO: Can we go off the
14      record a minute?
15          (A discussion was off the record.)
16          MS. BACCHUS: We're going on
17      the record. I'm sorry, you said you provided
18      those to me in discovery. I don't have any
19      requests that was written by Ms. Ryan's
20      handwriting besides for her EEO complaints.
21          MS. PIZZINO: They were in that
22      packet that we submitted to the Judge. Those
23      were in her handwriting.
24          MS. BACCHUS: All right.  We'll
25      go off the record and we'll go get that package

Page 125

1      and we'll see what's in there.
2          (Off the record.)
3          MS. BACCHUS: We'll go back on
4      the record. We're going to mark this as
5      Government's Exhibit H. And unfortunately, I
6      don't have these Bates-stamped, because this is
7      a copy you e-mailed to me.
8          (Government's Exhibit H was marked for
9      identification.)
10  Q   Ms. Ryan, before we went off the record, your
11      counsel indicated that you provided copies of
12      the statement, the transfer requests that you
13      had made, and that it was in the submittal to
14      the Court.
15          This was a submittal to the Court that was
16      received in our office via e-mail from your
17      counsel. Can you look through, and it's front
18      and back side, and tell me which pages has your
19      written request for a transfer.
20          MS. PIZZINO: I'm going to
21      correct the record. I indicated to counsel that
22      there were documents within this packet that I
23      submitted that's now marked as Exhibit H that
24      included handwritten requests by Ms. Ryan to be
25      transferred.

**Annette Ryan (K.N.A. Katz) v.**
**Robert McDonald, Secretary, etc.**

**Plaintiff**
**March 2, 2017**

Page 126

1      MS. BACCHUS: Okay.
2      MS. PIZZINO: I just want to
3  make that clarification, it includes, but at the
4  time I submitted this, I was on the case for
5  about 38 days --
6      MS. BACCHUS: We don't need all
7  of that.
8      MS. PIZZINO: -- and there's
9  been -- I'm still making a --
10      MS. BACCHUS: You made your
11  objection and that's it.  Let's go forward.
12  Q    Okay.  Can you just tell me what pages in
13  Exhibit H has your handwritten requests for a
14  transfer?
15      MS. PIZZINO: You can go
16  through it.  Take your time.  Go through this
17  exhibit page by page.
18  A    Could you repeat the question?
19  Q    Sure.  I asked you if you can tell me in Exhibit
20  H which page has your handwritten form, your
21  personal submission for a request for a
22  transfer.
23  A    This is in terms that I don't understand.  This
24  is lawyer talk, so I can't pinpoint to you which
25  ones would be that.  I don't understand it.

Page 127

1  Q    Can you flip through the pages and tell me if
2  there is any page in there that you submitted to
3  the VA personally requesting a transfer?  That's
4  all I'm asking.
5  A    I don't know how to answer that.  Again, that's
6  lawyer talk and this doesn't help me looking at
7  these exhibits.
8  Q    Okay.  Can we agree that if you made a request
9  in writing personally to the VA, it would be in
10  this exhibit?
11      MS. PIZZINO: Objection.
12  Objection, because this is something that I
13  submitted and counsel has not given my client
14  time to look through the entire document, nor
15  has she.  She's looked through the first four
16  pages and she can't testify about something that
17  she has not looked at.
18  Q    All right.  Let's walk through the document.
19  Exhibit H, page one through six is something
20  that your counsel said that she prepared.  Can
21  we agree to that?
22  A    Yes.
23  Q    The next page which is marked Plaintiff's
24  Exhibit A of Exhibit H is a letter addressed to
25  you from Mr. Kafer; correct?

Page 128

1  A    Which one now?
2  Q    It says "Plaintiff's Exhibit A" down at the
3  bottom there.
4  A    Yes.
5  Q    And following that page, is Plaintiff's Exhibit
6  B which is request for a medical documentation;
7  correct?
8  A    Yes.
9  Q    And then the following pages marked Plaintiff's
10  Exhibit C and it appears to be pages from an
11  affidavit of transcript proceeding for Annette
12  Ryan on February 27th, 2014; is that correct?
13  A    Yes.
14  Q    And that takes another three pages; correct?
15  A    Yes.
16  Q    Then Plaintiff's Exhibit D, the page marked
17  Plaintiff's Exhibit D is an authorization for
18  release of medical information, EEO Complaint of
19  Annette Ryan; is that correct?
20  A    Yes.
21  Q    Then the following page which is marked
22  Plaintiff's Exhibit E is another letter written
23  to you dated February 13th, 2014, from Andrea
24  Freeman; is that correct?
25  A    Yes.

Page 129

1  Q    The next page which is marked Plaintiff's
2  Exhibit F says, "Affidavit Transcript of
3  Proceedings in the above-entitled action of the
4  examination of Roseann McDevitt" dated February
5  12, 2014, and that's two pages; is that correct?
6  A    Correct.
7  Q    The following page is marked Plaintiff's Exhibit
8  G and is a letter from Community Health Care
9  that is written to you dated February 4th, 2014;
10  correct?
11  A    Correct.
12  Q    The next page which is marked Plaintiff's
13  Exhibit H is an affidavit of transcript
14  proceedings of Annette Ryan dated January 28th,
15  2014, and that is two pages; is that correct?
16  A    Correct.
17  Q    Then the following page is Plaintiff's Exhibit I
18  which is a written confirmation of request for
19  accommodation and that is completed by you;
20  correct?
21  A    Correct.
22  Q    And in that written request for accommodation,
23  it says to your accommodation requested was to
24  be "Removed from Cleveland VA and put into CBOC
25  off-site"?

**Annette Ryan (K.N.A. Katz) v.**
**Robert McDonald, Secretary, etc.**

**Plaintiff**
**March 2, 2017**

Page 130

1  A    Correct.

2  Q    And that was dated December 20th, 2013?

3  A    December 20th, 2013, yes.

4  Q    In that document as identified as Plaintiff's

5       Exhibit I, did you identify any vacant position

6       for which you were applying?

7  A    No.

8  Q    The following page of the exhibit is labeled

9       Plaintiff's Exhibit J and it is letter addressed

10      to you dated December 12, 2013, regarding

11      reasonable accommodation; is that correct?

12 A    Correct.

13 Q    The following page is identified as Plaintiff's

14      Exhibit K and it appears to be e-mails?

15 A    Correct.

16 Q    Following page is marked Plaintiff's Exhibit L

17      and it is dated November 27th, 2013, and it is a

18      letter addressed to you; correct?

19 A    Correct.

20 Q    From Community Health Care?

21 A    Correct.

22 Q    The following page identified as Plaintiff's

23      Exhibit M, it is a memorandum from Department of

24      Veterans Affairs and it is to the chief of the

25      Human Resources Department regarding

Page 131

1       discretionary leave without pay; is that

2       correct?

3  A    Correct.

4  Q    The next page is identified as Plaintiff's

5       Exhibit N and it is a "Certification of Health

6       Care Provider for Employee's Serious Health

7       Condition"; is that correct?

8  A    Correct.

9  Q    And then the next page is identified as

10      Plaintiff's Exhibit O and this is a complaint of

11      employment discrimination and it looks like it

12      was filed on August 14, 2013 according to the

13      stamp?

14 A    Correct.

15 Q    And as a result of your complaint of employment

16      discrimination, I believe if you look in the

17      middle of the page where there's an asterisk as

18      part of the solution you requested was you "want

19      to be either reassigned to Parma CBOC or to day

20      shift on the blind unit on basement level"; is

21      that correct?

22 A    Correct.

23 Q    And the next page is identified as Plaintiff's

24      Exhibit P and this is a counselor report and

25      that's the equivalent of four pages I believe;

Page 132

1       correct?

2  A    Correct.

3  Q    The next page is identified as Plaintiff's

4       Exhibit Q and this is a letter to you from the

5       Department of Veterans Affairs regarding your

6       EEO complaint; is that correct?

7  A    Are we looking at R, oh, sorry, yes, correct.

8  Q    Next page is Plaintiff's Exhibit R and it is

9       letter from Catholic Charities addressed "To

10      Whom It May Concern" dated August 5th, 2013; is

11      that correct?

12 A    Correct.

13 Q    The next page is Plaintiff's Exhibit S.  It

14      appears to be an e-mail sent by you to Joseph

15      Picklo?

16 A    Yes.

17 Q    And it is in regards to forms that need to be

18      completed?

19 A    Forms that need to be completed?

20 Q    That's what the subject line says.

21 A    Oh, okay, yes.

22 Q    Can you read through your e-mail and tell me if

23      you made a request for a transfer in this

24      e-mail.

25 A    What was your question again?

Page 133

1  Q    Did you make a request for a transfer in this

2       e-mail to Mr. Picklo?

3  A    Unless I'm missing something, I don't believe so

4       in this e-mail.

5  Q    And on the following page there's another short

6       e-mail from you to Mr. Picklo and that states,

7       "I sent you all the information I have including

8       his charges.  Thank you.  I am unable to work

9       due to the trauma and emotional distress this

10      man has caused in my life" and that's the

11      complete e-mail; correct?

12 A    Correct.

13 Q    Next page which is identified as Plaintiff's

14      Exhibit T is a letter addressed "To Whom It May

15      Concern" regarding Annette Ryan dated July 24th,

16      2013; is that correct?

17 A    Correct.

18 Q    Plaintiff's Exhibit U which is the next page is

19      a letter from Rape Crisis to the Attorney

20      General's Office dated June 18th, 2013, written

21      on your behalf; is that correct?

22 A    Correct.

23 Q    Next page is identified as Plaintiff's Exhibit V

24      and it is a "Certification of Health Care

25      Provider for Employee's Serious Health

**Annette Ryan (K.N.A. Katz) v.**
**Robert McDonald, Secretary, etc.**

**Plaintiff**
**March 2, 2017**

Page 134

1 Condition" and this was completed by Dr. Holmer
2 on your behalf; is that correct?
3 A   Correct.
4 Q   The next document identified as Plaintiff's
5 Exhibit W is a May 22nd, 2013 letter to you from
6 the Department of Veterans Affairs; is that
7 correct?
8 A   Correct.
9 Q   And that's front and back page; right?
10 A   Yes.
11 Q   Then there's the next document identified as
12 Plaintiff's Exhibit X and it appears to be an
13 incomplete copy of the original complaint for
14 employment discrimination; correct?
15 A   It looks to be complete to me.
16 Q   Well, let's go back, because there's another one
17 that you had identified in --
18 A   I believe all the boxes are filled in.
19 Q   Compare Plaintiff's Exhibit X to the one that's
20 marked Plaintiff's Exhibit O please.
21     MS. PIZZINO: Renee, did you
22 say O?
23     MS. BACCHUS: Uh-huh.
24 Q   Do you see the middle box under number seven
25 appears to be complete on Exhibit O as compared

Page 135

1 to Plaintiff's Exhibit X where number seven is
2 incomplete?
3 A   I'm not going to say that this is incomplete,
4 because I don't know that.
5 Q   Okay.  Well, looking at Exhibit O, did you fill
6 in that information under number seven?
7 A   Yes, I signed it.
8 Q   Okay.  And looking at Exhibit X, did you sign
9 this document as well?
10 A   Yes.
11 Q   Okay.  And do you know what date you signed this
12 letter?
13 A   On this one?
14 Q   Exhibit X, yes.  It appears undated, correct,
15 next to your signature?
16 A   Yes.
17 Q   Then after that is Plaintiff's Exhibit Y and it
18 appears to be a progress note from Wanda Hively;
19 is that correct?
20 A   Yes.
21 Q   And then there's an Attachment A.  It has some
22 preprinted information; correct?
23 A   Yes.
24 Q   Then there's an Attachment B that appears to
25 have a page out of the VA handbook; is that

Page 136

1 correct?
2 A   What page are you on?
3 Q   At Attachment B when you flip the page past it.
4 Keep going.  Does yours have an Attachment B?
5 A   Yes.
6 Q   So besides for the documents that have been
7 identified in Defendant's Exhibit H, did you
8 make any other written requests for a transfer
9 yourself?
10 A   From what I can recall, this seems to be it.
11 Q   Are you alleging that anyone else at the VA who
12 made a complaint for sexual harassment received
13 a transfer once they made a complaint and
14 requested it?
15     MS. PIZZINO: Objection.
16 Speculation.
17 Q   You can answer if you know.
18 A   I don't quite understand what you're asking.
19 Q   My question is:  Are you aware of any other
20 employee who made a complaint for sexual
21 harassment, requested a transfer and got it?
22 A   Roseann.
23 Q   Anyone else?
24 A   No.
25 Q   And Roseann got a transfer through the

Page 137

1 settlement of her EEO complaint?
2 A   Her settlement was to drop her suit and then she
3 would get transferred and that's what she did.
4 Q   Outside of settling the EEO complaint, are you
5 aware of anyone else who requested a transfer
6 after filing sexual harassment complaints and
7 received it?
8 A   No.
9 Q   Are you aware of any policy of the VA that
10 requires the VA to transfer the victim who
11 alleges sexual harassment?
12 A   No.
13 Q   Were you made aware of Mr. Garrett being
14 reassigned to the Akron CBOC?
15 A   Yes.
16 Q   And when were you made aware of that?
17 A   I can't recall the exact date.  I was told by
18 the prosecutor.
19 Q   You were never told by Beth Noelker?
20 A   I could have been, yes.  I don't know.  I can't
21 recall that.
22 Q   After you filed your complaint of sexual
23 harassment with the police department on March
24 27th, 2013, did you have any contact with MD
25 Garrett in the workplace?

**Annette Ryan (K.N.A. Katz) v.**
**Robert McDonald, Secretary, etc.**

**Plaintiff**
**March 2, 2017**

---

Page 138

1  A      Can you rephrase that?

2  Q      After March 27th when you reported to the VA

3       police department and made your report, did you

4       have any contact with Mr. Garrett at the VA?

5  A      I did not return to work, so no.

6  Q      What's the first day that you can recall

7       visiting your physician for a leave slip from

8       work?

9  A      For a leave slip?

10  Q      Yes.

11  A      I just know it was in April.

12  Q      Now did you request your physician to fill out

13       an FMLA leave slip for you?

14  A      Yes.

15           (Government's Exhibit I was marked for

16       identification.)

17  Q      Ms. Ryan, I've handed you what's been marked as

18       Government Exhibit I.  Do you recognize this

19       document?

20  A      Yes.

21  Q      Okay.  And the first page is a handwritten note;

22       is this your handwriting?

23  A      Yes.

24  Q      And there is a date up top.  It says 3/4/13, is

25       that an error?

---

Page 139

1  A      Yes, that is an error.

2  Q      And the note appears to be incomplete.  Did you

3       keep a copy of this note?

4  A      No.

5  Q      Do you know -- you can read through it and then

6       tell me if you know what the next line was

7       supposed to be.

8  A      I can't recall four years ago.

9  Q      Okay.  Now according to your note to Dr. Holmer,

10       you said you "told HR I was taking the full 12

11       months."  What do you mean by full 12 months?

12  A      Because for FMLA, they explained it to me is

13       that you can take up to 12 months.

14  Q      Was it explained to you that you can take a

15       continuous amount of time off for 12 months?

16  A      You have to come back at that time and have

17       additional paperwork filled out.

18  Q      And who explained it to you this way?

19  A      HR.

20  Q      Who in HR?

21  A      I don't know her name.  Something Greene, last

22       name Greene.

23  Q      Mary Greene?

24  A      That could be her name.

25  Q      But you specifically remember speaking with

---

Page 140

1       someone with the last name as Greene?

2  A      Yes.

3  Q      And it says, "I am an emotional mess.  My days

4       are filled with counselors, therapy, and running

5       back and forth to the VA police and Cleveland

6       police.  The police are charging and arresting

7       him tomorrow.  So I was told by the police that

8       he could retaliate, so I am very scared and

9       just" -- and then it stops there; correct?

10  A      Correct.

11  Q      Do you know what day this was actually written?

12  A      It was probably April.  I can't -- I don't know.

13  Q      Was this written before you received the

14       paperwork for the FMLA from Dr. Holmer?

15  A      No.  Oh, wait, was this written before?

16  Q      Exhibit I, was this written before Dr. Holmer

17       filled out the FMLA certification for you?

18           MS. PIZZINO: Objection.

19       Speculation.

20  A      I don't recall.

21  Q      You don't recall?

22  A      No.

23  Q      The very next page is FMLA guidance and it says,

24       "Employee."  Is this information that you

25       provided to Dr. Holmer?

---

Page 141

1  A      I can't recall that.

2  Q      If Dr. Holmer testified that you had provided it

3       to her, would you dispute that?

4  A      No.

5  Q      This appears to be a page from -- it appears to

6       be information provided by the Union to

7       employees.  Do you know that this was

8       information that is provided by the Union?

9  A      I can't recall that.  I don't know.

10  Q      Is that your handwriting on the bottom of

11       Exhibit I, second page?

12  A      Yes.

13  Q      On the bottom, it says, "If you can put

14       yesterday's date on 4/2/2013 and through

15       4/2/2014"; correct?

16  A      Yes, it says "Advised by HR."

17  Q      And this guidance gives information about the

18       Family Medical Leave Act.  It states in the

19       second paragraph, "The Family and Medical Leave

20       Act FMLA provides Federal employees with a

21       statutory entitlement to a total of 12

22       administrative weeks (480) hours of Leave

23       Without Pay (LWOP) during any 12-month period of

24       time for the purpose of tending to specified

25       family and medical needs.  Accrued leave may be

---

**Annette Ryan (K.N.A. Katz) v.**
**Robert McDonald, Secretary, etc.**

**Plaintiff**
**March 2, 2017**

Page 142

1  substituted for Leave Without Pay when
2  appropriate.  To be eligible for FMLA, employees
3  must have completed 12 months of service.
4  Temporary and intermittent employees are
5  ineligible for FMLA."
6       And it goes on to give you the examples of
7  who are family members that would qualify and in
8  the fifth paragraph, it says, "To be eligible
9  for FMLA, the employee must show evidence of a
10  "Serious Health Condition" defined as:
11  Inpatient care in a hospital, hospice, or other
12  medical care facility, incapacitation for duty,
13  as evidenced by ongoing care and supervision by
14  a physician, and C, any chronic long-term
15  condition requiring ongoing or periodic
16  treatment by a health care provider."
17       Do you know which of these three criteria
18  you were requesting under FMLA under?
19  A   I couldn't tell you.  I don't know.
20  Q   Well, were you inpatient in any hospital,
21  hospice, or medical care facility?
22  A   No.
23  Q   Were you incapacitated for duty?
24       MS. PIZZINO: Objection to the
25  extent it calls for a legal conclusion, but if

Page 143

1  you understand, answer.
2  Q   Do you know what incapacitated means?
3  A   On that unit, I would have been incapacitated,
4  yes.
5  Q   You were incapacitated for duty; correct?
6  A   On that unit.
7  Q   Do you understand what a serious health
8  condition means?
9  A   Yes, I do.
10  Q   Are you aware that that term is defined in your
11  union contract?
12  A   Would you like to show me that?
13  Q   I'm asking you, are you aware that the term
14  "Serious medical condition" for purposes of FMLA
15  is defined in your union contract?
16  A   No, I'm not.
17       MS. PIZZINO: Objection.
18  Relevancy to this entire line of questioning.
19  Q   According to the union contract, you are
20  incapacitated due to a serious health condition
21  of the employee when you are unable to perform
22  the functions of your position.  You were
23  employed as an LPN; correct?
24  A   Correct.
25  Q   So were you unable to perform the functions of

Page 144

1  your position as an LPN in April of 2013?
2  A   Again, on that unit.
3  Q   So tell me what duties could you perform as an
4  LPN if you were not assigned to the spinal cord
5  unit.
6  A   I could perform being a nurse off of Wade Park,
7  not in the area that I had the trauma.  I would
8  be a regular nurse being able to do my job.
9  Q   And if you were working for another hospital
10  system, would you have been able to perform the
11  job duties of an LPN in April of 2013?
12       MS. PIZZINO: Objection.  It
13  calls for a legal conclusion.
14       MS. BACCHUS: It does not call
15  for a legal conclusion.
16  Q   Please answer the question.
17  A   I suffered a sexual trauma, no, I would not be
18  able to work.
19  Q   So why is it that you believe that you would
20  have been able to work in a facility off of Wade
21  Park not assigned to that unit, but you would
22  not be able to perform the job somewhere else or
23  for a different employer?
24  A   The next question that you said, you used the
25  dates.  You didn't use the dates in the first

Page 145

1  question.
2  Q   Let me clarify then.  As of April 2013, would
3  you have been able to perform the job duties of
4  the LPN position at any other facility whether
5  it be VA off of Wade Park, MetroHealth,
6  UniversityHospitals?  Would you have been able
7  to perform the duties of an LPN?
8  A   Not that month which was directly right after.
9  Q   When do you believe you would have been able to
10  perform the job duties of an LPN anywhere but
11  Wade Park?
12  A   Given time to heal, five months after.  That's
13  my speculation for me off of that unit.
14  Q   So you believe that you would have been able to
15  perform the job duties of an LPN at any place
16  other than Wade Park as of August 2013?
17       MS. PIZZINO: Objection.
18  Mischaracterization of her testimony.
19  Q   Five months, April, May, June, July, August.  So
20  after August, before August; what did you mean
21  by five months?
22  A   Giving me time to heal, yes.
23  Q   What specific duties could you not physically
24  perform at Wade Park campus as an LPN due to the
25  trauma?

**Annette Ryan (K.N.A. Katz) v.**
**Robert McDonald, Secretary, etc.**

**Plaintiff**
**March 2, 2017**

Page 146

1    MS. PIZZINO: Objection.  Asked
2  and answered.
3    MS. BACCHUS: No, she's never
4  told me which duties she could not perform.
5  A    Any duties.
6  Q    And why is that?
7  A    Because you're asking me to think critically as
8  a nurse and I could not think critically as a
9  nurse during the trauma that I endured.
10  Q    So you couldn't think critically as a nurse and
11  you believe you couldn't think critically as a
12  nurse for approximately five months; correct?
13    MS. PIZZINO: Objection.
14  Q    Is that correct?
15  A    Correct.
16  Q    So after five months, what duties do you feel
17  you could not perform at Wade Park as an LPN?
18  A    I would not be able to perform any duties at
19  Wade Park ever.
20  Q    So if you were unable to perform any duties at
21  Wade Park ever, why did you request as a remedy
22  in your EEO complaint dated August 13th, 2013,
23  to be transferred to the blind unit at Wade
24  Park?
25  A    I wanted anything I could as a transfer, but

Page 147

1  they weren't giving me any transfer.
2  Q    So you would have been willing to go to Wade
3  Park as a resolution -- I'm sorry, as requested
4  as a resolution in your EEO complaint dated
5  August 2013?
6    MS. PIZZINO: Objection to EEO
7  complaint.  It's mischaracterizing the complaint
8  if you look at the document.
9    (Government's Exhibit J was marked for
10  identification.)
11  Q    Ms. Ryan, I've handed you what's been marked as
12  Government's Exhibit J.  It is a copy of an EEO
13  complaint -- I'm sorry, it says, "Complaint of
14  Employment Discrimination" and your signature
15  appears at the bottom and it's dated August 12,
16  2013; is that correct?
17  A    Correct.
18  Q    And it says, "Remedy Requested" I believe.  I
19  think it's number ten.  It's kind of hard to
20  make out.  It says, "I want to either be
21  reassigned to Parma CBOC or to day shift on the
22  blind unit on the basement level"; is that
23  correct?
24  A    Correct, the blind unit is separate from the
25  whole building.

Page 148

1  Q    Is the blind unit at Wade Park?
2  A    Yes.
3    (Government's Exhibit K was marked for
4  identification.)
5  Q    Okay.  I've handed you what's been marked as
6  Government's Exhibit K.  Have you seen this
7  document before?
8  A    Yes.
9  Q    And this document is entitled "Certification of
10  Health Care Provider for Employee's Serious
11  Health Condition" and under that it says,
12  "Family and Medical Leave Act"; correct?
13  A    Correct.
14  Q    And this document was completed by your
15  physician, Michelle Holmer?
16  A    Yes.
17  Q    And according to the document, Part A on the
18  second page, it asks question one, "Approximate
19  date condition commenced:  March 28th, 2013";
20  correct?
21  A    Correct.
22  Q    It says, "Probable duration of condition:
23  Indefinite, minimum several months, may be much
24  longer," did I read that correctly?
25  A    Yes.

Page 149

1  Q    Then under question three, it states, "Use the
2  information provided by the employer in Section
3  I to answer this question.  If the employer
4  fails to provide a list of the employee's
5  essential functions or a job description, answer
6  these questions based upon the employee's own
7  description of his/her job functions."
8    Did you ever tell Dr. Holmer what your job
9  functions were at the VA?
10  A    Yes.
11  Q    What did you tell her your job functions were?
12  A    I can't recall four years ago.
13  Q    And under three, the next question says, "Is the
14  employee unable to perform any of his/her job
15  functions due to the condition" and she didn't
16  answer that question; is that correct?
17  A    No, she answered it.  It says "unable."
18  Q    No, there's no check by yes or no; is there?
19    MS. PIZZINO: Objection.  The
20  document speaks for itself.  There's no
21  foundation.
22  Q    According to the document, it does not have a
23  check by yes or no; correct?
24  A    I believe she answered the question, but she did
25  not --

Page 150

1  Q   That is not the question I asked you.  I asked
2      you is there a check by yes or no?
3  A   No.
4  Q   The next line says, "If so, identify the job
5      functions the employee is unable to perform:"
6      And it just says "unable"; correct?
7  A   That's what's on the document, yes.
8  Q   If you'll flip the page, Part B says, "Amount of
9      Leave Required" and it asks, "Will the employee
10     be incapacitated for a single continuous period
11     of time due to his or her medical condition,
12     including any time for treatment and recovery"
13     and it's checked yes; correct?
14 A   Yes.
15 Q   "If so, estimate the beginning and ending dates
16     for the period of incapacity" and it states July
17     1st, 2013; correct?
18 A   Correct.
19 Q   Then at the bottom, it asks for any additional
20     information and that appears to be left blank?
21 A   Where?
22 Q   Very bottom of the page.
23 A   Yes, she doesn't have any additional information
24     to add.
25 Q   This was signed by Dr. Holmer according to the

Page 151

1      document on April 8th, 2013?
2  A   Yes.
3  Q   Did Dr. Holmer provide this document directly to
4      you or did she submit it to the VA on your
5      behalf?
6  A   She made a copy for me and sent it into the VA.
7  Q   Did you disagree with any of Dr. Holmer's
8      conclusions as stated in her certification?
9  A   No.
10 Q   And the very next page of the exhibit is
11     "Request for Leave or Approved Absence," is that
12     your handwriting on this request?
13 A   Except for the signature of Lisa Herman, that's
14     my writing, yes.
15 Q   And you requested leave from April 9th, 2013 to
16     April 10, 2014?
17 A   Where?
18 Q   I'm looking at the top where it says "Dates from
19     and to"?
20 A   On here, oh, the "Leave Without Pay" or up here?
21 Q   At number four.
22 A   Okay.  What line are you on?
23 Q   I'm at the very first line where it says "From
24     and to"?
25 A   For accrued annually?

Page 152

1  Q   Did you have annual -- were you checking that to
2      say you wanted annual leave for a year?
3  A   It says "Total hours zero."
4  Q   So on that line for zero, it says that you
5      wanted leave from April 9th, 2013 to April 10th,
6      2014?
7  A   I went by however Lisa Herman wanted me to put
8      the dates to fill this form out, so I actually
9      don't -- I don't know what -- I can only tell
10     you what Lisa Herman had me fill out for here.
11 Q   Did you write in those dates?
12 A   That she told me to fill in, yes.
13 Q   But you signed the certification requesting that
14     amount of leave?
15 A   Uh-huh.
16 Q   And you state under "Remarks:  Once I have
17     exhausted AL and SL accrued, I am requesting
18     sick leave in advance" -- I don't know what that
19     says.  Do you know what that says?
20 A   Under where?
21 Q   I'm under number six.
22 A   This was a recommendation by Lisa Herman.  I
23     filled in what she told me to put in here, "Sick
24     leave and advance."
25 Q   If you can make it out.

Page 153

1  A   I don't even know.
2  Q   And your signature is on here dated 4/9/2013;
3      correct?
4  A   Correct.
5  Q   In the following page you applied for the
6      Voluntary Leave Transfer Program?
7  A   Yes, that was also with Lisa Herman's
8      recommendation.
9  Q   Was that approved for you?
10 A   It was approved, but nobody gave me any.
11 Q   I'm sorry, I didn't hear that.
12 A   Nobody gave me any.
13 Q   And Bates-stamp page 494 is a handwritten note.
14     Is this your writing?
15 A   Yes.
16 Q   Now was this to apply for the Voluntary Leave
17     Program?
18 A   Yes.
19 Q   If you would turn to the Bates-stamp page 500
20     and this document is "Certification of Health
21     Care Provider for Employee's Serious Health
22     Condition (Family Medical Leave Act)"; is that
23     correct?
24 A   Yes.
25 Q   And this was completed for you by Dr. Holmer,

**Annette Ryan (K.N.A. Katz) v.**
**Robert McDonald, Secretary, etc.**

**Plaintiff**
**March 2, 2017**

Page 154

1      your physician?
2  A    Yes.
3  Q    And according to Part A on the next page,
4      Bates-stamped 501, it says, "Approximate date
5      condition commenced:  March 28th, 2013.
6      Probable duration of condition:  Indefinite -
7      minimum several months, may be longer"; do you
8      see that?
9  A    Yes.
10  Q    Did you agree with that?
11  A    Yes.
12  Q    And under question number three, there's a
13      question again, "Is the employee unable to
14      perform any of his or her job functions due to
15      the condition" and she does not check yes or no;
16      correct?
17  A    Correct.
18  Q    And then under there the next line says, "If so,
19      identify the job functions the employee is
20      unable to perform" and she writes "Unable to
21      perform any of her job duties on currently
22      assigned unit"; correct?
23  A    Correct.
24  Q    Did you agree with that?
25  A    Yes.

Page 155

1  Q    If you turn to Part B, it says, "Amount of Leave
2      Needed", it says, "Will the employee be
3      incapacitated for a single continuous period of
4      time due to his or her medical condition,
5      including any time for treatment and recovery?"
6      There's a check by the answer yes.
7          It says, "If so, estimate the beginning
8      and ending dates for the period of incapacity:
9      March 28th, 2013 beginning to September 2nd,
10      2013 ending"; do you see that?
11  A    Yes.
12  Q    Did you agree with her conclusion?
13  A    Yes.
14  Q    And, again, on the bottom of that page where it
15      says "Additional Information," it's left blank;
16      correct?
17  A    Correct.
18  Q    And this was signed by Dr. Holmer on June 13th,
19      2013?
20  A    Yes.
21  Q    If you will turn to what's been Bates-stamped as
22      509 which is a little hard to read, because it
23      goes over the typewritten words there.  This is
24      a "Request for Leave or Approved Absence."  Is
25      your signature on here?

Page 156

1  A    Yes.
2  Q    And your signature is dated June 24th, 2013?
3  A    Yes.
4  Q    And you were requesting leave from June 27th,
5      2013, until September 2nd, 2013?
6  A    Yes.
7  Q    Let me direct your attention now to page 469
8      Bates-stamped.  That to is a"Certification of
9      Health Care Provider for Employee's Serious
10      Health Condition (Family Medical Leave Act)."
11          This was signed by your family doctor,
12      Michelle Holmer; is that correct?
13  A    Yes.
14  Q    And, again, under question number one, It says,
15      "Approximate date condition commenced:  March
16      28th, 2013" and it says, "Probable duration of
17      condition:  Many months"; is that correct?
18  A    Yes.
19  Q    Did you agree with her conclusion?
20  A    Yes, I did.
21  Q    And under question number three, there is "Is
22      the employee unable to perform any of his/her
23      job functions due to the condition" and there is
24      no check mark by the question yes or no;
25      correct?

Page 157

1  A    Correct.
2  Q    And under that, it says, "If so, identify the
3      job functions the employee is unable to
4      perform," and it says, "Unable to perform any of
5      her job duties on currently assigned unit"; is
6      that correct?
7  A    Correct.
8  Q    If you flip the page, again, question number
9      five, it says, "Will the employee be
10      incapacitated for a single continuous period of
11      time due to his or her medical condition,
12      including any time for that treatment and
13      recovery?"  She checks the box yes.  "If so,
14      estimate the beginning and ending dates for the
15      period of incapacity:  March 28th, 2013 begin,
16      December 2nd, 2013 end"; did you agree with her
17      conclusion?
18  A    Yes.
19  Q    Under the bottom where there's a spot for
20      additional comments, it's left blank; correct?
21  A    Correct.
22  Q    It's also signed by Dr. Holmer on August 30th,
23      2013?
24  A    Yes.
25  Q    Then on the next page which is marked

**Annette Ryan (K.N.A. Katz) v.**
**Robert McDonald, Secretary, etc.**

**Plaintiff**
**March 2, 2017**

Page 158

1    Bates-stamp 1746 is another "Request for Leave
2    or Approved Absence"; do you see that?
3 A    Yes.
4 Q    Under that one, you check, "Leave without pay
5    from September 3rd, 2013 to December 2nd, 2013"
6    and you signed it on August 21st, 2013?
7 A    Yes.
8 Q    I think the next page is not supposed to be on
9    there.  After December 2nd, 2013, did you
10    specifically request any type of leave from the
11    VA?
12 A    I can't recall.  There's so much paperwork I had
13    to fill out.  I can't recall those things.
14 Q    There came a point in time where you applied for
15    Workers' Compensation; do you recall when that
16    was?
17 A    I don't recall exactly.
18 Q    Did you have to go to the VA to fill out the
19    paperwork for the Workers' Compensation?
20 A    Yes, I had to go to HR.
21 Q    Do you recall who you met with at HR?
22 A    Again, it was -- I don't know if Mary, but Ms.
23    Greene, yes.
24 Q    Ms. Greene?  You filed your complaint with the
25    VA Office of Resolution Management and I believe

Page 159

1    the informal complaint was filed in May and the
2    formal complaint which is Government Exhibit J
3    was filed in August.  Did any mediations
4    transpire between May and August?
5 A    No.
6 Q    Had you requested mediation?
7 A    Yes.
8 Q    What did you understand the purpose of mediation
9    was?
10 A    I understood that we would try to resolve the
11    issue and that I would hopefully be transferred.
12 Q    Do you know why there was no mediation that took
13    place between May and August?
14 A    Yes.
15 Q    Tell me why please.
16 A    I was told by Andrea Freeman in an e-mail that
17    there was a lot of people that had to meet and
18    had to agree to the meeting and a lot of people
19    were taking vacations and that I would have to
20    be patient.
21 Q    Did that include you were taking vacations as
22    well during that period of time?
23 A    No.
24 Q    So you didn't tell them that you were
25    unavailable during a week in August of 2013?

Page 160

1 A    I don't recall that.  If I did --
2 Q    It's possible?
3 A    Yeah.
4 Q    And when did the mediation take place?
5 A    I don't know the exact date.
6 Q    It was scheduled for September 26th, 2013,
7    according to the information I have received.
8    Do you have any reason to dispute that?
9 A    Without having a document in front of me, I do
10    know that it was cancelled a couple of times by
11    the VA.
12 Q    And when you say "by the VA," was that because
13    VA people were unavailable or because the
14    mediator was unavailable or do you know?
15 A    I don't know.
16 Q    At some point in your statements during this
17    lawsuit, you said that you had a mediation
18    scheduled and the mediator didn't show up?
19 A    Oh, Andrea Freeman, yes.
20 Q    Andrea Freeman didn't show up?
21 A    She couldn't be there.
22 Q    But Andrea Freeman was not the mediator;
23    correct?
24 A    She was the EEO representative.
25 Q    So how many mediations did you actually have?

Page 161

1 A    One.
2 Q    Was the mediator present?
3 A    I don't know who the mediator would have been.
4    I was there with my attorney, so I don't know.
5    I just know people there present was Beth
6    Noelker, the VA attorney, and another VA
7    representative.  I don't know the titles.
8 Q    You said another VA representative.  The
9    mediator doesn't work for the VA.
10 A    I didn't know that.
11 Q    Are you disputing that there was a mediator
12    present or you don't recall?
13 A    I don't recall.
14 Q    Fair enough.  Prior to the mediation around
15    August 28th, did you call Beth Noelker and ask
16    her could you come back to work on the blind
17    unit and just settle the EEO?
18 A    No.
19 Q    You didn't call her?
20 A    No.
21 Q    You have no recollection of talking to Beth
22    Noelker?
23 A    No.
24 Q    You don't recall asking her if you could be
25    assigned to the blind unit with Roseann?

**Annette Ryan (K.N.A. Katz) v.**
**Robert McDonald, Secretary, etc.**

**Plaintiff**
**March 2, 2017**

Page 162

1  A    Oh, I wanted to be assigned, yes, but I don't
2    recall calling her and asking her that.
3  Q    You don't recall it or it didn't happen?
4  A    I don't recall it.
5  Q    So at the mediation, what happened?  What did
6    the VA propose?
7  A    The VA wanted to know if there was anything in
8    writing from my doctor stating that I could not
9    work on that unit and my attorney stated yes.
10    And she handed them the letters from the doctor.
11        They said that there was -- they could
12    transfer me, but I would have to sign a document
13    stating that I would not pursue this suit and
14    everything that's going on.  And I turned to my
15    attorney and I asked her what I should do and
16    she said, "If you settle, we can't fight this
17    case," so it was up to me.
18        And I said, "I'm not willing to drop this
19    case."  So they said then this meeting is going
20    to -- we can't go on any further and they
21    weren't going to reassign me.
22  Q    And you said that your attorney gave them
23    letters.  What letters did she give them?
24  A    The documentation from my doctor stating I could
25    not work in that unit.

Page 163

1        (Government's Exhibit L was marked for
2    identification.)
3  Q    And handing you what's been marked as
4    Government's Exhibit L.  The first page is a
5    letter from Catholic Charities to whom it may
6    concern dated August 5th.
7        And you stated that your attorney gave
8    letters from your doctor to the VA people who
9    were present at the mediation.  Is this one of
10    the letters that your counsel gave them?
11        MS. PIZZINO: Objection.
12  A    The letter that was given was from Dr. Holmer.
13  Q    So you don't believe this was one of the letters
14    that was given to them?
15  A    No.
16  Q    If you turn to the next page of Exhibit L,
17    there's a letter from Dr. Holmer.  It is dated
18    July 24th, 2013.  It says, "To Whom It May
19    Concern:  Ms. Ryan has been a patient in my
20    office for many years.  Recently, she has been
21    seen on several occasions for symptoms of PTSD
22    related to an alleged sexual assault by a
23    co-worker.  As a result of this assault, there
24    was also a conflict with other employees on that
25    unit as well.  It would be in her best interest

Page 164

1    to be re-assigned to a different location.  If
2    you need any additional information, please do
3    not hesitate to contact me."
4        Is this the letter that you're referring
5    to that your counsel gave the VA people at the
6    mediation?
7        MS. PIZZINO: Objection.
8    Speculation.  You can answer.
9  A    My doctor wrote many letters.  It could have
10    been any one of them.  I don't know which exact
11    one she sent.
12  Q    So you have no knowledge of what letter was
13    actually provided to the VA?
14  A    No.
15  Q    Did you yourself provide any letters directly to
16    the VA from your doctor or from your mental
17    health therapist?
18  A    Yes, I did.
19  Q    What letters do you recall providing?
20  A    Ever single letter I got from Dr. Holmer was
21    made copies and sent to the VA.
22  Q    You sent them directly?
23  A    Yes.
24  Q    Who did you send it to?
25  A    Beth Noelker.

Page 165

1  Q    How did you send it Beth?
2  A    I usually hand-delivered or put it in her inner
3    mail like in her office --
4  Q    So you would --
5  A    -- when I was up there.  Prior to not going up
6    there, I gave it to my attorney.
7  Q    But you don't recall specifically what days you
8    actually did go to the VA?
9  A    No.
10  Q    If you turn to the last page of Exhibit L, there
11    is a letter.  It is dated November 27th, 2013,
12    and it's addressed to you, but it says, "To Whom
13    It May Concern," it's from Community Health Care
14    signed by Dr. Holmer.
15        It states, "Annette has been suffering
16    from Post-Traumatic Stress Disorder due to
17    sexual harassment/assault by a co-worker in the
18    job.  She has continued to have symptoms related
19    to these events and cannot return to job duties
20    on her currently assigned unit at this time.
21    Unless resigned to work on a different unit, her
22    time off needs to continue indefinitely."
23        Do you know who you gave this letter to?
24  A    No, I can't recall.
25  Q    Did you keep any type of documentation when you

**Annette Ryan (K.N.A. Katz) v.**
**Robert McDonald, Secretary, etc.**

**Plaintiff**
**March 2, 2017**

---

Page 166

1    would deliver letters either by fax or sent
2    certified mail or e-mail or have anybody
3    time-stamp a copy to show that you had submitted
4    it?
5 A    My attorney, Pam Kurt, at the time, did.  I did
6    not.
7 Q    Do you have any copies of the confirmations of
8    Ms. Kurt?
9 A    No.
10 Q    So as you sit here today, you're uncertain which
11    letters you actually sent over to VA?
12         MS. PIZZINO:  Objection.  Asked
13    and answered.
14 Q    You can answer.
15 A    I have no idea what she had sent.
16         (Government's Exhibit M was marked for
17    identification.)
18 Q    Ms. Ryan, I'm handed you what's been marked as
19    Government's Exhibit M is another letter from
20    Community Health Care that is dated February 4,
21    2014.  It is addressed to you and it says, "To
22    Whom It May Concern:  I am writing this letter
23    at the request of Annette Ryan as an update to
24    her current work situation.  Please see the
25    excerpt below from my most recent office visit

---

Page 167

1    on November 25th, 2013" and then there's some
2    affirmation about your visit.
3         And it says, "As far as I'm aware, there
4    has been no significant change in this
5    situation.  If you need any additional
6    information, please do not hesitate to contact
7    me."  Did you receive a copy of this letter?
8 A    Yes, I did.
9 Q    Why did you request Dr. Holmer to write this
10    letter?
11 A    Because every time I fill out paperwork to the
12    VA, I have to have a doctor's notation, a
13    doctor's letter.  It came directly from them.
14 Q    Do you know whom at the VA you gave a copy of
15    this letter to, if anyone?
16 A    I always gave it to Beth Noelker.
17 Q    Do you know how you provided it to Beth Noelker?
18 A    Again, when I was up there, I handed it to her
19    personally or I put it into her box.
20 Q    Do you have any recollection of going to the VA
21    after February 4, 2014?
22 A    No.
23 Q    So if you would not have hand-delivered it to
24    Beth, how else would you have delivered it to
25    her?

---

Page 168

1 A    I would have given it to my attorney.
2 Q    Do you know if your attorney actually sent this
3    over to Beth or anybody else at the VA?
4 A    I can't speak for her.  I don't know.
5 Q    And if I tell you that this document actually
6    appears in the files of the Attorney General
7    Ohio Victims of Crime, does that change your
8    mind as to whether or not you provided a copy of
9    this document to the VA?
10 A    No, it does not change my mind.
11 Q    At what point do you believe that the VA was
12    aware that you were claiming you had a
13    disability?
14         MS. PIZZINO:  Objection.  Calls
15    for a legal conclusion.
16 Q    You can answer.
17 A    I would like you to rephrase that
18 Q    At what point did you either notify the VA that
19    you had a disability or that you believe they
20    knew that you had a disability?
21         MS. PIZZINO:  Objection.  Calls
22    for speculation of what they knew.
23 A    I don't know what they would have known.
24 Q    So at what point did you notify them you had a
25    disability?

---

Page 169

1 A    When I had to fill out those FMLA papers.
2 Q    And at that time when you filled out the FMLA
3    papers, you were requesting Family Medical
4    Leave; correct?
5 A    Correct.
6 Q    And it states that you needed to be off for a
7    serious health condition; correct?
8 A    Correct.
9 Q    What do you believe is your disability or was
10    your disability?
11 A    I think my grief was a disability.
12         MS. PIZZINO:  Objection as to
13    -- let me state my objection.  Objection calls
14    for a legal conclusion as to the word
15    "disability".
16 Q    You said you had a disability.  You were
17    requesting an accommodation for a disability;
18    correct?
19 A    An accommodation --
20         MS. PIZZINO:  Objection.  Calls
21    for a legal conclusion.
22         MS. BACCHUS:  Note her
23    continuing objection to this line of questions,
24    so we don't have to keep doing this or else
25    we're going to be here all day.

---

**Annette Ryan (K.N.A. Katz) v.**
**Robert McDonald, Secretary, etc.**

**Plaintiff**
**March 2, 2017**

Page 170

1 Q   Did you request an accommodation for a
2     disability?
3 A   I requested an accommodation.
4 Q   And why did you request that accommodation?
5 A   From the trauma that I endured on that unit.
6 Q   So are you saying that you did not specifically
7     request an accommodation for a disability?
8 A   I requested a transfer from that floor from that
9     Wade Park because of the sexual assault I
10    endured.
11 Q  And do you know what a disability is?
12 A  Yes, I do.
13 Q  Okay.  Tell me what your definition of a
14    disability is.
15 A  On that unit --
16 Q  I don't want hear on that unit.  I want to know
17    what you think is a disability in general.
18 A  Someone who can't perform their duties on a
19    floor on the unit where I was sexually
20    assaulted.
21 Q  And that was because I believe you said you
22    could not make critical decisions as a nurse?
23 A  Correct.
24 Q  So you believe that your mental ability was
25    impaired?

Page 171

1 A   Can you rephrase, mental capacity or mental
2     ability?
3 Q   You said that the reason that you could not
4     perform your job duties on that unit, and I
5     think you said anywhere for, at least, five
6     months, was because you could not make critical
7     nursing decisions; did I misstate that?
8 A   No, that's correct.
9 Q   So you believe that your mental ability had been
10    impaired?
11 A  Yes, correct.
12 Q  And at any point did you tell the VA that you
13    could not work on that unit because your mental
14    ability had been impaired?
15     MS. PIZZINO: Objection.  Asked
16    and answered.
17 A  I didn't use that wording, no.
18 Q  What did you tell them?
19 A  Who would I have told this to?  Beth Noelker.
20    Can you be more specific?
21 Q  Okay.  Who at the VA did you speak to about your
22    mental ability being impaired for critical
23    nursing decisions?
24     MS. PIZZINO: Objection.  Asked
25    and answered.

Page 172

1 A   Beth Noelker is who I spoke to.
2 Q   Anyone else?
3      MS. PIZZINO: Objection.  Asked
4     and answered.
5 Q   Anyone else?
6 A   Lisa Herman.
7 Q   So what did you tell Beth Noelker about not
8     being able to function, because you couldn't
9     make critical nursing decisions on that floor?
10 A  That I was sexually assaulted.
11 Q  Okay.  Anything else?
12 A  No, my doctor filled out the paperwork.
13 Q  When you say "paperwork," are you talking about
14    the FMLA paperwork?
15 A  And the note.  She always had a note that
16    followed the FMLA paperwork.
17 Q  But as you sit here today, you don't know which
18    notes were actually delivered from your doctor
19    is your testimony; correct?
20 A  It could be one of many.
21 Q  Okay.
22 A  I can't be specific.
23 Q  And let's go back to Government Exhibit L and in
24    looking at the page Bates-stamped 671 which is a
25    note from your doctor, is there any statement

Page 173

1     that you believe notifies the VA that your
2     mental judgment would be impaired working on
3     that floor?
4      MS. PIZZINO: Objection.  The
5     letter speaks for itself.  You're asking her to
6     interpret something that --
7      MS. BACCHUS: I heard your
8     objection.
9      MS. PIZZINO: -- her counsel
10    has said.
11     MS. BACCHUS: There's no
12    speaking objections.  We're going to be here all
13    day.  I'm trying to get her out of here.
14 A  I can't read my doctor's mind.  I can't
15    interpret what she meant.
16 Q  I asked you what did this mean to you?  Is there
17    a statement in here that you believe tells the
18    VA that your mental ability is impaired?
19 A  You're asking something that happened --
20     MS. PIZZINO: Wait a second,
21    you're on Exhibit L.  Can you tell me which page
22    you're on?
23     MS. BACCHUS: Page two of 671,
24    a letter from Dr. Holmer dated July 24, 2013.
25     MS. PIZZINO: Thank you.  Are

**Annette Ryan (K.N.A. Katz) v.**
**Robert McDonald, Secretary, etc.**

**Plaintiff**
**March 2, 2017**

---

Page 174

1  you asking her to interpret this letter?
2        MS. BACCHUS: I am not.
3  Q   I am asking you is there any statement in this
4      letter that you believe notified the VA that you
5      would not be able to think critically as a
6      nurse on the spinal cord unit?
7  A   I think it speaks for itself.
8  Q   That didn't answer my question.
9  A   But I can't interpret what she's saying.
10 Q   You can either tell me yes or no.  Answer the
11     question.  I'm asking your belief.  I'm not
12     asking you to interpret what she says.
13 A   Yes, I think it speaks for itself.  I think this
14     letter speaks for PTSD.
15 Q   It says that you have PTSD; right?
16 A   Yes.
17 Q   And that's all it says, right, in terms of a
18     medical condition?
19        MS. PIZZINO: Objection.
20 A   PTSD is numerous things.  That's generalized.
21 Q   In terms of your medical condition, this letter
22     dated July 24, 2013, simply says that you have
23     symptoms of PTSD related to the sexual assault;
24     correct?
25        MS. PIZZINO: Objection.

---

Page 175

1  A   It's one of many.
2  Q   And you also said you spoke with Lisa Herman.
3      What did you tell Lisa Herman about why you
4      could not work on the unit in terms of your
5      alleged mental impairment to think critically as
6      a nurse?
7  A   Because I was sexually assaulted.  She didn't
8      have me go into deep -- because it spoke for
9      itself.  She heard the tape.  She heard -- I was
10     emotional.  She didn't go and ask any more
11     questions than what was right there in front of
12     her.
13 Q   So to the best of your recollection, you don't
14     recall ever telling Beth or Lisa that your
15     judgment and critical nursing abilities would be
16     impaired if you worked on the spinal cord unit?
17 A   They did know I was impaired.  I did tell them
18     that I was impaired when I told Beth Noelker.
19     You said Lisa Herman.  Beth Noelker, yes.
20 Q   So specifically tell me what you told Beth.
21 A   Are we going back to the first initial time or
22     an ongoing time?  I spoke to Beth on numerous
23     occasions.
24 Q   So tell me on any occasions that you can recall
25     what you told her about why you could not

---

Page 176

1  perform your job duties on the spinal cord unit
2  besides for the fact that you had been sexually
3  assaulted?
4  A   She never asked me.
5  Q   So what did you tell her?
6  A   I didn't volunteer information except for the
7      letters from my doctor.  I don't know what
8      you're asking.
9  Q   You just told me you told her on many times.
10 A   But I don't know what you're asking me.  She got
11     the letter.  She didn't ask me to describe to
12     her what things I could not perform.
13     I asked for a transfer.  The letter spoke
14     for itself.  I don't know what -- honestly, I
15     don't know what you're asking me.
16 Q   So absent of what is stated in the letters, you
17     don't recall specifically telling her that you
18     could not perform this function or that function
19     or why?
20 A   Correct.
21 Q   How did it come about that you ended up making a
22     request for a reasonable accommodation?
23 A   Day one with the Union.
24 Q   You asked for a transfer then.  I'm asking about
25     the request for a reasonable accommodation.

---

Page 177

1        MS. PIZZINO: Objection.  Legal
2  conclusion and she answered your question.
3  Q   If you can pull out Exhibit H please.  I'm
4  sorry, never mind.
5        (Government's Exhibit N was marked for
6  identification.)
7  Q   I'm handing you what's been marked as
8  Government's Exhibit N, do you recognize this
9  document?
10 A   Not to my recollection.  The first page?
11 Q   Yes.
12 A   No.  The second page, yes.
13 Q   The first page shows an e-mail that was written
14  and you were cc'd and it was sent to your
15  counsel.  Was that your correct e-mail address
16  at the time?
17 A   That is my e-mail address, yes.
18 Q   And according to this e-mail, it was an e-mail
19  from Sonya Hall.  And it says, "Hi Annette, per
20  our discussion yesterday, I am attaching the
21  reasonable accommodation forms and a letter with
22  instructions.  Please complete and return to me
23  at your earliest convenience.  Feel free to
24  contact me if you have any questions.  Thanks."
25  Do you recall speaking with Sonya Hall on

---

**Annette Ryan (K.N.A. Katz) v.**
**Robert McDonald, Secretary, etc.**

**Plaintiff**
**March 2, 2017**

Page 178

1 December 11th, 2013?
2 A I recall talking to her, but the exact date, I
3 don't recall.
4 Q And do you recall receiving this e-mail?
5 A Yes.
6 Q And do you recall what forms were actually
7 attached to the e-mail?
8 A No, I don't recall that.
9 Q Do you still have this e-mail from Ms. Hall?
10 A No.
11 Q The reason I ask you is because another version
12 of this e-mail appears in your production of
13 documents. So are you saying you don't have a
14 physical copy or you don't have the e-mail?
15 A I don't have the e-mail on my records.
16 Q If you flip the page of Exhibit N, the next page
17 is an actual letter and it was sent along with
18 the e-mail and it says, "Our office is in
19 receipt of your Reasonable Accommodation
20 Request. I have enclosed the Confirmation for
21 Reasonable Accommodation form, Medical
22 Documentation form, and Reassignment form.
23 Please complete the Confirmation and
24 Reassignment forms and return to my office. In
25 addition, please have your physician complete

Page 179

1 the medical documentation and answer the five
2 questions on form (a-e) and return to me at your
3 earliest." Did you ever have your doctor
4 complete the medical form?
5 A I believe so.
6 Q Do you have a copy of the completed form?
7 A I don't. That would be in the box with my
8 attorney.
9 Q Did you return the actual medical certification
10 form from your physician?
11 A I returned everything that I was given, yes.
12 Q Did you return it yourself or do you believe
13 your attorney returned it for you?
14 A My attorney returned it.
15 Q And which physician would you have had fill out
16 this request?
17 A Dr. Holmer.
18 Q I will tell you that we have subpoenaed Dr.
19 Holmer's records and requested for everything
20 relating to you and this form was not in there,
21 so do you have a copy of this form by chance?
22 A I can't recall.
23 Q Can you just take a look and see if you have
24 this documentation yourself, the medical
25 certification form from Dr. Holmer?

Page 180

1 A I will.
2 (Government's Exhibit O was marked for
3 identification.)
4 Q Ms. Katz, I've handed you what's been marked as
5 Government's Exhibit O. Do you recognize this
6 document?
7 A It looks like a lot of the documents I've seen,
8 without -- yes.
9 Q Is this your handwriting on this form?
10 A Yes.
11 Q And the form is dated 12/20/2013?
12 A Yes.
13 Q And this document was provided to me in
14 discovery from your counsel. Do you recall if
15 you personally returned this document to the VA?
16 A I don't recall. I do -- looking at this date is
17 one that you had handed in here in the past.
18 That's what it looks like.
19 (Government's Exhibit P was marked for
20 identification.)
21 Q Ms. Ryan, I've handed you what's been marked as
22 Government's Exhibit P. This is a letter from
23 the VA to you dated February 13, 2014; do you
24 recognize this letter?
25 A Yes.

Page 181

1 Q Did you actually receive this letter?
2 A I can't recall.
3 Q Were you living at the address at 71 Westvue
4 Drive in February 13, 2014?
5 A Yes.
6 Q According to this letter, it says, "You
7 submitted a request for a Reasonable
8 Accommodation due to a disability as defined by
9 the Americans with Disabilities Act. We have
10 attempted to contact you, but we have received
11 no response to date. Please contact the EEO
12 office." It gives you a number and an address.
13 Did you contact the EEO office following receipt
14 of this letter?
15 A I can't recall. I spoke with a Bruce Kafer. I
16 was directed by Andrea Freeman and I do have her
17 e-mail, but I was not allowed to contact her
18 anymore, so I would not have contacted her, no.
19 Q But you spoke with Mr. Kafer?
20 A With Bruce Kafer, yes.
21 (Government's Exhibit Q was marked for
22 identification.)
23 Q Ms. Katz, I've handed you what's been marked as
24 Defendant's Exhibit Q. It is a letter to you
25 from Bruce Kafer and it was sent to your address

**Annette Ryan (K.N.A. Katz) v.**
**Robert McDonald, Secretary, etc.**

**Plaintiff**
**March 2, 2017**

Page 182

1    from 71 Westvue Drive and it is dated March 6th,
2    2014.
3         Were you still residing at Westvue on
4    March 6th, 2014?
5  A    Yes.
6  Q    Do you recall receiving this letter?
7  A    Yes.
8  Q    And according to this letter, it says, "Thank
9    you for calling me back, Tuesday, March 4, 2014,
10    and responding to my inquiry about your
11    Reasonable Accommodation request."  Do you
12    recall that conversation?
13  A    Yes.
14  Q    Had you had any other conversation with Bruce
15    prior to March 4th, 2014?
16  A    I don't recall.  I spoke to him on numerous
17    occasions.  He was very helpful.
18  Q    According to this letter, it says, "You stated
19    to me on the phone you were on medical leave.
20    If this is the case, you may complete VA Form
21    0857A Written Confirmation of Request for
22    Accommodation and also please have your Medical
23    Provider complete VA Form 0857e Request for
24    Medical Documentation and fax them both to me."
25    Did you tell him that you had received this form

Page 183

1    before?
2  A    I don't recall that conversation.
3  Q    So in response to his request for the medical
4    documentation, did you return it?
5  A    I did.
6  Q    Did you personally return it or you believe your
7    attorney returned it?
8  A    My attorney did.  I was not allowed to have any
9    contact with the VA, anything with the EEO per
10    Andrea Freeman and I have an e-mail per that
11    conversation.
12  Q    Do you have any confirmation that your attorney
13    returned all the forms that were requested?
14  A    I do not.
15         (Government's Exhibit R was marked for
16    identification.)
17  Q    I've handed you Government's Exhibit R is a
18    letter addressed to you at the 71 Westvue Drive
19    address dated May 13th, 2014.  Did you receive
20    this letter?
21  A    I don't recall when I did.
22  Q    The letter is also -- there's a cc to your then
23    counsel, Pamela Kurt?
24  A    Correct.
25  Q    According to this letter, it advised you that

Page 184

1    "Your Reasonable Accommodation process will be
2    closed effective Tuesday, May 14th, due to
3    receiving no medical documentation"; do you see
4    that in the first paragraph?
5  A    Yes, I do.
6  Q    Did you call Mr. Kafer to ask about the no
7    documentation received?
8  A    I can't recall the conversation of that.
9  Q    Did you follow up in any way on your reasonable
10    accommodation request after receiving this
11    letter?
12  A    I always followed up with my attorney.  I was
13    not allowed to have contact with the VA.
14  Q    Are you aware of whether or not your attorney
15    followed up with the VA?
16  A    I only can go with what she told me and she
17    stated she did.
18  Q    And did anything else happen after that?
19  A    No.
20  Q    Although you said you were told that you were to
21    have no personal contact with the VA, you just
22    said previously that you had conversations with
23    Bruce Kafer?
24  A    I did.
25  Q    So did you ever call him back to say, "Why are

Page 185

1    you closing my case?"
2  A    I don't recall that conversation.
3  Q    So what actions do you believe that the VA took
4    in retaliation for you exercising your rights
5    under Title 7 or under the Rehabilitation Act
6    against you?
7         MS. PIZZINO: Objection.  Calls
8    for a legal conclusion.
9  A    I'd like you to rephrase that.
10  Q    What actions do you believe that the VA took in
11    retaliation for you exercising your rights under
12    Title Seven of the Rehabilitation Act?
13         MS. PIZZINO: Same objection.
14  A    I asked for a transfer and I never got it.
15  Q    Anything else?
16         MS. PIZZINO: Same objection.
17  A    They kept him employed with pay.
18  Q    And where did you get that information from?
19  A    The prosecutor.
20  Q    And the prosecutor works for Cuyahoga County?
21  A    Yes.
22  Q    You're aware that you made an allegation of
23    sexual harassment against Mr. Garrett; correct?
24  A    Yes.
25  Q    And you're aware that the VA has an obligation

**Annette Ryan (K.N.A. Katz) v.**
**Robert McDonald, Secretary, etc.**

**Plaintiff**
**March 2, 2017**

Page 186

1    to investigate it before taking action; correct?
2  A    Yes.
3  Q    And how long do you allege Mr. Garrett was
4    allowed to remain employed and be paid?
5  A    He got interviewed and he admitted to everything
6    that I complained about.  So with that being
7    said, they should not have transferred him with
8    an admission.
9          At least, I felt that they should put him
10   on administrative leave with or without pay, but
11   not be put into an area where he's going to be
12   working with other people even with his
13   admission.  He admitted what he did to me.
14 Q    Are you aware that when Mr. Garrett was charged
15   formally by Cuyahoga County, that he was placed
16   on unpaid leave?
17 A    In July.
18 Q    So why do you believe that the fact that he was
19   allowed to remain employed while the
20   investigation was pending was discriminatory
21   against you or was a reprisal for your EEO
22   activity?
23 A    I can't answer that.  I don't know why the VA
24   does what they do.  I just know for me, I would
25   not want to be working with somebody who

Page 187

1    admitted to the sexual harassment that was
2    caused by him.
3  Q    Okay.  Any other reasons that you believe that
4    the VA's actions were discriminatory against
5    you?
6          MS. PIZZINO: Objection.  Calls
7    for a legal conclusion.
8  Q    You can answer.
9          MS. PIZZINO: Asked and
10   answered.
11 Q    Any other reasons?
12 A    No.
13 Q    Are you alleging that they took any other
14   employment actions against you as a result of
15   you filing the EEO?
16         MS. PIZZINO: Objection.  Calls
17   for a legal conclusion.
18 Q    You can answer.
19 A    They fired me.
20 Q    You believe they fired you; correct?
21 A    I know they fired me.
22 Q    Okay.  You were off on Workers' Compensation for
23   a period of time; is that correct?
24 A    Correct.
25 Q    When do you believe that the VA actually fired

Page 188

1    you?
2  A    2014.
3  Q    When in 2014?
4  A    I can't recall.
5  Q    There was a period of time when you were off on
6    Workers' Compensation and at some point you were
7    seen by an Erika DeLong on behalf of the
8    Workers' Compensation Department; is that
9    correct?
10 A    For one day.
11 Q    You also were still seeing your therapist at the
12   Catholic Charities; correct?
13 A    Correct.
14 Q    And are you aware that in January 2014 that your
15   therapist at Catholic Charities sent a form to
16   the Attorney General's Office stating that you
17   could return to work without any restrictions?
18 A    I would need to see that.
19 Q    Were you aware that Erika DeLong concluded that
20   you could return to work without any
21   restrictions in April of 2014?
22 A    Could return to work, but they told me I had to
23   return to that floor.
24 Q    But Erika DeLong's opinion was that you could
25   return to work on that floor?

Page 189

1          MS. PIZZINO: Objection.
2    Mischaracterization.
3  A    She only met with me one time.  I don't
4    understand how could she possibly come to that
5    conclusion.
6  Q    You said she only met with you one time?
7  A    Yes.
8  Q    She's an expert in psychiatry; are you aware of
9    that?
10 A    My doctor's an expert too.
11 Q    Your doctor is an expert in psychiatry?
12 A    No, she's an expert in medical.
13         (Government's Exhibit S was marked for
14   identification.)
15 Q    Okay.  I'm handing you what's been marked as
16   Government's Exhibit S.  The first page of the
17   exhibit which is Bates-stamped "Removal 1105, it
18   is a letter addressed to you August 1st, 2014.
19   Have you seen this letter before?
20 A    Yes.
21 Q    Did you receive this letter?
22 A    Yes.
23 Q    And in this letter, the VA is offering you a
24   position; correct?
25 A    Correct.

**Annette Ryan (K.N.A. Katz) v.**
**Robert McDonald, Secretary, etc.**

**Plaintiff**
**March 2, 2017**

Page 190

1  Q    And the position is on a different floor;
2    correct?
3  A    It's on the Wade Park campus, yes.
4  Q    But it's on a different floor; correct?
5  A    Correct.
6  Q    And it asks you to contact the VA.  Did you
7    contact them to follow up with this?
8  A    I contacted my attorney.
9  Q    So you didn't contact the VA?
10  A   No, I contacted my attorney.
11  Q   Did your attorney contact the VA in response to
12    this letter?
13  A   She told me she did.
14  Q   And what was the outcome of that contact?
15  A   She was going to make -- she was going to talk
16    to them and follow up.
17  Q   And to the best of your knowledge, did she
18    follow up?
19  A   The best of my knowledge, yes.
20  Q   What was that follow-up going to consist of?
21  A   She was going to let them know that my doctor
22    stated to be off of that unit and off of that
23    campus.
24  Q   Now you state that your doctor said for you to
25    be off of that unit and off of that campus.  I

Page 191

1    will represent to you that when we took Dr.
2    Holmer's deposition, there was some letters that
3    said off of the unit and some that said to a
4    different location.
5        Were you told specifically that you could
6    not go back to work at the VA Wade Park campus
7    for medical reasons?
8  A   From my doctor, yes.
9  Q   From Dr. Holmer?
10  A   Yes.
11  Q   Do you have any proof, correspondence, anything
12    that suggests that your attorney followed up
13    with the VA following this August 1st, 2014
14    letter?
15  A   Just her word.
16  Q   And then the very next -- I'm sorry, the page
17    that is Bates-stamped 1098.
18        MS. PIZZINO: Fourth page in.
19  Q   This is a letter that was sent to you from the
20    VA.  It's dated September 22nd, 2014, and it is
21    sent to your address on Westvue Drive; did you
22    receive this letter?
23  A   Yes, I did.
24  Q   And after you received this letter, did you call
25    the VA or call your attorney and ask "What the

Page 192

1    heck is going on?"
2  A   I believe I answered that.  I called my
3    attorney.
4  Q   After September 22nd, 2014?
5  A   Yes, I did.
6  Q   And after you called your attorney, what was the
7    result?
8  A   I answered that and I stated that she would
9    follow-up.
10  Q   Okay.  Well, I'm talking about specifically to
11    this letter, September 22nd, 2014; does that
12    change your previous response?
13  A   No.
14  Q   So you believe you contacted your attorney after
15    September 22nd, 2014, in response to this
16    letter?
17  A   Yes.
18  Q   Did you hear anything back as to what was the
19    VA's position?
20  A   No.
21  Q   So as you sit here today, do you know whether or
22    not your attorney actually followed up with the
23    VA after this September 22nd, 2014 letter?
24  A   I don't know.  I haven't spoken to her.
25  Q   And then the very next page which is

Page 193

1    Bates-stamped 1082 is another letter addressed
2    to you on October 21st, 2014, and it was sent to
3    your Westvue address and it says "Proposed
4    Removal."  Did you see this letter?
5  A   Yes.
6  Q   And what did you do in response to the October
7    21st, 2014 letter?
8  A   Called my attorney.
9  Q   And do you know what, if any, actions your
10    attorney took?
11  A   She would follow up.
12  Q   And did you inquire as to what her follow-up
13    consisted of?
14  A   I trusted my attorney, so I trusted that she
15    would do what needed to be done, so I didn't
16    ask.
17  Q   So you didn't ask her what follow-up actions she
18    actually took?
19  A   Oh, I believe she told me that she has to file
20    appeals.  I don't know what that means.  That I
21    just know that there was appeals that had to be
22    filed.
23  Q   Do you know if she actually filed those appeals?
24  A   I don't know.
25  Q   If you would turn to the page that is

Annette Ryan (K.N.A. Katz) v.
Robert McDonald, Secretary, etc.

Plaintiff
March 2, 2017

Page 194

1    Bates-stamped 1078 of Exhibit S please.  This is
2    a letter to you dated November 17, 2014, and it
3    was sent to the Monroe Falls Avenue address.
4    Did you receive this letter?
5 A  I also got it at the Westvue and this is because
6    this is a condo that was also in my name.  So I
7    got one sent there and Westvue.
8 Q  So you did receive a copy of this letter?
9 A  Yes, I did.
10 Q  When you received a copy of this letter, did you
11    call anyone, the VA, your attorney to say, "Hey,
12    what are you all doing?  I'm trying to keep my
13    job"?
14 A  Again, I was not allowed to contact the VA and
15    that was at the request of the VA and the
16    request of my attorney.  So all my transactions
17    and communications were to my attorney.
18 Q  And what did your attorney do in response, if
19    you know?
20 A  That she's working on it with the appeals.
21 Q  And did you ever receive any documents entitled
22    "Appeals"?
23 A  No, I did not.
24 Q  Did you ever follow up with your counsel as to
25    what was the resolution of her appeals or her

Page 195

1    contact with the VA regarding the removal?
2 A  Yes.
3 Q  And what did you learn?
4 A  That she's working on it.
5    (Government's Exhibit T was marked for
6    identification.)
7 Q  Ms. Katz, I've handed you what's been marked as
8    Government's Exhibit T.  This is a document that
9    was submitted by Catholic Charities entitled
10    "Mental Health Report" to the Attorney General's
11    Office Victim of Crimes.  Have you seen this
12    report before?
13 A  Yes, I have.
14 Q  I want to direct your attention to page two of
15    this report.  I'm sorry, before we go there,
16    page one, there's a stamp on it that says
17    received July 13, 2013 [sic] by Crime Victim
18    Services.
19    Do you have any reason to dispute that's
20    the day this document was submitted?
21 A  No.
22 Q  I want to direct your attention to page two
23    please.  And this is in relationship to Victims
24    of Crime claim number V1341713, the claim number
25    is listed on the top; do you see that?

Page 196

1 A  Yes.
2 Q  The third box down, it asks, "Is or was patient
3    unable to perform any type of gainful employment
4    as a direct result of the crime?"  And Ms.
5    Hively checks yes and it says, "Date unable to
6    work, March 26, 2013 to be determined"; did
7    you agree with her conclusion?
8 A  Was this Wanda?
9 Q  Yes, it's signed by Wanda Hively.
10 A  Yes, I wouldn't have had any reason to dispute
11    her.
12    (Government's Exhibit U was marked for
13    identification.)
14 Q  Ms. Katz, I've handed you what's been marked as
15    Government's Exhibit U.  This is a report that
16    was submitted on your behalf by Dr. Holmer.
17    It's dated June 26, 2013?
18 A  Uh-huh.
19 Q  Have you seen this document before?
20 A  I believe so, yes.
21 Q  Actually, I think this is a mixture of
22    documents.
23    MS. PIZZINO: It looks to be.
24    MS. BACCHUS: Yeah, that's the
25    wrong second page.

Page 197

1 A  Yeah, this is Wanda down here.
2 Q  Yeah, I apologize.  That's two I just removed
3    from Exhibit U.  We'll destroy those.  I
4    probably have it in here.
5    (Government's Exhibit U was remarked
6    for identification.)
7    I've handed you what's been marked now as
8    Defendant's Exhibit U and hopefully, we all have
9    the right pages now.  Have you seen this
10    document before?
11 A  Yes, if it was a little bit bigger.
12 Q  Yeah, I apologize.  This is a Medical
13    Information Report to the Ohio Attorney
14    General's Office Victim of Crime and it's
15    completed by Dr. Holmer; is that correct?
16 A  Correct.
17 Q  And if you turn to page two under the section
18    where it says, "Is the patient injured or
19    emotionally distressed to the extent that they
20    were unable to work," she checks the box yes and
21    says "Date unable to work from March 28, 2013"
22    and there's no end date at that point in time;
23    do you see that?
24 A  Yes.
25 Q  And then under the next box, "Is patient still

Annette Ryan (K.N.A. Katz) v.
Robert McDonald, Secretary, etc.

Plaintiff
March 2, 2017

Page 198

1   unable to work" and she checks the box yes. "If
2   yes, what is the anticipated date the patient
3   can return to full-time work," and she wrote in
4   "September 2nd, 2013."  Did you agree with that
5   conclusion?
6   A    Yes.
7           (Government's Exhibit V was marked for
8   identification.)
9   Q    Okay.  I've handed you what's been marked as
10  Government's Exhibit V.  And this is a Mental
11  Health Report that appears to have been
12  submitted to the Attorney General's Office by
13  your mental health counselor, Diane
14  Setlak-Micheller.
15  A    When Wanda retired, that was the person who was
16  in her spot.
17  Q    And this is dated January 28th, 2014.  Have you
18  seen this document before?
19  A    Yes.
20  Q    According to page two, it asks, "Is the patient
21  unable to perform any type of gainful employment
22  as a direct result of the crime," and it looks
23  like she originally checked yes and then she
24  changed it to no and circled it; do you see
25  that?

Page 199

1   A    Uh-huh.
2   Q    You have to say yes or no.
3   A    Oh, yes, I see it.
4   Q    The next question is:  "Is patient still unable
5   to work" and she says no.  "If yes, what is the
6   anticipated date the patient can return to
7   full-time work" and she just says "Anytime."
8   Did you agree with her conclusion?
9   A    Yes, because this was dated 2014, so yes.
10  Q    At what point did you believe that you would not
11  be able to return to the VA whether voluntary or
12  involuntary?
13  A    I always felt and stood ground to not return to
14  the main campus VA.  I always wanted to be off
15  campus.
16  Q    And do you recall having a conversation with
17  your therapist saying that you did not intend to
18  return to work at the VA?
19  A    To the VA main campus, yes.  I always stood that
20  ground.
21  Q    Did you specify main campus?
22  A    Yes.
23  Q    And when you met with Erika DeLong, do you
24  recall telling her that you had no intention of
25  returning to work at the VA?

Page 200

1   A    I told her I was not going to return to work at
2   the main campus.
3   Q    So you would dispute her statement that you said
4   you were not going to return to work at the VA?
5   A    Yes, I would dispute that.
6           (Government's Exhibit W was marked for
7   identification.)
8   Q    Mrs. Katz, I've handed you what's been marked as
9   Government's Exhibit W and this the report that
10  Ms. DeLong prepared and submitted to the
11  Workers' Compensation at the Department of Labor
12  and it is seven pages long.
13          Then after that is another form that she
14  has completed and submitted to the Department of
15  Labor and then the last two pages appear to be
16  her intake form that was completed by you.  Have
17  you seen these documents before?
18  A    No.
19  Q    You've never seen the report?
20  A    I've never seen the report.  This is the first
21  time.
22  Q    Okay.  And what about the form that is attached
23  Bates-stamped 1302?
24  A    I have not seen this.
25          MS. PIZZINO: Renee, maybe this

Page 201

1   a good time to take a break.  I have to use the
2   rest room.
3           MS. BACCHUS: Sure.
4           (A short break was taken.)
5           MS. BACCHUS: Okay.  We're
6   going to go back on the record.  We've been
7   waiting on Ms. Lola.
8   By Ms. Bacchus:
9   Q    We're talking about the Defendant's Exhibit W. I
10  know you said you didn't see the first set of
11  pages, but the last two, are these pages
12  completed by you?
13  A    Oh, these two here?
14  Q    Yes.
15  A    Yes, this must have been health information,
16  yes, this is.
17  Q    Okay.  And you completed this for Dr. DeLong?
18  A    Yes.
19  Q    And I want you to take a look at the last page.
20  Under "Known Medical Problems," there's a
21  question that asks "Previous psychiatric care"
22  and you checked no.
23  A    Okay.
24  Q    Why did you check no; had you not had any
25  previous psychiatric care?

Annette Ryan (K.N.A. Katz) v.
Robert McDonald, Secretary, etc.

**Plaintiff**
**March 2, 2017**

Page 202

1 A    I haven't.  I mean, depression, but not
2      psychiatric care.
3 Q    And how do you define psychiatric care?
4 A    How do I define psychiatric care?
5 Q    Yes.
6 A    I don't think I can answer that.
7 Q    You're a nurse; correct?
8 A    I'm a nurse but...
9 Q    Did you have any psych classes?
10 A   Yes, I had psych classes.
11 Q   When the question asks have you had previous
12     psychiatric care and you checked no, had you had
13     prior mental health treatment?
14 A   I've always gone to my doctor.  Clarify that
15     more, because I don't --
16 Q   Have a problem.
17 A   Psychiatric care, no.  No psychiatric care, no.
18 Q   So you don't classify mental health treatment or
19     counseling as psychiatric care?
20 A   No, I do not.
21 Q   And you don't classify the fact that you had
22     been treated for depression and anxiety prior to
23     March 27th, 2013, as psychiatric care?
24 A   You're asking me personally?
25 Q   Yes.

Page 203

1 A    No.
2 Q    But under psychiatric medication, you list,
3      "Wellbutrin, Adderall, Zoloft, Ativan"; correct?
4 A    But I'm not a doctor, so I can't really
5      speculate on that diagnosis of medication.  With
6      a nurse background, I can't diagnosis.
7 Q    I agree that you cannot diagnosis, but you are
8      aware of what type of medication qualifies as
9      psychiatric medication?
10         MS. PIZZINO: Objection.
11         MS. BACCHUS: Objection noted.
12 Q   Are you aware of what type of medication
13     qualifies as psychiatric medication?
14         MS. PIZZINO: Objection.
15 Q   You can answer.
16 A   Those can be classified under more than just
17     psychiatric medication.  They could be used for
18     many things.  Wellbutrin can be used for
19     smoking.
20 Q   But, obviously, you assumed that it was part of
21     the psychiatric medications, because you listed
22     it; correct?
23         MS. PIZZINO: Objection.  The
24     document doesn't say that.  That's a
25     mischaracterization.

Page 204

1 Q    The documents asks, "If psychiatric medications,
2      give dosage as well" and you list medications
3      and dosages; correct?
4          MS. PIZZINO: Objection.
5      Mischaracterization to the question.
6          MS. BACCHUS: Your objection is
7      noted.
8 A    It says list your medications. "If psychiatric
9      medications, give dosage," and I don't think I
10     did that.
11 Q   You gave dosages though; correct?
12 A   No, I didn't give dosages
13 Q   There's Wellbutrin at 150 milligrams; correct?
14 A   But Wellbutrin can be used for smoking
15     cessation?
16 Q   Were you using it for a smoking cessation?
17 A   No,
18 Q   You don't smoke; do you?
19 A   No.
20 Q   Then it says, "Adderall, 20 milligrams, severe
21     anxiety"; correct?
22 A   No, Adderall, 20 milligrams.
23 Q   So that was separate?
24 A   The severe anxiety is for Zoloft.
25 Q   Then you list "Zoloft, one and a half tablets";

Page 205

1      correct?
2 A    Correct.
3 Q    You list "Ativan and, I assume, prn for sleep
4      and nightmares, ADHD"; correct?
5 A    Correct.
6 Q    I want to go back to your complaint for a
7      minute.  You gave sworn testimony to the EEO
8      investigator; is that correct?
9 A    Show me what you're referring to.
10 Q   I sure will.
11         (Government's Exhibits X and Y were
12     marked for identification.)
13 Q   Handing you what's been marked Government's
14     Exhibit X and Y, do you recognize these
15     documents?
16 A   Yes.
17 Q   Okay.  The first one is an affidavit dated
18     January 28th, 2014; is that correct?
19 A   Yes.
20 Q   And then Exhibit Y is an affidavit dated
21     February 27th, 2014; is that correct?
22 A   Yes.
23 Q   And this was your sworn testimony that you gave
24     to the investigator appointed to investigate
25     your ORM complaint?

Annette Ryan (K.N.A. Katz) v.
Robert McDonald, Secretary, etc.

**Plaintiff**
**March 2, 2017**

Page 206

1   A     Regina Watts, yes.

2   Q     And in your sworn statement, and I don't want to

3   rehash it, I assume that you told the truth

4   during your sworn statements?

5   A     Yes.

6   Q     And one of the things that you said in your

7   sworn statement was that you believed you had

8   been retaliated against, because you were sent a

9   Report of Contact dated October 2012, do you

10  recall that?

11  A     Can you show me that?

12  Q     It starts at the page that is Bates-stamped 217.

13  A     Can you say the question again?

14  Q     Do you recall telling the investigator that you

15  believe that you were being retaliated against

16  when you received the Report of Contact?

17  A     I believe I was being retaliated, because I went

18  outside of the VA to report the crime.

19  Q     Okay.

20  A     And I was told that I should have stayed within

21  the VA, because they have their own police

22  department and I should not have gone outside of

23  the VA to report it.

24  Q     And you believe that you received the Report of

25  Contact as retaliation for reporting the --

Page 207

1   A     I believe for reporting what I did outside of

2   the VA, yes, was one of those.

3   Q     As a result of receiving the Report of Contact,

4   were you ever disciplined?

5   A     I wasn't.  I was on leave at that time.

6   Q     So you never received any type of discipline for

7   the Report of Contact?

8   A     No, I was told by Beth Noelker that it

9   could have been handled in-house.

10            (Government's Exhibits Z and AA were

11  marked for identification.)

12  Q     Okay.  Ms. Katz, I've just handed you what's

13  been marked as Exhibit Z and double A.  Do you

14  recognize these two documents?

15  A     Yes, I do.

16  Q     And Exhibit Z is the Report of Contact that you

17  were complaining about receiving?

18  A     I don't believe that's how I answered it in

19  this, no.

20  Q     Then let's back up.  Maybe I misunderstood your

21  testimony.  Did you believe that the VA was

22  taking some type of retaliatory action against

23  you by sending you this Report of Contact?

24  A     Yes.

25  Q     And is this the Report of Contact that you

Page 208

1         actually received?

2   A     Yes.

3   Q     And this Report of Contact is dated October

4   25th, 2012, and it appears to be typed by Lisa

5   Herman or, at least, prepared by Lisa Herman?

6   A     Yes.

7   Q     And the Report of Contact documents an

8   interaction that happened on October 25, 2012;

9   is that correct?

10  A     Right, but I didn't get it to my home until May.

11  Q     But the actual incident that's described in the

12  Report of Contact documents an incident that

13  happened October 25th, 2012?

14  A     Correct, but I wasn't reprimanded at that time

15  for this.

16  Q     And as a result of receiving the Report of

17  Contact, were you reprimanded in May?

18  A     I was not reprimanded.  I was just sent this via

19  FedEx to my home.

20  Q     Do you have any reason to believe that this

21  Report of Contact was not created in October of

22  2012?

23  A     I don't know when it was created.

24  Q     And you were not reprimanded in October of 2012?

25  A     No, I was not.

Page 209

1   Q     And then according to Government's Exhibit AA --

2   A     Uh-huh.

3   Q     -- this is a leave restriction letter written by

4   Lisa Herman on October 26, 2012?

5   A     Yes, this was given to all staff on the floor.

6   Q     You did receive the leave restriction letter?

7   A     Yes.

8   Q     Can you take out Exhibit O.  It's that big thick

9   ring.

10           MS. PIZZINO: This is L.

11  Q     Okay.  We're getting late in the day.  I must be

12  getting tired.  Sorry, Exhibit H.  It's H and

13  then it's Plaintiff's Exhibit D that page that

14  says Exhibit D outside the Exhibit H.  Do you

15  recall signing this document?

16  A     Yes, that's my signature.

17  Q     And this was a medical release that was given to

18  the investigator for ORM; is that correct?

19  A     Correct.

20  Q     Did you ever provide a copy of this release to

21  the VA?

22  A     I wasn't allowed to communicate with them at

23  that time.

24  Q     So that would be no?

25  A     Yeah.

**Annette Ryan (K.N.A. Katz) v.**
**Robert McDonald, Secretary, etc.**

**Plaintiff**
**March 2, 2017**

Page 210

1  Q   And going back to the other, so we'll go to
2       Exhibit Y, and this is an affidavit that you
3       gave to the ORM investigator, Regina Watts?
4  A   Yes.
5  Q   And you've seen this document before?
6  A   Yes.
7  Q   And you had a chance to review it after it was
8       typed up?
9  A   Yes, a couple of times.
10 Q   Thank you.  And presumably you told the truth
11      during that statement?
12 A   Yes.
13 Q   That's all I wanted to ask you about.
14         (Government's Exhibit BB was marked for
15      identification.)
16 Q   Ms. Katz, I've handed you what has been marked
17      as Government's Exhibit BB, have you seen this
18      document before?
19 A   Yes, I have.
20 Q   And is this your application for Workers'
21      Compensation?
22 A   I thought there was more than this.
23 Q   There may have been more submissions, but this
24      appears to be the actual application part of it.
25      Did you sign this document?

Page 211

1  A   Yes.
2  Q   And I'm going to need you to redact your Social
3       Security off of that.  Just turn it to the side.
4       I'll get to it when we're done rather than
5       stopping now.
6  A   You don't want me to scratch it off?
7  Q   No, because some people may still see it.  Just
8       turn it sideways on the stack, so I make sure
9       that it gets redacted there.  I just want to go
10      through with you a couple of documents before we
11      go on to the next set of questions.
12         (Government's Exhibit CC was marked for
13      identification.)
14 Q   Ms. Katz, I've handed what has been marked as
15      Government's Exhibit double C.  It appears to be
16      a correspondence to you dated May 22, 2013, from
17      the Office of Resolution Management Department
18      of Veterans Affairs.  Have you seen this
19      document before?
20 A   Yes.
21 Q   And did you receive this document on or about
22      May 22nd, 2013?
23 A   I can't recall the exact date.
24 Q   Did you receive it contemporaneous like May or
25      do you recall seeing it like through the

Page 212

1       litigation, I guess, is my question?
2  A   I don't know.  I can't answer that.
3  Q   But you did receive this document at your home?
4  A   Yes.
5  Q   If you turn to the very last couple of pages,
6       there's two pages.  It's Bates-stamped 50 and 51
7       and this is dated May 24th, 2013, as being
8       received.  It is the "Agreement for Mediation
9       and Confidentiality Agreement."  Does your
10      signature appear on the second page to this?
11 A   Yes.
12         (Government's Exhibit DD was marked for
13      identification.)
14 Q   Ms. Katz, I've handed you what's been marked as
15      Defendant's Exhibit DD.  It is a letter to you
16      from the Office of Resolution Management August
17      19, 2013, and it's a "Notice of Receipt of the
18      Discrimination Complaint" for your EEO case?
19 A   Correction, it was sent to my attorney.
20 Q   I'm sorry, to your attorney, you're correct.
21      Have you seen this document before?
22 A   I can't recall.
23 Q   Well, on the second page, it shows that it was
24      cc'd to you at your address?
25 A   Right, but I still can't recall.

Page 213

1  Q   Were you stilled residing at the Westvue
2       address or receiving mail there again?
3  A   Yes.
4         (Government's Exhibit EE was marked for
5       identification.)
6  Q   Ms. Katz, I've handed you Government's Exhibit
7       EE.  It is a letter from the Office of
8       Resolution Management dated October 31st, 2013.
9       It's addressed to your counsel, Pamela Kurt and
10      it is also cc'd to you at your Westvue address
11      and it's dated October 31st, 2013.  It's
12      entitled, "Acceptance of the Mixed Case EEO
13      Complaint of Annette Ryan."  Did you receive
14      this document?
15 A   I can't recall that I did.
16 Q   Were you still receiving mail at the Westvue
17      address around the time of October 31st, 2013?
18 A   Yes, I was.
19         (Government's Exhibit FF was marked for
20      identification.)
21 Q   Ms. Katz, I've handed you what's been marked as
22      Government's Exhibit FF.  It's several pages
23      that were returned to the Office of Resolution
24      Management in your EEO case and your signature
25      appears on several of these pages and I'm just

Annette Ryan (K.N.A. Katz) v.
Robert McDonald, Secretary, etc.

**Plaintiff**
**March 2, 2017**

Page 214

1    wondering if you've seen this document before?
2 A   Yes.
3       (Government's Exhibit GG was marked for
4    identification.)
5 Q   Ms. Katz, I've handed you what has been marked
6    as Government's Exhibit double G.  This is a
7    letter that was provided to your counsel and it
8    informs her that DSZ, Incorporated has been
9    assigned to investigate your case.  And he says
10   the investigator will be contacting you.  Did
11   you see this letter before?
12 A  I don't recall.
13 Q  Did you realize that the investigator worked for
14   an outside corporation, the investigator for
15   your EEO complaint?
16 A  No, I did not.
17      (Government's Exhibit HH was marked for
18   identification.)
19 Q  Ms. Katz, I've handed you what has been marked as
20   Defendant's Exhibit HH.  This is a document that
21   we received from your doctor, Dr. Holmer.
22 A  Uh-huh.
23 Q  And it is dated January 21st, 2014 [sic] and it
24   appears that the call was answered at her office
25   by a Sarah Ferrise and under the message it

Page 215

1    states, "Needs letter to go to Attorney General
2    about the reason she has been off work since
3    4/1/2013, needs to be faxed within the next
4    week, needs to state she's been off because of
5    PTSD due to sexual assault, sleeping issues.
6    Needs to state that she can't go back to work
7    because of that.  The state won't pay her back
8    pay, letter needs to be faxed to attention of
9    Debbie Miller"; do you recall asking for that
10   letter?
11 A  Yes.
12     MS. BACCHUS: I'm going to mark
13   this as I.  As a matter of fact, I know this
14   letter was actually an exhibit in here before,
15   but rather than spending the time to dig it up
16   again, we're going mark it as II.
17     (Government's Exhibit II was marked for
18   identification.)
19 Q  This was a letter that was drafted by Dr. Holmer
20   February 4, 2014, and there's a faxed notation
21   on the bottom that just says faxed 2/4/2014.
22   Did you receive this document by fax?
23 A  I don't believe it went to me.  No, I don't have
24   a fax machine.
25 Q  Does this jog your memory as to whether or not

Page 216

1    this letter was written in response to your
2    request for a letter to the Attorney General
3    that we discussed in Exhibit HH?
4 A   It doesn't jog my memory, no.
5 Q   Did you receive any other letter to your
6    knowledge written by Dr. Holmer during the week
7    that followed January 21st, 2014, with the
8    Attorney General's Office?
9 A   Not that I can recall, no.
10     (Government's Exhibit JJ was marked for
11   identification.)
12 Q  Ms. Katz, I've handed you what's been marked as
13   Government's Exhibit double J.  It appears to be
14   a handwritten letter.  Is this your handwriting
15   on the first page?
16 A  Yes.
17 Q  It states, "I need this paper filled out to
18   extend my medical leave.  The VA is refusing to
19   reassign me to another location.  It's still
20   being fought through my attorney.  My counselor,
21   Wanda, does not want me to return to the same
22   unit due to PTSD and my anxiety and crying and
23   also because the attacker is still permitted to
24   come on the unit whenever he wants.  My attorney
25   has been working with the VA to have me

Page 217

1    reassigned, but at this point the nurse manager
2    and administration refuse to reassign me. I
3    wrote September 1st down in hopes that I will be
4    reassigned"; did I read that correctly?
5 A   Yes.
6 Q   Now you say that they are refusing to reassign
7    you.  Who specifically refused to reassign you?
8 A   Beth Noelker.
9 Q   When did she refuse to reassign you?
10 A  After I would not sign off on the lawsuit.
11 Q  This letter that you wrote to Dr. Holmer is
12   dated for June 11, 2013; do you see that?
13 A  Uh-huh.
14 Q  You have to say yes.
15 A  Yes.
16 Q  And you said that the mediation happened in
17   September; correct?
18 A  I don't know when the mediation happened.
19 Q  Well, if I represent to you that the records
20   indicated it happened in September, as of June
21   11, 2013, who had refused to reassign you?
22 A  It's always been Beth Noelker.
23 Q  Was that prior to June 11th, 2013?
24 A  I can't recall.
25 Q  You also state, "He's allowed to come up to the

**Annette Ryan (K.N.A. Katz) v.**
**Robert McDonald, Secretary, etc.**

**Plaintiff**
**March 2, 2017**

Page 218

1 unit any time he wants," where did you get that
2 information from?
3 A Because Roseann McDevitt was still on that unit
4 and she was working one night and he came up to
5 visit other patients.
6 Q So that was once. Are you aware --
7 A No, that was more than once.
8 Q When you found out that he was still coming up
9 to the unit, did you report that to anyone?
10 A Yes, I did.
11 Q Who did you report it to?
12 A I reported it to Beth and I reported it to Lisa.
13 Q What were you told?
14 A I was told that he is not to come up to the unit
15 and if he does, he has to get a police escort.
16 Q Anything else?
17 A No.
18 Q Were you told that he is a veteran and he's
19 allowed to seek medical treatment at the VA?
20 A Yes.
21 Q That included any of the CBOCs as well?
22 A Yes.
23 Q On these times when he would come up to the unit
24 and Ms. McDevitt was working, did she report any
25 negative interactions with Mr. Garrett?

Page 219

1        MS. PIZZINO: Objection.
2 Foundation.
3 A I can't answer that. I don't know.
4 Q I'm sorry, did she report any negative
5 interactions with Mr. Garrett to you?
6 A She reported it to -- I don't know what you mean
7 by the negative --
8 Q Did -- I'm sorry.
9 A She did report it to management, but then he
10 came back to the floor. And told me, but not
11 any interactions as far as her and him.
12 Q That's what I'm asking. Did she say to you that
13 he made any lewd comments or tried to touch her
14 or anything like that?
15 A No.
16 Q At some point in the fall of 2013, do you recall
17 having a conversation with Wanda Hively that you
18 may need to seek alternative employment while
19 this EEO process is completed?
20 A Yes.
21 Q And what did you do to seek alternative
22 employment in the fall of 2013?
23 A I did flu clinics.
24 Q Is that U.S. Wellness?
25 A Yes.

Page 220

1 Q Anything else?
2 A There was Provant.
3 Q Provant?
4 A Provant, they were all independent companies
5 that did flu shots.
6 Q And do you have any records for working for
7 Provant?
8 A I have my tax information.
9 Q Was that on an as-needed basis or was that
10 full-time employment?
11 A As-needed basis.
12 Q Did you seek out any type of full-time
13 employment?
14 A I tried to, yes.
15 Q Where are you seeking employment?
16 A What dates are you looking at?
17 Q I'm looking at starting in October of 2013 going
18 forward.
19 A Heritage of Hudson.
20 Q Where else?
21 A I did a lot of, like I said, independent work.
22 So there could have been Provant, a lot of
23 nursing companies. There was Total Wellness,
24 U.S. Wellness, there was two different ones,
25 Provant, and then the full time was Heritage of

Page 221

1 Hudson.
2 Q Did you keep any type of log or records of your
3 job search starting in say October 2013?
4 A No.
5 Q You accepted a position at Heritage of Hudson;
6 correct?
7 A Correct.
8 Q I'm sorry, could you --
9        MS. PIZZINO: Oh, you just sent
10 this.
11        (Government's Exhibits KK and LL were
12 marked for identification.)
13 Q All right. First, I want to ask you about
14 Government's Exhibit LL, have you seen this
15 document before?
16 A LL, this one?
17 Q Have you seen this document here before?
18 Yes.
19 Q Was this document completed by you?
20 A Yes, it was.
21 Q And according to the last page -- you signed
22 this document as a person completing the
23 questionnaire on April 17th, 2013?
24 A Uh-huh, yes.
25 Q I'm going to direct you now to Exhibit KK. I

**Annette Ryan (K.N.A. Katz) v.**
**Robert McDonald, Secretary, etc.**

**Plaintiff**
**March 2, 2017**

Page 222

1    will represent to you that these are the
2    documents or a portion of the documents we
3    received from a subpoena issued to Catholic
4    Charities Services and they are the individual
5    progress notes mental health assessment for your
6    treatment April 17, 2013?
7  A    Correct.
8  Q    I want to direct your attention to the page that
9    is Bates-stamped page 106 at the bottom.  I
10    believe it's like six pages in.  It is a note
11    May 3rd, 2013; do you see that?
12  A    Uh-huh, yes, I do.
13  Q    And the last sentence under "Client's Response
14    to Intervention" states "Annette recently spoke
15    with her attorney who plans on contacting the VA
16    about this issue and following protocol with
17    their sexual harassment policy to reassign a
18    worker who has experienced sexual harassment."
19       Was that information that you provided to
20    Ms. Hively?
21  A    Yes.
22  Q    What policy were you referring to?
23  A    I can't recall that.
24  Q    And I believe I asked you previously are you
25    aware of any policy of the VA that requires the

Page 223

1    VA to transfer the victim of a sexual assault
2    and you said no.  Am I recalling that correctly?
3  A    Yes.
4  Q    Turn to the next page which is the Bates-stamp
5    page 105 and it is dated May 23rd, 2013, and
6    under "Client Responses to Intervention" it
7    states, "Annette was able to take a short
8    vacation with her children to come home to a
9    bogus "write up" from the VA."  When you say
10    "write up," are you talking about the Report of
11    Contact that we discussed?
12  A    Yes.
13  Q    When you say "write up," did you consider that
14    to be disciplinary?
15  A    It is a disciplinary.
16  Q    It is?
17  A    Uh-huh.
18  Q    What discipline were you issued?
19  A    I wasn't issued any, but that's in my personnel
20    record.  That is disciplinary.  Anything with a
21    Report of Contact is a disciplinary action.
22  Q    So you believe that at any time a Report of
23    Contact is made, it is disciplinary?
24  A    I believe that was a disciplinary action, yes.
25  Q    Did you check your personnel file to see if it

Page 224

1    was in there?
2  A    I asked Beth Noelker if I could have a copy of
3    my personnel file and she said I have to ask my
4    attorney to get that.
5  Q    Were you aware that your personnel file was
6    available to you on-line?
7  A    No, I wasn't aware of that.
8  Q    Did you request a copy of your personnel file?
9  A    Yes, I did.
10  Q    And was that in your personnel file, the Report
11    of Contact?
12  A    I never received my personnel file.
13  Q    So you don't know if it was in your personnel
14    file?
15  A    I don't know, but that was my boss and that was
16    a negative towards me, so I wanted that out of
17    my file.
18  Q    But you don't know that it was in the file to be
19    taken out of the file?
20  A    No, I don't know that.  I also don't know if
21    it's not.
22  Q    I want to direct your attention to Bates-stamp
23    page 102.  It states under "Client Responses to
24    Intervention" and this was dated June 12, 2013,
25    "A," I'm assuming means Annette, "described the

Page 225

1    process of her perpetrator's grooming behaviors
2    toward her before he began his sexually abusive
3    behaviors toward her.  Annette described her
4    style of avoiding conflict and confrontation and
5    how she recently challenged herself and was
6    assertive by making a p/c to the Union about
7    info she recently received about her
8    perpetrator."  Do you know what p/c stands for?
9  A    No, I do not.
10  Q    Did you make some kind of request to the Union
11    about MD Garrett?
12  A    I don't know what that's referring to except
13    that I went to the Union and reported him.  I
14    don't know what that means.
15  Q    And then on the next page which is dated June
16    19, 2013, it states "Client Responses to
17    Intervention" and the second sentence states
18    "Annette has taken care of her extended FMLA
19    leave, is keeping in contact with a couple of
20    close co-workers and a previous supervisor at
21    another job."  Who were the co-workers you were
22    keeping in contact with during this time?
23  A    Doug Jenison, and Roseann McDevitt.
24  Q    Then under "Progress Goals," it has a statement,
25    "I'm starting to feel better now being away from

Annette Ryan (K.N.A. Katz) v.
Robert McDonald, Secretary, etc.

**Plaintiff**
**March 2, 2017**

Page 226

1  work and safer due to not being there," is that
2  information that you gave to Ms. Hively?
3  A  Yes, it is.
4  Q  And if you would turn to the next page and that
5  is a note from July 29th, 2013 [sic] and under
6  "Significant Life Events" it says, "Annette
7  received a C in the last History class she took
8  due to impaired ability to focus and feel
9  motivated.  The C grade is rare and
10  disappointing for Annette.  She has two classes
11  in the fall, one in the spring and one in the
12  fall of 2014 that she has to repeat due to
13  dropping the class last year when she was going
14  through the sexual harassment and assaults."
15      When you said last year, did you drop a
16  class during 2012 or were you referring to?
17  A  The last semester.
18  Q  So that would have been the fall semester of
19  2012?
20  A  Fall I believe so, yes, yes.
21  Q  Do you recall what class you dropped?
22  A  No, I don't recall.
23  Q  Would that be reflected on your transcript that
24  you withdrew from the class?
25  A  Yes.

Page 227

1  Q  Where were you in school at that time?
2  A  Indiana State University.
3  Q  And the next page which is Bates-stamp page 99
4  and it is note from July 22nd, 2013, the third
5  sentence says, "Annette has a meeting with her
6  attorney and the VA EEO for a mediation session
7  on July 29th about being reassigned to a
8  different location for her final field placement
9  to finish her degree.  She expressed her fears
10  about returning to a hostile work environment
11  with several nurses who are friends of her
12  perpetrator."  Was there some issue about a
13  field placement for your degree?
14  A  Can you?
15  Q  I'm just reading what's in the record here.
16  A  The field placement is I had to be on campus
17  there.
18  Q  And was the field placement part of your job or
19  was that part of your education?
20  A  Part of my education.
21  Q  Did you actually perform your field placement at
22  the VA?
23  A  I did.
24  Q  And when was that?
25  A  During this time.  I can't recall the dates.

Page 228

1  Q  Do you believe it was in 2013?
2  A  Yes.
3  Q  And how many field placements did you perform at
4  the VA?
5  A  One.
6  Q  That was like a student nursing clinical
7  rotation?
8  A  Yes.
9  Q  Do you recall what unit that was on?
10  A  No, I don't.
11  Q  Was it a medical/surgical rotation?
12  A  No, Med-surge was done.  It was a higher -- it
13  was my last year.
14  Q  There's records that indicate that you did a
15  Med-surge rotation in the fall of 2013?
16  A  Well, there's a Med-surge II so it's not
17  Med-surge.  It would be graduate.  I don't
18  know if it was called Med-surge or it was called
19  something else.
20  Q  So the student nursing that you recalled doing
21  at the VA in 2013, where was your assignment at?
22  A  I don't recall the unit.
23  Q  Do you recall what building it was in?
24  A  It wasn't in the spinal, no.  And no, I don't
25  recall the building.

Page 229

1  Q  But it occurred at Wade Park?
2  A  Yes.
3  Q  Do you know how long that student nursing
4  assignment lasted?
5  A  The semester and I don't know, anywhere from ten
6  to 13 weeks.  I can't speculate.  I can't
7  pinpoint the exact.
8  Q  What type of duties were you performing during
9  your student nursing?
10  A  What an RN -- student RN does, everything, as
11  long as I have a preceptor with me.
12  Q  And was your ability to critically think as a
13  nurse affected during the time period that you
14  were doing your student nursing at the Wade Park
15  campus?
16  A  Yes, it was.
17  Q  And did you make any requests for accommodation
18  from either the school or VA during that time
19  period?
20  A  I did it at the VA.
21  Q  Was that your request for accommodation, was
22  that in relationship to your student nursing?
23  A  No.
24  Q  Were there any of your student nursing duties
25  that you felt you were unable to perform as a

**Annette Ryan (K.N.A. Katz) v.**
**Robert McDonald, Secretary, etc.**

**Plaintiff**
**March 2, 2017**

Page 230

1　　result of your inability to think critically as
2　　a nurse?
3　A　　Yes.
4　Q　　Which duties were you unable to perform during
5　　your RN student nursing?
6　A　　When I flunked that rotation, so that kind of
7　　gives the answer.
8　Q　　And who determined the grade that you received
9　　for that rotation?
10　A　　Indiana State University.
11　Q　　Was it simply because of the actual performance
12　　or did you have testing involved like actually
13　　having to sit down and take written exams?
14　A　　And I would take written exams.
15　Q　　Were the written exams part of your grade?
16　A　　Yes.
17　Q　　Did you make any critical mistakes during your
18　　student nursing in terms of patient care?
19　A　　No, I didn't have that total control.
20　Q　　Were you reprimanded for any type of nursing
21　　care that you provided as a student RN?
22　A　　No.
23　Q　　So did you repeat that rotation, that student
24　　nursing rotation?
25　A　　I believe I did.

Page 231

1　Q　　Do you know where you repeated it at?
2　A　　I can't recall.
3　Q　　And turning to the next page, I'm sorry, the
4　　page that's marked 97 which is from an August
5　　5th, 2013 date, under "Describe Staff
6　　Therapeutic Intervention Provided" there is
7　　sentence, last sentence, "Clinician provided a
8　　letter to Annette that she had previously
9　　requested as evidence of her attendance in
10　　therapy to take to her own mediation session."
11　　Is that the August 5th, 2013 letter that we
12　　previously talked about?
13　A　　I can't recall that. I can't answer that. I
14　　don't know.
15　Q　　And under "Client Response to Intervention," it
16　　says "Annette was tearful as she spoke about
17　　recent knowledge of her co-worker having a
18　　mediation session about sexual harassment by the
19　　same perpetrator as her own and the less than
20　　ideal outcome." What do you mean by less than
21　　ideal outcome?
22　A　　She had to sign-off. Roseann had to sign-off
23　　her part in the lawsuit in order for them to
24　　reassign her.
25　Q　　When you say lawsuit, the EEO complaint?

Page 232

1　A　　No, she was part of my -- of our suit. It was
2　　me and her in the beginning.
3　Q　　Your lawsuit wasn't filed in court in 2013;
4　　correct?
5　A　　Right.
6　Q　　So you don't mean an actual lawsuit at the time?
7　A　　Then, no, I'm sorry, I don't know the law terms.
8　Q　　On the next page which is Bates-stamped 96, it
9　　is from August 27th, 2013, under "Client
10　　Response," it says, "Annette was tearful at the
11　　beginning of today's session as she proceeded to
12　　share recent disappointing news about the VA
13　　telling her she could not complete her 90 hour
14　　placement with them for her med./surg. rotation
15　　as she initially had planned for and had been
16　　accepted for." Do you recall telling your
17　　clinician that?
18　A　　The clinician -- I'm trying to think. It's not
19　　a disciplinary action. It was more with money.
20　Q　　And according to page 95, which was from a visit
21　　that happened on September 11, 2013, under
22　　"Client Response," it says, "Annette feels
23　　unable to return to her place of work in the
24　　same building that she was assaulted and
25　　sexually harassed in. She has been refused

Page 233

1　　opportunities to transfer and recognizes needing
2　　to seek employment elsewhere while this lengthy
3　　process of bringing charges to trial occurs.
4　　Annette reviewed why she did not leave her place
5　　of employment earlier."
6　　　　When you say refused a transfer,
7　　specifically you're talking about refused a
8　　transfer during a mediation?
9　A　　I asked for a transfer from the first day that I
10　　reported this, so that's what I'm referring to.
11　Q　　So who actually refused to transfer you?
12　A　　Beth Noelker.
13　Q　　Did she tell you, "I'm not transferring you"?
14　A　　Yes, she did.
15　Q　　When did she tell you that?
16　A　　I can't recall.
17　Q　　So it could have been at the mediation as well?
18　A　　It could have been, but I wasn't dropping the
19　　case.
20　Q　　So you don't know the specific date that Beth
21　　Noelker told you she was not going to transfer
22　　you?
23　A　　No.
24　Q　　That's a no?
25　A　　No.

Annette Ryan (K.N.A. Katz) v.
Robert McDonald, Secretary, etc.

**Plaintiff**
**March 2, 2017**

Page 234

1 Q    At any time did anyone at the VA tell you you no
2    longer had your job on the spinal cord unit
3    during 2013?
4 A    Not until I got that letter.
5 Q    Are you talking about the proposed removal
6    letter in 2014?
7 A    Correct.
8 Q    Did anyone tell you you could not come back to work
9    in the spinal cord unit prior to getting that
10    letter in 2014?
11        MS. PIZZINO: Objection.
12 A    I don't know how to answer that.
13 Q    Let me requalify that.  Did anyone at the VA
14    tell you you could not return to work at your
15    position on the spinal cord unit in 2013?
16 A    They wanted me to go back to work there.
17 Q    So no one told you you could not go back to work
18    there?
19 A    Correct.
20 Q    Next note is page 94.  It's dated September
21    30th, 2013, under "Client Response," it says,
22    "Annette attended a final mediation appointment
23    with her attorney, the mediator was not present,
24    but she was told this was the last attempt
25    before being able to proceed forward in court

Page 235

1    with the lawsuit."  I think I asked you about
2    this earlier.  Does this bring any recollection
3    back as to whether or not the mediator was
4    present?
5 A    I can't answer that.  I don't recall.
6 Q    The next page is page 93 and it is dated October
7    8, 2013.  Under "Client Response to
8    Intervention," it says, "Annette was
9    starting her clinicals (90 hours) at the VA in a
10    different building from where her assault/sexual
11    harassment occurred.  She will make arrangements
12    to complete her second clinical at Summa
13    hospital to exit the VA site as soon as possible
14    due to her mistrust of being treated fairly by
15    the VA Hospital."
16        So does this jog your recollection about
17    when you did your actual student nursing?
18 A    I did do my student nursing.  I never ended up
19    at Summa, because I flunked out again.
20 Q    At the time that you did your student nursing at
21    the VA in presumably the fall of 2013, did you
22    have any interaction with your former co-workers
23    on the spinal cord unit?
24 A    Specifically, I don't know what you're asking.
25 Q    I'm asking the people that you believe were

Page 236

1    harassing or threatening you, did you have any
2    interaction?  Did you run into them?  Did they
3    speak to you, anything like that?
4 A    Yes.
5 Q    And I'm specifying the fall of 2013 while you
6    were doing your student nursing.
7 A    I ran into them, yes.
8 Q    Did you have any interaction with them?
9 A    Nonverbal communication.
10 Q    Such as?
11 A    Not speaking to me at all.
12 Q    Then next page is page 92.  It's from October
13    17, 2013, and it says under "Describe Staff
14    Therapeutic Interventions," the last sentence
15    says, "Encouraged Annette to look at alternative
16    work sites to use her nursing skills."  And then
17    "Client Response," third sentence, "Annette will
18    find different parking to avoid running into
19    anyone she previously worked with at the other
20    building due to this feeling traumatized due to
21    the association with her perpetrator."  This is
22    talking about student nursing?
23 A    Yes.
24 Q    And "Annette will continue to look for
25    alternative sites for continued employment as

Page 237

1    she finishes her RN degree," so is this when you
2    started working at U.S. Wellness doing the flu
3    shots?
4 A    I can't tell you when I exactly started that.  I
5    don't know, but that's not what that's in
6    reference to.  She wanted me to go off-site, not
7    to the VA, but I never ended up there, because I
8    flunked out.
9 Q    This was in reference to going off site to do
10    your student nursing?
11 A    Yes.
12 Q    Can you take a look at page 88 please dated
13    1/28/14.  It says, "Client agreed to transfer
14    for workers and reviewed her diagnosis and
15    history of her recent need for counseling."  Is
16    this when you began to see Diane
17    Setlak-Micheller?
18 A    I can't recall.
19 Q    Do you have any recollection of seeing her in
20    2013?
21 A    It must be, because Diane is the one who signed
22    it.
23 Q    If you'll take a look at page 86 please under
24    "Client Response to Intervention," it says,
25    "Client entered therapy tearfully and processed

Annette Ryan (K.N.A. Katz) v.
Robert McDonald, Secretary, etc.

**Plaintiff**
**March 2, 2017**

Page 238

1 needing a letter from her doctor" -- I'm sorry,
2 are you still looking for the page?
3 A    Yeah.
4 Q    Take your time and let me know when you have it.
5 Ready?
6 A    Uh-huh.
7 Q    Under "Client Response," it said, "Client
8 entered therapy tearfully and processed needing
9 a letter from her doctor for the Attorney
10 General's Office to maintain that she cannot
11 work before April of 2014"; do you recall saying
12 that?
13 A    No, I don't.
14 Q    Do you deny making that statement?
15 A    I don't recall.
16 Q    Do you deny it?
17 A    I don't remember making that statement.
18 Q    Was there some reason that you could not return
19 to work before April of 2014?
20 A    No.
21        (Government's Exhibit MM was marked for
22 identification.)
23 Q    Ms. Ryan, I've just handed you what's been
24 marked as Government's Exhibit MM and this is
25 the records that we received in response to a

Page 239

1 subpoena to Heritage of Hudson.
2 A    Uh-huh.
3 Q    You said you accept employment at Heritage of
4 Hudson?
5 A    Yes.
6 Q    And according to Exhibit MM, it says that you
7 were hired at Heritage of Hudson on April 3rd,
8 2014; do you see where it says seniority on the
9 bottom of page one?
10 A    Yes.
11 Q    And you were hired as an LPN?
12 A    Correct.
13 Q    And if you turn to page two, it shows that you
14 were hired full time?
15 A    Correct.
16 Q    Were you working as a supervisor at Heritage of
17 Hudson?
18 A    Yes.
19 Q    When you started working at Heritage of Hudson,
20 did you notify the VA?
21 A    I notified my attorney.
22 Q    Was it your intent to only work at Heritage of
23 Hudson while your EEO complaint was going
24 forward?
25 A    I can't speculate on what I intended.  I wanted

Page 240

1 to move forward.
2 Q    Did you have any intention of returning to the
3 VA as of the time that you took the job at
4 Heritage of Hudson?
5 A    I don't know what I felt.  I never got an offer
6 so.
7 Q    But at the time that you accepted the position
8 at Heritage of Hudson, you had not been
9 terminated from the VA; correct?
10 A    Correct.
11 Q    If you would turn to Bates-stamp page 2697 of
12 the exhibit, it indicates that your annual
13 salary was $45,760; does that comport with your
14 recollection?
15 A    Yes.
16 Q    Were you eligible for overtime at Heritage of
17 Hudson?
18 A    I don't know if I was.  I can't recall.
19 Q    And under "Job Details," it lists a pay
20 frequency of biweekly and scheduled hours 80
21 hours biweekly.
22 A    Correct.
23 Q    And how long did you work at Heritage of Hudson?
24 A    It was a short time, because I ended up having
25 surgery, because I fell.

Page 241

1 Q    I think I saw in your records that you fell some
2 time in May of 2014; does that sound about
3 correct?
4 A    Yes.
5 Q    After you fell, did you have to go on leave from
6 Heritage of Hudson?
7 A    Yes.
8 Q    Were you on leave or had you resigned before?
9 A    No, I wanted to go back, but I had to have
10 another surgery, so I ended up quitting.
11 Q    And if you will turn to Bates-stamp page 2699,
12 it is termination information and it says that
13 you were terminated, and I don't mean that in
14 terms of fired.
15 A    No.
16 Q    It says, "Terminated September 9th, 2014.  Last
17 day worked was August 17, 2014," does that
18 comport with your recollection?
19 A    Yeah, I don't know the exact date.
20 Q    But around that time frame?
21 A    Yes.
22 Q    And it says, "Did not give notice.  Stated she
23 did not want to be lifting at her age."  Is that
24 information you provided to your employer?
25 A    No, I did not.  I didn't -- the notice, yeah, I

Page 242

1     don't -- I was off.  I just had surgery so.
2  Q     You had had surgery in September?
3  A     I had surgery when I fell.  I had to have
4     another surgery the same place.
5  Q     Well, it indicated that you worked in August, so
6     I thought maybe you went back.
7  A     I did.  I went back, but I wasn't allowed to
8     lift patients or do CPR.
9  Q     So because of your injury, you could not lift or
10     do CPR?
11  A     Yeah.
12  Q     How long were you off after you had had surgery
13     the second time?
14  A     I don't recall.
15  Q     After you left Heritage of Hudson based on the
16     employment records that we have received
17     pursuant to the subpoena, you were applying for
18     that position as a home health nurse?
19  A     Correct.
20  Q     Were those the only jobs you were seeking?
21  A     That and the flu clinics.
22  Q     Flu clinics.  You didn't seek any type of
23     employment in a hospital or clinic?
24  A     No, I did not want to work in a hospital.
25  Q     And when you do the home health, are those paid

Page 243

1     by appointments?
2  A     Correct.
3  Q     And are you guaranteed a certain number of
4     appointments per week?
5  A     There's never a guarantee, no.
6  Q     And you worked for several agencies at the time
7     that you were doing your home health nursing?
8  A     Correct.
9  Q     And when you were doing the home health nursing,
10     you were employed as an LPN?
11  A     Correct.
12  Q     And the home health nursing positions that you
13     applied for paid between like $20 and $25; is
14     that correct?
15  A     Correct.
16  Q     Were you ever eligible for medical benefits when
17     you were working for the different companies
18     doing visits?
19  A     No.
20  Q     What did you do for medical coverage?
21  A     My husband.
22  Q     By the way, when did you get married?
23  A     April 15th.
24  Q     What year?
25  A     2015.

Page 244

1  Q     During the time that you were off at the VA, did
2     you have medical coverage?
3  A     I had medical coverage until they fired me.
4  Q     Up until?
5  A     2014 and then I got Obamacare.
6  Q     And currently you are working at Brookdale in
7     Florida?  You can answer.  I got the records.
8     The Judge will order to give the records so.
9  A     Yes.
10  Q     And are you still doing home health LPN work
11     through Brookdale?
12  A     Yes.
13  Q     Is that on a per visit basis?
14  A     No.
15  Q     Do you have any guaranteed number of visits or
16     do you just have a guaranteed salary?
17  A     I have a guaranteed salary.
18  Q     Is that an hourly salary or a flat rate?
19  A     Hourly.
20  Q     And what's your hourly salary?
21  A     27.
22  Q     Are you guaranteed, at least, 40 hours a week?
23  A     But I work overtime, yes.
24  Q     But you're guaranteed 40 as a baseline?
25  A     Correct.

Page 245

1  Q     And through Brookdale, do you have insurance,
2     health insurance?
3  A     Yes.
4  Q     And what is the cost of your health insurance?
5  A     $800 a month.
6  Q     $800 a month?
7  A     Yes.
8  Q     Do you have any of the paperwork that detail the
9     cost of the various health plans through
10     Brookdale?
11  A     Yes.
12  Q     Can you provide that to your attorney please?
13  A     Yes.
14  Q     I was looking at your payroll stuff --
15         MS. PIZZINO: Excuse me, Renee,
16     can you state specifically the document you're
17     looking for, so I can write it down.
18         MS. BACCHUS: Any information
19     -- you know when you start a new job, your
20     employer gives you the various health plans and
21     they tell you the cost of the health plans and
22     the price of it.
23         (Government's Exhibit NN was marked for
24     identification.)
25  Q     Ms. Katz, I'm going to represent to you that

Annette Ryan (K.N.A. Katz) v.
Robert McDonald, Secretary, etc.

**Plaintiff**
**March 2, 2017**

Page 246

1     these are the documents about your current
2     employment which your attorney has provided to
3     me.
4 A    Okay.
5 Q    And if you will, I'm sorry, unfortunately,
6     they're not numbered in pages, but if you would
7     go to the fifth page in from the back please.
8     It is your pay stub.  It looks like it was
9     December 9th, 2016, and according to the pay
10     stub, you are paying $20.47 biweekly for dental,
11     medical-silver BT, whatever that stands for,
12     $271.71 and vision $12.05; is that correct?
13 A    Correct, and that's biweekly.
14 Q    When you were working at Heritage of Hudson, did
15     you have health insurance through Heritage of
16     Hudson or were you still receiving it through
17     the VA?
18 A    I can't recall.
19 Q    I'm going to hand you a few documents for
20     purposes of identification.  I'd like to believe
21     that after that, we should be getting done.
22        (Government's Exhibit OO was marked for
23     identification.)
24 Q    Ms. Katz, I've handed you what's been marked as
25     Government's Exhibit OO.  I'll represent to you

Page 247

1     that we have subpoenaed the Ohio Victims of
2     Crimes Compensation Program for the records
3     regarding your request for compensation from the
4     sexual assault by MD Garrett.  And these are
5     documents that we received from the Victims of
6     Crime Department.  Have you seen this document
7     before?
8 A    Yes.
9 Q    And did you complete the document?
10 A    Yes.
11 Q    And at the top, it's stamped I believe the
12     actual claim number is v13-41713; does that
13     comport with your recollection?
14 A    Yes.
15 Q    I'm going to hand you what we're going to mark
16     Government's Exhibit PP.
17        (Government's Exhibit PP was marked for
18     identification.)
19 Q    Ms. Katz, I've handed you Government's Exhibit
20     PP which is entitled, "Ohio Victims of Crime
21     Compensation Program, Supplemental Compensation
22     Application."  Have you seen this document
23     before?
24 A    Yes.
25 Q    And at the bottom, it said, "I made an average

Page 248

1     of overtime $5,000 monthly," do you see that?
2 A    With overtime, yes.
3 Q    So you're saying that was your average with
4     overtime?
5 A    Correct.
6 Q    Was overtime guaranteed at the VA?
7 A    No.
8 Q    If you turn to the third page in at the top
9     under section six, there's a statement that
10     said, "The VA made me take advanced sick, so I
11     will be negative sick time," do you see that?
12 A    Yes.
13 Q    Did you apply for advanced sick leave or did
14     they tell you you had to take advanced sick
15     leave in order to be off?
16 A    Told me that I had to take it.
17 Q    That you had to?
18 A    Had to.
19 Q    Are you aware that under the union contract, you
20     were allowed to be off without pay?
21 A    No, I did not.
22 Q    Would you have preferred to be off without pay?
23 A    I had bills to pay.
24 Q    So did you want the advanced sick time?
25 A    Yes.

Page 249

1 Q    And were you also given advanced annual leave?
2 A    Yes.
3 Q    Did you ever pay that advanced sick time or
4     annual leave back to the VA?
5 A    No, not that I can recall.
6        (Government's Exhibit QQ was marked for
7     identification.)
8 Q    I've handed you what's been marked Government's
9     Exhibit QQ.  It is a second Ohio Victims of
10     Crime Compensation Program for Supplemental
11     Compensation Application."  Have you seen this
12     document before?
13 A    Yes.
14 Q    And if you turn to page two, there's a notation
15     that, "The Workers' Compensation will only pay
16     for straight pay, not my overtime in which I
17     worked.  I worked a lot of overtime which was
18     figured out by Debbie Miller."
19 A    Yes.
20 Q    So is that the purpose of the supplemental
21     application was to give compensation for
22     overtime?
23 A    Correct.
24        (Government's Exhibit RR was marked for
25     identification.)

**Annette Ryan (K.N.A. Katz) v.**
**Robert McDonald, Secretary, etc.**

**Plaintiff**
**March 2, 2017**

Page 250

1 Q    Ms. Katz, I'm handing you what's been marked as
2    Government's Exhibit RR.  This appears to be
3    titled, "Request For Full Payment And Waiver Of
4    Reconsideration" and it's in regards to claim
5    number v13-41713-0 and it's dated October 23rd,
6    2013 and states, "I agree with the Attorney
7    General's Finding of Fact and Decision and am
8    requesting that payment be made immediately.  I
9    understand that by signing this document, I am
10    giving up my right to appeal" and it is signed
11    by you on November 6, 2013, on the front page;
12    is that correct?
13 A    Yes.
14 Q    And according to the second page, it appears
15    that for that claim, you were awarded $375.77;
16    is that correct?
17 A    Yes, correct.
18        (Government's Exhibit SS was marked for
19    identification.)
20 Q    Ms. Katz, I'm handing you what's been marked as
21    Government's Exhibit SS.  It too is an awards
22    summary from the Ohio Attorney General Ohio
23    Victims of Crime Compensation Program.  At the
24    top, it says, "Decision Date March 3rd, 2014 and
25    the claim number is S-V13-41713-1; do you see

Page 251

1    that?
2 A    Yes.
3 Q    It appears that you were awarded $130.05;
4    correct?
5 A    Correct.
6 Q    And on the page two of that exhibit is a
7    "Request For Full Payment And Waiver Of
8    Reconsideration" for this claim and, again, it
9    says, "I agree with the Attorney General's
10    Finding of Fact and Decision and am requesting
11    that payment be made immediately.  I understand
12    that by signing this document, I am giving up my
13    right to appeal."  It's signed March 11th, 2014,
14    by yourself?
15 A    Correct.
16        (Government's Exhibit TT was marked for
17    identification.)
18 Q    Ms. Katz, I've handed you what's been marked as
19    Government's Exhibit TT.  The first sheet is a
20    fax sheet and it's to the Ohio Attorney General
21    and it says from yourself.  Page two is dated
22    October 9th, 2014, and it has a claim number
23    V13-41713-2.  And at paragraph four, it states,
24    "You incurred work loss as listed on the
25    attached Detail Expense Exhibit and Work Loss

Page 252

1    Exhibit.  Accordingly, the amounts totaling
2    $32,264.56, as listed on the attached Award
3    Summary, will be paid."
4        And on the very last page of the
5    exhibit is the "Request For Full Payment" for
6    this claim and "Waiver of Reconsideration", and
7    again, it says, "I agree with the Attorney
8    General's Finding of Fact and Decision and am
9    requesting that payment be made immediately.  I
10    understand that by signing this document, I am
11    giving up my right to appeal."  You signed this
12    on October 9th, 2014; is that correct?
13 A    Correct.
14 Q    And I believe you told me previously that your
15    Workers' Comp claim had been approved, your
16    Workers' Compensation claim?
17 A    For which dates?
18 Q    Oh, I'm sorry, related to MD Garrett's sexual
19    assault.
20 A    Yes.
21 Q    And according to the documents I received from
22    Workers' Compensation, once you submitted a
23    documentation that you had a dependent, your
24    claim was paid at three-fourths of your normal
25    hourly salary?

Page 253

1 A    Correct.
2 Q    And do you recall what period of time you
3    actually received the payments from Workers'
4    Comp?
5 A    No, I do not recall.
6 Q    Give me a second.  I have the documents from
7    Workers' Comp.  No, actually, I cannot find that
8    document at this point in time.
9        When you were paid by Workers'
10    Compensation, do you recall how much you
11    received as a lump sum?
12 A    I don't recall.
13 Q    Did you receive any payments from Workers'
14    Compensation in 2016?
15 A    I don't recall.
16 Q    Do you have any records of the payments that you
17    received from Workers' Compensation?
18 A    My attorney did.
19 Q    And your attorney -- if you would have received
20    records of compensation that you received during
21    2016, those would have went to Ms. Kurt?
22 A    Yes.
23 Q    So how would you have been paid; would you have
24    been paid through Ms. Kurt?
25 A    No, it went to my home, but I had to hand over

Annette Ryan (K.N.A. Katz) v.
Robert McDonald, Secretary, etc.

**Plaintiff**
**March 2, 2017**

Page 254

1    the copies to her.
2 Q    So did you receive actual checks?
3 A    Yes.
4 Q    Did you deposit those checks in your account?
5 A    I believe so, yes.
6 Q    So you would have some records of payments that
7    you received from Workers' Comp?
8 A    Yes.
9 Q    I would ask that you review your checking
10    account records and provide us with any copies
11    of payments that you received from Workers'
12    Compensation subsequent to during 2016 or if you
13    received any payments during 2015.
14 A    Okay.
15        MS. PIZZINO: We can go off the
16    record for just a second.
17        (A discussion was had off the record
18    and a short break was taken.)
19        MS. BACCHUS: We're going to go
20    back on the record.
21 Ms. Bacchus:
22 Q    Ms. Katz, under witnesses, in your answers to
23    Interrogatories Number 17, you listed Ted
24    Hunkele and we've already talked about him;
25    correct?

Page 255

1 A    Correct.
2 Q    You listed doctors and counselors identified
3    above. Would that be Wanda Hively, Michelle
4    Setlak?
5 A    I think it's Diane Setlak-Micheller.
6 Q    Thank you. Any other doctors or counselors?
7 A    Just the ones that the VA had me go to.
8 Q    Okay. And you're talking about the examination
9    yesterday?
10 A    Yes, and then Dr. DeLong.
11 Q    You said the VA had you go to. The Department
12    of Labor sent you to Dr. DeLong and Dr. Korikee
13    [phonetic]; correct?
14 A    Correct.
15 Q    And that was part of your Workers' Compensation
16    claim?
17 A    Correct.
18 Q    And then you list Steve Katz, your now husband.
19 A    Correct.
20 Q    What knowledge does Mr. Katz have regarding your
21    claim?
22 A    How I felt, my relationships with the family,
23    how I communicate with people, how tearful I
24    was, and then in our relationship.
25 Q    And did you live with Mr. Katz during 2012/2013

Page 256

1    when these sexual assaults were going on?
2 A    Yes, I mean, back and forth. I mean, I lived
3    there and then I had my own residence.
4 Q    So when you say "lived there," you weren't
5    living with him full time?
6 A    Correct.
7 Q    So were you going and maybe staying a couple
8    nights and then going home?
9 A    Correct.
10 Q    You list Roseann McDevitt and we talked about
11    what she knows; correct?
12 A    Correct.
13 Q    And did Roseann ever see Mr. Garrett sexually
14    harassing you, to your knowledge?
15 A    I don't believe so.
16 Q    And you list Jamila Bell and that's the union
17    rep; correct?
18 A    Correct.
19 Q    Anyone else that we haven't talked about today?
20 A    Not that I can recall.
21        MS. PIZZINO: Didn't we list
22    Lisa Herman on there?
23 Q    No, you did not. Although I do believe that for
24    one of the questions you listed as a witness
25    Nancy LaSalvia; does that sound right?

Page 257

1 A    That's my sister.
2 Q    And what knowledge does she have?
3 A    I guess, just how I am as far as a family
4    member.
5        MS. PIZZINO: Renee, on our
6    initial disclosure, not mine technically, but
7    they were Attorney Kurt's, that's where she
8    listed Beth Noelker and Lisa Herman.
9        MS. BACCHUS: I'm just asking
10    her about her response to Interrogatories.
11 Q    According to the records that we received from
12    Catholic Charities, you stopped going to therapy
13    in 2014; does that comport with your
14    recollection?
15 A    From what I can recall, yes. Diane was the last
16    person I saw there.
17 Q    I'm looking at Exhibit KK, according to Diane's
18    records, the last entry date was in -- I'm
19    sorry, the last entry date was May 2014 and it
20    states that "The client has not been in for
21    several weeks." Does that comport with your
22    recollection?
23 A    Yes.
24 Q    Did you have any other mental health counseling,
25    treatment, or psychological therapy with anybody

Annette Ryan (K.N.A. Katz) v.
Robert McDonald, Secretary, etc.

**Plaintiff**
**March 2, 2017**

---

Page 258

1    following your treatment at Catholic Charities?
2 A   I continued to go to my doctor, Dr. Holmer.
3 Q   Dr. Holmer prescribed medications for you?
4 A   Correct.
5 Q   Did you treat with anyone else regarding your
6    mental health or the issues or diagnosis as a
7    result of your sexual harassment?
8 A   No.
9 Q   Other than Catholic Charities, have you received
10    any other mental health counseling, psychiatric
11    counseling, or psychological counseling from
12    anyone else period?
13 A   No.
14 Q   I'm going to ask you this question and please
15    don't take it the wrong way.  I'm not trying to
16    insult you, but there was a notation in your
17    records from Catholic Charities that stated that
18    you had been sexually assaulted previously.
19    Were you ever sexually assaulted before?
20 A   No.
21 Q   So the notations that said that you had been
22    assaulted at work were incorrect?
23 A   Incorrect.
24 Q   Your tax records seemed to indicate that you may
25    have had some type of self-employment.  Did you

---

Page 259

1    have your own business at any point in time?
2 A   No, that had to do with my divorce and alimony
3    and so no.
4 Q   Okay.  So no self-employment where you had your
5    own business?
6 A   No.
7 Q   There's been some other notations in your record
8    that says basically that part of your damages is
9    that you've been crying regularly.  What do you
10    consider regularly?
11 A   More than usual.  If you talked to me about that
12    earlier on, I would just crumble.  I would have
13    nightmares about him coming to my home.  I was
14    fearful.
15 Q   But I mean, in terms of regularly, are you
16    saying that you were crying for an hour a day or
17    are you crying just when you thought about this
18    incident?
19 A   Sometimes it could have been an hour a day.  I
20    don't know what would have caused the crying.
21    Sometimes it would just come on for no reason.
22 Q   There's also a notation in the records from
23    Catholic Charities from Wanda Hively that you
24    experienced panic attacks; is that true?
25 A   Correct.

---

Page 260

1 Q   Did you ever tell Dr. Holmer that you were
2    experiencing panic attacks?
3 A   I can't recall.
4 Q   There's a notation in your responses to
5    Interrogatories that as part of your treatment
6    you were prescribed massage therapy?
7 A   Correct.
8 Q   According to Dr. Holmer's records, you told her
9    you wanted to try massage therapy, so did you
10    tell her you wanted to do this or did she
11    prescribe it to you?
12 A   She told me that I could feel better doing that,
13    because as a nurse and with the stress that I'm
14    carrying, that would help and that she would
15    write me a script if I wanted to further do
16    this.
17 Q   So did you ever actually go to massage therapy?
18 A   I did.
19 Q   And do you have any records from that?
20 A   I paid for it out of my own pocket.
21 Q   Did she ever write you a script prescribing
22    massage therapy?
23 A   No, she didn't.
24 Q   You say "because of stress," when you say
25    stress, what do you mean stress?

---

Page 261

1 A   Dealing with the continuous thinking about the
2    episodes.
3 Q   Okay.  Under Dr. Holmer's records, there is a
4    list of various stressers and at various dates
5    and times, she would list stressers.  And some
6    of the stressers that she listed for you was
7    financial trouble.  Was that causing you stress?
8 A   Yes.
9 Q   She was listing that you had issues with your
10    daughter in the past; was that causing you
11    stress?
12       MS. PIZZINO: Objection.
13    Vague.
14 Q   I'm just asking.  I don't know if you were or
15    not.  I'm asking.
16 A   Children stressers.
17 Q   One of the other stresses she listed is that you
18    got married.  Was that causing you stress?
19 A   That was the good part, but the stress in a
20    relationship and having to deal with the
21    emotion.
22 Q   One of the other stressers I recall her listing
23    is the fact that you were moving to Florida.
24    Was that causing you stress?
25 A   No, stressing leaving my family; yes.

---

Annette Ryan (K.N.A. Katz) v.
Robert McDonald, Secretary, etc.

**Plaintiff**
**March 2, 2017**

Page 262

1  Q    There's a notation in Dr. Holmer's records that
2       you asked her to send a letter to the Department
3       of Labor Workers' Compensation Program in
4       September of 2016 stating that you could no
5       longer work at the VA Wade Park campus. Why did
6       you ask her for that letter?
7  A    I don't recall it being stated that way.
8  Q    Okay. Do you recall asking her for a letter to
9       be sent to the Department of Labor in September
10      of 2016?
11 A    Yes.
12 Q    Why did you ask her for that letter?
13 A    Because Workers' Comp stated that I had to get a
14      letter from my doctor to re-open the case.
15 Q    So you were trying to re-open your Workers' Comp
16      case?
17 A    Yes.
18 Q    Were you successful in getting that case
19      re-opened?
20 A    No.
21 Q    So you didn't receive any additional
22      compensation?
23 A    No.
24 Q    Did you file another application to get it
25      re-opened?

Page 263

1  A    No.
2            MS. BACCHUS: I think that's
3       about all the questions I have for today. I am
4       not going to conclude the deposition, because
5       there's still some documents outstanding, but
6       pretty much that has to do, I'm assuming, with
7       your damages and I don't think we need to get
8       into any of those issues until after summary
9       judgment unless I receive documents based on
10      what we requested today that deals with your
11      claim, but we're over for now.
12           MS. PIZZINO: I just have a
13      couple.
14           MS. BACCHUS: Sure.
15           REDIRECT EXAMINATION
16  By Ms. Pizzino:
17 Q    At the time that the assault or series of
18      assaults from MD began some time in mid 2013,
19      were you on any medications at the time the
20      assault began?
21 A    No.
22 Q    And when Attorney Bacchus was questioning you
23      earlier, you indicated that you would see
24      co-workers from the spinal cord unit. You named
25      Andrea, Princess, Ebony. Where did you see

Page 264

1       them?
2  A    On the elevator.
3  Q    Okay. And can you tell me about that?
4  A    I was going to my rotation and I was getting off
5       the elevator and they were coming into the
6       elevator, but they didn't see me and until --
7  Q    Did you say "hi" to them?
8  A    Yes.
9  Q    What was their behavior towards you?
10 A    They didn't say nothing. They ignored me as if
11      I wasn't there.
12 Q    Did they say anything to you at all?
13 A    No.
14 Q    Did they say anything to each other?
15 A    Yes.
16 Q    Tell me about that.
17 A    They whispered to each other. I didn't hear
18      what they were saying. I felt very
19      uncomfortable.
20 Q    And you had indicated that you are not being
21      able to perform your job duties. Was there
22      anything other than your inability to
23      concentrate and focus on your nursing tasks that
24      would have prevented you from working?
25 A    Yes.

Page 265

1  Q    Can you tell me what other things may have
2       prevented you from that?
3  A    Going to my counselor, my doctor's appointments,
4       meeting with Pam at the time, my attorney at the
5       time, having to constantly talk about the trauma
6       to my doctors and trying to deal with that.
7  Q    Was there any other physical limitations that
8       you had?
9  A    What do you mean?
10 Q    Well, I mean you mentioned just a few minutes
11      ago that you used to cry a lot. Would that have
12      prevented you from carrying out your nursing
13      duties?
14 A    Yes.
15           MS. PIZZINO: That's all.
16           MS. BACCHUS: Okay. I have
17      some follow-up questions.
18           RECROSS-EXAMINATION
19  By Ms. Bacchus:
20 Q    You said that when you got on the elevator with
21      them, who specifically was on the elevator?
22 A    Ebony Winters, Teresa, I can't think of her last
23      name, Andrea Swails, and Princess Jefferson.
24 Q    And you said they were whispering, but you
25      didn't hear what they were saying?

**Annette Ryan (K.N.A. Katz) v.**
**Robert McDonald, Secretary, etc.**

**Plaintiff**
**March 2, 2017**

Page 266

1  A    No, I just felt uncomfortable as though they
2       were talking about me.
3  Q    But you don't know if they were talking about
4       you; correct?
5  A    I don't know.
6  Q    And when did this happen?
7  A    During my rotation.
8  Q    Do you know what month that would have been in?
9  A    No, I do not.
10 Q    You said you were crying a lot and you said that
11      would have prevented you from doing your job?
12 A    Yes.
13 Q    Okay.  And when you said you were crying a lot,
14      your records seemed to indicate from Dr. Holmer
15      that you were still crying a lot all the way up
16      until December of 2013; is that true?
17 A    She saw me at the times when I had to talk about
18      it, when I had to talk about the issues.  When I
19      don't talk about it, when I don't have to have
20      them raise it or being on the floor having to
21      work in that area, that's different.
22         I'm having to go to my doctor's office and
23      I'm having to deal with those issues, so I'm
24      going to breakdown and cry.
25 Q    But I'm saying the doctor said that you were

Page 267

1       still having crying spells and crying a lot as
2       late as the last FMLA form that she completed
3       for you in September of 2003 [sic] extending
4       your time off until December 2nd, 2003 [sic];
5       was that a true statement?
6  A    Yes.
7  Q    And the crying affected your ability to do your
8       job?
9  A    In 2013?
10        MS. PIZZINO: You said 2003.
11 Q    I'm sorry, I meant 2013.
12 A    In 2013, yes.
13 Q    So the crying a lot affected your ability to
14      perform your job functions as an LPN up until,
15      at least, December 2nd, 2013?
16 A    Correct.
17 Q    And after December 2nd, 2013, were you still
18      having crying spells that affected your ability
19      to do your job?
20 A    I still have crying spells even now, but it's
21      not as frequent.
22 Q    Does it affect your ability to perform as an
23      LPN?
24 A    No.
25 Q    When you were having the crying spells in 2013,

Page 268

1       you believe it would have affected your ability
2       to do your job anywhere other than the Wade Park
3       VA?
4  A    I believe if I don't have a constant reminder of
5       the trauma that I went through, I believe I
6       could do my job, yes.
7  Q    And you said that the appointments with your
8       doctor and counselors and everything, meeting
9       with the lawyers, prevented you from being able
10      to work?
11 A    Absolutely.  I was filing paperwork after
12      paperwork, doctor visits, yes.
13 Q    So that is a function of needing to complete the
14      paperwork and going to your doctor visits and so
15      you physically were unable to go to work?
16 A    Yes.
17 Q    And were these doctor's appointments and
18      counselor's appointments all day?
19 A    Some of them were, yes.
20 Q    And so were you able to work on the days when
21      you did not have to go to the counselors or to
22      the doctor's appointments?
23 A    I didn't work until I did my independent work,
24      you know, working at the flu clinics.
25 Q    Right.  My question is:  Were you physically

Page 269

1       able to go to work on the days that you weren't
2       meeting with the counselors or doctors?
3  A    No.
4  Q    You were not?
5  A    No.
6  Q    So you weren't able to work at all?
7  A    No.
8  Q    Your counselor asked were you on medication at
9       the time before the assault happened.  Do you
10      recall that in September of 2012 you went to see
11      Dr. Holmer and said that you believe you suffer
12      from seasonal depression?
13 A    September 2012?
14 Q    Yes.
15 A    Around the time that I was dealing with MD.
16 Q    But do you deny telling Dr. Holmer that it was
17      seasonal depression?
18 A    I didn't use the word "seasonal depression," no.
19 Q    So if those words appear in her records, she's
20      mistaken?
21        MS. PIZZINO: Objection.
22      Speculation.
23 A    Yeah.
24 Q    What words did you use?
25 A    I don't recall.

Annette Ryan (K.N.A. Katz) v.
Robert McDonald, Secretary, etc.

**Plaintiff**
**March 2, 2017**

Page 270

1 Q    Did you tell her it was as a result of being
2      sexually harassed at work?
3 A    No.
4 Q    Did you tell Dr. Holmer that your father had
5      also suffered from seasonal depression?
6 A    No.
7 Q    And in 2010, do you recall that Dr. Holmer
8      prescribed you anti-depressants?
9 A    In 2010?
10 Q    Yes.
11 A    Yes.
12 Q    So you had been taking anti-depressants before
13      the sexual harassment?
14 A    I went through a divorce, a very bad divorce.
15 Q    So is that a yes, you had been taking
16      anti-depressants?
17        MS. PIZZINO: Asked and
18      answered.  You asked that on Direct and she
19      answered yes.
20 Q    And your divorce was when?
21 A    My divorce was 2007.  I was married for 21 years
22      and I went through a very bad divorce.
23 Q    Were you on anti-depressants prior to getting
24      divorced?
25 A    Yes, my divorce was four years long.

Page 271

1 Q    So you got divorced in 2007 and your divorce was
2      four years long.  Were you on anti-depressants
3      prior to 2003?
4        MS. PIZZINO: Objection.
5      Relevancy.
6 Q    You can answer.
7 A    I don't recall.
8 Q    If your medical records indicated that you were
9      on anti-depressants prior to 2003, would you
10      dispute that?
11 A    No.
12        MS. BACCHUS: I have nothing
13      further.
14        MS. PIZZINO: We'll read.
15      (Deposition adjourned at 5:28 p.m.)
16      (Signature not waived.)
17            - - -
18
19
20
21
22
23
24
25

Page 272

1              SIGNATURE PAGE
2
3 In Re:      Annette Ryan, (K.N.A. Katz) -v- Robert
             McDonald, Secretary of Department of
4             Veterans' Affairs
5 Case Number: 1:15-CV-02384
6 Deponent:   Annette M. Katz
7 Date:       March 2, 2017
8
9 To the Reporter:
10      I have read the entire transcript of my
11 Deposition taken in the captioned matter or the same
12 has been read to me.  I request that the following
13 changes be entered upon the record for the reasons
14 indicated.
15      I have signed my name to the Errata Sheet and the
16 appropriate Certificate and authorize you to attach
17 both to the original transcript.
18
19
20                    _____
                       Annette M. Katz
21      Subscribed and sworn to before me this
22 _____day of _____, 2017
23
24                    _____
                       Notary Public
25 My commission expires: _____

Page 273

1      I have read the foregoing transcript from page 1
2 through page 272 and note the following corrections:
3 PAGE-LINE     REQUESTED CHANGE      REASON FOR CHANGE
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24 _____     _____
25 Annette M. Katz                Date

**Annette Ryan (K.N.A. Katz) v.**
**Robert McDonald, Secretary, etc.**

**Plaintiff**
**March 2, 2017**

Page 274

1   The State of Ohio,  )
                         )  SS:  CERTIFICATE
2   County of Lake.      )

3        I, Mary Bolas-Dietz, a Court Reporter and Notary

4   Public in and for the State of Ohio aforesaid, duly

5   commissioned and qualified, do hereby certify that the

6   within-named witness, Annette M. Katz, was by me, first

7   duly sworn to testify the truth, the whole truth, and

8   nothing but the truth in the cause aforesaid; that the

9   testimony then given by her was by me reduced to

10  stenotypy/computer in the presence of said witness,

11  afterward transcribed and that the foregoing is a true

12  and correct transcript of the testimony so given by her

13  as aforesaid.

14       I do further certify that this deposition was

15  taken at the time and place in the foregoing caption

16  specified, and was completed without adjournment.

17       I do further certify that I am not a relative,

18  counsel or attorney of either party, or otherwise

19  interested in the event of this action.

20       IN WITNESS WHEREOF, I have hereunto set my hand

21  and affixed my seal of office, at Cleveland, Ohio, on

22  this 9th day of March, A.D. 2017.

23

24       _____
         Mary Bolas-Dietz, Court Reporter and
         Notary Public in and for the State of Ohio.
25       My commission expires November 25, 2021.

Annette Ryan (K.N.A. Katz) v.
Robert McDonald, Secretary, etc.

Plaintiff
March 2, 2017

## $

**$12.05 (1)**
246:12
**$130.05 (1)**
251:3
**$20 (1)**
243:13
**$20.47 (1)**
246:10
**$22 (2)**
9:14,20
**$25 (1)**
243:13
**$271.71 (1)**
246:12
**$32,264.56 (1)**
252:2
**$375.77 (1)**
250:15
**$45,760 (1)**
240:13
**$5,000 (1)**
248:1
**$800 (2)**
245:5,6

## [

**[phonetic] (1)**
255:13
**[sic] (5)**
195:17;214:23;
226:5;267:3,4

## A

**AA (2)**
207:10;209:1
**abilities (1)**
175:15
**ability (14)**
6:19;170:24;171:2,9,
14,22;173:18;226:8;
229:12;267:7,13,18,22;
268:1
**able (23)**
74:24;106:15;
110:16;144:8,10,18,20,
22;145:3,6,9,14;
146:18;172:8;174:5;
199:11;223:7;234:25;
264:21;268:9,20;
269:1,6
**above (1)**
255:3
**above-entitled (1)**
129:3
**Absence (3)**
151:11;155:24;158:2
**absent (1)**
176:16

**absolutely (2)**
121:1;268:11
**abusive (1)**
225:2
**accept (1)**
239:3
**Acceptance (1)**
213:12
**accepted (4)**
45:24;221:5;232:16;
240:7
**access (1)**
13:5;17:8
**accommodation (22)**
129:19,22,23;
130:11;169:17,19;
170:1,3,4,7;176:22,25;
177:21;178:19,21;
181:8;182:11,22;
184:1,10;229:17,21
**accompany (3)**
61:8;62:5;91:21
**accompanying (1)**
65:16
**According (31)**
56:23;63:17,23;
69:14;91:24;113:13;
123:17;131:12;139:9;
143:19;148:17;149:22;
150:25;154:3;160:7;
177:18;181:6;182:8,
18;183:25;198:20;
209:1;221:21;232:20;
239:6;246:9;250:14;
252:21;257:11,17;
260:8
**Accordingly (1)**
252:1
**account (2)**
254:4,10
**Accrued (3)**
141:25;151:25;
152:17
**accusations (1)**
98:1
**aCertification (1)**
156:8
**act (10)**
15:6;108:15;141:18,
20;148:12;153:22;
156:10;181:9;185:5,12
**acting (4)**
15:15,19,20;43:23
**action (6)**
129:3;186:1;207:22;
223:21,24;232:19
**actions (7)**
99:10;185:3,10;
187:4,14;193:9,17
**activity (1)**
186:22
**acts (2)**
107:7;109:7

**actual (14)**
10:22;11:25;64:9;
74:1;81:4;178:17;
179:9;208:11;210:24;
230:11;232:6;235:17;
247:12;254:2
**actually (33)**
8:1;14:25;23:22;
43:5;64:8,18,22;66:15;
108:17;140:11;152:8;
160:25;164:13;165:8;
166:11;168:2,5;
172:18;178:6;181:1;
187:25;192:22;193:18,
23;196:21;208:1;
215:14;227:21;230:12;
233:11;253:3,7;260:17
**add (3)**
48:7;50:22;150:24
**Adderall (3)**
203:3;204:20,22
**addition (1)**
178:25
**additional (10)**
22:3;115:6;139:17;
150:19,23;155:15;
157:20;164:2;167:5;
262:21
**address (19)**
7:8;8:3,18;9:4,5;
112:5;177:15,17;
181:3,12,25;183:19;
191:21;193:3;194:3;
212:24;213:2,10,17
**addressed (13)**
121:23,24;127:24;
130:9,18;132:9;
133:14;165:12;166:21;
183:18;189:18;193:1;
213:9
**addresses (1)**
37:5
**ADHD (1)**
205:4
**adjourned (1)**
271:15
**Administration (2)**
5:20;217:2
**administrative (2)**
141:22;186:10
**admission (2)**
186:8,13
**admitted (3)**
186:5,13;187:1
**advance (2)**
152:18,24
**advanced (6)**
248:10,13,14,24;
249:1,3
**advances (1)**
109:25
**advice (1)**
80:15

**advised (8)**
57:14;80:3,6;81:6,9;
89:15;141:16;183:25
**a-e (1)**
179:2
**Affairs (7)**
16:17;87:6;121:25;
130:24;132:5;134:6;
211:18
**affect (2)**
6:19;267:22
**affected (5)**
229:13;267:7,13,18;
268:1
**affidavit (6)**
128:11;129:2,13;
205:17,20;210:2
**affirmation (1)**
167:2
**afraid (3)**
87:24;88:3,5
**African-American (1)**
116:7
**again (26)**
6:25;46:10;47:25;
50:12;77:3;85:11;
92:12;95:17;97:21;
99:20;127:5;132:25;
144:2;154:13;155:14;
156:14;157:8;158:22;
167:18;194:14;206:13;
213:2;215:16;235:19;
251:8;252:7
**against (18)**
58:4,13;71:17;81:15;
82:23;98:2,6;115:14,
18;116:22;185:6,23;
186:21;187:4,14;
206:8,15;207:22
**age (2)**
5:2;241:23
**agencies (1)**
243:6
**Agent (2)**
87:5,10
**ago (4)**
40:21;139:8;149:12;
265:11
**agree (17)**
10:10;87:16;127:8,
21;154:10,24;155:12;
156:19;157:16;159:18;
196:7;198:4;199:8;
203:7;250:6;251:9;
252:7
**agreed (2)**
46:4;237:13
**agreement (3)**
21:10;212:8,9
**ahead (6)**
19:10;43:20;44:21;
52:15,21;54:1
**aide (5)**

**advised (8)** [continued right column]
27:12,15,23;29:18;
116:17
**aides (5)**
27:9,18;28:1,3,18
**aide's (2)**
29:17,23
**AIG (1)**
69:12
**Akron (2)**
8:5;137:14
**AL (1)**
152:17
**alimony (1)**
259:2
**allegation (2)**
41:4;185:22
**allegations (2)**
42:2;70:12
**allege (3)**
73:19;107:8;186:3
**alleged (8)**
41:6,14,19;43:16;
67:24;93:25;163:22;
175:5
**alleges (2)**
106:25;137:11
**alleging (3)**
109:2;136:11;187:13
**allow (1)**
7:2
**allowed (11)**
181:17;183:8;
184:13;186:4,19;
194:14;209:22;217:25;
218:19;242:7;248:20
**almost (1)**
39:8
**along (1)**
178:17
**alternative (4)**
219:18,21;236:15,25
**Although (2)**
184:20;256:23
**always (22)**
23:25;24:1,17,20;
26:6;29:4;78:12;99:21;
100:16;103:4;119:6,6;
120:5,7;167:16;
172:15;184:12;199:13,
14,19;202:14;217:22
**amended (1)**
106:24
**Americans (1)**
181:9
**amount (5)**
9:18;139:15;150:8;
152:14;155:1
**amounts (1)**
252:1
**Anderson (5)**
60:24,25;61:3,8;62:1
**Andrea (14)**
67:21;97:18,19;

Annette Ryan (K.N.A. Katz) v.
Robert McDonald, Secretary, etc.

Plaintiff
March 2, 2017

111:3;117:22;128:23;
159:16;160:19,20,22;
181:16;183:10;263:25;
265:23
**Angela (2)**
110:3,4
**angry (1)**
49:17
**ANNETTE (30)**
5:1,12,14;15:21;
128:11,19;129:14;
133:15;165:15;166:23;
177:19;213:13;222:14;
223:7;224:25;225:3,
18;226:6,10;227:5;
231:8,16;232:10,22;
233:4;234:22;235:8;
236:15,17,24
**annual (5)**
152:1,2;240:12;
249:1,4
**annually (1)**
151:25
**answered (21)**
6:14;92:13;95:8,10,
17;100:23;146:2;
149:17,24;166:13;
171:16,25;172:4;
177:2;187:10;192:2,8;
207:18;214:24;270:18,
19
**anticipated (2)**
198:2;199:6
**anti-depressants (6)**
270:8,12,16,23;
271:2,9
**anxiety (4)**
202:22;204:21,24;
216:22
**anymore (2)**
8:18;181:18
**apologize (4)**
107:17;108:1;197:2,
12
**appalled (3)**
45:22;46:11;62:8
**appalling (1)**
65:25
**apparently (2)**
77:16;91:5
**appeal (3)**
250:10;251:13;
252:11
**appeals (6)**
193:20,21,23;
194:20,22,25
**appear (5)**
44:11;83:7;200:15;
212:10;269:19
**appeared (1)**
71:16
**appears (26)**
87:3;128:10;130:14;

132:14;134:12,25;
135:14,18,24;139:2;
141:5,5;147:15;
150:20;168:6;178:12;
198:11;208:4;210:24;
211:15;213:25;214:24;
216:13;250:2,14;251:3
**application (6)**
210:20,24;247:22;
249:11,21;262:24
**applied (3)**
153:5;158:14;243:13
**apply (3)**
122:23;153:16;
248:13
**applying (2)**
130:6;242:17
**appointed (1)**
205:24
**appointment (2)**
86:9;234:22
**appointments (7)**
243:1,4;265:3;268:7,
17,18,22
**appraisal (1)**
23:6
**approached (1)**
54:8
**appropriate (2)**
109:12;142:2
**Approved (6)**
151:11;153:9,10;
155:24;158:2;252:15
**Approximate (3)**
148:18;154:4;156:15
**approximately (9)**
12:15;28:25;29:13;
52:9;56:25;66:25;67:3,
16;146:12
**April (23)**
55:19;113:14,17;
118:22;122:22;138:11;
140:12;144:1,11;
145:2,19;151:1,15,16;
152:5,5;188:21;
221:23;222:6;238:11,
19;239:7;243:23
**area (5)**
95:14;117:22;144:7;
186:11;266:21
**arguing (1)**
85:25
**around (32)**
26:18,23;27:1;31:20;
32:12;34:14;35:15;
38:13;39:1,15;40:5;
42:12;45:20,25;46:15,
16;49:5,21,25;54:19;
61:6;66:15;71:14;
80:18;82:8;118:22;
122:7,22;161:14;
213:17;241:20;269:15
**arrangements (1)**

235:11
**arresting (1)**
140:6
**as-needed (2)**
220:9,11
**assault (16)**
53:9,10,11;67:24;
80:8;163:22,23;170:9;
174:23;215:5;223:1;
247:4;252:19;263:17,
20;269:9
**assault/sexual (1)**
235:10
**assaulted (8)**
170:20;172:10;
175:7;176:3;232:24;
258:18,19,22
**assaults (3)**
226:14;256:1;263:18
**assertive (1)**
225:6
**assessment (1)**
222:5
**assign (1)**
36:3
**assigned (37)**
12:9,12,18,22,24;
16:5;21:14,17;24:14,
18;25:12;27:7,8,8,9,11,
14;28:13,19,22;29:6,9;
30:8,15;31:1;32:2;
33:8;57:25;58:25;
144:4,21;154:22;
157:5;161:25;162:1;
165:20;214:9
**assignment (2)**
228:21;229:4
**assignments (3)**
27:17;34:22;49:3
**assist (1)**
80:6
**assistant (11)**
22:15,17,20;30:2;
32:3,16,23;42:1,3,24;
73:14
**assistants (2)**
29:24;36:21
**association (1)**
236:21
**assume (8)**
6:4;48:2;52:1;71:24;
100:5,20;205:3;206:3
**assumed (1)**
203:20
**assuming (3)**
100:24;224:25;263:6
**asterisk (1)**
131:17
**Ativan (2)**
203:3;205:3
**attached (4)**
178:7;200:22;
251:25;252:2

**attaching (1)**
177:20
**Attachment (4)**
135:21,24;136:3,4
**attacker (1)**
216:23
**attacks (2)**
259:24;260:2
**attempt (1)**
234:24
**attempted (1)**
181:10
**attendance (1)**
231:9
**attended (1)**
234:22
**attention (11)**
70:21;79:25;83:19;
86:6;87:21;156:7;
195:14,22;215:8;
222:8;224:22
**attorney (86)**
12:4;81:6,12,22;
83:15,16,17;84:5;
85:18,20;86:4;113:2;
119:3,8,15;120:17,23,
24;121:8;122:8,8;
133:19;161:4,6;162:9,
15,22;163:7;165:6;
166:5;168:1,2,6;179:8,
13,14;183:7,8,12;
184:12,14;188:16;
190:8,10,11;191:12,25;
192:3,6,14,22;193:8,
10,14;194:11,16,17,18;
195:10;197:13;198:12;
212:19,20;215:1;
216:2,8,20,24;222:15;
224:4;227:6;234:23;
238:9;239:21;245:12;
246:2;250:6,22;251:9,
20;252:7;253:18,19;
257:7;263:22;265:4
**attorney-client (6)**
84:2,23;85:12,15,22;
120:20
**attorney's (1)**
85:1
**August (25)**
131:12;132:10;
145:16,19,20,20;
146:22;147:5,15;
157:22;158:6;159:3,4,
13,25;161:15;163:6;
189:18;191:13;212:16;
231:4,11;232:9;
241:17;242:5
**authority (2)**
25:19;26:3
**authorization (1)**
128:17
**authorized (1)**
87:10

**available (1)**
11:17;120:6;224:6
**Avenue (1)**
194:3
**average (9)**
28:3;29:3,4,5;30:7,
15,16;247:25;248:3
**avoid (1)**
236:18
**avoiding (1)**
225:4
**Award (1)**
252:2
**awarded (2)**
250:15;251:3
**awards (1)**
250:21
**aware (36)**
41:5,13,18;43:15,21;
44:2;63:4;75:5,7;79:4;
96:14;107:11;113:10;
136:19;137:5,9,13,16;
143:10,13;167:3;
168:12;184:14;185:22,
25;186:14;188:14,19;
189:8;203:8,12;218:6;
222:25;224:5,7;248:19
**away (4)**
6:22;59:2;96:16;
225:25

# B

**Bacchus (66)**
5:5,18;14:22;17:4;
18:22;20:3;47:14;
52:14;56:14;57:10;
59:8,11,19,20;63:18,
21;64:21;71:1;84:4,8;
85:17,24;90:2,7;95:9;
106:13,21;109:14;
110:13,20;118:7,10,12,
14;120:21;124:16,24;
125:3;126:1,6,10;
134:23;144:14;146:3;
169:22;173:7,11,23;
174:2;196:24;201:3,5,
8;203:11;204:6;
215:12;245:18;254:19,
21;257:9;263:2,14,22;
265:16,19;271:12
**back (63)**
11:15;33:24;48:18;
56:1,8;59:12;60:16;
63:16,21;72:1;73:1;
89:15,20;90:3;93:10,
23;95:24;96:7;97:20;
98:25;99:1,14,25;
100:11;102:13,15,16;
103:10,17;113:5;
118:12,18;125:3,18;
134:9,16;139:16;
140:5;161:16;172:23;

Annette Ryan (K.N.A. Katz) v.
Robert McDonald, Secretary, etc.

Plaintiff
March 2, 2017

175:21;182:9;184:25;
191:6;192:18;201:6;
205:6;207:20;210:1;
215:6,7;219:10;234:8,
16,17;235:3;241:9;
242:6,7;246:7;249:4;
254:20;256:2

**background (1)**
203:6

**backs (1)**
103:6

**bad (2)**
270:14,22

**bad-mouthing (2)**
111:21;112:2

**based (2)**
149:6;242:15;263:9

**baseline (1)**
244:24

**basement (2)**
131:20;147:22

**basically (1)**
259:8

**basis (13)**
25:25;30:9;67:10;
74:12;107:9;108:10;
115:14,18;116:14,23;
220:9,11;244:13

**Bates (2)**
70:24;71:4

**Bates-stamp (10)**
81:3,5;153:13,19;
158:1;223:4;224:22;
227:3;240:11;241:11

**Bates-stamped (16)**
77:13;87:22;125:6;
154:4;155:21;156:8;
172:24;189:17;191:17;
193:1;194:1;200:23;
206:12;212:6;222:9;
232:8

**bathroom (7)**
55:12;57:24;58:2,7,
8,12;60:6

**bathrooms (1)**
95:5

**BB (2)**
210:14,17

**beat (2)**
112:18,22;113:19

**became (4)**
9:8;24:12;46:19;
107:11

**bed (2)**
54:19;58:10

**beds (2)**
79:15,15

**began (5)**
52:5;225:2;237:16;
263:18,20

**begin (2)**
30:3;157:15

**beginning (6)**

150:15;155:7,9;
157:14;232:2,11

**behalf (6)**
121:17;133:21;
134:2;151:5;188:7;
196:16

**behavior (9)**
38:21;45:24;52:5;
60:14,17;76:20;
103:14;110:11;264:9

**behaviors (2)**
225:1,3

**behind (2)**
74:14,15

**belief (4)**
25:22,25;47:15;
174:11

**believes (1)**
109:2

**Bell (5)**
62:13,15;67:24;
93:17;256:16

**below (1)**
166:25

**benefits (1)**
243:16

**besides (13)**
41:6,8;43:15;79:5;
92:6,17;95:2;97:1;
105:18;120:1;124:20;
136:6;176:2

**best (8)**
42:10;70:13;103:9;
120:16;163:25;175:13;
190:17,19

**Beth (56)**
88:21,23,24;90:4,9,
14,18,21,21;93:12,16,
22;105:13;110:23;
113:2;114:24;115:8;
118:18,25;119:2,5,7,
11,22;120:2,3,11;
121:5;122:8,19;
137:19;161:5,15,21;
164:25;165:1;167:16,
17,24;168:3;171:19;
172:1,7;175:14,18,19,
20,22;207:8;217:8,22;
218:12;224:2;233:12,
20;257:8

**Beth's (1)**
89:17

**better (2)**
225:25;260:12

**big (2)**
117:22;209:8

**bigger (1)**
197:11

**bills (1)**
248:23

**bird (1)**
8:4

**birth (1)**

59:15

**bit (1)**
197:11

**biweekly (4)**
240:20,21;246:10,13

**black (1)**
115:21

**Blackstone (18)**
25:3;31:6;35:12,14,
17,21;45:16;46:9,14;
95:23,25;96:5,12,14,
17,25;97:12;111:2

**Blackstone's (1)**
35:23

**blank (3)**
150:20;155:15;
157:20

**Blast (1)**
13:21

**blind (7)**
131:20;146:23;
147:22,24;148:1;
161:16,25

**blocked (3)**
112:20,23;115:5

**Bob (1)**
80:2

**bogus (1)**
223:9

**book (1)**
37:4

**boss (1)**
224:15

**both (2)**
49:17;182:24

**bothered (1)**
76:12

**bottom (29)**
38:4;71:21;72:23;
73:7;80:23;81:3,5;
82:22;99:11;100:9,13,
14,16;101:4,5,8,18;
128:3;141:10,13;
147:15;150:19,22;
155:14;157:19;215:21;
222:9;239:9;247:25

**bottoms (1)**
99:19

**box (8)**
134:24;157:13;
167:19;179:7;196:2;
197:20,25;198:1

**boxes (1)**
134:18

**boys (2)**
8:24;9:5

**bra (2)**
49:14;108:7

**break (16)**
6:12,13;55:8;59:6,
10,21;78:11;106:12,
14;110:14,17,21;
118:11;201:1,4;254:18

**breakdown (1)**
266:24

**breaking (1)**
59:5

**breaks (1)**
45:21

**breast (7)**
37:17;49:13,14;
72:16;108:14,16;109:1

**breathing (1)**
10:17

**bring (3)**
72:1;90:10;235:2

**bringing (1)**
233:3

**broke (2)**
54:10;55:2

**Brookdale (4)**
244:6,11;245:1,10

**brought (2)**
88:24;90:9

**brown (1)**
49:18

**Bruce (5)**
181:15,20,25;
182:14;184:23

**BT (1)**
246:11

**building (7)**
78:15;147:25;
228:23,25;232:24;
235:10;236:20

**bunch (1)**
106:17

**business (2)**
259:1,5

**butt (2)**
54:17;72:16

**buttocks (1)**
97:9

**butts (1)**
110:8

### C

**calendar (2)**
55:19;84:17

**call (25)**
5:9;10:10;36:25;
62:24;80:17,21;96:8,8;
98:22;112:1,13,19,21,
24;113:20;114:24;
144:14;161:15,19;
184:6,25;191:24,25;
194:11;214:24

**called (16)**
13:20;28:9;62:7,25;
96:10;97:24;111:20;
112:3,9,20,21;192:2,6;
193:8;228:18,18

**calling (6)**
63:2;97:2;112:6,8;
162:2;182:9

**Calls (23)**
20:1;41:23;47:12;
59:23;84:2;85:9,12;
92:9;108:19;109:9,19;
112:11;115:7;116:25;
142:25;144:13;168:14,
21;169:13,20;185:7;
187:6,16

**came (14)**
27:17;42:4,12;54:6;
58:3,7;63:24;71:15;
122:9;123:17;158:14;
167:13;218:4;219:10

**camel (2)**
65:10;71:9;78:7

**campus (16)**
68:5;81:7,8;145:24;
190:3,23,25;191:6;
199:14,15,19,21;200:2;
227:16;229:15;262:5

**Can (134)**
5:10;7:8;10:8;11:12;
12:4;13:14;15:9;16:6,
19,24;19:3;20:2,7,20,
22;21:16;24:25;25:5;
26:1,19;27:2;28:2;
29:15,24;31:13;32:16,
18;34:22;37:14;38:2;
40:2,9;42:16;47:15;
49:5,8;50:4;53:17;
54:1;55:20;56:7,8;
61:14;64:14;65:1;
66:22;69:6;70:23;73:1;
76:8;79:16;81:24;83:3;
86:4,17;89:6;90:23;
92:11,14,23;95:12,19;
96:23;98:7;99:4;
101:15;104:10;106:11,
13;108:20;109:13,24;
110:19,20;116:25;
117:25;121:10;122:6;
124:13;125:17;126:12,
15,19;127:1,8,20;
132:22;136:10,17;
138:1,6;139:5,13,14;
141:13;152:9,25;
164:8;166:14;168:16;
171:1,20;173:21;
174:10;175:24;177:3;
179:23;184:16;187:8,
18;198:3;199:6;202:6;
203:15,16,18;204:14;
206:11,13;209:8;
216:9;227:14;237:12;
244:7;245:12,16,17;
249:5;254:15;256:20;
257:15;264:3;265:1;
271:6

**cancelled (1)**
160:10

**capacity (2)**
58:15;171:1

**capital (2)**

Annette Ryan (K.N.A. Katz) v.
Robert McDonald, Secretary, etc.

Plaintiff
March 2, 2017

34:4,4
**car (8)**
37:18,18;39:17,18;
78:12,13,17,19
**care (32)**
10:16;29:21;58:1;
115:1,2;129:8;130:20;
131:6;133:24;142:11,
12,13,16,21;148:10;
153:21;156:9;165:13;
166:20;201:21,25;
202:2,3,4,12,17,17,19,
23;225:18;230:18,21
**carrying (1)**
260:14;265:12
**cars (1)**
78:25
**case (14)**
82:13;126:4;162:17,
19;182:20;185:1;
212:18;213:12,24;
214:9;233:19;262:14,
16,18
**categorize (1)**
53:6
**Catholic (11)**
132:9;163:5;188:12,
15;195:9;222:3;
257:12;258:1,9,17;
259:23
**caused (4)**
55:9;133:10;187:2;
259:20
**causing (4)**
261:7,10,18,24
**CBOC (4)**
129:24;131:19;
137:14;147:21
**CBOCs (1)**
218:21
**cc (2)**
183:22;211:12
**cc'd (3)**
177:14;212:24;
213:10
**cell (12)**
37:6,9;64:4,6,11,12,
18,19,22,24;65:18;92:7
**center (2)**
30:23;88:3
**central (1)**
30:20
**certain (4)**
15:6,7;100:18;243:3
**Certification (9)**
131:5;133:24;
140:17;148:9;151:8;
152:13;153:20;179:9,
25
**certified (2)**
5:3;166:2
**cessation (2)**
204:15,16

**chair (1)**
50:11
**challenged (1)**
225:5
**chance (6)**
16:25;45:8,14;47:24;
179:21;210:7
**change (8)**
9:15;27:22;34:22;
38:1;167:4;168:7,10;
192:12
**changed (3)**
37:25;38:3;198:24
**characterization (1)**
89:25
**charge (16)**
26:17;27:4,5,6,19;
35:25;49:2,4,6,7,13,18;
103:4;104:5;108:7,24
**charged (1)**
186:14
**charges (6)**
112:17;122:10,11,
12;133:8;233:3
**charging (1)**
140:6
**Charities (11)**
132:9;163:5;188:12,
15;195:9;222:4;
257:12;258:1,9,17;
259:23
**charting (1)**
71:16
**check (11)**
64:14;65:1;149:18,
23;150:2;154:15;
155:6;156:24;158:4;
201:24;223:25
**checked (4)**
150:13;198:23;
201:22;202:12
**checking (2)**
152:1;254:9
**checks (6)**
157:13;196:5;
197:20;198:1;254:2,4
**chief (1)**
130:24
**children (2)**
223:8;261:16
**choose (3)**
18:1,3,5
**chronic (1)**
142:14
**circled (1)**
198:24
**circumstances (1)**
107:5
**claim (17)**
5:23;101:13;195:24,
24;247:12;250:4,15,
25;251:8,22;252:6,15,
16,24;255:16,21;

263:11
**claiming (1)**
168:12
**claims (2)**
60:13;98:24
**clarification (2)**
34:2;126:3
**clarify (15)**
14:23;16:19;21:16;
26:1,19;37:14;47:10;
53:17;55:23;59:23;
83:3;90:8;104:10;
145:2;202:14
**class (5)**
226:7,13,16,21,24
**classes (4)**
11:9;202:9,10;
226:10
**classified (1)**
203:16
**classify (2)**
202:18,21
**Cleveland (16)**
60:12;81:16;82:1,20,
23;83:2;88:3;91:5,12,
16,21;92:20;93:8;
113:6;129:24;140:5
**client (16)**
127:13;223:6;
224:23;225:16;231:15;
232:9,22;234:21;
235:7;236:17;237:13,
24,25;238:7,7;257:20
**Client's (1)**
222:13
**clinic (1)**
242:23
**clinical (2)**
228:6;235:12
**clinicals (1)**
235:9
**Clinician (3)**
231:7;232:17,18
**clinics (4)**
219:23;242:21,22;
268:24
**close (3)**
74:20,21;225:20
**closed (2)**
77:25;184:2
**closet (22)**
55:5;73:16,20,23,25;
74:3,9,11,20,23;75:2,
12,19;76:3;77:1,4,8,9,
10;79:9,14;94:8
**closet/linen (1)**
79:14
**closing (1)**
185:1
**coats (1)**
39:19
**comfortable (4)**
35:19;80:5;91:18;

105:16
**coming (3)**
218:8;259:13;264:5
**commenced (3)**
148:19;154:5;156:15
**comments (26)**
38:5,7,18;39:12,14;
43:13,18;45:24;51:14;
52:1;53:13;58:11;
63:25;65:9,12,13;71:9;
88:17;94:4;95:6;97:9;
99:21;102:2;118:5;
157:20;219:13
**common (1)**
114:16
**communicate (2)**
209:22;255:23
**communication (2)**
36:9;236:9
**communications (1)**
194:17
**Community (4)**
129:8;130:20;
165:13;166:20
**Comp (6)**
252:15;253:4,7;
254:7;262:13,15
**companies (3)**
220:4,23;243:17
**Compare (1)**
134:19
**compared (1)**
134:25
**Compensation (26)**
158:15,19;187:22;
188:6,8;200:11;
210:21;247:2,3,21,21;
249:10,11,15,21;
250:23;252:16,22;
253:10,14,17,20;
254:12;255:15;262:3,
22
**complained (1)**
186:6
**complaining (2)**
103:6;207:17
**complaint (32)**
5:23;106:25;116:13;
117:4;122:15;128:18;
131:10,15;132:6;
134:13;136:12,13,20;
137:1,4,22;146:22;
147:4,7,7,13,13;
158:24;159:1,2;205:6,
25;212:18;213:13;
214:15;231:25;239:23
**complaints (3)**
107:6;124:20;137:6
**complete (16)**
15:22;18:16;106:3;
133:11;134:15,25;
177:22;178:23,25;
179:4;182:20,23;

232:13;235:12;247:9;
268:13
**completed (17)**
69:23;129:19;
132:18,19;134:1;
142:3;148:14;153:25;
179:6;197:15;200:14,
16;201:12,17;219:19;
221:19;267:2
**completely (1)**
45:15
**completing (1)**
221:22
**comport (6)**
92:1;240:13;241:18;
247:13;257:13,21
**computer (20)**
11:18;12:8,21;13:2;
15:12;16:20,23;17:6,7,
9,23,24;18:12,13,14;
59:4;64:25;66:13;
68:21;71:15
**computers (1)**
50:8
**computer's (1)**
13:5
**concentrate (1)**
264:23
**Concern (6)**
132:10;133:15;
163:6,19;165:13;
166:22
**conclude (1)**
263:4
**concluded (1)**
188:19
**conclusion (23)**
20:2;47:13;92:10;
109:10,20;116:25;
142:25;144:13,15;
155:12;156:19;157:17;
168:15;169:14,21;
177:2;185:8;187:7,17;
189:5;196:7;198:5;
199:8
**conclusions (1)**
151:8
**Condition (25)**
131:7;134:1;142:10,
15;143:8,14,20;148:11,
19,22;149:15;150:11;
153:22;154:5,6,15;
155:4;156:10,15,17,23;
157:11;169:7;174:18,
21
**conditions (2)**
15:7;107:3
**condo (1)**
194:6
**conduct (3)**
48:20;51:18;96:18
**conference (2)**
42:13;45:20

**Annette Ryan (K.N.A. Katz) v.**
**Robert McDonald, Secretary, etc.**

Plaintiff
March 2, 2017

**Confidentiality (1)**
212:9
**confirm (1)**
6:25
**confirmation (5)**
129:18;178:20,23;
182:21;183:12
**confirmations (1)**
166:7
**conflict (2)**
163:24;225:4
**confrontation (1)**
225:4
**consider (2)**
223:13;259:10
**considered (5)**
19:21,25;23:11,12;
56:4
**consist (1)**
190:20
**consisted (1)**
193:13
**constant (3)**
76:7;111:12;268:4
**constantly (3)**
79:4,8;265:5
**contact (42)**
111:4,13;115:3;
120:24;137:24;138:4;
164:3;167:6;177:24;
181:10,11,13,17;183:9;
184:13,21;190:6,7,9,
11,14;194:14;195:1;
206:9,16,25;207:3,7,
16,23,25;208:3,7,12,
17,21;223:11,21,23;
224:11;225:19,22
**contacted (8)**
80:2,11;111:9;
115:11;181:18;190:8,
10;192:14
**contacting (3)**
80:9;214:10;222:15
**contained (1)**
11:22
**contemporaneous (2)**
53:16;211:24
**continue (3)**
101:17;165:22;
236:24
**continued (6)**
33:7;101:19,22;
165:18;236:25;258:2
**continuing (1)**
169:23
**continuous (5)**
139:15;150:10;
155:3;157:10;261:1
**contract (5)**
21:11;143:11,15,19;
248:19
**control (2)**
121:12;230:19

**convenience (1)**
177:23
**conversation (33)**
35:1,16;36:2;44:9,
11;46:1;47:19;48:10,
10;60:16,18;61:23,25;
75:8;96:12;97:19,22,
25;98:5,15;111:23;
114:20;120:1;122:21;
123:1;182:12,14;
183:2,11;184:8;185:2;
199:16;219:17
**conversations (19)**
44:15,24;46:8,10;
48:14;85:9;96:17,21,
24;97:1,11;110:10;
111:24,25;118:21;
119:22;120:17;122:17;
184:22
**copies (8)**
89:6;121:16;124:11;
125:11;164:21;166:7;
254:1,10
**copy (26)**
11:25;12:4;14:20;
21:10;68:25;81:21;
83:12;84:21;123:25;
125:7;134:13;139:3;
147:12;151:6;166:3;
167:7,14;168:8;
178:14;179:6,21;
194:8,10;209:20;
224:2,8
**cord (30)**
10:8,9,10,23;14:10;
21:14,18;22:4,8,12;
25:7;41:5,18;43:1;
62:3;110:24;111:4;
113:23;115:10;116:21;
117:17;144:4;174:6;
175:16;176:1;234:2,9,
15;235:23;263:24
**corner (1)**
72:13
**corporation (1)**
214:14
**Correction (1)**
212:19
**correctly (3)**
148:24;217:4;223:2
**correspondence (2)**
191:11;211:16
**cost (3)**
245:4,9,21
**counsel (18)**
64:15;66:23;81:25;
121:17;125:11,17,21;
127:13,20;163:10;
164:5;173:9;177:15;
180:14;183:23;194:24;
213:9;214:7
**counseling (2)**
202:19;237:15;

257:24;258:10,11,11
**counselor (6)**
86:10;131:24;
198:13;216:20;265:3;
269:8
**counselors (6)**
140:4;255:2,6;268:8,
21;269:2
**counselor's (1)**
268:18
**County (4)**
82:4,6;185:20;
186:15
**couple (16)**
31:23;40:5,7;76:14,
18;86:12;93:14;119:5,
10;160:10;210:9;
211:10;212:5;225:19;
256:7;263:13
**court (15)**
6:8;7:4;29:11;40:6;
46:25;77:18;82:3,16;
83:7;85:6;116:2;
125:14,15;232:3;
234:25
**coverage (3)**
243:20;244:2,3
**co-worker (3)**
163:23;165:17;
231:17
**coworkers (1)**
36:12
**co-workers (5)**
117:17;225:20,21;
235:22;263:24
**CPR (2)**
242:8,10
**create (1)**
83:22
**created (3)**
107:3;208:21,23
**Crime (11)**
168:7;195:17,24;
196:4;197:14;198:22;
206:18;247:6,20;
249:10;250:23
**Crimes (2)**
195:11;247:2
**criminal (3)**
81:10;82:12;87:7
**Crisis (1)**
133:19
**criteria (1)**
142:17
**critical (7)**
29:20;170:22;171:6,
22;172:9;175:15;
230:17
**critically (8)**
146:7,8,10,11;174:5;
175:5;229:12;230:1
**crossed (2)**
52:10;112:4

**CROSS-EXAMINATION (1)**
5:4
**crossing (1)**
52:19
**cruise (2)**
40:14,16
**crumble (1)**
259:12
**cry (2)**
265:11;266:24
**crying (15)**
216:22;259:9,16,17,
20;266:10,13,15;267:1,
1,7,13,18,20,25
**current (3)**
7:8;166:24;246:1
**currently (4)**
154:21;157:5;
165:20;244:6
**curtain (1)**
77:25
**cut (2)**
47:25;48:1
**cutting (1)**
48:4
**Cuyahoga (4)**
82:4,6;185:20;
186:15

## D

**dad's (2)**
80:2,13
**daily (4)**
13:12,15,21;39:9
**damages (3)**
5:23;259:8;263:7
**danger (1)**
81:13
**date (47)**
31:17;50:2;54:18;
55:16;57:2,8;59:15;
60:6;64:9;65:1;66:18;
72:17;74:1;77:14;81:4,
4;82:7;99:12,17;
113:15;115:19;117:15;
120:11;124:3;135:11;
137:17;138:24;141:14;
148:19;154:4;156:15;
160:5;178:2;180:16;
181:11;196:5;197:21,
22;198:2;199:6;
211:23;231:5;233:20;
241:19;250:24;257:18,
19
**dated (54)**
14:21;64:8,9;69:22;
70:5;87:2;128:23;
129:4,9,14;130:2,10,
17;132:10;133:15,20;
146:22;147:4,15;
153:2;156:2;163:6,17;
165:11;166:20;173:24;

174:22;180:11,23;
182:1;183:19;191:20;
194:2;196:17;198:17;
199:9;205:17,20;
206:9;208:3;211:16;
212:7;213:8,11;
214:23;217:12;223:5;
224:24;225:15;234:20;
235:6;237:12;250:5;
251:21
**dates (19)**
40:10;55:23;64:14;
66:22;107:7;120:4;
122:1;144:25,25;
150:15;151:18;152:8,
11;155:8;157:14;
220:16;227:25;252:17;
261:4
**date-stamped (1)**
66:19
**daughter (1)**
261:10
**Dawn (11)**
22:18;26:17,23;31:9;
50:18,19;80:5;103:2,3;
105:9,11
**day (45)**
27:22;28:2,2,12,16,
16,20,20;30:4;54:5;
55:10,14,15;57:19;
58:24;62:7;63:7,8;
66:16;69:24;72:19;
90:25;99:5;100:19;
101:18,20;117:4,5;
120:1;123:5;131:19;
138:6;140:11;147:21;
169:25;173:13;176:23;
188:10;195:20;209:11;
233:9;241:17;259:16,
19;268:18
**days (8)**
29:7,7,8;30:7,9,10,
11,12,14,17,17;117:16;
126:5;140:3;165:7;
268:20;269:1
**day-to-day (2)**
30:9;67:10
**DD (2)**
212:12,15
**deal (3)**
261:20;265:6;266:23
**Dealing (2)**
261:1;269:15
**deals (1)**
263:10
**dealt (2)**
119:6;122:19
**Debbie (2)**
215:9;249:18
**deceased (2)**
96:14;111:8
**December (12)**
130:2,3,10;157:16;

**FINCUN-MANCINI -- THE COURT REPORTERS**
**(216) 696-2272**

Annette Ryan (K.N.A. Katz) v.
Robert McDonald, Secretary, etc.

**Plaintiff**
**March 2, 2017**

158:5,9;178:1;246:9;
266:16;267:4,15,17
**Decision (4)**
250:7,24;251:10;
252:8
**decisions (5)**
29:20;170:22;171:7,
23;172:9
**deep (1)**
175:8
**Defendant's (13)**
16:13;56:19;70:3,9,
9;87:1;91:11;136:7;
181:24;197:8;201:9;
212:15;214:20
**define (2)**
202:3,4
**defined (5)**
94:1;142:10;143:10,
15;181:8
**defining (1)**
19:16
**definition (3)**
47:21;54:1;170:13
**degree (3)**
227:9,13;237:1
**delegate (2)**
29:24,25
**delegating (1)**
30:1
**deliver (1)**
166:1
**delivered (2)**
167:24;172:18
**DeLong (7)**
188:7,19;199:23;
200:10;201:17;255:10,
12
**DeLong's (1)**
188:24
**Delores (1)**
5:19
**denied (1)**
75:5
**dental (1)**
246:10
**deny (6)**
18:9;60:18;93:12;
238:14,16;269:16
**Department (39)**
16:16;41:4;63:12,14,
17,24;69:24;73:8;87:6;
88:20;91:6,13,16,20,
25;92:21;93:8;97:13;
104:16;110:23;113:7;
114:10;118:17;121:25;
130:23,25;132:5;
134:6;137:23;138:3;
188:8;200:11,14;
206:22;211:17;247:6;
255:11;262:2,9
**dependent (1)**
252:23

**depicted (1)**
66:11
**deposit (1)**
254:4
**deposition (5)**
10:7;106:16;191:2;
263:4;271:15
**depression (10)**
86:8,15,18,23;202:1,
22;269:12,17,18;270:5
**describe (5)**
78:6;92:16;176:11;
231:5;236:13
**described (5)**
104:7;108:2;208:11;
224:25;225:3
**description (7)**
14:1,7,9,11,24;149:5,
7
**Desi (6)**
73:13;75:16,16,18;
77:5;79:20
**designations (1)**
28:9
**destroy (1)**
197:3
**detail (2)**
245:8;251:25
**Details (1)**
240:19
**Detective (3)**
113:8,17;114:6
**determined (2)**
196:6;230:8
**Devitt (1)**
59:24
**diagnosis (5)**
203:5,6,7;237:14;
258:6
**Diane (5)**
198:13;237:16,21;
255:5;257:15
**Diane's (1)**
257:17
**difference (1)**
29:16
**different (17)**
15:19;24:15,20;
32:16,22;144:23;
164:1;165:21;190:1,4;
191:4;220:24;227:8;
235:10;236:18;243:17;
266:21
**differential (1)**
9:22
**difficult (2)**
6:8;7:4
**difficulties (2)**
10:18,18
**dig (1)**
215:15
**direct (14)**
70:21;83:19;85:23;

86:6;87:21;156:7;
195:14,22;196:4;
198:22;221:25;222:8;
224:22;270:18
**directed (5)**
20:18;85:25;109:7;
117:10;181:16
**directing (3)**
49:3;79:25;85:16
**direction (1)**
26:5
**directly (7)**
42:5;122:19;145:8;
151:3;164:15,22;
167:13
**directs (1)**
85:21
**Disabilities (1)**
181:9
**disability (16)**
168:13,19,20,25;
169:9,10,11,15,16,17;
170:2,7,11,14,17;181:8
**disagree (1)**
151:7
**disappointing (2)**
226:10;232:12
**disciplinary (7)**
223:14,15,20,21,23,
24;232:19
**discipline (5)**
25:19;26:3;98:12;
207:6;223:18
**disciplined (1)**
207:4
**disclosing (1)**
59:22
**disclosure (2)**
97:12;257:6
**discovery (3)**
65:19;124:18;180:14
**discretionary (1)**
131:1
**discriminated (3)**
115:14,18;116:22
**discrimination (9)**
14:14;15:4;17:21;
116:14;131:11,16;
134:14;147:14;212:18
**discriminatory (2)**
186:20;187:4
**discuss (3)**
37:12,16;119:13
**discussed (4)**
89:22;111:11;216:3;
223:11
**discussion (11)**
42:12,14;47:11;54:7;
63:20;76:5;100:2,8;
124:15;177:20;254:17
**discussions (1)**
37:20
**Disorder (1)**

165:16
**dispute (9)**
57:2;113:15;141:3;
160:8;195:19;196:10;
200:3,5;271:10
**disputing (1)**
161:11
**disrespect (1)**
5:10
**distinction (1)**
29:22
**distress (1)**
133:9
**distressed (1)**
197:19
**divorce (8)**
259:2;270:14,14,20,
21,22,25;271:1
**divorced (2)**
270:24;271:1
**divulge (1)**
85:14
**doctor (29)**
89:14;119:17;
156:11;162:8,10,24;
163:8;164:9,16;
172:12,18,25;176:7;
179:3;189:11;190:21,
24;191:8;202:14;
203:4;214:21;238:1,9;
258:2;262:14;266:25;
268:8,12,14
**doctors (4)**
255:2,6;265:6;269:2
**doctor's (8)**
167:12,13;173:14;
189:10;265:3;266:22;
268:17,22
**document (66)**
16:18,19,22;17:3;
56:21;69:7,8;70:6;
85:3;127:14,18;130:4;
134:4,11;135:9;
138:19;147:8;148:7,9,
14,17;149:20,22;
150:7;151:1,3;153:20;
160:9;162:12;168:5,9;
177:9;180:6,13,15;
195:8,20;196:19;
197:10;198:18;203:24;
209:15;210:5,18,25;
211:19,21;212:3,21;
213:14;214:1,20;
215:22;221:15,17,19,
22;245:16;247:6,9,22;
249:12;250:9;251:12;
252:10;253:8
**documentation (20)**
83:22,25;84:7,25;
85:2,8;121:2,3,4;
128:6;162:24;165:25;
178:22;179:1,24;
182:24;183:4;184:3,7;

252:23
**documentations (1)**
98:21
**documented (1)**
84:13
**documenting (4)**
83:21;84:10,12;85:8
**documents (22)**
125:22;136:6;
178:13;180:7;194:21;
196:22;200:17;204:1;
205:15;207:14;208:7,
12;211:10;222:2,2;
246:1,19;247:5;
252:21;253:6;263:5,9
**done (6)**
48:1,3;193:15;211:4;
228:12;246:21
**door (5)**
49:21;74:14,15,16;
77:12
**doors (2)**
49:16;75:24
**dosage (2)**
204:2,9
**dosages (3)**
204:3,11,12
**double (4)**
207:13;211:15;
214:6;216:13
**Doug (19)**
24:25;26:21;31:5;
32:10;34:5;35:12,13;
45:5,6,17,19;46:3,15;
111:8,9,12,22;113:2;
225:23
**Doug's (1)**
34:9
**down (17)**
6:9;7:5;38:25;54:11;
55:2,8;57:15;59:5;
74:10;75:24;78:6;
128:2;196:2;197:1;
217:3;230:13;245:17
**Dr (45)**
134:1;139:9;140:14,
16,25;141:2;149:8;
150:25;151:3,7;
153:25;155:18;157:22;
163:12,17;164:20;
165:14;167:9;173:24;
179:17,18,25;191:1,9;
196:16;197:15;201:17;
214:21;215:19;216:6;
217:11;255:10,12,12;
258:2,3;260:1,8;261:3;
262:1;266:14;269:11,
16;270:4,7
**drafted (1)**
215:19
**draw (1)**
27:20
**Drive (8)**

**FINCUN-MANCINI -- THE COURT REPORTERS**
**(216) 696-2272**

**Annette Ryan (K.N.A. Katz) v.**
**Robert McDonald, Secretary, etc.**

Plaintiff
March 2, 2017

7:9;8:4,7,15;181:4;
182:1;183:18;191:21
**drop (4)**
122:9;137:2;162:18;
226:15
**dropped (1)**
226:21
**dropping (2)**
226:13;233:18
**DSZ (1)**
214:8
**due (21)**
86:10;133:9;143:20;
145:24;149:15;150:11;
154:14;155:4;156:23;
157:11;165:16;181:8;
184:2;215:5;216:22;
226:1,8,12;235:14;
236:20,20
**duly (1)**
5:2
**duration (3)**
148:22;154:6;156:16
**during (42)**
16:1;19:22;20:7,15;
23:24,25;26:5,10;
40:22;53:18;61:18;
90:22;96:18;99:20;
108:14,23;114:20;
122:14;141:23;146:9;
159:22,25;160:16;
206:4;210:11;216:6;
225:22;226:16;227:25;
229:8,13,18;230:4,17;
233:8;234:3;244:1;
253:20;254:12,13;
255:25;266:7
**duties (28)**
27:20;29:16,17,22,
23;144:3,11;145:3,7,
10,15,23;146:4,5,16,
18,20;154:21;157:5;
165:19;170:18;171:4;
176:1;229:8,24;230:4;
264:21;265:13
**duty (3)**
142:12,23;143:5

**E**

**earlier (4)**
233:5;235:2;259:12;
263:23
**earliest (2)**
177:23;179:3
**early (7)**
24:12;33:23;39:1,3,
7,10;60:14
**eat (1)**
86:11
**eating (1)**
42:13
**Ebony (8)**

24:25;31:5,11,16;
117:22;118:4;263:25;
265:22
**education (2)**
227:19,20
**EE (2)**
213:4,7
**EEO (30)**
20:14;116:13;
122:11,15;123:18;
124:20;128:18;132:6;
137:1,4;146:22;147:4,
6,12;160:24;161:17;
181:11,13;183:9;
186:21;187:15;205:7;
212:18;213:12,24;
214:15;219:19;227:6;
231:25;239:23
**effective (1)**
184:2
**eight (2)**
17:12;29:8
**either (12)**
38:7;48:21;51:3;
61:22;80:3;123:14;
131:19;147:20;166:1;
168:18;174:10;229:18
**elevator (5)**
264:2,5,6;265:20,21
**eligible (4)**
142:2,8;240:16;
243:16
**Elizabeth (5)**
23:1;62:24,25;63:2,8
**else (58)**
7:16,22;8:13;11:11;
22:9;25:4;29:19;32:5,
17;34:7,17;41:1,5,13,
18;42:14;43:15,18,21;
46:5;48:7,9;62:17;
80:25;89:22;90:20;
95:15,19;96:11;102:8;
107:17;111:4,17;
113:23;114:1,12;
115:10;116:21;117:24;
136:11,23;137:5;
144:22;167:24;168:3;
169:24;172:2,5,11;
184:18;185:15;218:16;
220:1,20;228:19;
256:19;258:5,12
**elsewhere (1)**
233:2
**e-mail (25)**
13:13;125:16;
132:14,22,24;133:2,4,
6,11;159:16;166:2;
177:13,15,17,18,18;
178:4,7,9,12,14,15,18;
181:17;183:10
**e-mailed (1)**
125:7
**e-mails (1)**

130:14
**emotion (1)**
261:21
**emotional (3)**
133:9;140:3;175:10
**emotionally (1)**
197:19
**employed (6)**
9:8;143:23;185:17;
186:4,19;243:10
**employee (34)**
10:15,25;11:6,8;
12:16,19;15:25;41:20;
42:6,6,18,19,22;
102:13,16,17;107:16,
20;108:24;112:5;
113:5;136:20;140:24;
142:9;143:21;149:14;
150:5,9;154:13,19;
155:2;156:22;157:3,9
**employees (12)**
20:6;44:3,4;48:10;
88:2;103:6,11;141:7,
20;142:2,4;163:24
**employees' (3)**
37:3,4;103:5
**Employee's (7)**
131:6;133:25;
148:10;149:4,6;
153:21;156:9
**employer (5)**
144:23;149:2,3;
241:24;245:20
**employment (20)**
19:4;131:11,15;
134:14;147:14;187:14;
196:3;198:21;219:18,
22;220:10,13,15;233:2,
5;236:25;239:3;
242:16,23;246:2
**empty (1)**
58:2
**enclosed (1)**
178:20
**encounters (1)**
67:8
**Encouraged (1)**
236:15
**end (3)**
46:19;157:16;197:22
**ended (7)**
67:7;91:15;176:21;
235:18;237:7;240:24;
241:10
**ending (4)**
150:15;155:8,10;
157:14
**endured (3)**
146:9;170:5,10
**engage (1)**
48:20
**engaging (1)**
44:8

**enjoyed (1)**
109:25
**Enough (2)**
28:5;161:14
**entered (3)**
92:4;237:25;238:8
**entire (2)**
127:14;143:18
**entitled (7)**
70:4;87:2;148:9;
194:21;195:9;213:12;
247:20
**entitlement (1)**
141:21
**entry (4)**
17:12,16;257:18,19
**environment (1)**
227:10
**episodes (1)**
261:2
**equivalent (1)**
131:25
**Erika (4)**
188:7,19,24;199:23
**error (2)**
138:25;139:1
**escalate (1)**
52:5
**escalated (2)**
53:9;73:5
**escalating (1)**
80:19
**escort (2)**
78:21;218:15
**especially (1)**
81:13
**essential (1)**
149:5
**Estero (1)**
7:9
**estimate (4)**
79:13;150:15;155:7;
157:14
**Evans (3)**
113:8,17;114:6
**even (4)**
38:13;153:1;186:12;
267:20
**evening (1)**
80:24
**events (3)**
53:4;165:19;226:6
**eventually (1)**
37:24
**everybody (1)**
49:5
**evidence (3)**
66:3;142:9;231:9
**evidenced (1)**
142:13
**exact (12)**
31:17;98:4;99:17;
115:19;117:15;137:17;

160:5;164:10;178:2;
211:23;229:7;241:19
**exactly (3)**
98:3;158:17;237:4
**examination (3)**
129:4;255:8;263:15
**examined (1)**
5:3
**examples (1)**
142:6
**exams (3)**
230:13,14,15
**Except (3)**
151:13;176:6;225:12
**excerpt (1)**
166:25
**exchange (2)**
61:2,11
**exclude (1)**
41:12
**Excuse (1)**
245:15
**exercising (2)**
185:4,11
**exhausted (1)**
152:17
**Exhibit (182)**
14:4,5,20;16:13,14;
56:15,16,19,19,23;
59:13,17;63:16,23;
67:15;69:3,6,14,16,23;
70:1,4,9,9,12,22;77:14;
79:25;83:20;86:6;87:1;
91:8,11;105:21,25;
125:5,8,23;126:13,17,
19;127:10,19,24,24;
128:2,5,10,16,17,22;
129:2,7,13,17;130:5,8,
9,14,16,23;131:5,10,
24;132:4,8,13;133:14,
18,23;134:5,12,19,20,
25;135:1,5,8,14,17;
136:7;138:15,18;
140:16;141:11;147:9,
12;148:3,6;151:10;
159:2;163:1,4,16;
165:10;166:16,19;
172:23;173:21;177:3,
5,8;178:16;180:2,5,19,
22;181:21,24;183:15,
17;189:13,16,17;
194:1;195:5,8;196:12,
15;197:3,5,8;198:7,10;
200:6,9;201:9;205:14,
20;207:13,16;209:1,8,
12,13,14,14;210:2,14,
17;211:12,15;212:12,
15;213:4,6,19,22;
214:3,6,17,20;215:14,
17;216:3,10,13;221:14,
25;238:21,24;239:6;
240:12;245:23;246:22,
25;247:16,17,19;249:6,

**Annette Ryan (K.N.A. Katz) v.**
**Robert McDonald, Secretary, etc.**

Plaintiff
March 2, 2017

9,24;250:2,18,21;
251:6,16,19,25;252:1,
5;257:17
**exhibits (4)**
127:7;205:11;
207:10;221:11
**exit (1)**
235:13
**expect (1)**
11:10
**Expense (1)**
251:25
**experience (4)**
43:11;54:25;60:5,7
**experienced (2)**
222:18;259:24
**experiencing (4)**
54:13;55:4;57:5;
260:2
**expert (4)**
189:8,10,11,12
**explain (1)**
19:21
**explained (3)**
139:12,14,18
**expressed (1)**
227:9
**extend (1)**
216:18
**extended (1)**
225:18
**extending (1)**
267:3
**extent (7)**
84:2,22;85:12,13;
86:3;142:25;197:19
**extra (1)**
79:15
**extras (1)**
79:15

**F**

**face (1)**
49:8
**facilities (1)**
89:11
**facility (6)**
81:9;89:10;142:12,
21;144:20;145:4
**fact (12)**
37:16;85:5,7;105:18;
176:2;186:18;202:21;
215:13;250:7;251:10;
252:8;261:23
**facts (1)**
70:18
**fails (1)**
149:4
**Fair (1)**
161:14
**fairly (1)**
235:14

**fall (11)**
99:1,15;219:16,22;
226:11,12,18,20;
228:15;235:21;236:5
**Falls (1)**
194:3
**family (16)**
40:1,23;71:25;
104:19;141:18,19,25;
142:7;148:12;153:22;
156:10,11;169:3;
255:22;257:3;261:25
**far (15)**
29:6,20;36:9;55:4;
60:17;92:23;93:5,5,23;
97:14;99:10;111:14;
167:3;219:11;257:3
**father (1)**
270:4
**fax (5)**
166:1;182:24;
215:22,24;251:20
**faxed (4)**
215:3,8,20,21
**FEAR (3)**
17:16;18:20,23
**fearful (2)**
104:17;259:14
**fears (1)**
227:9
**February (10)**
128:12,23;129:4,9;
166:20;167:21;180:23;
181:4;205:21;215:20
**Federal (1)**
141:20
**FedEx (1)**
208:19
**feel (11)**
48:16;67:11;68:4;
80:4;81:8;91:18;
146:16;177:23;225:25;
226:8;260:12
**feeling (1)**
236:20
**feels (1)**
232:22
**fell (4)**
240:25;241:1,5;
242:3
**felt (11)**
85:6;98:8;105:2,16;
186:9;199:13;229:25;
240:5;255:22;264:18;
266:1
**Ferrise (1)**
214:25
**few (3)**
64:2;246:19;265:10
**FF (2)**
213:19,22
**field (6)**
227:8,13,16,18,21;

228:3
**fifth (3)**
71:6;142:8;246:7
**fight (1)**
162:16
**figured (1)**
249:18
**file (16)**
67:20;81:17;116:13;
117:3;193:19;223:25;
224:3,5,8,10,12,14,17,
18,19;262:24
**filed (9)**
84:14;131:12;
137:22;158:24;159:1,
3;193:22,23;232:3
**files (1)**
168:6
**filing (5)**
81:15;83:1;137:6;
187:15;268:11
**fill (16)**
68:2;69:16,17;89:15;
120:13;123:2;135:5;
138:12;152:8,10,12;
158:13,18;167:11;
169:1;179:15
**filled (10)**
69:20;124:1;134:18;
139:17;140:4,17;
152:23;169:2;172:12;
216:17
**final (3)**
9:18;227:8;234:22
**financial (1)**
261:7
**find (4)**
5:22;11:14;236:18;
253:7
**Finding (3)**
250:7;251:10;252:8
**fine (2)**
106:21;110:15
**finish (7)**
7:2;47:24;52:14;
106:14,15,22;227:9
**finishes (1)**
237:1
**fired (7)**
42:9;187:19,20,21,
25;241:14;244:3
**firm (1)**
80:2
**first (56)**
5:2;11:4;16:1,4;23:9,
12,14,17;24:7,9;30:4;
31:14,23;32:9,22;33:4,
25;34:11;36:7,15;38:6;
39:11;41:4;43:7;48:24;
57:4;58:21;60:6;68:12;
70:8,10;107:11;114:8;
115:17;118:16;120:1;
122:22;123:5;127:15;

138:6,21;144:25;
151:23;163:4;175:21;
177:10,13;184:4;
189:16;200:20;201:10;
205:17;216:15;221:13;
233:9;251:19
**five (19)**
17:12;30:17;40:21;
53:3,7;72:12;73:3,4;
87:23;94:21;100:17;
145:12,19,21;146:12,
16;157:9;171:5;179:1
**five-day (1)**
30:16
**flat (1)**
244:18
**flip (5)**
127:1;136:3;150:8;
157:8;178:16
**floor (25)**
12:10,13,18,22,25;
42:7;44:5;73:14;75:23;
88:2;106:20;107:16,
20;115:3;170:8,19;
172:9;173:3;188:23,
25;190:1,4;209:5;
219:10;266:20
**Florida (8)**
7:10,12,12,25;8:2;
40:23;244:7;261:23
**flowed (2)**
23:9,18
**flu (6)**
219:23;220:5;237:2;
242:21,22;268:24
**flunked (3)**
230:6;235:19;237:8
**FMLA (19)**
89:16;120:13;
138:13;139:12;140:14,
17,23;141:20;142:2,5,
9,18;143:14;169:1,2;
172:14,16;225:18;
267:2
**focus (2)**
226:8;264:23
**folder (2)**
68:22;112:5
**Foley (1)**
58:3
**follow (9)**
34:25;51:13;118:25;
184:9;190:7,16,18;
193:11;194:24
**followed (6)**
172:16;184:12,15;
191:12;192:22;216:7
**following (19)**
54:19;69:23;97:12;
119:2;128:5,9,21;
129:7,17;130:8,13,16,
22;133:5;153:5;
181:13;191:13;222:16;

258:1
**follows (1)**
5:3
**follow-up (7)**
35:3;36:1;190:20;
192:9;193:12,17;
265:17
**foot (2)**
74:16;77:12
**force (1)**
55:12
**forcibly (1)**
64:1
**forcing (1)**
55:5
**form (27)**
16:23;17:6;69:16,17,
22;126:20;152:8;
178:21,22,22;179:2,4,
6,10,20,21,25;180:9,
11;182:20,23,25;
188:15;200:13,16,22;
267:2
**formal (1)**
159:2
**formally (1)**
186:15
**former (2)**
235:22
**forms (7)**
68:2;132:17,19;
177:21;178:6,24;
183:13
**forth (2)**
140:5;256:2
**forward (5)**
126:11;220:18;
234:25;239:24;240:1
**fought (1)**
216:20
**found (5)**
51:6,8;52:2,9;218:8
**foundation (8)**
17:1,2;43:20;57:8,
13;90:1;149:21;219:2
**Four (18)**
12:17;16:1,4;25:6,
18;29:7;40:21;50:7;
70:21;71:2;127:15;
131:25;139:8;149:12;
151:21;251:23;270:25;
271:2
**Fourth (1)**
191:18
**frame (16)**
31:18,19;32:12;38:2,
20,25;46:17;49:24;
50:1;51:20;53:8;61:5;
86:21;117:8;120:10;
241:20
**free (1)**
177:23
**Freeman (8)**

Annette Ryan (K.N.A. Katz) v.
Robert McDonald, Secretary, etc.

Plaintiff
March 2, 2017

67:21;128:24;
159:16;160:19,20,22;
181:16;183:10
**frequency (1)**
240:20
**frequent (1)**
267:21
**Friday (1)**
77:15
**friend (4)**
80:13;97:25;111:12,
18
**friendly (2)**
36:9;105:5
**friends (6)**
36:12,13;88:1;105:2;
114:3;227:11
**friendship (1)**
36:6
**front (13)**
15:15,20;47:6;48:21;
56:5;74:16;101:20,21;
125:17;134:9;160:9;
175:11;250:11
**full (8)**
139:10,11;220:25;
239:14;250:3;251:7;
252:5;256:5
**full-time (4)**
198:3;199:7;220:10,
12
**function (4)**
172:8;176:18,18;
268:13
**functions (13)**
143:22,25;149:5,7,9,
11,15;150:5;154:14,
19;156:23;157:3;
267:14
**further (8)**
10:21;35:6,11;78:6;
112:16;162:20;260:15;
271:13
**fuzzy (1)**
40:11

**G**

**gainful (2)**
196:3;198:21
**garage (3)**
79:1;94:11;95:4
**Garcia (1)**
5:19
**Garrett (71)**
30:3,8;31:2,15;
32:11;33:6,14,16,18,
20;34:1,4,6,13;36:4,7,
24;37:13,15;41:7,15;
43:11,23;44:9,19;
46:20;47:5;48:19;51:2;
53:19,24;54:15,25;
56:4;57:6;58:5,12;

59:2;60:23,25;61:13;
65:5;67:8;75:18;78:13,
22;83:23;85:3;92:18;
93:25;95:2,23;96:18,
25;97:20;98:25;104:2,
16;105:24;106:7;
137:13,25;138:4;
185:23;186:3,14;
218:25;219:5;225:11;
247:4;256:13
**Garrett's (3)**
60:14;82:12;252:18
**gauge (1)**
110:19
**gave (24)**
37:9;60:12;62:23;
69:15,17;73:7;84:5;
89:5;123:13;153:10,
12;162:22;163:7,10;
164:5;165:6,23;
167:14,16;204:11;
205:7,23;210:3;226:2
**gender (3)**
107:1,9;108:10
**general (9)**
14:11;74:3;87:6;
168:6;170:17;215:1;
216:2;250:22;251:20
**generalized (1)**
174:20
**General's (10)**
133:20;188:16;
195:10;197:14;198:12;
216:8;238:10;250:7;
251:9;252:8
**gets (1)**
211:9
**GG (1)**
214:3
**given (15)**
11:25;12:7,19;68:2;
69:11;79:5;127:13;
145:12;163:12,14;
168:1;179:11;209:5,
17;249:1
**gives (4)**
141:17;181:12;
230:7;245:20
**giving (6)**
43:12;145:22;147:1;
250:10;251:12;252:11
**Goals (1)**
225:24
**goes (2)**
142:6;155:23
**good (2)**
201:1;261:19
**gosh (1)**
8:17
**Government (3)**
138:18;159:2;172:23
**Government's (77)**
14:5;16:14;56:16,19;

69:3,6;70:1;91:8;
105:21;125:5,8;
138:15;147:9,12;
148:3,6;163:1,4;
166:16,19;177:5,8;
180:2,5,19,22;181:21;
183:15,17;189:13,16;
195:5,8;196:12,15;
197:5;198:7,10;200:6,
9;205:11,13;207:10;
209:1;210:14,17;
211:12,15;212:12;
213:4,6,19,22;214:3,6,
17;215:17;216:10,13;
221:11,14;238:21,24;
245:23;246:22,25;
247:16,17,19;249:6,8,
24;250:2,18,21;251:16,
19
**grab (2)**
38:4;106:18
**grabbed (1)**
95:13
**grabbing (3)**
38:7;64:1;78:25
**grade (3)**
226:9;230:8,15
**gradual (1)**
73:4
**gradually (1)**
39:8
**graduate (1)**
228:17
**Grand (1)**
7:9
**Greene (6)**
139:21,22,23;140:1;
158:23,24
**grief (1)**
169:11
**grooming (1)**
225:1
**gross (1)**
92:5
**ground (2)**
199:13,20
**grounds (1)**
81:11
**group (2)**
78:16,17
**guarantee (1)**
243:5
**guaranteed (7)**
243:3;244:15,16,17,
22,24;248:6
**guess (6)**
36:10;83:3;93:4;
94:24;212:1;257:3
**guidance (2)**
140:23;141:17

**H**

hair (1)
49:18
**Hale (6)**
75:16,16;76:5,15,19,
24
**Hale's (1)**
76:10
**half (1)**
204:25
**hall (6)**
57:25;58:25;74:10;
177:19,25;178:9
**hallway (16)**
28:5,9,10,11,19,22;
29:1,9,14;30:15;32:4;
59:4,5;74:19;117:21;
118:2
**hallways (3)**
28:6,8,14
**hand (8)**
14:3;16:12;71:17;
91:10;95:13;246:19;
247:15;253:25
**Handbook (8)**
11:19,20,22,25;12:2;
19:14,15;135:25
**hand-delivered (2)**
165:2;167:23
**handed (33)**
56:18;69:5;105:24;
138:17;147:11;148:5;
162:10;166:18;167:18;
180:4,17,21;181:23;
183:17;195:7;196:14;
197:7;198:9;200:8;
207:12;210:16;211:14;
212:14;213:6,21;
214:5,19;216:12;
238:23;246:24;247:19;
249:8;251:18
**handing (7)**
70:3;163:3;177:7;
189:15;205:13;250:1,
20
**handled (1)**
207:9
**handwriting (7)**
124:20,23;138:22;
141:10;151:12;180:9;
216:14
**handwritten (6)**
125:24;126:13,20;
138:21;153:13;216:14
**happen (6)**
53:21;80:16;81:11;
162:3;184:18;266:6
**happened (25)**
39:7;42:25;43:3;
53:5;55:13;57:19;59:3;
62:20,22;63:4;81:1;
83:6;85:3;93:2;95:2;
99:5;162:5;173:19;
208:8,13;217:16,18,20;

232:21;269:9
**happening (7)**
38:15;42:15;53:6,15;
81:14;84:14;100:20
**happy (1)**
49:20
**harassed (12)**
41:7,15;43:16;106:7;
107:9,15,19;108:9,17;
109:3;232:25;270:2
**harassing (8)**
43:12;53:19,24;61:4;
104:3,13;236:1;256:14
**harassment (66)**
13:17;14:14;15:4;
16:6;17:21;18:1,7,7;
19:1,5,13,17,22,25;
20:8,12,16;38:8,10;
41:19;47:6,9,11,18;
48:13,13,21;51:17;
53:6;54:1;56:4;57:5;
73:4;80:7;82:9;86:10;
88:12,16;92:6,8,15,17;
94:1;101:10,11;
104:23;107:2;108:16;
109:8;110:22;114:9;
118:17;136:12,21;
137:6,11,23;185:23;
187:1;222:17,18;
226:14;231:18;235:11;
258:7;270:13
**harassment/assault (1)**
165:17
**harassment/No (3)**
17:16;18:20,23
**hard (6)**
5:6;18:24;66:12;
71:16;147:19;155:22
**harm (2)**
98:9;114:17
**heal (5)**
89:12;145:12,22
**Health (42)**
129:8;130:20;131:5,
6;133:24,25;142:10,
16;143:7,20;148:10,
11;153:20,21;156:9,
10;164:17;165:13;
166:20;169:7;195:10;
198:11,13;201:15;
202:13,18;222:5;
242:18,25;243:7,9,12;
244:10;245:2,4,9,20,
21;246:15;257:24;
258:6,10
**hear (6)**
58:14;153:11;
170:16;192:18;264:17;
265:25
**heard (5)**
62:8;78:4;173:7;
175:9,9
**Hearsay (1)**

FINCUN-MANCINI -- THE COURT REPORTERS
(216) 696-2272

**Annette Ryan (K.N.A. Katz) v.**
**Robert McDonald, Secretary, etc.**

44:21
**heck (1)**
192:1
**held (1)**
42:22
**help (11)**
13:21;72:5;89:7;
97:5,10;101:24;102:3,
7,8;127:6;260:14
**helpful (2)**
70:25;182:17
**helping (1)**
111:14
**hereinafter (1)**
5:2
**Here's (2)**
11:2;55:19
**Heritage (17)**
220:19,25;221:5;
239:1,3,7,16,19,22;
240:4,8,16,23;241:6;
242:15;246:14,15
**Herman (52)**
22:14,15,23,25;23:7,
8,17;24:10,16;26:14;
31:7;36:3;44:24;47:7;
48:21;49:15;50:10,17,
18;51:5;56:5;88:25;
90:10,11,14,17,21;
103:2,9,22;104:23;
113:2;114:25;119:22;
120:24;122:18,22,23;
123:14;151:13;152:7,
10,22;172:6;175:2,3,
19;208:5,5;209:4;
256:22;257:8
**Herman's (1)**
22:21;120:15;153:7
**herself (2)**
61:21;225:5
**hesitate (2)**
164:3;167:6
**Hey (1)**
194:11
**HH (3)**
214:17,20;216:3
**Hi (2)**
177:19;264:7
**Highar (4)**
80:2,9,12,17
**higher (1)**
228:12
**himself (3)**
55:6,12;76:8
**hired (13)**
9:11;10:1,3;13:24,
25;16:1;21:13;25:12,
13,15;239:7,11,14
**his/her (3)**
149:7,14;156:22
**History (2)**
226:7;237:15
**hit (1)**

101:4
**Hively (8)**
135:18;196:5,9;
219:17;222:20;226:2;
255:3;259:23
**Holmer (37)**
134:1;139:9;140:14,
16,25;141:2;148:15;
149:8;150:25;151:3;
153:25;155:18;156:12;
157:22;163:12,17;
164:20;165:14;167:9;
173:24;179:17,25;
191:9;196:16;197:15;
214:21;215:19;216:6;
217:11;258:2,3;260:1;
266:14;269:11,16;
270:4,7
**Holmer's (6)**
151:7;179:19;191:2;
260:8;261:3;262:1
**home (20)**
7:8;88:10;97:2;
112:3,7,8,9;208:10,19;
212:3;223:8;242:18,
25;243:7,9,12;244:10;
253:25;256:8;259:13
**hometown (2)**
81:16;82:23
**honestly (1)**
176:14
**hopefully (2)**
159:11;197:8
**hopes (1)**
217:3
**hoping (2)**
106:15,16
**horrendous (1)**
52:17
**hospice (2)**
142:11,21
**hospital (8)**
41:14;142:11,20;
144:9;235:13,15;
242:23,24
**hostile (1)**
227:10
**hour (4)**
110:18;232:13;
259:16,19
**hourly (5)**
9:20;244:18,19,20;
252:25
**hours (17)**
17:18;18:3;21:20;
22:3;23:3,11,12,20;
50:19;67:16;92:1;
141:22;152:3;235:9;
240:20,21;244:22
**house (1)**
112:18
**housekeeper (1)**
79:21

**HR (6)**
139:10,19,20;
141:16;158:20,21
**Hudson (17)**
220:19;221:1,5;
239:1,4,7,17,19,23;
240:4,8,17,23;241:6;
242:15;246:14,16
**Human (2)**
80:3;130:25
**hung (2)**
114:13,19
**Hunkele (2)**
75:15;254:24
**H-u-n-k-e-l-e (1)**
75:15
**husband (4)**
7:15;8:12;243:21;
255:18
**husband's (1)**
7:18

# I

**idea (4)**
65:8;72:14;91:1;
166:15
**ideal (2)**
231:20,21
**identification (45)**
14:6;16:15;56:17;
69:4;70:2;91:9;105:22;
125:9;138:16;147:10;
148:4;163:2;166:17;
177:6;180:3,20;
181:22;183:16;189:14;
195:6;196:13;197:6;
198:8;200:7;205:12;
207:11;210:15;211:13;
212:13;213:5,20;
214:4,18;215:18;
216:11;221:12;238:22;
245:24;246:20,23;
247:18;249:7,25;
250:19;251:17
**identified (14)**
130:4,13,22;131:4,9,
23;132:3;133:13,23;
134:4,11,17;136:7;
255:2
**Identify (5)**
107:7;130:5;150:4;
154:19;157:2
**ignored (2)**
107:6;264:10
**II (3)**
215:16,17;228:16
**immediate (2)**
22:12;88:1
**immediately (3)**
250:8;251:11;252:9
**impaired (10)**
170:25;171:10,14,

22;173:2,18;175:16,17,
18;226:8
**impairment (1)**
175:5
**imposition (1)**
92:5
**inability (2)**
230:1;264:22
**inappropriate (8)**
38:12;43:24;44:17,
23;49:19,22;54:3,17
**inappropriately (1)**
43:17
**inappropriateness (1)**
20:5
**incapacitated (8)**
142:23;143:2,3,5,20;
150:10;155:3;157:10
**incapacitation (1)**
142:12
**incapacity (3)**
150:16;155:8;157:15
**incidence (1)**
117:11
**incidences (1)**
49:1
**incident (45)**
39:24;57:18,23;
71:19;73:22,25;74:2,4,
6,8;75:9,10,18,22;76:6,
15,19,24,25;77:1,4,5,7,
15,20,23;78:7,8,10;
80:20;83:6;91:12;
94:15;99:3;100:13,25;
101:1,2,13,17;107:21;
117:5;208:11,12;
259:18
**incidents (18)**
53:16,21;56:3,6;
63:25;77:6;83:23;85:3;
88:14;93:24;94:10,13,
18,20;95:2,11;104:7;
110:4
**include (3)**
9:22;70:18;159:21
**included (3)**
87:16;125:24;218:21
**includes (1)**
126:3
**including (5)**
99:9;133:7;150:12;
155:5;157:12
**incomplete (4)**
134:13;135:2,3;
139:2
**Incorporated (1)**
214:8
**incorrect (3)**
55:24;258:22,23
**incurred (1)**
251:24
**Indefinite (2)**
148:23;154:6

**indefinitely (1)**
165:22
**independent (1)**
220:4,21;268:23
**Indiana (2)**
227:2;230:10
**indicate (4)**
91:2;228:14;258:24;
266:14
**indicated (7)**
125:11,21;217:20;
242:5;263:23;264:20;
271:8
**indicates (3)**
17:14;18:4;240:12
**individual (1)**
222:4
**ineligible (1)**
142:5
**influence (1)**
6:18
**info (1)**
225:7
**informal (1)**
159:1
**information (35)**
13:6,16;16:22;17:5;
18:2;25:17;37:12;68:6;
85:13;128:18;133:7;
135:6,22;140:24;
141:6,8,17;149:2;
150:20,23;155:15;
160:7;164:2;167:6;
176:6;185:18;197:13;
201:15;218:2;220:8;
222:19;226:2;241:12,
24;245:18
**informs (1)**
214:8
**in-house (1)**
207:9
**initial (4)**
9:13;11:6;175:21;
257:6
**initially (2)**
11:8;232:15
**initials (1)**
34:3
**initiate (1)**
37:1
**initiation (1)**
68:12
**injured (1)**
197:18
**injury (1)**
10:6;242:9
**inner (1)**
165:2
**innuendos (1)**
110:7
**Inpatient (2)**
142:11,20
**inquire (1)**

Annette Ryan (K.N.A. Katz) v.
Robert McDonald, Secretary, etc.

193:12

**inquiry (1)**
182:10

**Inspector (1)**
87:5

**instance (5)**
38:6;39:11;48:24;
50:4,16

**instructions (1)**
177:22

**insult (2)**
5:24;258:16

**insurance (5)**
13:9;245:1,2,4;
246:15

**intake (1)**
200:16

**intend (1)**
199:17

**intended (1)**
239:25

**intent (1)**
239:22

**intention (2)**
199:24;240:2

**interaction (4)**
208:8;235:22;236:2,
8

**interactions (4)**
85:4;218:25;219:5,
11

**interest (1)**
163:25

**intermittent (1)**
142:4

**interpret (5)**
173:6,15;174:1,9,12

**interpreted (1)**
112:15

**Interrogatories (10)**
95:22;97:17;98:24;
100:10;101:23;106:6;
109:17;254:23;257:10;
260:5

**Interrogatory (1)**
106:23

**Intervention (8)**
222:14;223:6;
224:24;225:17;231:6,
15;235:8;237:24

**Interventions (1)**
236:14

**interviewed (2)**
75:6;186:5

**interviewing (1)**
68:7

**into (38)**
10:3;18:13;23:9,18;
55:11;57:19,24;58:3,7,
8,12;60:5;64:2;71:15;
73:15,20;74:22;75:2,
19;76:2;77:8,9;79:9;
88:25;89:20;90:11;

94:7;95:4;129:24;
151:6;167:19;175:8;
186:11;236:2,7,18;
263:8;264:5

**intolerable (1)**
107:3

**introduced (1)**
26:6

**investigate (3)**
186:1;205:24;214:9

**investigation (1)**
186:20

**Investigations (1)**
87:7

**investigator (9)**
123:18;205:8,24;
206:14;209:18;210:3;
214:10,13,14

**involuntary (1)**
199:12

**involved (3)**
52:5;107:8;230:12

**involving (1)**
110:4

**issue (6)**
11:3;14:13;34:10;
159:11;222:16;227:12

**issued (5)**
82:3,11;222:3;
223:18,19

**issues (6)**
215:5;258:6;261:9;
263:8;266:18,23

---

**J**

**Jamal (1)**
67:17

**Jamila (10)**
62:12,13,15,18,19;
67:18;68:24;93:17,21;
256:16

**January (7)**
71:14;129:14;
188:14;198:17;205:18;
214:23;216:7

**Jeff (1)**
87:4

**Jefferson (3)**
109:5,21;265:23

**Jenison (20)**
24:25;26:21;31:5;
32:10,15,24;33:5,10,
12;35:12;45:5,6,17,19;
46:1;111:8,9,11;112:1;
225:23

**Jenison's (2)**
32:19;46:3

**Jennifer (5)**
107:23,24;108:6,8,9

**Jessica (6)**
41:23,23,25;106:8,8;
107:13,19;108:5

**JJ (1)**
216:10

**job (51)**
14:1,7,9,11,24;88:5,
7,10,11,16;102:5;
104:17,21;105:19;
144:8,11,22;145:3,10,
15;149:5,7,8,11,14;
150:4;154:14,19,21;
156:23;157:3,5;
165:18,19;171:4;
176:1;194:13;221:3;
225:21;227:18;234:2;
240:3,19;245:19;
264:21;266:11;267:8,
14,19;268:2,6

**jobs (2)**
88:13;242:20

**jog (4)**
49:9;215:25;216:4;
235:16

**John (10)**
25:3;31:5;35:12;
45:16;95:23,25;96:5,
12;111:1;113:3

**joining (2)**
19:2,13

**joke (1)**
50:25

**jokes (6)**
38:17;50:21,22;51:3,
14,23

**Joseph (1)**
132:14

**journal (4)**
84:16,18,19,21

**judge (3)**
82:12;124:22;244:8

**judgment (3)**
173:2;175:15;263:9

**July (12)**
39:5;133:15;145:19;
150:16;163:18;173:24;
174:22;186:17;195:17;
226:5;227:4,7

**June (12)**
39:5;133:20;145:19;
155:18;156:2,4;
196:17;217:12,20,23;
224:24;225:15

---

**K**

**Kafer (7)**
127:25;181:15,19,
20,25;184:6,23

**Kalahari (2)**
40:11,13

**KATZ (33)**
5:1,7,12,13,18;7:19,
24;69:5;118:15;180:4;
181:23;195:7;196:14;
200:8;207:12;210:16;

211:14;212:14;213:6,
21;214:5,19;216:12;
245:25;246:24;247:19;
250:1,20;251:18;
254:22;255:18,20,25

**keep (9)**
5:6;6:7;79:15;136:4;
139:3;165:25;169:24;
194:12;221:2

**keeping (4)**
84:16,25;225:19,22

**kept (1)**
185:17

**kids (1)**
38:22

**kind (8)**
10:20;38:23,25;
48:17;55:8;102:2;
119:13;147:19;225:10;
230:6

**kiss (3)**
79:1;94:10;95:3

**KK (3)**
221:11,25;257:17

**knew (8)**
35:4;67:9;104:2,12;
105:4;112:9;168:20,22

**knowledge (19)**
21:7;25:9,14;42:11;
59:25;103:9;108:21,
22;117:1;120:16;
123:13;164:12;190:17,
19;216:6;231:17;
255:20;256:14;257:2

**known (6)**
5:13,16;104:2,13;
168:23;201:20

**knows (1)**
256:11

**Korikee (1)**
255:12

**Kurt (10)**
83:18;119:3;121:12,
15;166:5,8;183:23;
213:9;253:21,24

**Kurt's (1)**
257:7

**Kyle (2)**
7:21;8:25

---

**L**

**labeled (1)**
130:8

**Labor (3)**
200:11,15;255:12;
262:3,9

**Lake (1)**
7:9

**LaSalvia (2)**
5:17;256:25

**last (27)**
75:14;86:7,11;

139:21;140:1;165:10;
200:15;201:11,19;
212:5;221:21;222:13;
226:7,13,15,17;228:13;
231:7;234:24;236:14;
241:16;252:4;257:15,
18,19;265:22;267:2

**lasted (1)**
229:4

**late (3)**
78:15;209:11;267:2

**later (1)**
56:9

**laugh (1)**
44:22

**laughed (5)**
100:24;101:1,2,4,6

**laughing (2)**
100:7,8

**Laura (6)**
60:24,25;61:3,8;
62:1,19

**law (2)**
80:2;232:7

**lawful (1)**
5:2

**lawsuit (8)**
81:12;160:17;
217:10;231:23,25;
232:3,6;235:1

**lawyer (2)**
126:24;127:6

**lawyers (1)**
268:9

**leads (1)**
39:15

**learn (2)**
123:22;195:3

**learned (3)**
53:23;123:19;124:4

**least (7)**
28:23;30:19;171:5;
186:9;208:5;244:22;
267:15

**leave (47)**
24:12;78:11;131:1;
138:7,9,13;141:18,19,
22,25;142:1;148:12;
150:9;151:11,15,20;
152:2,5,14,18,24;
153:6,16,22;155:1,24;
156:4,10;158:1,4,10;
169:4;182:19;186:10,
16;207:5;209:3,6;
216:18;225:19;233:4;
241:5,8;248:13,15;
249:1,4

**leaving (1)**
261:25

**left (7)**
74:24;78:15,19;
150:20;155:13;157:20;
242:15

Annette Ryan (K.N.A. Katz) v.
Robert McDonald, Secretary, etc.

Plaintiff
March 2, 2017

**left-hand (1)**
72:13
**leg (8)**
50:13;94:16;95:5,24;
97:20;99:1,14,25
**legal (19)**
20:2;38:10;47:9,13;
68:20;92:10;109:10,
20;116:25;142:25;
144:13,15;168:15;
169:14,21;177:1;
185:8;187:7,17
**legs (4)**
50:11;66:15;100:12,
16
**lengthy (3)**
70:17;107:13;233:2
**less (2)**
231:19,20
**letter (97)**
119:17;127:24;
128:22;129:8;130:9,
18;132:4,9;133:14,19;
134:5;135:12;163:5,
12,17;164:4,12,20;
165:11,23;166:19,22;
167:7,10,13,15;173:5,
24;174:1,4,14,21;
176:11,13;177:21;
178:17;180:22,24;
181:1,6,14,24;182:6,8,
18;183:18,20,22,25;
184:11;189:18,19,21,
23;190:12;191:14,19,
22,24;192:11,16,23;
193:1,4,7;194:2,4,8,10;
209:3,6;212:15;213:7;
214:7,11;215:1,8,10,
14,19;216:1,2,5,14;
217:11;231:8,11;
234:4,6,10;238:1,9;
262:2,6,8,12,14
**letters (23)**
121:4,7,10,15,16,21,
23;122:1,5;162:10,23,
23;163:8,10,13;164:9,
15,19;166:1,11;176:7,
16;191:2
**level (3)**
53:9;131:20;147:22
**lewd (5)**
63:25;95:5;97:9;
99:21;219:13
**licensed (1)**
9:12
**life (3)**
38:24;133:10;226:6
**lift (2)**
242:8,9
**lifting (1)**
241:23
**liking (1)**
110:1

**limitations (1)**
265:7
**line (12)**
52:10,19;71:6;
132:20;139:6;143:18;
150:4;151:22,23;
152:4;154:18;169:23
**linen (12)**
55:5;73:23,25;74:3,
6,9,10,20;75:12;77:1,4;
94:8
**lines (2)**
71:23;87:23
**lip (2)**
108:11;109:1
**lip-smacking (1)**
49:11
**Lisa (61)**
22:14,15,21;23:4,7;
26:14;31:7;34:20,21,
23;35:4,8;49:15;50:9,
12,17,18,21;51:4,5,8,
13;80:5;88:25;90:10,
11,14,17,21;103:1,3,9,
22;104:4,23;111:15;
113:2;114:25;115:8;
119:22;120:14,24;
121:5;122:18,21;
151:13;152:7,10,22;
153:7;172:6;175:2,3,
14,19;208:4,5;209:4;
218:12;256:22;257:8
**list (16)**
73:10;107:13;109:5;
110:3;149:4;203:2;
204:2,8,25;205:3;
255:18;256:10,16,21;
261:4,5
**listed (11)**
118:4;195:25;
203:21;251:24;252:2;
254:23;255:2;256:24;
257:8;261:6,17
**listened (1)**
34:10
**listing (2)**
261:9,22
**lists (1)**
240:19
**litigation (1)**
212:1
**little (4)**
40:10;106:19;
155:22;197:11
**live (9)**
7:22;8:6,21,23;
15:10,14,24;19:20;
255:25
**lived (5)**
7:25;8:8,17;256:2,4
**living (4)**
8:15;75:17;181:3;
256:5

**LL (3)**
221:11,14,16
**Local (1)**
21:2
**located (1)**
7:11
**location (4)**
164:1;191:4;216:19;
227:8
**log (3)**
18:13,17;221:2
**log-in (5)**
12:7,19,21;13:2;
18:14
**Lola (1)**
201:7
**long (14)**
7:24;8:21;12:11,15;
54:21;56:12;186:3;
200:12;229:3,11;
240:23;242:12;270:25;
271:2
**longer (5)**
75:17;148:24;154:7;
234:2;262:5
**long-term (1)**
142:14
**look (17)**
16:25;33:24;67:6;
81:23;87:1;89:20;
109:13;125:17;127:14;
131:16;147:8;179:23;
201:19;236:15,24;
237:12,23
**looked (2)**
127:15,17
**looking (13)**
127:6;132:7;135:5,8;
151:18;172:24;180:16;
220:16,17;238:2;
245:14,17;257:17
**looks (9)**
49:18;110:18;
131:11;134:15;180:7,
18;196:23;198:22;
246:8
**lose (8)**
88:5,6,11,13,15;
104:17,21;105:19
**loss (2)**
251:24,25
**lost (4)**
86:11;123:19,22;
124:4
**lot (26)**
9:18;25:1;50:20,21;
75:10;79:11,12;80:14;
88:8;94:20,23;99:8,22;
117:9;159:17,18;
180:7;220:21,22;
249:17;265:11;266:10,
13,15;267:1,13
**lots (1)**

**121:3**
**Louis (1)**
9:8
**Love (12)**
41:23,23,25;42:2,5;
43:6,10;106:8,8;
107:14,19;108:5
**L-o-v-e (1)**
41:24
**LPN (23)**
9:12;13:25;14:11,12;
21:13;62:2;116:17,20;
143:23;144:1,4,11;
145:4,7,10,15,24;
146:17;239:11;243:10;
244:10;267:14,23
**LPNs (5)**
21:4;27:9;28:1,25;
36:23
**lucid (2)**
58:16;78:1
**lump (1)**
253:11
**lunch (8)**
36:15;37:21;42:13;
45:21;106:12,14,17;
118:11
**lunches (1)**
36:18
**lunchtime (2)**
46:11;99:20
**LWOP (1)**
141:23

**M**

**machine (1)**
215:24
**maiden (1)**
5:17
**mail (4)**
165:3;166:2;213:2,
16
**main (6)**
81:7;105:20;199:14,
19,21;200:2
**maintain (1)**
238:10
**maintained (1)**
107:1
**maintenance (1)**
75:23
**making (17)**
31:11,14;38:7;39:12;
49:11;50:24;51:3,15;
71:9;85:2;87:8;95:5;
126:9;176:21;225:6;
238:14,17
**male (6)**
42:6,18,19,21;44:8
**Mallard (4)**
8:4,7,15;9:4
**man (1)**

**133:10**
**management (9)**
104:1;107:10;117:3;
158:25;211:17;212:16;
213:8,24;219:9
**manager (17)**
20:13;22:20,22;
24:14,17,21;25:11;
26:6,16,21,22,22;80:5,
6;105:12;110:5;217:1
**managers (5)**
24:22;25:13;26:11;
27:3;45:2
**manner (1)**
43:24
**many (30)**
27:25;28:3,6,25;
29:6,13;30:7,9,11,14,
17;49:1;66:9;76:11;
79:19;88:2;110:9;
121:7,21;124:7,8;
156:17;160:25;163:20;
164:9;172:20;175:1;
176:9;203:18;228:3
**March (81)**
41:3,15,20;46:21,22;
47:3;55:19;56:24;
57:16,21;60:14,19;
61:6,6,9,12,12,19,19;
62:6,11;63:9;67:2,15;
68:16,19;69:22;70:5,
14,19;72:15,17;77:14;
80:1,12,16,20,24;82:9;
86:16,19,24;87:3;89:1,
23;90:22,24;91:5,25;
92:21,25;93:12;
104:15,23;105:14,18;
113:23;115:24;116:15;
117:7,12;118:22;
120:2,11;123:5;
137:23;138:2;148:19;
154:5;155:9;156:15;
157:15;182:1,4,9,15;
196:6;197:21;202:23;
250:24;251:13
**Marie (1)**
5:12
**mark (7)**
14:3;16:12;125:4;
156:24;215:12,16;
247:15
**marked (90)**
14:5;16:14;56:15,16,
18;69:3,5;70:1,3;91:8,
10;105:21;125:8,23;
127:23;128:9,16,21;
129:1,7,12;130:16;
134:20;138:15,17;
147:9,11;148:3,5;
157:25;163:1,3;
166:16,18;177:5,7;
180:2,4,19,21;181:21,
23;183:15;189:13,15;

Annette Ryan (K.N.A. Katz) v.
Robert McDonald, Secretary, etc.

Plaintiff
March 2, 2017

195:5,7;196:12,14;
197:7;198:7,9;200:6,8;
205:12,13;207:11,13;
210:14,16;211:12,14;
212:12,14;213:4,19,21;
214:3,5,17,19;215:17;
216:10,12;221:12;
231:4;238:21,24;
245:23;246:22,24;
247:17;249:6,8,24;
250:1,18,20;251:16,18
**married (3)**
243:22;261:18;
270:21
**Mary (2)**
139:23;158:22
**Maslar (2)**
87:4,10
**massage (4)**
260:6,9,17,22
**master (1)**
21:10
**masturbate (1)**
38:19
**masturbating (1)**
38:18
**matter (2)**
96:4;215:13
**may (41)**
6:19;18:9;22:6;
37:21,23;42:23;117:2,
7,13;132:10;133:14;
134:5;141:25;145:19;
148:23;154:7;159:1,4,
13;163:5,18;165:13;
166:22;182:20;183:19;
184:2;208:10,17;
210:23;211:7,16,22,24;
212:7;219:18;222:11;
223:5;241:2;257:19;
258:24;265:1
**maybe (7)**
12:23;38:22;115:20;
200:25;207:20;242:6;
256:7
**McDevitt (16)**
41:6;53:24;54:24;
59:22;60:1,2,4,8,10,19;
68:1;129:4;218:3,24;
225:23;256:10
**MD (60)**
30:3,8;33:15,16,18,
23,25;34:1,1,3,4,16;
35:20;41:6,15;43:11,
23;45:23;46:8;49:3,11,
17;50:9,20;54:15;56:4;
57:5;58:5;60:14,19;
61:4,13,15;65:5;67:8;
71:15;73:19;74:14,22;
76:2,11;79:8;81:13;
83:23;85:3;87:24;88:1;
92:18;96:17,25;98:1;
104:16;112:17;114:3;

137:24;225:11;247:4;
252:18;263:18;269:15
**MD's (3)**
76:20;110:6,11
**mean (33)**
17:1;18:1;21:24;
28:9;36:12,20;38:21;
39:5;43:8;45:13;46:23;
50:2;55:3;58:5;77:2;
80:20;93:6;114:17;
122:11;139:11;145:20;
173:16;202:1;219:6;
231:20;232:6;241:13;
256:2,2;259:15;
260:25;265:9,10
**meaning (1)**
14:25
**means (7)**
71:25;79:17;143:2,8;
193:20;224:25;225:14
**meant (3)**
5:24;173:15;267:11
**med/surg (1)**
232:14
**mediation (25)**
119:14,19,21;
120:12,18;122:7,14;
159:6,8,12;160:4,17;
161:14;162:5;163:9;
164:6;212:8;217:16,
18;227:6;231:10,18;
233:8,17;234:22
**mediations (2)**
159:3;160:25
**mediator (9)**
160:14,18,22;161:2,
3,9,11;234:23;235:3
**Medical (40)**
88:3;128:6,18;
141:18,19,25;142:12,
21;143:14;148:12;
150:11;153:22;155:4;
156:10;157:11;169:3;
174:18,21;178:21;
179:1,4,9,24;182:19,
22,24;183:3;184:3;
189:12;191:7;197:12;
201:20;209:17;216:18;
218:19;243:16,20;
244:2,3;271:8
**medical/surgical (1)**
228:11
**medical-silver (1)**
246:11
**medication (13)**
6:18;29:18;86:15,18,
23;203:2,5,8,9,12,13,
17;269:8
**medications (8)**
65:9;203:21;204:1,2,
8,9;258:3;263:19
**meds (1)**
71:10

**Med-surge (5)**
228:12,15,16,17,18
**meet (12)**
63:7,8,11;93:22;
119:4,4,10,13;120:3,5,
11;159:17
**meeting (16)**
27:20;89:3;90:11,22;
93:12,16;102:21,23;
108:14,23;159:18;
162:19;227:5;265:4;
268:8;269:2
**meetings (4)**
102:12,15,18;103:18
**member (3)**
20:23;21:9;257:4
**members (3)**
85:10;123:24;142:7
**memorandum (1)**
130:23
**memory (3)**
49:9;215:25;216:4
**men (2)**
44:5,6
**mental (19)**
164:16;170:24;
171:1,1,9,13,22;173:2,
18;175:5;195:10;
198:10,13;202:13,18;
222:5;257:24;258:6,10
**mentioned (2)**
33:25;265:10
**mess (1)**
140:3
**message (4)**
65:13;72:9,25;
214:25
**messages (11)**
61:3,11,16,24;65:21;
66:1,3,5;72:7,20;94:2
**messaging (1)**
61:15
**met (14)**
5:18;57:16;62:11,17;
88:21,22;93:14;
110:23;114:6;120:2;
158:21;189:3,6;199:23
**Metro (1)**
49:10
**MetroHealth (1)**
145:5
**Michelle (3)**
148:15;156:12;255:3
**mid (1)**
263:18
**middle (3)**
7:12;131:17;134:24
**might (3)**
70:24;72:19;88:5
**Miller (2)**
215:9;249:18
**milligrams (3)**
204:13,20,22

**mind (6)**
56:8;79:24;168:8,10;
173:14;177:4
**mine (1)**
257:6
**minimum (2)**
148:23;154:7
**minute (3)**
63:16;124:14;205:7
**minutes (2)**
118:8;265:10
**mischaracterization (5)**
90:6;145:18;189:2;
203:25;204:5
**mischaracterizing (2)**
52:20;147:7
**misconstrued (1)**
55:25
**misinterpret (1)**
6:10
**missing (1)**
133:3
**misstate (1)**
171:7
**mistaken (1)**
269:20
**mistakes (1)**
230:17
**mistrust (1)**
235:14
**misunderstood (2)**
12:23;207:20
**Mixed (1)**
213:12
**mixture (1)**
196:21
**MM (3)**
238:21,24;239:6
**modified (1)**
23:20
**money (1)**
232:19
**Monroe (1)**
194:3
**month (13)**
40:12,15,24;46:17;
52:8;53:2;67:2;98:18;
114:11;145:8;245:5,6;
266:8
**monthly (2)**
102:19;248:1
**months (32)**
31:24;38:13,16;
46:22,23;51:19,19;
53:4,5,7;72:12;73:3,4;
83:21;84:9;86:12;
94:21;100:17;139:11,
11,13,15;142:3;145:12,
19,21;146:12,16;
148:23;154:7;156:17;
171:6
**more (21)**
30:10,11;46:19;

51:22;80:7;94:23;
96:23;98:7;99:4;
104:10;110:18;111:15;
171:20;175:10;202:15;
203:16;210:22,23;
218:7;232:19;259:11
**most (4)**
44:3,4;49:2;166:25
**mother (1)**
104:18
**motivated (1)**
226:9
**move (1)**
240:1
**moved (1)**
9:4
**moving (2)**
8:2;261:23
**Mrs (3)**
24:25;31:5;200:8
**much (6)**
89:13;114:13;
148:23;158:12;253:10;
263:6
**multiple (1)**
52:22
**must (5)**
142:3,9;201:15;
209:11;237:21
**myself (2)**
37:1;75:25

## N

**name (19)**
5:11,17;7:18,20;
13:22;34:1;41:23;49:8;
75:14;107:10;108:3,4;
114:2;139:21,22,24;
140:1;194:6;265:23
**named (3)**
25:6,18;263:24
**names (4)**
5:16;24:21,24;34:3
**Nancy (1)**
256:25
**narrow (1)**
38:25
**nature (2)**
37:24;38:1
**near (1)**
38:2
**necessary (1)**
66:2
**need (23)**
6:12;10:20;11:2;
26:8,25;45:8,13;47:24;
59:6;106:17;115:21;
116:4;126:6;132:17,
19;164:2;167:5;
188:18;211:2;216:17;
219:18;237:15;263:7
**needed (16)**

**Annette Ryan (K.N.A. Katz) v.**
**Robert McDonald, Secretary, etc.**

**Plaintiff**
March 2, 2017

11:15;23:2;24:11;
37:16,17,18;77:11;
89:11,13,14;90:15;
97:6;111:15;155:2;
169:6;193:15
**needing (4)**
233:1;238:1,8;
268:13
**needs (8)**
10:20;141:25;
165:22;215:1,3,4,6,8
**negative (6)**
98:5;218:25;219:4,7;
224:16;248:11
**new (12)**
10:15,25;11:6;12:15;
15:25;37:18;59:16;
64:25;87:25;110:6;
123:24;245:19
**news (1)**
232:12
**newsletter (1)**
13:15
**newsletters (1)**
13:12
**next (51)**
53:9;67:15;68:1;
71:14;72:11;73:10;
77:13;78:12;112:19;
127:23;129:1,12;
131:4,9,23;132:3,8,13;
133:13,18,23;134:4,11;
135:15;139:6;140:23;
144:24;149:13;150:4;
151:10;154:3,18;
157:25;158:8;163:16;
178:16;191:16;192:25;
197:25;199:4;211:11;
215:3;223:4;225:15;
226:4;227:3;231:3;
232:8;234:20;235:6;
236:12
**night (2)**
78:15;218:4
**nightmares (2)**
205:4;259:13
**nights (1)**
256:8
**nipples (1)**
66:12
**NN (1)**
245:23
**nobody (2)**
153:10,12
**Noelker (33)**
23:1;24:8;62:24,25;
63:3,8,11;88:22;93:22;
105:14;113:2;122:8,
19;123:15;137:19;
161:6,15,22;164:25;
167:16,17;171:19;
172:1,7;175:18,19;
207:8;217:8,22;224:2;

233:12,21;257:8
**noises (1)**
49:11
**None (1)**
5:23
**Nonverbal (1)**
236:9
**nor (1)**
127:14
**normal (1)**
252:24
**normally (1)**
58:20
**notation (7)**
167:12;215:20;
249:14;258:16;259:22;
260:4;262:1
**notations (3)**
53:15;258:21;259:7
**note (16)**
14:19;18:20;135:18;
138:21;139:2,3,9;
153:13;169:22;172:15,
15,25;222:10;226:5;
227:4;234:20
**noted (2)**
203:11;204:7
**notes (4)**
53:20;66:14;172:18;
222:5
**notice (4)**
69:21;212:17;
241:22,25
**noticed (2)**
54:8;71:7
**notified (2)**
174:4;239:21
**notifies (1)**
173:1
**notify (3)**
168:18,24;239:20
**November (7)**
12:14;30:5;130:17;
165:11;167:1;194:2;
250:11
**number (34)**
12:7;17:18;37:2,6,
10;59:15;65:6;70:24;
71:4;106:23;111:24,
25;112:4;115:5;
134:24;135:1,6;
147:19;151:21;152:21;
154:12;156:14,21;
157:8;181:12;195:24,
24;243:3;244:15;
247:12;250:5,25;
251:22;254:23
**numbered (1)**
246:6
**numbers (2)**
37:3,5
**numerous (6)**
79:16,17;112:10;

174:20;175:22;182:16
**nurse (50)**
9:12;11:10;22:20,22;
24:14,15,17,20,22;
25:11,12;26:6,7,11,16,
21,21,22;27:2;33:23;
49:2,4,6,7,13,19;80:5,
6;103:4;108:6,24;
110:5;114:2;144:6,8;
146:8,9,10,12;170:22;
174:6;175:6;202:7,8;
203:6;217:1;229:13;
230:2;242:18;260:13
**nurses (7)**
13:17;25:1;31:2;
35:24;36:17;104:4;
227:11
**nurses' (1)**
112:6
**nurse's (13)**
27:9,12,15,18,22,25;
28:3,18;29:17,18,23;
42:24;116:17
**nurses's (2)**
50:7,8
**nursing (39)**
29:24;30:2,20;32:3,
16,23;36:20;42:1,3,24;
73:14;171:7,23;172:9;
175:15;220:23;228:6,
20;229:3,9,14,22,24;
230:5,18,20,24;235:17,
18,20;236:6,16,22;
237:10;243:7,9,12;
264:23;265:12

## O

**Obamacare (1)**
244:5
**object (2)**
17:1;121:12
**objection (83)**
17:2;19:9;20:1,19;
38:9;43:19;44:20;45:7;
47:8,12,15;52:13,18,
22;53:25;57:7,11,12;
82:18;84:1;85:11;
86:20;89:24;92:9;95:7,
16;100:22;107:11,12;
108:19;109:9,19,23;
116:24;120:19;126:11;
127:11,12;136:15;
140:18;142:24;143:17;
144:12;145:17;146:1,
13;147:6;149:19;
163:11;164:7;166:12;
168:14,21;169:12,13,
13,20,23;171:15,24;
172:3;173:4,8;174:19,
25;177:1;185:7,13,16;
187:6,16;189:1;
203:10,11,14,23;204:4,

6;219:1;234:11;
261:12;269:21;271:4
**objections (1)**
173:12
**obligation (1)**
185:25
**observe (1)**
78:25
**observed (2)**
43:23;48:19
**obviously (2)**
109:16;203:20
**occasion (3)**
79:23;97:7,8
**occasions (10)**
79:20,22;112:10;
119:5,11,12;163:21;
175:23,24;182:17
**occur (2)**
42:10;55:14
**occurred (7)**
56:3,5;77:16;113:14;
115:24;229:1;235:11
**occurring (2)**
79:10;121:2
**occurs (1)**
233:3
**October (24)**
8:1;9:9;46:23;47:2,
2;193:2,6;206:9;208:3,
8,13,21,24;209:4;
213:8,11,17;220:17;
221:3;235:6;236:12;
250:5;251:22;252:12
**off (52)**
23:2;47:25;48:1,4;
59:8;63:18,20;81:7,8;
89:9,12,13;90:15;
112:5;119:16;120:6;
124:13,15,25;125:2,10;
139:15;144:6,20;
145:5,13;165:22;
169:6;187:22;188:5;
190:22,22,25,25;191:3;
199:14;211:3,6;215:2,
4;217:10;237:9;242:1,
12;244:1;248:15,20,
22;254:15,17;264:4;
267:4
**offense (1)**
92:4
**offensive (6)**
51:6,9,14,23;52:2;
108:22
**offer (2)**
119:18;240:5
**offering (1)**
189:23
**office (38)**
36:13,13,14;61:9;
62:6,10,21;63:1,5;
67:19;69:19,24;87:5;
88:25;117:3;123:25;

125:16;133:20;158:25;
163:20;165:3;166:25;
178:18,24;181:12,13;
188:16;195:11;197:14;
198:12;211:17;212:16;
213:7,23;214:24;
216:8;238:10;266:22
**officer (2)**
68:7;69:12
**officer's (1)**
91:11
**official (1)**
107:10
**off-site (2)**
129:25;237:6
**often (1)**
79:9
**Ohio (9)**
8:5;168:7;197:13;
247:1,20;249:9;
250:22,22;251:20
**old (1)**
80:2
**older (1)**
114:2
**Once (8)**
12:18,24;16:4;
136:13;152:16;218:6,
7;252:22
**one (75)**
7:5;15:1;22:10;
27:11,12;28:10,13,22,
23;29:5,9;36:11;39:21;
49:1;50:9,9,10;66:13;
70:10;77:5,7;79:23,24;
82:19,20;83:2;97:1;
106:22,23;108:2,7,12,
13;109:25;110:19;
112:12,21;122:20;
127:19;128:1;134:16,
19;135:13;148:18;
156:14;158:4;161:1;
163:9,13;164:10,11;
172:20;175:1;176:23;
180:17;188:10;189:3,
6;194:7;195:16;
204:25;205:17;206:6;
207:2;218:4;221:16;
226:11,11;228:5;
234:17;237:21;239:9;
256:24;261:17,22
**ones (5)**
56:7;118:1;126:25;
220:24;255:7
**ongoing (5)**
94:21;100:17;
142:13,15;175:22
**on-line (1)**
224:6
**only (16)**
42:9,16;77:1;79:24;
110:19;112:12;120:13;
122:6;152:9;184:16;

**FINCUN-MANCINI -- THE COURT REPORTERS**
**(216) 696-2272**

**(14) needing - only**

Plaintiff
March 2, 2017

Annette Ryan (K.N.A. Katz) v.
Robert McDonald, Secretary, etc.

189:3,6;207:8;239:22;
242:20;249:15
**onto (1)**
68:21
**OO (2)**
246:22,25
**open (1)**
99:19
**opened (1)**
74:13
**opening (1)**
120:9
**openings (1)**
89:10
**opinion (1)**
188:24
**opportunities (1)**
233:1
**opposed (1)**
78:21
**order (20)**
20:16;81:10,15,17,
19,21;82:1,3,5,11,15,
17,22;83:1,4,8,12;
231:23;244:8;248:15
**orientation (1)**
15:25
**original (2)**
48:18;134:13
**originally (1)**
198:23
**ORM (3)**
205:25;209:18;210:3
**out (64)**
5:22;13:12,15;15:6,
15,19,20;25:6;30:4;
46:2;49:2,21;54:18,18;
56:8;58:3,11;59:16;
68:2;69:16,17,20;
74:17,24;76:1;78:22,
24;89:15;97:10;
101:25;111:14;113:19;
118:1;120:13;123:2;
124:1;135:25;138:12;
139:17;140:17;147:20;
152:8,10,25;158:13,18;
167:11;169:1,2;
172:12;173:13;177:3;
179:15;209:8;216:17;
218:8;220:12;224:16,
19;235:19;237:8;
249:18;260:20;265:12
**outcome (3)**
190:14;231:20,21
**outside (9)**
36:13,24;40:17;
137:4;206:18,22;
207:1;209:14;214:14
**outstanding (1)**
263:5
**over (18)**
7:5;9:15;11:9,9,13;
23:9,18;71:5;82:12;

93:24;107:11;108:13;
121:12;155:23;166:11;
168:3;253:25;263:11
**Overboard (1)**
86:21
**overtime (12)**
9:19;21:20;23:3;
240:16;244:23;248:1,
2,4,6;249:16,17,22
**overtook (1)**
99:22
**overweight (1)**
49:18
**own (11)**
58:18;115:22;116:5;
149:6;206:21;231:10,
19;256:3;259:1,5;
260:20

# P

**p/c (2)**
225:6,8
**package (1)**
124:25
**packet (2)**
124:22;125:22
**pad (1)**
68:20
**page (139)**
14:19;17:12;59:13,
16,17,18;70:21;71:21;
72:11,23;73:10,10;
77:13,13;78:6,10;79:3,
8,25;80:23;81:3,5;
82:22;86:7,7;87:19,22,
22;126:17,17,20;127:2,
19,23;128:5,16,21;
129:1,7,12,17;130:8,
13,16,22;131:4,9,17,
23;132:3,8,13;133:5,
13,18,23;134:9;
135:25;136:2,3;
138:21;140:23;141:5,
11;148:18;150:8,22;
151:10;153:5,13,19;
154:3;155:14;156:7;
157:8,25;158:8;163:4,
16;165:10;172:24;
173:21,23;177:10,12,
13;178:16,16;189:16;
191:16,18;192:25;
193:25;195:14,16,22;
196:25;197:17;198:20;
201:19;206:12;209:13;
212:10,23;216:15;
221:21;222:8,9;223:4,
5;224:23;225:15;
226:4;227:3,3;231:3,4;
232:8,20;234:20;
235:6,6;236:12,12;
237:12,23;238:2;
239:9,13;240:11;

241:11;246:7;248:8;
249:14;250:11,14;
251:6,21;252:4
**pages (21)**
125:18;126:12;
127:1,16;128:9,10,14;
129:5,15;131:25;
197:9;200:12,15;
201:11,11;212:5,6;
213:22,25;222:10;
246:6
**paid (9)**
186:4;242:25;
243:13;252:3,24;
253:9,23,24;260:20
**Pam (6)**
83:18;119:3;121:12,
15;166:5;265:4
**Pamela (2)**
183:23;213:9
**panic (2)**
259:24;260:2
**pants (2)**
65:10;71:10
**paper (1)**
216:17
**papers (3)**
89:16;169:1,3
**paperwork (22)**
120:13;123:2,7,11,
14,19,23;124:1,5;
139:17;140:14;158:12,
19;167:11;172:12,13,
14,16;245:8;268:11,12,
14
**paragraph (7)**
67:15;68:1;106:24;
141:19;142:8;184:4;
251:23
**paralyzed (1)**
10:17
**Park (24)**
68:5;78:11;81:7;
119:16;120:6;144:6,
21;145:5,11,16,24;
146:17,19,21,24;147:3;
148:1;170:9;190:3;
191:6;229:1,14;262:5;
268:2
**parking (4)**
79:1;94:11;95:3;
236:18
**Parma (2)**
131:19;147:21
**part (19)**
15:25;122:22;
131:18;148:17;150:8;
154:3;155:1;203:20;
210:24;227:18,19,20;
230:15;231:23;232:1;
255:15;259:8;260:5;
261:19
**particular (6)**

14:9;55:10;58:24;
71:18;75:21;101:17
**partner (2)**
80:3,14
**pass (1)**
29:18
**passing (3)**
65:9;71:10;96:16
**past (4)**
110:6;136:3;180:17;
261:10
**patient (17)**
29:21;58:2,9,14,16;
78:1,3;159:20;163:19;
196:2;197:18,25;
198:2,20;199:4,6;
230:18
**patients (15)**
10:17;29:13;43:25;
44:4,7,8,14,19;45:23;
46:9;48:11;58:18;
74:13;218:5;242:8
**patient's (8)**
55:11;57:19,24;58:1;
77:16,25;94:13;95:4
**Pauline (2)**
67:18,21
**pause (1)**
48:2
**pay (23)**
9:13,20;21:22,23,24;
131:1;141:23;142:1;
151:20;158:4;185:17;
186:10;215:7,8;
240:19;246:8,9;
248:20,22,23;249:3,15,
16
**paycheck (1)**
13:8
**paying (1)**
246:10
**Payment (6)**
250:3,8;251:7,11;
252:5,9
**payments (6)**
253:3,13,16;254:6,
11,13
**payroll (4)**
11:3,9;13:6;245:14
**pending (1)**
186:20
**penis (2)**
71:16;95:14
**people (21)**
15:10,15,18,20;25:6,
18;78:18,24;88:13;
99:8;118:3;159:17,18;
160:13;161:5;163:8;
164:5;186:12;211:7;
235:25;255:23
**people's (1)**
110:8
**per (6)**

28:23;177:19;183:9,
10;243:4;244:13
**perform (37)**
143:21,25;144:3,6,
10,22;145:3,7,10,15,
24;146:4,17,18,20;
149:14;150:5;154:14,
20,21;156:22;157:4,4;
170:18;171:4;176:1,
12,18;196:3;198:21;
227:21;228:3;229:25;
230:4;264:21;267:14,
22
**performance (2)**
23:5;230:11
**performing (1)**
229:8
**perhaps (1)**
99:23
**period (26)**
8:6;9:15;43:6;51:25;
52:8,11,16;53:2,7,18;
56:12;61:19;141:23;
150:10,16;155:3,8;
157:10,15;159:22;
187:23;188:5;229:13,
19;253:2;258:12
**periodic (1)**
142:15
**permitted (2)**
107:1;216:23
**perpetrator (4)**
225:8;227:12;
231:19;236:21
**perpetrator's (1)**
225:1
**person (14)**
13:7,8;20:17;26:16,
25;38:19;42:16;45:11;
48:14;96:9;107:4;
198:15;221:22;257:16
**personal (6)**
12:7;18:14;37:12;
80:13;126:21;184:21
**personalized (1)**
12:19
**personally (10)**
37:9;119:21,25;
124:12;127:3,9;
167:19;180:15;183:6;
202:24
**personnel (8)**
223:19,25;224:3,5,8,
10,12,13
**persons (1)**
107:8
**phone (30)**
36:25;37:2,6,9;64:4,
6,8,11,12,18,20,22,24,
25;65:6,18;66:20;67:6;
71:8,11;85:9;92:7;
97:24;98:21;112:11,
13,20,24;115:5;182:19

**Annette Ryan (K.N.A. Katz) v.**
**Robert McDonald, Secretary, etc.**

**Plaintiff**
**March 2, 2017**

**photo (1)**
64:19

**photograph (1)**
106:3

**photographs (10)**
65:15,16,18;67:3;
72:21;79:5;92:6,18;
105:23,25

**photos (2)**
64:19,22

**physical (7)**
39:12;52:6;53:11;
114:18,21;178:14;
265:7

**physically (6)**
53:14;92:24;117:12;
145:23;268:15,25

**physician (8)**
138:7,12;142:14;
148:15;154:1;178:25;
179:10,15

**pick (2)**
21:20;23:2

**picked (2)**
17:25;22:3

**Picklo (3)**
132:15;133:2,6

**picture (1)**
64:10

**pictures (17)**
63:6;64:3,6,7,11;
65:1,7,8;71:8,11;72:20,
24,24,25;79:3;89:5;
90:12

**pinpoint (2)**
126:24;229:7

**PIZZINO (123)**
14:18;15:21;16:24;
18:19,24;19:9;20:1,19;
33:22;38:9;43:19;
44:20;45:7,13;47:8,12,
23;52:13,15,18;53:25;
55:18;58:7,12;59:18;
64:17;70:23;71:2,22;
82:18,25;84:1,6,22;
85:11,20;86:2,20;
89:24;90:5;92:9,12;
95:7,16;100:22;
106:10,18;108:19;
109:9,19,23;110:15;
116:24;118:9;120:19;
121:11,18;124:13,21;
125:20;126:2,8,15;
127:11;134:21;136:15;
140:18;142:24;143:17;
144:12;145:17;146:1,
13;147:6;149:19;
163:11;164:7;166:12;
168:14,21;169:12,20;
171:15,24;172:3;
173:4,9,20,25;174:19,
25;177:1;185:7,13,16;
187:6,9,16;189:1;

191:18;196:23;200:25;
203:10,14,23;204:4;
209:10;219:1;221:9;
234:11;245:15;254:15;
256:21;257:5;261:12;
263:12,16;265:15;
267:10;269:21;270:17;
271:4,14

**place (7)**
106:19;145:15;
159:13;160:4;232:23;
233:4;242:4

**placed (1)**
186:15

**placement (6)**
227:8,13,16,18,21;
232:14

**placements (1)**
228:3

**places (1)**
117:9

**Plaintiff (1)**
106:25

**Plaintiff's (32)**
127:23;128:2,5,9,16,
17,22;129:1,7,12,17;
130:4,9,13,16,22;
131:4,10,23;132:3,8,
13;133:13,18,23;134:4,
12,19,20;135:1,17;
209:13

**planned (1)**
232:15

**plans (4)**
222:15;245:9,20,21

**pleasant (1)**
97:25

**please (38)**
5:11,25;6:2,12,15;
12:5;47:17;48:1,4;
50:6;56:11,15;66:23;
70:22;71:4;81:25;86:4;
87:1;121:10;134:20;
144:16;159:15;164:2;
166:24;167:6;177:3,
22;178:23,25;181:11;
182:22;194:1;195:23;
237:12,23;245:12;
246:7;258:14

**pm (2)**
56:25;271:15

**pocket (1)**
260:20

**point (23)**
13:24;38:1;52:4,9;
63:2;86:1;90:10;
106:11;110:17;123:17;
158:14;160:16;168:11,
18,24;171:12;188:6;
197:22;199:10;217:1;
219:16;253:8;259:1

**police (50)**
41:4;42:9;46:21;

56:20,23;57:8;59:23;
60:13;61:18;63:12,14,
17,23,24;67:19;69:11,
24;73:8;75:6;78:21;
88:20;91:6,12,16,16,
19,22,24,25;92:4,20;
93:8;96:3,22;97:13;
104:16;110:23;113:4,
6;114:9;118:3,17;
137:23;138:3;140:5,6,
6,7;206:21;218:15

**policies (6)**
11:1,10,13,14,17,22

**policy (4)**
137:9;222:17,22,25

**Pond (2)**
8:4,7,15;9:4

**portion (1)**
222:2

**position (16)**
9:11;14:11,12;21:6;
42:21;130:5;143:22;
144:1;145:4;189:24;
190:1;192:19;221:5;
234:15;240:7;242:18

**positions (2)**
89:19;243:12

**possession (1)**
121:19

**possible (3)**
63:7;160:2;235:13

**possibly (1)**
189:4

**Post-Traumatic (1)**
165:16

**pounds (1)**
86:12

**PP (3)**
247:16,17,20

**practical (1)**
9:12

**preceptor (1)**
229:11

**preferred (1)**
248:22

**prepare (1)**
85:21

**prepared (3)**
127:20;200:10;208:5

**preprinted (1)**
135:22

**prescribe (1)**
260:11

**prescribed (3)**
258:3;260:6;270:8

**prescribing (1)**
260:21

**presence (2)**
69:20;102:14

**present (21)**
24:10,16;37:22;
42:14;49:4;51:4,4,8;
62:17;67:23;88:22;

90:14,17;102:23;
103:22;161:2,5,12;
163:9;234:23;235:4

**presided (1)**
82:12

**president (1)**
67:22

**presumably (2)**
210:10;235:21

**presume (1)**
116:7

**pretty (2)**
107:12;263:6

**prevented (5)**
264:24;265:2,12;
266:11;268:9

**prevention (2)**
17:15;18:23

**previous (6)**
52:20;192:12;
201:21,25;202:11;
225:20

**previously (9)**
5:13;78:8;184:22;
222:24;231:8,12;
236:19;252:14;258:18

**price (1)**
245:22

**Prignitz (1)**
5:19

**Princess (19)**
109:5,18,21,22;
111:20;112:2,6,8;
114:5,24;115:7,13,17;
116:7,17;117:22;
118:4;263:25;265:23

**Princess's (2)**
113:20;116:14

**prior (26)**
8:2,15;19:2,13;41:3,
15,20;53:5;65:18;
86:15,19,23;96:16;
104:23;116:15;120:18;
161:14;165:5;182:15;
202:13,22;217:23;
234:9;270:23;271:3,9

**privilege (5)**
84:3,23,24;85:15;
120:20

**privileged (3)**
85:13,22,23

**prn (1)**
205:3

**Probable (2)**
148:22;154:6;156:16

**probably (2)**
140:12;197:4

**problem (3)**
13:7,9;202:16

**Problems (1)**
201:20

**procedures (4)**
11:2,14,17,23

**proceed (1)**
234:25

**proceeded (1)**
232:11

**proceeding (1)**
128:11

**proceedings (3)**
85:6;129:3,14

**process (4)**
184:1;219:19;225:1;
233:3

**processed (2)**
237:25;238:8

**produce (5)**
81:24;84:21,24;86:4;
121:10

**produced (2)**
65:19;71:12

**product (6)**
84:24;85:15,18,19,
19,22

**production (1)**
178:12

**program (8)**
15:25;153:6,17;
247:2,21;249:10;
250:23;262:3

**progress (4)**
39:8;135:18;222:5;
225:24

**prompted (1)**
80:21

**proof (2)**
67:13;191:11

**propose (2)**
25:23;162:6

**Proposed (2)**
193:3;234:5

**prosecutor (2)**
137:18;185:19,20

**protected (1)**
86:3

**protecting (1)**
81:12

**protocol (1)**
222:16

**Provant (6)**
220:2,3,4,7,22,25

**provide (11)**
12:4;64:14;66:22;
83:12;109:12;149:4;
151:3;164:15;209:20;
245:12;254:10

**provided (20)**
68:6;109:11;124:17;
125:11;140:25;141:2,
6,8;149:2;164:13;
167:17;168:8;180:13;
214:7;222:19;230:21;
231:6,7;241:24;246:2

**Provider (2)**
131:6;133:25;
142:16;148:10;153:21;

Annette Ryan (K.N.A. Katz) v.
Robert McDonald, Secretary, etc.

Plaintiff
March 2, 2017

156:9;182:23
**provides (1)**
  141:20
**providing (1)**
  164:19
**psych (2)**
  202:9,10
**psychiatric (18)**
  201:21,25;202:2,3,4,
  12,17,17,19,23;203:2,
  9,13,17,21;204:1,8;
  258:10
**psychiatry (2)**
  189:8,11
**psychological (2)**
  257:25;258:11
**PTSD (7)**
  163:21;174:14,15,
  20,23;215:5;216:22
**pull (1)**
  177:3
**pulled (1)**
  50:10
**pulling (1)**
  49:12
**purpose (4)**
  93:9;141:24;159:8;
  249:20
**purposes (4)**
  47:11,21;143:14;
  246:20
**pursuant (1)**
  242:17
**pursue (5)**
  35:6,8,10,16;162:13
**pursuing (1)**
  35:13
**push (6)**
  34:10;73:15,19;
  74:22;75:2;76:2
**pushed (13)**
  55:11;57:19,23;58:4,
  12,13;60:5;71:17;
  74:14;75:25;77:8,12;
  95:13
**pushes (1)**
  79:9
**pushing (5)**
  64:2;75:19;76:8;
  94:7;95:4
**put (19)**
  59:16;74:15;129:24;
  141:13;152:7,23;
  165:2;167:19;186:9,11

**Q**

**QQ (2)**
  249:6,9
**qualifies (2)**
  203:8,13
**qualify (1)**
  142:7

**quantity (2)**
  79:12,18
**questionnaire (1)**
  221:23
**quick (1)**
  106:20
**quite (2)**
  70:17;136:18
**quitting (1)**
  241:10

**R**

**race (6)**
  115:14,18,22;116:5,
  14,23
**raise (1)**
  266:20
**ran (1)**
  236:7
**Rape (1)**
  133:19
**rare (1)**
  226:9
**rate (3)**
  9:13,20;244:18
**Rather (3)**
  10:7;211:4;215:15
**read (9)**
  18:25;87:13;132:22;
  139:5;148:24;155:22;
  173:14;217:4;271:14
**reading (1)**
  227:15
**Ready (1)**
  238:5
**realize (2)**
  59:14;214:13
**really (4)**
  50:20;52:10,17;
  203:4
**reason (20)**
  65:24;104:11,20,22;
  105:3,7,9,13,17,20;
  113:15;160:8;171:3;
  178:11;195:19;196:10;
  208:20;215:2;238:18;
  259:21
**reasonable (11)**
  107:4;130:11;
  176:22,25;177:21;
  178:19,21;181:7;
  182:11;184:1,9
**reasons (5)**
  35:18;104:9;187:3,
  11;191:7
**reassign (9)**
  162:21;216:19;
  217:2,6,7,9,21;222:17;
  231:24
**reassigned (7)**
  21:18;131:19;
  137:14;147:21;217:1,

4;227:7
**re-assigned (1)**
  164:1
**Reassignment (2)**
  178:22,24
**recall (226)**
  9:18;11:12;14:13,16;
  15:3,13;16:7,9;17:23;
  18:8;19:12,16,18,20;
  20:7;21:12;24:21,24,
  25;25:5,16;27:2;28:2;
  29:15;30:11;31:11,14;
  32:9,15,18;33:9,11,12;
  34:11;35:13;38:2,6,15;
  39:11,24,25;40:2,9,12,
  15,19,20,22,24;41:1;
  42:16,17;43:5;45:18,
  19,20;46:2,13;48:25;
  49:24;50:4;54:15;55:7,
  20;56:7,10,11;60:7,15,
  17,24;61:23;64:9;
  70:10,18;73:21,22,25;
  74:1,2,21;75:13,21;
  79:16;80:9,22;81:4;
  83:11;87:8;89:3;90:23;
  91:6;93:16,21,23;
  95:12,19;96:11,13;
  98:4,15,20;101:15;
  108:3,9;109:18,21;
  110:3;111:9;114:7,15;
  115:19;117:4,5,5,6,11;
  119:2,11;120:3,10;
  121:6,24;122:3,6,24;
  123:1,12;124:3;
  136:10;137:17,21;
  138:6;139:8;140:20,
  21;141:1,9;149:12;
  158:12,13,15,17,21;
  160:1;161:12,13,24;
  162:2,3,4;164:19;
  165:7,24;175:14,24;
  176:17;177:25;178:2,
  3,4,6,8;179:22;180:14,
  16;181:2,15;182:6,12,
  16;183:2,21;184:8;
  185:2;188:4;199:16,
  24;206:10,14;209:15;
  211:23,25;212:22,25;
  213:15;214:12;215:9;
  216:9;217:24;219:16;
  222:23;226:21,22;
  227:25;228:9,22,23,25;
  231:2,13;232:16;
  233:16;235:5;237:18;
  238:11,15;240:18;
  242:14;246:18;249:5;
  253:2,5,10,12,15;
  256:20;257:15;260:3;
  261:22;262:7,8;
  269:10,25;270:7;271:7
**recalled (2)**
  109:16;228:20
**recalling (1)**

223:2
**recalls (1)**
  109:15
**receipt (3)**
  178:19;181:13;
  212:17
**receive (32)**
  10:25;13:25;15:12;
  16:5,10,11;19:1;81:19;
  82:5;83:4,7;113:22;
  115:6;167:7;181:1;
  183:19;189:21;191:22;
  194:4,8,21;209:6;
  211:21,24;212:3;
  213:13;215:22;216:5;
  253:13;254:2;262:21;
  263:9
**received (56)**
  10:14;14:7,24;15:4,
  24;17:15,20;18:4,9;
  19:5,8,14;36:1;43:17;
  67:5;72:6;82:16;106:4;
  113:18;122:4;125:16;
  136:12;137:7;140:13;
  160:7;181:10;182:25;
  184:7;191:24;194:10;
  195:17;206:16,24;
  207:6;208:1;212:8;
  214:21;222:3;224:12;
  225:7;226:7;230:8;
  238:25;242:16;247:5;
  252:21;253:3,11,17,19,
  20;254:7,11,13;
  257:11;258:9
**receiving (12)**
  14:13;92:17;178:4;
  182:6;184:3,10;207:3,
  17;208:16;213:2,16;
  246:16
**recent (4)**
  166:25;231:17;
  232:12;237:15
**recently (5)**
  71:7;163:20;222:14;
  225:5,7
**recognize (6)**
  138:18;177:8;180:5,
  24;205:14;207:14
**recognizes (1)**
  233:1
**recollect (1)**
  93:11
**recollection (17)**
  17:19;39:20;70:14;
  72:2;92:2;161:21;
  167:20;175:13;177:10;
  235:2,16;237:19;
  240:14;241:18;247:13;
  257:14,22
**recommendation (2)**
  152:22;153:8
**Reconsideration (3)**
  250:4;251:8;252:6

**record (30)**
  5:11;6:24;14:19;
  16:16,21;18:20;23:11;
  33:23;59:9,12;63:19,
  20,22;116:9;118:13;
  124:14,15,17,25;125:2,
  4,10,21;201:6;223:20;
  227:15;254:16,17,20;
  259:7
**records (30)**
  17:8;91:2;178:15;
  179:19;217:19;220:6;
  221:2;228:14;238:25;
  241:1;242:16;244:7,8;
  247:2;253:16,20;
  254:6,10;257:11,18;
  258:17,24;259:22;
  260:8,19;261:3;262:1;
  266:14;269:19;271:8
**recovery (3)**
  150:12;155:5;157:13
RECROSS-EXAMINATION (1)
  265:18
**redact (1)**
  211:2
**redacted (1)**
  211:9
**REDIRECT (1)**
  263:15
**redirected (1)**
  22:8
**refer (4)**
  5:21;11:15;33:18,23
**reference (7)**
  31:18;38:20;70:24;
  72:12;73:6;237:6,9
**referring (11)**
  49:5;68:23;72:17;
  80:24;84:15;164:4;
  205:9;222:22;225:12;
  226:16;233:10
**reflected (1)**
  226:23
**refuse (4)**
  102:3,7;217:2,9
**refused (4)**
  217:7,21;232:25;
  233:6,7,11
**refusing (2)**
  216:18;217:6
**regarding (12)**
  61:13,17;83:22;
  121:5;130:10,25;
  132:5;133:15;195:1;
  247:3;255:20;258:5
**regardless (1)**
  24:16
**regards (2)**
  132:17;250:4
**Regina (2)**
  206:1;210:3
**register (1)**
  18:17

Annette Ryan (K.N.A. Katz) v.
Robert McDonald, Secretary, etc.

Plaintiff
March 2, 2017

**regular (2)**
74:12;144:8
**regularly (3)**
259:9,10,15
**Rehabilitation (2)**
185:5,12
**rehash (1)**
206:3
**related (6)**
38:23,23;163:22;
165:18;174:23;252:18
**relating (2)**
80:25;179:20
**relationship (8)**
36:7,10;37:25;38:1;
195:23;229:22;255:24;
261:20
**relationships (1)**
255:22
**relatively (1)**
87:24
**release (3)**
128:18;209:17,20
**Relevancy (3)**
19:10;143:18;271:5
**relocate (1)**
122:10
**remain (2)**
186:4,19
**remarked (1)**
197:5
**Remarks (1)**
152:16
**remedy (2)**
146:21;147:18
**remember (10)**
39:17,18;42:23;
55:18;76:9;115:4;
117:14,25;139:25;
238:17
**remembering (1)**
5:7
**remind (1)**
6:22
**reminder (1)**
268:4
**Removal (4)**
189:17;193:4;195:1;
234:5
**Removed (2)**
129:24;197:2
**Renee (12)**
5:18;14:18;16:24;
33:22,25;64:17;70:23;
106:10;134:21;200:25;
245:15;257:5
**re-open (2)**
262:14,15
**re-opened (2)**
262:19,25
**rep (1)**
256:17
**repairs (1)**

37:18
**repeat (4)**
10:7;126:18;226:12;
230:23
**repeated (1)**
231:1
**rephrase (11)**
6:16;13:14;19:3;
31:13;61:14;92:14,23;
138:1;168:17;171:1;
185:9
**report (76)**
20:8;44:23;45:1,4,6,
17;56:20,24;57:4,9,20,
20;59:23;61:17;63:23;
67:20;76:22;87:24;
88:4;91:12,17,22,24;
92:4,15,20;93:7;94:22;
95:25;102:5;104:16,
22;105:9,13;110:22;
111:2;112:24;113:1,6;
118:3,16;131:24;
138:3;195:10,12,15;
196:15;197:13;198:11;
200:9,19,20;206:9,16,
18,23,24;207:3,7,16,
23,25;208:3,7,12,16,
21;218:9,11,24;219:4,
9;223:10,21,22;224:10
**reported (28)**
22:23;42:7,8;45:12;
46:13,20;54:5;55:15,
20,21;63:25;76:19;
82:8;88:7;95:23;96:1,
2,22;97:21;98:17;
114:24;115:7;138:2;
218:12,12;219:6;
225:13;233:10
**reporter (7)**
6:8;7:4;29:11;40:6;
46:25;77:18;116:2
**reporting (9)**
20:11;46:7;88:12,13,
16;111:10;114:9;
206:25;207:1
**reports (1)**
94:20
**represent (8)**
5:20;21:4,6;191:1;
217:19;222:1;245:25;
246:25
**representations (1)**
37:15
**representative (5)**
62:16;93:17;160:24;
161:7,8
**reprimanded (5)**
208:14,17,18,24;
230:20
**reprisal (1)**
186:21
**requalify (1)**
234:13

**request (53)**
31:1,4,7,9,11,15;
68:10,13,14,18;85:1;
118:15;124:5;125:19;
126:21;127:8;128:6;
129:18,22;132:23;
133:1;138:12;146:21;
151:11,12;155:24;
158:1,10;166:23;
167:9;170:1,4,7;
176:22,25;178:20;
179:16;181:7;182:11,
21,23;183:3;184:10;
194:15,16;216:2;
224:8;225:10;229:21;
247:3;250:3;251:7;
252:5
**requested (19)**
68:3,9,11;81:8;
129:23;131:18;136:14,
21;137:5;147:3,18;
151:15;159:6;170:3,8;
179:19;183:13;231:9;
263:10
**requesting (12)**
33:13;123:23;127:3;
142:18;152:13,17;
156:4;169:3,17;250:8;
251:10;252:9
**requests (11)**
107:6;124:7,8,9,11,
19;125:12,24;126:13;
136:8;229:17
**required (2)**
30:18;150:9
**requires (2)**
137:10;222:25
**requiring (1)**
142:15
**reside (2)**
7:14;8:16
**residence (1)**
256:3
**residing (2)**
182:3;213:1
**resigned (2)**
107:5;165:21;241:8
**Resolution (9)**
117:3;147:3,4;
158:25;194:25;211:17;
212:16;213:8,23
**resolve (1)**
159:10
**resolved (1)**
11:3
**Resources (2)**
80:4;130:25
**respond (2)**
89:8;120:7
**responding (1)**
182:10
**response (32)**
32:7,19,24;34:9,19;

35:23;46:3;76:10;
89:18;107:13;114:25;
122:4,6;181:11;183:3;
190:11;192:12,15;
193:6;194:18;216:1;
222:13;231:15;232:10,
22;234:21;235:7;
236:17;237:24;238:7,
25;257:10
**responses (8)**
95:22;98:24;101:23;
106:6;223:6;224:23;
225:16;260:4
**responsible (1)**
23:5
**rest (1)**
201:2
**restating (1)**
109:10
**restraining (15)**
81:10,15,17,19,21,
25;82:3,5,11,15,17;
83:1,4,8,12
**restriction (2)**
209:3,6
**restrictions (2)**
188:17,21
**result (11)**
131:15;163:23;
187:14;192:7;196:4;
198:22;207:3;208:16;
230:1;258:7;270:1
**retaliate (1)**
140:8
**retaliated (3)**
206:8,15,17
**retaliation (3)**
185:4,11;206:25
**retaliatory (1)**
207:22
**retired (1)**
198:15
**return (29)**
68:2;69:16,18;
110:24;138:5;165:19;
177:22;178:24;179:2,
9,12;183:4,6;188:17,
20,22,23,25;198:3;
199:6,11,13,18;200:1,
4;216:21;232:23;
234:14;238:18
**returned (7)**
179:11,13,14;
180:15;183:7,13;
213:23
**returning (4)**
96:6;199:25;227:10;
240:2
**review (3)**
69:6;210:7;254:9
**reviewed (2)**
233:4;237:14
**Right (28)**

14:22;35:15;36:4,5;
38:11;58:17;72:15;
90:2;108:8;111:10;
114:5;124:24;127:18;
134:9;145:8;174:15,
17;175:11;197:9;
208:10;212:25;221:13;
232:5;250:10;251:13;
252:11;256:25;268:25
**rights (2)**
185:4,11
**ring (1)**
209:9
**RN (14)**
25:10;27:12,15,19,
23;28:22;108:6;
116:18,19;229:10,10;
230:5,21;237:1
**RNs (10)**
25:1,2,13;27:5,6,8,
18,25;31:2;36:21
**Robinson (9)**
22:18;24:5;31:9;
44:24;47:7;48:22;
50:18;103:2;105:10
**Robinson's (2)**
22:19;50:19
**role-play (1)**
15:8
**role-playing (3)**
15:6,7,10
**room (4)**
55:11;57:19,24;58:1,
3,18;64:2;71:15;75:24;
77:16;94:13;100:1;
201:2
**Roseann (33)**
41:8,11;42:17;43:15;
53:24;54:7;57:15;
58:20,24;60:11,12,22;
61:1,2,3,4,8,8,11,16;
62:5,19;63:15;73:11;
77:21;129:4;136:22,
25;161:25;218:3;
225:23;231:22;256:10,
13
**rotated (1)**
58:22
**rotation (10)**
228:7,11,15;230:6,9,
23,24;232:14;264:4;
266:7
**RR (2)**
249:24;250:2
**rub (1)**
103:17
**rubbed (1)**
94:16
**rubbing (13)**
50:11,13;95:5,24;
97:20;98:25;99:14,24;
100:11;102:13,15;
103:5,10

Plaintiff
Robert McDonald, Secretary, etc.

Annette Ryan (K.N.A. Katz) v.

March 2, 2017

**run (1)**
236:2
**running (2)**
140:4;236:18
**Ryan (22)**
5:9,14;7:21;8:25;
67:16;68:1,3;105:23;
125:10,24;128:12,19;
129:14;133:15;138:17;
147:11;163:19;166:18,
23;180:21;213:13;
238:23
**Ryan's (2)**
107:4;124:19

## S

**safe (1)**
68:4
**safer (1)**
226:1
**salary (6)**
240:13;244:16,17,
18,20;252:25
**same (21)**
7:3;27:15;28:18;
30:15;32:12;34:14;
35:15,19;46:15,16;
54:14;66:16;78:7;
82:11;111:23;185:13,
16;216:21;231:19;
232:24;242:4
**Sarah (1)**
214:25
**sat (1)**
49:6
**save (4)**
65:21,24,25;72:9
**saved (1)**
71:11
**saw (25)**
30:9;49:20;73:15,19;
74:22;76:2;98:25;99:6,
13,16,18,24;100:5,6,9,
11,21;101:14;104:4,4,
5,6;241:1;257:16;
266:17
**saying (20)**
18:5;23:22;32:9,15;
45:19;46:21;93:4;
108:15;109:7;117:14;
170:6;174:9;178:13;
199:17;238:11;248:3;
259:16;264:18;265:25;
266:25
**scared (1)**
140:8
**scenarios (1)**
15:19
**scheduled (5)**
90:24;91:3;160:6,18;
240:20
**school (3)**

38:22;227:1;229:18
**scratch (1)**
211:6
**scream (1)**
58:11
**script (2)**
260:15,21
**Sean (1)**
9:3
**search (1)**
221:3
**seasonal (4)**
269:12,17,18;270:5
**seats (1)**
50:10
**second (38)**
9:24;10:1;17:12;
23:10,13,15,18,23,24,
25;24:10;27:4;33:5,9,
13;36:17;41:11;43:7;
49:25;58:21;79:23;
87:21;102:24;141:11,
19;148:18;173:20;
177:12;196:25;212:10,
23;225:17;235:12;
242:13;249:9;250:14;
253:6;254:16
**Section (3)**
149:2;197:17;248:9
**security (2)**
59:14;211:3
**seeing (6)**
75:5;100:3;104:14;
188:11;211:25;237:19
**seek (6)**
218:19;219:18,21;
220:12;233:2;242:22
**seeking (2)**
220:15;242:20
**seemed (2)**
258:24;266:14
**seems (1)**
136:10
**self-employment (2)**
258:25;259:4
**semester (3)**
226:17,18;229:5
**send (6)**
13:12,15;64:15;
164:24;165:1;262:2
**sending (4)**
64:4;65:7;71:8;
207:23
**seniority (1)**
239:8
**sent (34)**
39:22;65:14,18,22;
72:21;121:4,6,16;
122:1;132:14;133:7;
151:6;164:11,21,22;
166:1,11,15;168:2;
177:14;178:17;181:25;
188:15;191:19,21;

193:2;194:3,7;206:8;
208:18;212:19;221:9;
255:12;262:9
**sentence (9)**
71:5,6;222:13;
225:17;227:5;231:7,7;
236:14,17
**separate (4)**
77:6,23;147:24;
204:23
**Separately (1)**
93:20
**September (22)**
155:9;156:5;158:5;
160:6;191:20;192:4,
11,15,23;198:4;217:3,
17,20;232:21;234:20;
241:16;242:2;262:4,9;
267:3;269:10,13
**series (1)**
263:17
**Serious (10)**
131:6;133:25;
142:10;143:7,14,20;
148:10;153:21;156:9;
169:7
**seriously (1)**
5:9
**service (1)**
142:3
**Services (2)**
195:18;222:4
**session (4)**
227:6;231:10,18;
232:11
**set (2)**
201:10;211:11
**Setlak (1)**
255:4
**Setlak-Micheller (3)**
198:14;237:17;255:5
**settle (2)**
161:17;162:16
**settlement (2)**
137:1,2
**settling (1)**
137:4
**seven (6)**
71:23;134:24;135:1,
6;185:12;200:12
**seventh (1)**
106:20
**several (8)**
148:23;154:7;
163:21;213:22,25;
227:11;243:6;257:21
**severe (2)**
204:20,24
**sex (2)**
107:9;108:10
**sexual (70)**
13:17;14:14;15:3;
16:6;17:25;18:6;19:1,

5,12,17,21,25;20:8,12,
16;38:5,7,17;41:19;
44:3;45:23;47:6,9,10,
17;48:12,13,20;
50:21;54:1;55:4;56:4;
57:5;67:24;80:7,8;
82:9;86:10;88:12,16;
92:5;94:1;99:11;107:1;
108:16;110:7;136:12,
20;137:6,11,22;
144:17;163:22;165:17;
170:9;174:23;185:23;
187:1;215:5;222:17,
18;223:1;226:14;
231:18;247:4;252:18;
256:1;258:7;270:13
**sexually (24)**
20:14;41:7,15;43:16,
24;44:6;53:19,24;
104:3,13;106:7;
107:15,19;108:17;
170:19;172:10;175:7;
176:2;225:2;232:25;
256:13;258:18,19;
270:2
**share (4)**
33:1;54:12,24;
232:12
**sharing (1)**
60:7
**sheet (3)**
91:2;251:19,20
**shift (44)**
9:22,24;10:1;23:8,9,
10,12,13,14,15,17,18,
23,24,25;24:3,5,7,8,9,
11,15,18,22;25:12;
26:4,7,12;27:3,4,8,19,
21,25;28:4,23;36:17;
43:7;49:25;58:20;
102:24;110:6;131:20;
147:21
**shifts (2)**
58:22;102:21
**shirt (1)**
49:12
**shit (1)**
113:19
**short (7)**
29:4;59:10;133:5;
201:4;223:7;240:24;
254:18
**shortage (2)**
21:19;22:7
**shots (2)**
220:5;237:3
**shoved (1)**
77:11
**show (10)**
49:13;55:25;66:5;
142:9;143:12;160:18,
20;166:3;205:9;206:11
**showed (4)**

90:12,13;108:7,13
**showing (1)**
108:15
**shows (3)**
177:13;212:23;
239:13
**shut (1)**
74:15
**shy (1)**
6:22
**sick (9)**
24:12;152:18,23;
248:10,11,13,14,24;
249:3
**side (3)**
49:13;125:18;211:3
**sideways (1)**
211:8
**sign (5)**
19:14;135:8;162:12;
210:25;217:10
**signature (12)**
120:14,15;135:15;
147:14;151:13;153:2;
155:25;156:2;209:16;
212:10;213:24;271:16
**signed (17)**
14:25;87:19;135:7,
11;150:25;152:13;
155:18;156:11;157:22;
158:6;165:14;196:9;
221:21;237:21;250:10;
251:13;252:11
**significant (2)**
167:4;226:6
**signing (2)**
209:15;250:9;
251:12;252:10
**sign-off (2)**
231:22,22
**silent (1)**
118:6
**simply (2)**
174:22;230:11
**Sims (3)**
110:3,4,11
**single (5)**
104:18;150:10;
155:3;157:10;164:20
**sister (1)**
257:1
**sit (7)**
53:2;95:19;110:1;
166:10;172:17;192:21;
230:13
**site (2)**
235:13;237:9
**sites (2)**
236:16,25
**sitting (7)**
45:20,25;50:9,9;
66:13;108:3;122:7
**situation (2)**

**Annette Ryan (K.N.A. Katz) v.**
**Robert McDonald, Secretary, etc.**

**Plaintiff**
**March 2, 2017**

166:24;167:5

**six (20)**
46:22,23;51:18,19;
52:8;53:2,3,5,7;72:12;
73:3,4;83:21;84:9;
94:21;100:17;127:19;
152:21;222:10;248:9

**six-month (2)**
46:18,20

**skills (1)**
236:16

**SL (1)**
152:17

**sleep (2)**
86:11;205:3

**sleeping (1)**
215:5

**slip (3)**
138:7,9,13

**smacking (2)**
108:11;109:1

**smoke (1)**
204:18

**smoking (3)**
203:19;204:14,16

**social (2)**
59:14;211:2

**solution (1)**
131:18

**somebody (2)**
102:8;186:25

**someone (4)**
107:17;111:19;
140:1;170:18

**sometimes (5)**
23:24;24:4;103:4;
259:19,21

**somewhere (2)**
22:9;144:22

**son (2)**
7:17,24

**son's (1)**
7:20

**Sonya (2)**
177:19,25

**soon (4)**
106:12;111:10;
114:5;235:13

**sorry (33)**
6:21;12:23;14:23;
26:9;31:25;44:4;45:11;
49:4;56:2;68:24;
107:16;109:14;113:5;
124:17;132:7;147:3,
13;153:11;177:4;
191:16;195:15;209:12;
212:20;219:4,8;221:8;
231:3;232:7;238:1;
246:5;252:18;257:19;
267:11

**sound (2)**
241:2;256:25

**southern (2)**

7:11,13

**span (2)**
46:18,20

**spanned (1)**
51:18

**speak (6)**
24:13;52:8;91:4;
168:4;171:21;236:3

**speaking (10)**
7:2;33:12,25;57:21;
79:22;106:1;139:25;
173:12;177:25;236:11

**speaks (5)**
149:20;173:5;174:7,
13,14

**special (4)**
10:19,20;87:5,10

**specific (22)**
10:3,22;12:12;17:25;
28:8;74:4;75:10;80:20;
86:17;94:22,23;96:23;
98:7;99:4,12;100:18,
18;117:11;145:23;
171:20;172:22;233:20

**Specifically (25)**
19:11;21:21;26:15,
20;27:4,11;61:14,15;
99:13;101:2;122:17;
123:7;139:25;158:10;
165:7;170:6;175:20;
176:17;191:5;192:10;
217:7;233:7;235:24;
245:16;265:21

**specifics (1)**
19:16

**specified (1)**
141:24

**specify (1)**
199:21

**specifying (1)**
236:5

**speculate (6)**
30:11;115:4;117:8;
203:5;229:6;239:25

**speculation (7)**
108:20;136:16;
140:19;145:13;164:8;
168:22;269:22

**spells (4)**
267:1,18,20,25

**spending (1)**
215:15

**spinal (31)**
10:8,9,10,23;14:10;
21:14,17;22:4,8,12;
25:7;41:5,18;43:1;
62:3;110:24;111:4;
113:23;115:10;116:21;
117:17;144:4;176:16;
175:16;176:1;228:24;
234:2,9,15;235:23;
263:24

**spinal/traumatic/brain (1)**

10:6

**spoke (14)**
33:10;89:25;90:4,9;
172:1;175:2,8,22;
176:13;181:15,19;
182:16;222:14;231:16

**spoken (3)**
111:1,3;192:24

**spot (2)**
157:19;198:16

**spring (2)**
40:5;226:11

**SS (2)**
250:18,21

**stack (1)**
211:8

**staff (9)**
102:12,15,18,21,23;
103:17;209:5;231:5;
236:13

**stamp (2)**
131:13;195:16

**stamped (1)**
247:11

**stand (2)**
56:8;118:1

**stands (4)**
46:2;49:1;225:8;
246:11

**start (5)**
7:3;59:12;71:4;77:3;
245:19

**started (17)**
10:11;12:12;27:21;
31:24;36:8,16;38:21;
43:8,11;46:18;51:21;
83:21;84:9,11;237:2,4;
239:19

**starting (6)**
38:22;71:6;220:17;
221:3;225:25;235:9

**starts (3)**
71:5;87:23;206:12

**state (18)**
5:10;17:14;47:15;
62:22;71:23;95:22;
97:5,6;152:16;169:13;
190:24;215:4,6,7;
217:25;227:2;230:10;
245:16

**stated (25)**
33:2;68:4;82:19,20;
83:5;88:21;101:24;
102:12;106:7;111:19;
115:13;119:15;122:21;
151:8;162:9;163:7;
176:16;182:18;184:17;
190:22;192:8;241:22;
258:17;262:7,13

**statement (41)**
60:12;62:23;68:2,22,
25;69:1,10,15,19,21;
70:4,8,14;71:14;87:2,4,

8,11,13,17,19,22;
113:4,7,10,13;122:9;
123:18;125:12;172:25;
173:17;174:3;200:3;
206:2,7;210:11;
225:24;238:14,17;
248:9;267:5

**statements (9)**
36:11;39:21;52:1;
53:3;86:13;116:11;
122:20;160:16;206:4

**states (21)**
17:13;66:14;80:1;
86:7;106:24;133:6;
141:18;149:1;150:16;
165:15;169:6;215:1;
216:17;222:14;223:7;
224:23;225:16,17;
250:6;251:23;257:20

**stating (7)**
66:12;93:21;162:8,
13,24;188:16;262:4

**station (4)**
30:20;50:7,8;112:6

**statutory (1)**
141:21

**stay (2)**
9:5;116:4

**stayed (2)**
111:12;206:20

**staying (1)**
256:7

**Steve (1)**
255:18

**Steven (1)**
7:19

**stick (1)**
115:21

**Stiles (6)**
107:23,24;108:6,8,9;
109:2

**still (26)**
12:2;64:11;66:20;
84:19;120:6;126:9;
178:9;182:3;188:11;
197:25;199:4;211:7;
212:25;213:16;216:19,
23;218:3,8;238:2;
244:10;246:16;263:5;
266:15;267:1,17,20

**stilled (1)**
213:1

**Stokes (1)**
9:8

**stood (2)**
199:13,19

**stop (16)**
50:13,23,24,24;
51:11;101:9,12,16,16;
103:14,15,20,24,24;
114:16;115:22

**stopped (1)**
257:12

**stopping (1)**
211:5

**stops (1)**
140:9

**storage (1)**
64:2

**story (1)**
43:10

**straight (1)**
249:16

**street (1)**
8:19

**Stress (10)**
165:16;260:13,24,
25,25;261:7,11,18,19,
24

**stressers (5)**
261:4,5,6,16,22

**stresses (1)**
261:17

**stressing (1)**
261:25

**stub (2)**
246:8,10

**student (20)**
22:1,2;228:6,20;
229:3,9,10,14,22,24;
230:5,18,21,23;235:17,
18,20;236:6,22;237:10

**stuff (2)**
54:12;245:14

**style (1)**
225:4

**subject (2)**
96:4;132:20

**submission (1)**
126:21

**submissions (1)**
210:23

**submit (1)**
151:4

**submittal (2)**
125:13,15

**submitted (14)**
124:22;125:23;
126:4;127:2,13;166:3;
181:7;195:9,20;
196:16;198:12;200:10,
14;252:22

**subpoena (3)**
222:3;239:1;242:17

**subpoenaed (2)**
179:18;247:1

**subsequent (2)**
118:21;254:12

**substitute (1)**
59:13

**substituted (1)**
142:1

**successful (1)**
262:18

**suffer (1)**
269:11

**Annette Ryan (K.N.A. Katz) v.**
**Robert McDonald, Secretary, etc.**

Plaintiff
March 2, 2017

**suffered (2)**
144:17;270:5
**suffering (2)**
86:8;165:15
**suggests (1)**
191:12
**suit (3)**
137:2;162:13;232:1
**sum (1)**
253:11
**Summa (2)**
235:12,19
**summary (3)**
250:22;252:3;263:8
**summer (8)**
39:1,2,3,7,10,16;
40:25;71:25
**supervision (1)**
142:13
**supervisor (9)**
22:13;26:4,7;88:1;
102:14,24;103:1;
225:20;239:16
**Supplemental (3)**
247:21;249:10,20
**supplies (2)**
74:12;77:11
**supply (5)**
73:15,20;74:11;79:9,
14
**support (3)**
62:9;104:18;111:16
**supposed (3)**
67:18;139:7;158:8
**supposedly (1)**
100:14
**sur (1)**
71:1
**Sure (19)**
19:4;29:6;31:14,17;
37:15;48:2;53:18;
56:10;57:9;73:2;86:18;
96:24;97:2;110:16;
126:19;201:3;205:10;
211:8;263:14
**surgery (8)**
37:17;240:25;
241:10;242:1,2,3,4,12
**suspension (1)**
25:23
**S-V13-41713-1 (1)**
250:25
**Swails (22)**
24:25;26:22;31:5;
34:12,15,25;36:2;
97:18,19,22;98:3,6,16,
22,25;100:21;101:20;
111:3;117:22,22;
118:4;265:23
**Swails's (1)**
34:19
**swat (1)**
101:17

**swatted (2)**
101:5,8
**sworn (3)**
5:2;70:4;87:2;
122:20;205:7,23;
206:2,4,7
**symptoms (3)**
163:21;165:18;
174:23
**system (4)**
11:18;12:8;13:5;
144:10

**T**

**table (7)**
42:13;45:21,25;49:6;
99:20;108:12;122:7
**tablets (1)**
204:25
**talk (26)**
23:3;35:24;36:23;
40:6;44:3,5,6,6;45:22,
23;48:17;54:17;61:1;
67:20;78:10;80:14;
99:6;114:14;115:20;
126:24;127:6;190:15;
265:5;266:17,18,19
**talked (17)**
60:13,22;61:2;67:17;
78:8;94:2,4,7,15,19;
107:21;120:23;231:12;
254:24;256:10,19;
259:11
**talking (23)**
7:5;33:19;40:20;
51:20;53:1,11;56:12;
59:21;84:7;104:6;
105:23;161:21;172:13;
178:2;192:10;201:9;
223:10;233:7;234:5;
236:22;255:8;266:2,3
**talks (2)**
73:16;99:11
**Tallmadge (5)**
8:17;81:16;82:16,19,
24
**tape (1)**
175:9
**tapping (1)**
110:7
**tasks (1)**
264:23
**tax (2)**
220:8;258:24
**Teaching (2)**
21:25;22:1
**team (3)**
36:18,20;78:14
**tearful (3)**
231:16;232:10;
255:23
**tearfully (2)**

237:25;238:8
**teary-eyed (3)**
54:9;55:1,9
**technically (1)**
257:6
**Ted (16)**
73:13,13,19,24;74:4,
6,9,18;75:1,3,5,8,11;
76:25;77:4;254:23
**Ted's (1)**
75:14
**telephone (3)**
92:5,15,16
**telling (16)**
34:11;42:5;53:4;
54:13;60:4,24;67:23;
77:20;80:5;175:14;
176:17;199:24;206:14;
232:13,16;269:16
**tells (1)**
173:17
**Temporary (1)**
142:4
**ten (5)**
29:8,15;106:11;
147:19;229:5
**tend (1)**
48:2
**tending (1)**
141:24
**Teresa (1)**
265:22
**term (3)**
38:10;143:10,13
**terminated (3)**
240:9;241:13,16
**termination (1)**
241:12
**terms (10)**
30:14;79:18;126:23;
174:17,21;175:4;
230:18;232:7;241:14;
259:15
**testified (4)**
5:3;83:2;90:1;141:2
**testify (2)**
6:19;127:16
**testimony (9)**
52:20;55:24;109:11,
15;145:18;172:19;
205:7,23;207:21
**testing (1)**
230:12
**texted (6)**
65:2,4,5;67:4;71:24;
105:24
**texting (4)**
47:19;61:25;72:2;
92:6
**Thanks (1)**
177:24
**Therapeutic (2)**
231:6;236:14

**therapist (4)**
164:17;188:11,15;
199:17
**therapy (10)**
140:4;231:10;
237:25;238:8;257:12,
25;260:6,9,17,22
**thereof (1)**
107:8
**thick (1)**
209:8
**thinking (1)**
261:1
**third (5)**
110:6;196:2;227:4;
236:17;248:8
**though (2)**
204:11;266:1
**thought (6)**
38:8,11;52:17;
210:22;242:6;259:17
**threat (5)**
113:18,20,22;
114:15,21
**threaten (3)**
98:8;114:4,18
**threatened (4)**
112:14,22;114:1;
115:11
**threatening (1)**
236:1
**threats (2)**
98:6,7
**three (17)**
8:22;14:19;28:5,7,
13;29:5;30:19;40:20;
49:25;89:22,25;
128:14;142:17;149:1,
13;154:12;156:21
**three-fourths (1)**
252:24
**throwing (1)**
55:5
**tight (1)**
71:10
**times (11)**
51:2;79:16;93:14;
119:25;120:4;160:10;
176:9;210:9;218:23;
261:5;266:17
**time-stamp (1)**
166:3
**tired (1)**
209:12
**title (7)**
22:19,21;25:9;34:2;
41:25;185:5,12
**titled (1)**
250:3
**titles (1)**
161:7
**today (10)**
6:20;47:22;104:7;

106:16;166:10;172:17;
192:21;256:19;263:3,
10
**today's (1)**
232:11
**toe (3)**
65:10;71:9;78:7
**together (8)**
30:10;36:15,19;
54:19;57:25;93:18,20;
105:5
**told (75)**
13:24;25:11;26:10,
13;33:5,19;34:5;35:21;
42:18;43:10;49:17,22;
50:13,24;51:7,8;54:5,
10,11,11;55:2;60:24;
67:19;77:21;79:22;
81:14;84:4;89:9,19;
90:14,18;97:1,18;
101:16;111:20;112:8;
113:17;118:18;122:23;
137:17,19;139:10;
140:7;146:4;152:12,
23;159:16;171:19;
175:18,20,25;176:9,9;
184:16,20;188:22;
190:13;191:5;193:19;
200:1;206:3,20;207:8;
210:10;218:13,14,18;
219:10;233:21;234:17,
24;248:16;252:14;
260:8,12
**tomorrow (1)**
140:7
**took (15)**
59:21;65:8;67:13;
71:17;93:25;115:2;
159:12;185:3,10;
187:13;191:1;193:10,
18;226:7;240:3
**top (12)**
17:13;72:13;79:8;
80:1;81:6;83:20;
138:24;151:18;195:25;
247:11;248:8;250:24
**total (4)**
141:21;152:3;
220:23;230:19
**totaling (1)**
252:1
**touch (3)**
75:11;101:9;219:13
**touched (5)**
43:17;72:16,18;
100:16;101:4
**Touching (26)**
20:5;39:13;43:13;
45:18;46:19;47:20;
51:21,22;52:6,11;
53:14;54:3,17;60:19,
23;61:18;64:1;76:7;
88:17;97:9;99:11,19;

Annette Ryan (K.N.A. Katz) v.
Robert McDonald, Secretary, etc.

**Plaintiff**
March 2, 2017

100:9,14;101:14;103:7
**toward (2)**
225:2,3
**towards (7)**
46:19;77:10;95:13;
105:6;109:8;224:16;
264:9
**train (1)**
10:19
**training (43)**
10:12,14,21,22;11:1,
7,8;12:16;14:13,17;
15:4,10,12,14,15,24;
16:6,16,21;17:8,15,20,
23,24;18:5,6,6,10,16,
17,21;19:2,5,7,12,19,
20,22;20:7,15;26:5,10;
30:4
**transactions (2)**
85:9;194:16
**transcript (5)**
33:24;128:11;129:2,
13;226:23
**transfer (50)**
68:3,9,10,11,19;
81:7;89:17;90:18;
118:16,22,23,25;
119:23;120:18,25;
121:5;122:18,24;
123:4,23;124:6;
125:12,19;126:14,22;
127:3;132:23;133:1;
136:8,13,21,25;137:5,
10;146:25;147:1;
153:6;162:12;170:8;
176:13,24;185:14;
223:1;233:1,6,8,9,11,
21;237:13
**transferred (8)**
64:24;89:9;119:16;
125:25;137:3;146:23;
159:11;186:7
**transferring (1)**
233:13
**transfers (1)**
124:7
**translate (1)**
6:24
**transpire (1)**
159:4
**trauma (8)**
133:9;144:7,17;
145:25;146:9;170:5;
265:5;268:5
**traumatized (1)**
236:20
**treat (1)**
258:5
**treated (2)**
202:22;235:14
**treatment (12)**
118:6;142:16;
150:12;155:5;157:12;

202:13,18;218:19;
222:6;257:25;258:1;
260:5
**treats (1)**
99:10
**trial (1)**
233:3
**tried (5)**
55:12;75:11;94:10;
219:13;220:14
**trouble (1)**
261:7
**true (3)**
259:24;266:16;267:5
**trusted (2)**
193:14,14
**truth (3)**
6:1;206:3;210:10
**truthfully (1)**
6:20
**try (8)**
6:22,22;7:2;77:3;
95:1;98:12;159:10;
260:9
**trying (13)**
5:10;6:25;70:17;
79:1;95:3;104:18;
119:14;173:13;194:12;
232:18;258:15;262:15;
265:6
**TT (2)**
251:16,19
**Tuesday (2)**
182:9;184:2
**turn (18)**
17:11;153:19;155:1,
21;163:16;165:10;
193:25;197:17;211:3,
8;212:5;223:4;224:6;
239:13;240:11;241:11;
248:8;249:14
**turned (2)**
49:21;162:14
**turning (2)**
63:16;231:3
**two (39)**
8:8,24;9:5;28:5,10;
29:5;59:13,18;65:19;
66:10;72:23,24,24;
73:6;75:24;77:6;79:5,
20,21;93:18;129:5,15;
173:23;195:14,22;
197:2,17;198:20;
200:15;201:11,13;
207:14;212:6;220:24;
226:10;239:13;249:14;
251:6,21
**type (29)**
10:12,25;15:12;16:5;
19:1,5;38:21;43:24;
53:15,20;92:7,16;95:1,
11;98:10;158:10;
165:25;196:3;198:21;

203:8,12;207:6,22;
220:12;221:2;229:8;
230:20;242:22;258:25
**typed (4)**
68:21;69:1;208:4;
210:8
**typewritten (1)**
155:23
**typically (1)**
27:25

## U

**uh-huhs (1)**
6:23
**Uh-uh (1)**
6:21
**uh-uhs (1)**
6:23
**um-hmm (1)**
7:1
**unable (25)**
133:8;143:21,25;
146:20;149:14,17;
150:5,6;154:13,20,20;
156:22;157:3,4;196:3,
5;197:20,21;198:1,21;
199:4;229:25;230:4;
232:23;268:15
**unavailable (3)**
159:25;160:13,14
**uncertain (2)**
79:17;166:10
**uncomfortable (6)**
33:15,20;34:5;48:17;
264:19;266:1
**undated (1)**
135:14
**under (48)**
6:18;18:14;72:15;
134:24;135:6;142:18,
18;148:11;149:1,13;
152:16,20,21;154:12,
18;156:14,21;157:2,
19;158:4;185:5,5,11;
197:17,25;201:20;
203:2,16;214:25;
222:13;223:6;224:23;
225:24;226:5;231:5,
15;232:9,21;234:21;
235:7;236:13;237:23;
238:7;240:19;248:9,
19;254:22;261:3
**undergo (1)**
18:6
**understood (3)**
6:5;33:1;159:10
**unfortunately (2)**
125:5;246:5
**uninvited (1)**
43:12
**Union (41)**
20:13,22,23,25;21:1,

4,9,10;55:22;57:14,16;
61:18;62:16;67:17,22;
68:11,18;76:23;80:4;
93:16;96:3;105:15,17;
123:9,10,13,19,22,24;
124:4;141:6,8;143:11,
15,19;176:23;225:6,10,
13;248:19;256:16
**Union's (4)**
61:9;62:6,10,21
**unique (1)**
13:3
**unit (87)**
10:3,5,8,9,10,23;
14:10,10;16:5;21:14,
15,18,19,20,21,22;
22:4,4,7,8,11,12;25:7;
30:21;36:19;37:4;41:6,
19;43:1;62:3;68:19;
78:11;87:7;110:24;
111:5;113:23;115:10,
23;116:21;117:18;
131:20;143:3,6;144:2,
5,21;145:13;146:23;
147:22,24;148:1;
154:22;157:5;161:17,
25;162:9,25;163:25;
165:20,21;170:5,15,16,
19;171:4,13;174:6;
175:4,16;176:1;
190:22,25;191:3;
216:22,24;218:1,3,9,
14,23;228:9,22;234:2,
9,15;235:23;263:24
**units (1)**
21:22
**University (2)**
227:2;230:10
**UniversityHospitals (1)**
145:6
**unlawfully (1)**
106:25
**unless (5)**
101:25;122:9;133:3;
165:21;263:9
**unlike (1)**
11:4
**unpaid (1)**
186:16
**unsafe (1)**
81:8
**unsigned (1)**
14:20
**unsure (2)**
23:21;83:14
**Unwanted (5)**
47:19,19;61:17
**unwelcomed (10)**
20:17;43:13;44:12,
13,13,16,17;51:18;
88:17;96:18
**up (72)**
6:7;9:17;21:20;22:3;

23:3;25:22;26:3;27:20;
34:25;40:6;42:12;50:8,
11;51:13;58:13;67:7;
71:17,23;72:15;77:14;
87:23;90:3;91:15;
92:24;96:4;112:18,22;
114:13,19;118:25;
119:2;138:24;139:13;
151:20;160:18,20;
162:17;165:5,5;
167:18;176:21;184:9,
12,15;190:7,16,18;
191:12;192:22;193:11;
194:24;207:20;210:8;
215:15;217:25;218:4,
8,14,23;223:9,10,13;
235:18;237:7;240:24;
241:10;244:4;250:10;
251:12;252:11;266:15;
267:14
**update (1)**
166:23
**upon (1)**
149:6
**upset (2)**
76:7;98:1
**use (11)**
38:18;47:21;52:19;
101:11;144:25;149:1;
171:17;201:1;236:16;
269:18,24
**used (7)**
65:11;106:9;144:24;
203:17,18;204:14;
265:11
**using (1)**
204:16
**usual (1)**
259:11
**usually (5)**
27:14;36:17;50:19;
103:3;165:2

## V

**V1341713 (1)**
195:24
**v13-41713 (1)**
247:12
**v13-41713-0 (1)**
250:5
**V13-41713-2 (1)**
251:23
**VA (176)**
5:21;9:8;10:11;11:4,
14,18;13:5,6,13;15:5;
16:2;19:2,13,20;20:9,
23;21:1,15;42:9;43:25;
45:2;49:10;55:22;
56:20;63:12,14,24;
69:11;73:8;83:13;85:4,
10;88:3,8,11,20;91:18;
92:22,24,25;93:2,8,9,

10;96:19,22;97:12;
104:2;106:25;107:3,
10;110:23;117:6,12,
16;121:8;17;122:2,5,8;
127:3,9;129:24;
135:25;136:11;137:9,
10;138:2,4;140:5;
145:5;149:9;151:4,6;
158:11,18,25;160:11,
12,13;161:6,6,8,9;
162:6,7;163:8;164:5,
13,16,21;165:8;
166:11;167:12,14,20;
168:3,9,11,18;171:12,
21;173:1,18;174:4;
180:15,23;182:20,23;
183:9;184:13,15,21;
185:3,10,25;186:23;
187:25;189:23;190:6,
9,11;191:6,13,20,25;
192:23;194:11,14,15;
195:1;199:11,14,18,19,
25;200:4;206:18,21,
23;207:2,21;209:21;
216:18,25;218:19;
222:15,25;223:1,9;
227:6,22;228:4,21;
229:18,20;232:12;
234:1,13;235:9,13,15,
21;237:7;239:20;
240:3,9;244:1;246:17;
248:6,10;249:4;255:7,
11;262:5;268:3
**vacant (1)**
130:5
**vacation (9)**
39:23;40:2,4,8,23;
71:24;72:3,6;223:8
**vacations (4)**
40:10,21;159:19,21
**Vague (1)**
261:13
**varied (3)**
28:2,20;29:2
**various (5)**
30:24;245:9,20;
261:4,4
**vary (1)**
28:16
**VA's (3)**
17:9;187:4;192:19
**verbal (3)**
52:1;68:13,15
**verbally (2)**
20:5;43:25
**verbiage (1)**
47:20
**version (1)**
178:11
**vet (1)**
88:4
**veteran (1)**
218:18

**Veterans (8)**
5:20;16:17;87:6;
121:25;130:24;132:5;
134:6;211:18
**via (2)**
125:16;208:18
**victim (5)**
137:10;195:11,17;
197:14;223:1
**Victims (7)**
168:7;195:23;247:1,
5,20;249:9;250:23
**video (3)**
63:6;90:13;113:4
**videos (12)**
66:7,9,11,16,18,23,
25;67:13;72:23;73:6,7;
89:4
**videotape (1)**
113:13
**videotaped (1)**
113:11
**videotaping (1)**
67:8
**violence (2)**
114:18,22
**vision (1)**
246:12
**visit (5)**
166:25;167:2;218:5;
232:20;244:13
**visiting (2)**
117:12;138:7
**visits (4)**
243:18;244:15;
268:12,14
**voice (1)**
6:7
**voluntary (5)**
69:10,15;153:6,16;
199:11
**volunteer (1)**
176:6

---

## W

**Wade (23)**
68:5;81:7;119:16;
120:6;144:6,20;145:5,
11,16,24;146:17,19,21,
23;147:2;148:1;170:9;
190:3;191:6;229:1,14;
262:5;268:2
**wait (5)**
15:22;78:18;104:15;
140:15;173:20
**waiting (1)**
201:7
**waived (1)**
271:16
**Waiver (3)**
250:3;251:7;252:6
**walk (3)**

78:12,17;127:18
**walked (6)**
49:21;77:8;78:14,14,
16,24
**walking (6)**
39:17,18;49:15;
74:10;77:10;78:22
**wall (2)**
58:4,13
**Wanda (9)**
135:18;196:8,9;
197:1;198:15;216:21;
219:17;255:3;259:23
**wants (2)**
216:24;218:1
**ward (1)**
68:3
**warm (1)**
40:17
**warmer (1)**
40:18
**watching (1)**
15:18
**Watts (2)**
206:1;210:3
**way (8)**
5:25;63:7;139:18;
184:9;243:22;258:15;
262:7;266:15
**wearing (2)**
39:23;65:10
**wearing' (1)**
72:1
**week (14)**
11:4;13:17,17;30:7;
98:18;111:10;112:3;
114:8,11;159:25;
215:4;216:6;243:4;
244:22
**weekly (2)**
102:19,20
**weeks (8)**
12:17;16:1,4;76:14,
18;141:22;229:6;
257:21
**Wellbutrin (5)**
86:9;203:3,18;
204:13,14
**Wellness (4)**
219:24;220:23,24;
237:2
**Wells (2)**
67:19,21
**weren't (7)**
27:1;122:10;147:1;
162:21;256:4;269:1,6
**Westvue (15)**
8:20,21,23;9:6;
181:3;182:1,3;183:18;
191:21;193:3;194:5,7;
213:1,10,16
**what's (48)**
6:9,10;7:20;19:24,

24;20:4;56:18;61:5;
66:11;69:5;70:3;72:12;
75:14;91:10;125:1;
138:6,17;147:11;
148:5;150:7;155:21;
163:3;166:18;177:7;
180:4;21;181:23;
189:15;195:7;196:14;
197:7;198:9;200:8;
205:13;207:12;211:14;
212:14;213:21;214:19;
216:12;227:15;238:23;
244:20;246:24;249:8;
250:1,20;251:18
**whenever (1)**
216:24
**When's (3)**
31:14;38:6;48:24
**whispered (1)**
264:17
**whispering (1)**
265:24
**white (2)**
115:21;116:9
**whole (6)**
10:7;15:23;24:3;
105:4;106:17;147:25
**Who's (5)**
8:11;67:21;73:13;
106:8;111:8
**Willa (3)**
114:2,4,12
**Willa's (1)**
114:15
**willing (2)**
147:2;162:18
**wings (1)**
30:24
**Winter (6)**
31:21;32:12;38:13,
13,15;39:19
**Winters (7)**
25:1;26:23;31:5,12,
16;117:23;265:22
**Winters's (1)**
32:7
**wintertime (1)**
31:20
**withdrew (1)**
226:24
**within (6)**
31:23;46:18;88:8;
125:22;206:20;215:3
**without (14)**
21:23,24;131:1;
141:23;142:1;151:20;
158:4;160:9;180:8;
186:10;188:17,20;
248:20,22
**witness (7)**
69:10,15,21;82:21;
103:10;110:1;256:24
**witnessed (17)**

46:12;47:5;49:16;
73:24;74:5,9;75:18;
76:16,19,24,25;77:5;
97:6,8,9;99:9;100:15;
110:8
**witnesses (3)**
71:18;73:10;254:22
**witnessing (2)**
104:14;110:4
**women (2)**
76:11;99:10
**women's (1)**
99:19
**wondering (1)**
214:1
**word (8)**
38:10;47:9;52:19;
65:11;101:11;169:14;
191:15;269:18
**wording (1)**
171:17
**words (3)**
155:23;269:19,24
**work (110)**
10:1;21:15;23:8;
24:6;25:7;27:11,14;
28:3,12,25;30:3,8,15,
18;31:1,15;32:2,4,10;
33:3,6,13,15,20;34:6,
12,16;35:20;36:4,9,17,
24;49:10;58:20,24;
62:3;80:23;84:23;
85:14,18,19,19,21;
88:9;90:24;91:3;96:7;
105:11;110:24;111:21;
133:8;138:5,8;144:18,
20;161:9,16;162:9,25;
165:21;166:24;171:13;
175:4;188:17,20,22,25;
191:6;196:6;197:20,
21;198:1,3;199:5,7,18,
25;200:1,4;215:2,6;
220:21;226:1;227:10;
232:23;234:8,14,16,17;
236:16;238:11,19;
239:22;240:23;242:24;
244:10,23;251:24,25;
258:22;262:5;266:21;
268:10,15,20,23,23;
269:1,6;270:2
**worked (23)**
9:18,24;21:21;23:9,
17;24:8,22;27:3,23;
30:16;43:5,7;58:21;
105:5;110:9;175:16;
214:13;236:19;241:17;
242:5;243:6;249:17,17
**worker (2)**
75:23;222:18
**workers (1)**
237:14
**Workers' (22)**
158:15,19;187:22;

Annette Ryan (K.N.A. Katz) v.
Robert McDonald, Secretary, etc.

Plaintiff
March 2, 2017

188:6,8;200:11;
210:20;249:15;252:15,
16,22;253:3,7,9,13,17;
254:7,11;255:15;
262:3,13,15
**working (31)**
22:3;23:23;24:11;
28:1;30:10;31:24;36:6;
43:1,8;87:25;93:5;
107:2;115:23;144:9;
173:2;186:12,25;
194:20;195:4;216:25;
218:4,24;220:6;237:2;
239:16,19;243:17;
244:6;246:14;264:24;
268:24
**workplace (5)**
17:15;18:7,23;107:2;
137:25
**works (2)**
49:9;185:20
**workweek (1)**
30:16
**wound (1)**
10:18
**wrap (1)**
66:14
**write (12)**
25:22;26:3;68:20;
87:10;152:11;167:9;
223:9,10,13;245:17;
260:15,21
**writes (1)**
154:20
**writing (13)**
68:14,15,16;122:5;
123:3;124:6,9,12;
127:9;151:14;153:14;
162:8;166:22
**written (27)**
16:23;17:6;36:11;
68:18,25;70:12;87:14;
124:19;125:19;128:22;
129:9,18,22;133:20;
136:8;140:11,13,15,16;
177:13;182:21;209:3;
216:1,6;230:13,14,15
**wrong (3)**
54:10;196:25;258:15
**wrote (5)**
109:16;164:9;198:3;
217:3,11

**Y**

**year (8)**
8:1;40:1;98:18;
152:2;226:13,15;
228:13;243:24
**years (10)**
8:8,22;40:21;110:9;
139:8;149:12;163:20;
270:21,25;271:2

**yellow (1)**
68:20
**yesterday (2)**
177:20;255:9
**yesterday's (1)**
141:14

**Z**

**zero (2)**
152:3,4
**Zoloft (3)**
203:3;204:24,25

**0**

**0857A (1)**
182:21
**0857e (1)**
182:23

**1**

**1.5 (1)**
17:18
**1/28/14 (1)**
237:13
**10 (1)**
151:16
**102 (1)**
224:23
**105 (1)**
223:5
**106 (1)**
222:9
**1078 (1)**
194:1
**1082 (1)**
193:1
**1098 (1)**
191:17
**10th (4)**
117:2,7,13;152:5
**11 (4)**
23:16;217:12,21;
232:21
**1105 (1)**
189:17
**117 (1)**
71:21
**11th (3)**
178:1;217:23;251:13
**12 (12)**
17:13;106:11;129:5;
130:10;139:10,11,13,
15;141:21;142:3;
147:15;224:24
**12/14/2011 (1)**
17:14
**12/20/2013 (1)**
180:11
**12:30 (3)**
110:14,21;118:8

**1246 (1)**
91:25
**12-month (1)**
141:23
**13 (4)**
180:23;181:4;
195:17;229:6
**1302 (1)**
200:23
**13th (4)**
128:23;146:22;
155:18;183:19
**14 (1)**
131:12
**1440 (1)**
67:16
**14th (1)**
184:2
**150 (1)**
204:13
**15th (1)**
243:23
**17 (5)**
194:2;222:6;236:13;
241:17;254:23
**1746 (1)**
158:1
**176 (1)**
71:4
**177 (2)**
71:22,23
**178 (3)**
72:11,23;73:7
**179 (1)**
73:10
**17th (1)**
221:23
**180 (1)**
77:13
**181 (1)**
78:10
**182 (1)**
79:3
**183 (1)**
79:8
**186 (3)**
79:25;80:23;81:3
**187 (1)**
81:5
**189 (1)**
83:19
**18th (1)**
133:20
**19 (2)**
212:17;225:16
**191 (1)**
86:7
**1st (4)**
150:17;189:18;
191:13;217:3

**2**

**2/4/2014 (1)**
215:21
**20 (3)**
118:8;204:20,22
**20000 (1)**
7:9
**2003 (5)**
267:3,4,10;271:3,9
**2007 (2)**
270:21;271:1
**2010 (2)**
270:7,9
**2011 (3)**
9:9;30:5;31:21
**2012 (24)**
31:25;32:13;38:14,
16;39:1,10,16;40:1,22;
47:2,2;99:1,15;206:9;
208:4,8,13,22,24;
209:4;226:16,19;
269:10,13
**2012/2013 (1)**
255:25
**2013 (150)**
41:3,16,20;46:22;
47:3;55:19;56:24;
57:21;60:15,20;61:12,
12,19,20;62:6,11;63:9;
67:16;68:16,19;69:22;
70:5,15,19;71:15;
72:16,17;77:15;80:1;
82:9;86:16,19,24;87:3;
89:1,23;91:25;92:21,
25;93:13;104:15,24;
105:14,18;113:14,17,
24;115:25;116:15;
117:2;123:5;130:2,3,
10,17;131:12;132:10;
133:16,20;134:5;
137:24;144:1,11;
145:2,16;146:22;
147:5,16;148:19;
150:17;151:1,15;
152:5;154:5;155:9,10,
19;156:2,5,5,16;
157:15,16,23;158:5,5,
6,9;159:25;160:6;
163:18;165:11;167:1;
173:24;174:22;178:1;
195:17;196:6,17;
197:21;198:4;202:23;
211:16,22;212:7,17;
213:8,11,17;217:12,21,
23;219:16,22;220:17;
221:3,23;222:6,11;
223:5;224:24;225:16;
226:5;227:4;228:1,15,
21;231:5,11;232:3,9,
21;234:3,15,21;235:7,
21;236:5,13;237:20;
250:6,11;263:18;
266:16;267:9,11,12,15,
17,25

**2014 (54)**
8:9;128:12,23;129:5,
9,15;151:16;152:6;
166:21;167:21;180:23;
181:4;182:2,4,9,15;
183:19;188:2,3,14,21;
189:18;191:13,20;
192:4,11,15,23;193:2,
7;194:2;198:17;199:9;
205:18,21;214:23;
215:20;216:7;226:12;
234:6,10;238:11,19;
239:8;241:2,16,17;
244:5;250:24;251:13,
22;252:12;257:13,19
**2015 (2)**
243:25;254:13
**2016 (8)**
8:1,9;246:9;253:14,
21;254:12;262:4,10
**20th (2)**
130:2,3
**21 (1)**
270:21
**217 (1)**
206:12
**21st (10)**
60:15,20;61:6,12,19;
158:6;193:2,7;214:23;
216:7
**22 (1)**
211:16
**22nd (8)**
134:5;191:20;192:4,
11,15,23;211:22;227:4
**23rd (5)**
72:15,17;77:14;
223:5;250:5
**24 (2)**
173:24;174:22
**24th (4)**
133:15;156:2;
163:18;212:7
**25 (2)**
86:12;208:8
**25th (3)**
167:1;208:4,13
**26 (3)**
196:6,17;209:4
**2697 (1)**
240:11
**2699 (1)**
241:11
**26th (6)**
80:1,12,16,21,24;
160:6
**27 (1)**
244:21
**27th (46)**
41:3,16,20;46:21,22;
55:17;56:24;57:16,21;
61:6,9,12,19;62:6,10,
11;63:9;67:16;68:16,

Annette Ryan (K.N.A. Katz) v.
Robert McDonald, Secretary, etc.

Plaintiff
March 2, 2017

19;82:9;86:16,19,24;
88:21;89:1,23;90:22,
24;104:15,23;105:14,
18;115:24;116:15;
120:2;123:5;128:12;
130:17;137:24;138:2;
156:4;165:11;202:23;
205:21;232:9
**28 (1)**
197:21
**28th (24)**
69:22;70:5,15,19;
87:3;91:5,25;92:21,25;
93:3,7,12;113:23;
117:7,12;129:14;
148:19;154:5;155:9;
156:16;157:15;161:15;
198:17;205:18
**29th (2)**
226:5;227:7
**2nd (9)**
155:9;156:5;157:16;
158:5,9;198:4;267:4,
15,17

### 3

**3/4/13 (1)**
138:24
**3:00 (3)**
23:14,16;50:19
**3:22 (1)**
56:25
**3:30 (2)**
50:1,20
**30 (1)**
118:8
**30-minute (1)**
118:11
**30th (2)**
157:22;234:21
**31 (1)**
21:2
**31st (3)**
213:8,11,17
**33928 (1)**
7:10
**38 (2)**
106:24;126:5
**3rd (6)**
113:14,17;158:5;
222:11;239:7;250:24

### 4

**4 (4)**
166:20;167:21;
182:9;215:20
**4/1/2013 (1)**
215:3
**4/2/2013 (1)**
141:14
**4/2/2014 (1)**

141:15
**4/9/2013 (1)**
153:2
**40 (2)**
244:22,24
**44333 (1)**
8:5
**469 (1)**
156:7
**4712 (1)**
8:4
**480 (1)**
141:22
**494 (1)**
153:13
**4th (2)**
129:9;182:15

### 5

**5:28 (1)**
271:15
**50 (1)**
212:6
**500 (1)**
153:19
**501 (1)**
154:4
**509 (1)**
155:22
**51 (1)**
212:6
**5th (4)**
132:10;163:6;231:5,
11

### 6

**6 (1)**
250:11
**671 (2)**
172:24;173:23
**685 (1)**
87:23
**6th (2)**
182:1,4

### 7

**7 (1)**
185:5
**7:00 (1)**
23:14
**71 (3)**
181:3;182:1;183:18
**7th (1)**
12:14

### 8

**8 (1)**
235:7
**80 (1)**

240:20
**86 (1)**
237:23
**88 (1)**
237:12
**8th (1)**
151:1

### 9

**90 (2)**
232:13;235:9
**92 (1)**
236:12
**93 (1)**
235:6
**94 (1)**
234:20
**95 (1)**
232:20
**96 (1)**
232:8
**97 (1)**
231:4
**99 (1)**
227:3
**9th (6)**
151:15;152:5;
241:16;246:9;251:22;
252:12

```
1                          SIGNATURE PAGE

2

3    In Re:        Annette Ryan, (K.N.A. Katz) -v- Robert
                   McDonald, Secretary of Department of
4                  Veterans' Affairs

5    Case Number: 1:15-CV-02384

6    Deponent:    Annette M. Katz

7    Date:        March 2, 2017

8

9    To the Reporter:

10        I have read the entire transcript of my

11   Deposition taken in the captioned matter or the same

12   has been read to me.  I request that the following

13   changes be entered upon the record for the reasons

14   indicated.

15        I have signed my name to the Errata Sheet and the

16   appropriate Certificate and authorize you to attach

17   both to the original transcript.

18

19

20                           Annette M. Katz

21        Subscribed and sworn to before me this

22   23 day of March , 2017

23

24                     Notary Public

25        My commission expires: _____
```

HEATHER BILLY
MY COMMISSION # FF 046985
EXPIRES: September 20, 2017
Bonded Thru Notary Public Underwriters

```
 1        I have read the foregoing transcript from page 1
 2   through page 272 and note the following corrections:
 3   PAGE-LINE      REQUESTED CHANGE        REASON FOR CHANGE
 4   pg 26, line 11 meant to say Charge
 5                                         Nurse
 6                                    not Nurse Manager,
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24   _____  3|23|17
25   Annette M. Katz              Date
```