**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| **ANNETTE RYAN (nka Katz),** | ) | CASE NO.: 1:15-cv-02384-DAP |
|  | ) |  |
| *Plaintiff,* | ) |  |
|  | ) | JUDGE DAN POLSTER |
| v. | ) |  |
|  | ) |  |
| David J. Shulkin, *Secretary,* | ) | **PLAINTIFF'S BRIEF IN OPPOSITION** |
| *United States Department of Veterans* | ) | **TO DEFENDANTS' MOTION FOR** |
| *Affairs,* | ) | **SUMMARY JUDGMENT** |
|  | ) |  |
| *Defendant.* | ) |  |

NOW COMES PLAINTIFF, Annette Ryan, by and through counsel, and hereby opposes Defendants' Motion for Summary Judgment (Doc. #55-1). The record is replete with factual disputes as to highly material issues, such that a reasonable jury could easily find in favor of Annette Ryan on all of her pending claims. Thus, Defendants' Motion for Summary Judgment must be denied in its entirety, and this case must proceed to a jury trial.

Respectfully submitted,

s/ Elisa P. Pizzino
Elisa P. Pizzino (0043723)
697 West Market Street, Suite 102
Akron, Ohio 44303
330.603.1913 (T) 330.376.5069 (F)

*Attorney for Plaintiff Annette Ryan*

## <u>TABLE OF CONTENTS</u>

<u>TABLE OF CONTENTS</u>.................................................................................................... i

<u>TABLE OF AUTHORITIES</u> ............................................................................................ iii

SUMMARY OF PLAINTIFF'S ARGUMENT.......................................................................v

Issues To Be Decided.......................................................................................................... vii

STATEMENT OF FACTS ........................................................................................................1

LAW AND ARGUMENT ........................................................................................................10

I.  SUMMARY JUDGMENT STANDARD ...........................................................................10

II.  MATERIAL FACTS EXIST TO SUPPORT THAT A PRIMA FACIE CASE EXISTS
THAT RYAN WAS SUBJECTED TO A HOSTILE WORK ENVIRONMENT BY A CO-
WORKER. ................................................................................................................................10

A.  The VA knew, or should have known, that Garrett was sexually harassing Ryan..................11

    1)  ***Direct knowledge***................................................................................................ 11

    2)  ***Garrett's conduct toward Ryan created a hostile environment.***................................. 15

    3)  ***Management should have known of Sexually Harassing behaviors.*** ........................ 17

B.  The VA's response to the sexually harassing environment was unreasonable and showed a
level of indifference.................................................................................................................18

    1)  ***VA's policy of transferring the wrongdoer was dysfunctional and unreasonable.*** ... 20

III.  THERE ARE SUFFICIENT FACTS TO SUPPORT RYAN'S GENDER
DISCRIMINATION CLAIM. ..................................................................................................20

IV.  THE RECORD EVIDENCE IS REPLETE WITH MATERIAL FACTUAL EVIDENCE
TO SUPPORT THAT THE VA DISCRIMINATED AGAINST RYAN IN VIOLATION OF
THE REHABILITATION ACT. ..............................................................................................22

A.  Defendant's claim that Ryan did not have a qualifying disability that substantially limited her
ability to work at Wade Park is contradicted by clear record evidence.................................24

B.  The VA failed to accommodate Ryan. ...............................................................................26

    1)  ***Numerous accommodation requests were made.***........................................................ 26

V.  RYAN'S RETALIATION CLAIM IS SUPPORTED BY MATERIAL FACTS AND
EVIDENCE...............................................................................................................................29

i

A.   The VA is responsible for the retaliatory conduct of Ryan's co-workers. .............................30

B.   Ryan can establish that the VA retaliated against her in violation of both Title VII and the Rehabilitation Act. ...........................................................................................................30

CONCLUSION .....................................................................................................................31

## **TABLE OF AUTHORITIES**

**Cases**

*Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir.2000). ................................. 36

*Abeita v. Transam. Mailings, Inc.*, 159 F.3d 246 252 (6th Cir. 1998).......................... 18

*Blankenship v. Parke Care Ctrs., Inc.*  123 F.3d 868, 873 (6th Cir. 1997) ................... 22

*Brown v. BKW Drywall Supply, Inc.*, 305 F. Supp.2d 814, 828 (S.D. Ohio 2004) ..................... 32

*Bryson v. Regis Corp.*, 498 F.3d 561 (6th Cir. 2007). ............................................ 27, 35

*Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998)............................................ 22

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ................................................ 11

*Clark v. UPS, Inc.*, 400 F.3d 341, 349 (6th Cir 2005) ............................................ 13, 14

*Deleon v. Kalamazoo County Road Comm'n*, 739 F.3d 914, 917 (6th Cir. 2014) ...................... 11

*E.E.O.C. v. Harbert Yeargin, Inc.*, 266 F.3d 498, 518 (6th Cir. 2001)................................. 12, 22

*Equal Employment Opportunity Comm'n v. Avery Dennison Corp.*, 104 F.3d 858, 860 (6th

   Cir.1997) ......................................................................................... 35

*Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) ................................................ 22

*Gleed v. AT&T Mobility Servs, LLC*, 613 Fed. Appx. 535, 539 (6th Cir. 2015 ........................ 31

*Grace v. USCAR*, 521 F.3d 655, 678 (6th Cir. 2008) ............................................ 12, 24

*Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321 ................................................ 17, 20

*Hurtt v. Int'l Servs.*, 627 Fed. Appx. 414 (6th Cir. 2015)........................................... 34, 35

*Johnson v. JP Morgan Chase & Co.,* 922 F. Supp. 2d 658, 667 (S.D. Ohio 2013) ................... 32

*Jordan v. City of Cleveland, 464 F.3d 584, 597 (6th Cir. 2006)*............................. 17, 18

*Knox v. Neaton Auto Prods. Mfg.*, 375 F.3d 451, 459 (6th Cir. 2004) ......................... 20

*McCombs v. Meijer, Inc.*, 395 F.3d 346, 353 (6th Cir. 2005)..................................... 20

*Mobley v. Miami Valley Hosp.*, 603 Fed. Appx. 403 (6th Cir. 2015). ..................................... 33, 34

*Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 733 (6th Cir. 2006) ............................... 12

*Russell v. Nat'l Amusements, Inc.*, No. 3:07-cv-3216, <u>2009 WL 262494, *13</u> (N.D. Ohio Feb. 4, 2009) ................................................................................................................................................ 32

*U.S. Airways v. Barnett*, 535 U.S. 391 (2002). ........................................................................... 33

*Vance v. Ball State Univ.*, 133 S. Ct. 2434 (2013),............................................................................ 14

*Williams v. Gen. Motors Corp.*, 187 F.3d 553, 563 (6th Cir. 1999 ....................................... 18

*Williams v. Nashville Network*, 132 F.3d 1123, 1131 (6th Cir.1997)........................................ 36

**Statutes**

2 U.S.C. § 12111(9)(B)............................................................................................................... 21

42 U.S.C. § 12112(b)(5)(A)........................................................................................................ 17

42 U.S.C. § 12203(a). ................................................................................................................. 24

29 U.S.C.S. § 791 *et seq*

"Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the ADA," notes 1 and 3, Notice Number 915.002..........................................................................................

Treatises
Fed. R. Civ. P. 56(c) .................................................................................................................. 13

## SUMMARY OF PLAINTIFF'S ARGUMENT

A jury could easily find that the Veteran's Administration is liable to Plaintiff Annette Ryan on each and every one of her claims. As to her claim for sexual harassment, there are ample facts in the record showing that Ryan's supervisors on the Spinal Cord Unit at the Wade Park facility knew, both from first-hand observation and from indirect reports, that Ryan's co-worker, MD Garrett, routinely created a hostile and inappropriate sexual "culture" on the SCU, and yet, they let it persist. Moreover, Ryan repeatedly reported Garrett's misconduct to Charge Nurses who were, as one nursing supervisor admitted, performing a supervisory role when there were no other supervisors on the SCU floor.

Garrett's unchecked sexual misconduct culminated in an assault on Ryan that resulted in Garrett being criminally prosecuted and convicted. In addition to her prior complaints, Ryan reported Garrett's assault and ongoing harassment on March 27, 2013. The VA's inadequate and tardy response to Garrett's outrageous behavior resulted in his transfer to another facility, where he could earn his same pay and benefits, and perpetrate the same criminal conduct on other women.

Garrett's assault caused Ryan to be diagnosed with PTSD, a disabling condition that substantially limited her ability to engage in  major life activities, including caring for herself and for her family, and sleeping. Ryan's diagnosed PTSD also impacted her ability to perform the essential functions of her job, leading her to ask for a reasonable accommodation in the form of a transfer to another facility.

A transfer would have permitted Ryan to avoid being re-victimized each time she walked into her workplace, and to avoid the hostility of her co-workers, who resented her for reporting Garrett's assault. The VA, however, refused to engage in the interactive process and refused to accommodate Ryan's disability, even though it had plenty of medical documentation, and there were numerous vacant positions to which Ryan could easily have been moved.  In fact, at one

v

point, Ryan was to be transferred to a Warren, Ohio, facility, which would have accommodated her, but the VA unlawfully chose to transfer Garrett instead. Based on the evidence in this record, a jury could easily find that the VA should have terminated Garrett for engaging in criminal sexual assault, and accommodated Ryan by transferring her to a workplace where she could perform her nursing duties without the wrath of co-workers and the trauma of returning to a workplace where she was assaulted.

A jury could further find, based on record evidence, that the VA constructively discharged and retaliated against Ryan for reporting Garrett's unlawful sexual harassment – conduct protected under Title VII – and for requesting a reasonable accommodation, conduct protected under the Rehabilitation Act. Here, a jury could find that the VA retaliated by refusing to engage in the interactive process to determine how to bring Ryan, the victim of Garrett's criminal behavior, back to work. Instead, the VA cooked up false discipline for Ryan, and forced her to use both advanced sick leave and unpaid leave time – which Ryan is still repaying.  Ryan remained off work at the behest of the VA, until she was terminated for failure to respond to the one and only job presented to her – a position back at Wade Park.

Because there are myriad disputes of material fact on this record, this Court must deny Defendant's Motion for Summary Judgment in its entirety, and permit this case to proceed to a jury trial.

## <u>ISSUES TO BE DECIDED</u>

1) **Whether the VA violated the Rehabilitation Act by (a) refusing to accommodate Ryan's request for transfer to another VA location despite repeated requests for transfer beginning in March 2013, and (b) offering Ryan employment on the SCU where it was impossible for Ryan to work.**

2) **Whether the VA's unlawful actions resulted in Ryan's constructive discharge.**

3) **Whether the VA is liable under Title VII for the sexual harassment and assault perpetrated by Ryan's co-worker, MD Garrett, because it either knew, or should have known, that sexual harassment and other hostile behaviors routinely occurred on the SCU**

4) **Did Defendant retaliate against Ryan in violated of Title VII and/or the Rehabilitation Act by (a) denying a transfer to another VA facility and (b) offering Ryan a position that was impossible for her to accept, (c) burdening Ryan with paperwork that was unnecessary, duplicative, and unlawful to request, and (d) disciplining Ryan after Ryan reported the harassment for an incident that allegedly occurred months prior.**

## **STATEMENT OF FACTS**

On or about November 7, 2011, Annette Ryan ("Ryan") began her employment as a Licensed Practical Nurse at the Veterans Administration's (VA) Wade Park Facility ("Wade Park" "Wade Park Campus" "Wade Park Facility") on the Long Term Spinal Cord Unit ("Unit" or "SCU") (Ryan Dep. p. 12, l. 14).  Within months, a co-employee and nurse assistant, MD Garrett ("Garrett") who generally worked on the same shift and same unit as Ryan, began making sexually sexual remarks to Ryan around Summer 2012.  (Ryan Dep. p. 39).  Around October 2012, Garrett's behavior escalated from offensive, unwelcome gestures and sounds, to physical intimidation and forceful inappropriate touching[1] (Ryan Dep. p. 46-47, 50-51).  A co-worker, Roseanne McDevitt ("McDevitt") was also sexually harassed (Exh. 2). Garrett admitted to:

> holding Ryan's head and kissing her against her will while on duty…parking next to Ryan, grabbing her, and forcibly kissing her while she attempted to turn away…being alone in the linen closet with Ryan and blocking the door so she could not exit…grabbing Ryan's butt on a regular basis while they worked…may have grabbed Ryan's hand and put it on his aroused unexposed genital area….may have licked his fingers and put them in Ryan's crotch area…he deemed [the incidents] acceptable because of 'the culture' of their unit. …admitted to taking photos of Ryan's crotch and butt with his cell phone and telling her she was exposing her 'camel toe'…verified that he rubbed against Ryan and told her that 'your nipples feel good…'"

(Exh. 8, Memorandum of Interview, VA Police, dated 4/4/2013).   On March 26, 2013,[2] Garrett sexually harassed Ryan continually during the course of their evening shift,  and then physically and sexually attacked Ryan in the bathroom of one of the patient rooms. (Ryan Dep. p. 55, 57-58; Exh. 1 - Ryan Sworn Statement to VA Police).  Garrett tried to restrain her from behind, but Ryan eventually escaped  (Exh. 1, p. 2, l. 12).   From the time the verbal harassment began, Ryan was hesitant to report Garrett's behavior because she feared losing her job. (Ryan Depo p. 104-105).

---

[1] Ryan provided details of Garrett's sexually offensive and demeaning acts to the VA and policing agencies. Exh. 1.

[2] The shift Ryan typically worked was 3 p.m. – 11 p.m.

Ryan was aware that Garrett was a veteran, had seniority,  was hired by Nurse Manager, Lisa Herman ("Herman"), and believed that Garrett and Herman were friends. (*Id*.).  Ryan was afraid of Garrett because, on numerous occasions, he told her that he had a gun and a "conceal carry" permit (Exh. 1, p. 2).  Based upon a combination of the escalation and frequency of Garrett's behavior, Ryan's inability to handle the situation on her own, and the support of her co-workers, Ryan came forward to report Garrett's actions to policing authorities and the Union office.  (Ryan Dep. p. 62; Ex. 1).

After the last attack by Garrett, and publicly coming forward with the sexual harassment, Ryan exhibited signs of anxiety and post traumatic stress syndrome (PTSD), and was ultimately was diagnosed with PTSD (Exh. 5).  Every time Ryan arrived at Wade Park, her PTSD symptoms were triggered and manifested in episodes of crying, being fearful, anxious, angry, depressed, and similar debilitating symptoms (Exh. 3: Ryan Dec., ¶ 5,6,7).   While approaching the Wade Park campus, she would become fearful, her hands would tighten on the steering wheel and she could feel tightness in her arms and shoulders (Ex.3: Ryan Dec. ℙ 5).  While at Wade Park, Ryan would suffer with crying spells (Ryan Dep. p. 267-268; Exh. 3, Ryan Dec. ¶7; Exh. 3A-doctor notes; Exhs. 14.1 and 14.2 – doctor certifications; Exhs. 3.1-3.4-doctor visit notes).

Ryan was also enrolled in student nursing clinical at the VA in 2013 and 2014 (Exh. 3: Ryan Dec. Exh. C).  The sexual assault caused an inability to perform nursing tasks adequately during her clinicals.  (Exh.3: Ryan Dec. ℙs 5,7).  After leaving Wade Park (whether she was there for student nursing, to drop paperwork off related to her leave and transfer requests, or to meet with her managers related to these matters), Ryan would be sad, depressed, angry, and unable to perform tasks of daily living (*Id*. ℙ6). Because Ryan's PTSD was triggered every time she arrived

2

at Wade Park, she failed her student teaching clinical and upon the retake, failed it again.[3] (*Id.* ¶7, Exh. C-Transcript).  Prior to 2013, Ryan excelled in her studies, and performed well in her nursing program (Id. Ex. 3: Ryan Dec. Exh. C – Transcript).

After Ryan made her formal sexual harassment report on March 27 and March 28, 2017, first to the union office and then to policing authorities, she and Ms. McDevitt[4] met with a Nurse Manager, Beth Noelker ("Noelker") (Annette Dep. p.  62; Exh. 23), and told her of  the details of the sexual harassment and assaults by Garrett (Exh. 23).  Ms. Noelker reports that Ryan was visibly shaken and was sent home (*Id.*).  At that time, Ryan  requested to be moved and transferred to another clinic (Noelker Dep. p. 100, ll. 3-14;  p. 151, ll. 10-18; Dep p. 212, ll. 4-8; Exh. 23; Exh. 29; Ryan Dep. p. 89, l. 9).  Noelker acknowledges that Ryan requested this transfer accommodation (Exh. 23).  One reporting officer noted that Ryan "does not feel safe anywhere on the Wade Park campus", that Ryan "requested a transfer from the ward," (Exh. 6), and that she had emailed her request to "personnel in the Director's Office"  (*Id.*).

Garrett was initially placed on paid administrative leave for  a few days with full pay and benefits (Exhs. 9 and 32). The VA noted that Garrett's administrative leave ***"will have no adverse effect on [his] employment status."*** (*Id.*).  He was then transferred to the VA's Akron CBOC[5] where he resumed full time work. (Exhs. 10 and 32).  Despite orders from the VA that Garrett not return to the SCU or anywhere at the Wade Park campus unless escorted (Exh. 9), Garrett returned

---

[3] In the LPN to BSN program, a C- is considered a failing grade (Exh. 3: Ryan Dec ¶ 7).

[4] McDevitt was also sexually harassed by Garrett (Exh. 2)

[5] CBOC stands for Community Based Outpatient Clinic and are situated all around Ohio, 9 of which are within driving distance of Ryan.

almost immediately to the SCU in violation of the order (Exh. 24, p. 21, ¶ 3)[6] (Noelker Dep. p. 196, l. 2-9).  On July 8, 2013, VA was notified that Garrett was indicted on 5 counts of sexual imposition and 1 count of kidnapping.  On April 28, 2014, Garrett pled guilty to 2 counts of Sexual Imposition, and Unlawful Restraint, was declared a Tier 1 Sex Offender, and was required to register as a sex offender under RC § 2950.  Garrett was also ordered by the Court to refrain from contacting Ryan (Exh. 12-Court docket sheet). Though the VA was notified on July 8, 2013, that Garrett was indicted on multiple counts of sexual imposition (Exh. 13), the VA did not place him on indefinite suspension until August 16, 2013, or approximately five weeks after his indictment, and 5 months after Ryan made her March 27th report of harassment (Exh. 11). While Garrett worked with full pay, Ryan was unable to work drawing no regular pay, or was on leave without pay and diminishing benefits (Exh. 3: Ryan Dec. ¶ 3).

Ryan had to make several visits to Wade Park (police interviews, dropping off paperwork to personnel and managers, counseling sessions, clinicals, mediation) (Ryan Dec., ¶6; Ryan Depo. p.167).  Ryan provided medical certifications from Dr. Holmer, her primary physician, containing detailed descriptions of Ryan's symptoms and limitations to the VA on numerous occasions.  (Exh. 14;  Doc #8-3, PageID:117 ¶5). The medical certifications were required by the VA.  (*Id.*; Exh. 15).  The documentation noted that Ryan suffered from PTSD *and* her PTSD symptoms were preventing her from returning to her nursing duties at either the SCU or the Wade Park campus (Exh. 14; Herman Dep. p. 65 l .25 – p. 67 l. 20).  An August 5, 2013, medical note given to the VA states:

> The traumatic event is re-experienced by recurrent and intrusive images and thoughts of her assaults and harassments. She experiences intense psychological distress at

---

[6] The Final Agency Decision (Doc. 8-5, PageID#138) mistakenly notes that the complaint file contains no evidence that Garrett has returned to the Wade Park campus, despite the ORM investigative findings that he, in fact, did (*See* Exh. 24 – ORM investigative report, p. 21 ¶3).

4

exposure to cues and aspects of her traumatic experiences. Annette has made efforts to avoid her work site since it is the place of her trauma experience...Annettte experiences a sense of detachment and estrangement from others and feels emotionally numb at times..has a high arousel level with chronic anxiety, irritability, and impaired sleep. (Exh. 3: Ryan Dec., Exh. A).

Initially, Ryan was both mentally and physically unable to perform her nursing duties because she was suffering mentally, and was seeing doctors and going through therapy for her mental distress (Ryan Depo p. 264-265).  Thereafter, she was cleared to resume her nursing duties, so long as she did not return to the Wade Park facility. (Exhs. 14-16; Exhs. 3.1-3.5; Exh. 3: Ryan Dec. Exh. A). This diagnosis is corroborated by all medical reports which restricted Ryan from returning to work at Wade Park (*Id.*).

Ryan was also fearful of being attacked by other employees who were friends of Garrett (Ryan Dep. p. 112-115). Jenison  states that Princess Jefferson ("Jefferson"), a co-worker "made it impossible to—to have any kind of work environment suitable for her, just yelling at her, calling her names, talking about her behind her back, getting everybody else riled up against her…." (Exh. 4: Jenison Aff. p. 12). Jenison explained how Jefferson created a hostile work environment for Ryan (Id. p. 12-14).[7] At least two of the nurses called Ryan and threatened to "beat her up" for having reported Garrett (Ryan Depo. p. 112-113).  The EEO found that based upon Jenison's testimony that Ryan "was subjected to personal slurs or other denigrating or insulting verbal or physical conduct" (Doc#8-5, PageID. 142; Exh. 3.1). Herman, agreed that Ryan would be "**grossly unhappy**" if she were to return to work at Wade Park (Herman Dep. p. 149), and that such behaviors created a hostile work environment (Herman Depo. p. 119).

---

[7] The EEO Investigator found that "testimony provided by Ms. McDevitt and Mr. Jenison corroborates [Ryan's] allegation of hostile work environment." (Exh. 36 – Memorandum of EEO Investigator)

Hoping for a transfer,  Ryan continued to express her interest in working for the VA if her transfer request was granted. (Exhs. 14, 16, 17).

Ultimately, Ryan secured part-time employment elsewhere, but at a drastically reduced wage, and she did not find full-time work immediately (Exh. 3: Ryan Dec. ℙ 8).  Likewise, the benefits she had while working full time at the VA could not be matched (*Id*.).  Ryan was a single mom and sole provider for her family, and the job at the VA gave her the financial security and benefits they needed.

During the EEO Mediation, Ryan was offered a position on another floor at Wade Park (Ryan Dep. p. 122).  However, the offer was contingent upon Ryan dropping her EEO case (*Id*. l. 6-10) (Noelker Dep. p. 178, l. 25 – p. 179, l. 1).  Though no transfer accommodations were offered, Beth Noelker ("Noelker), another manager, believed that she transferred Ryan to the Warren CBOC (Exh. 23 – Report of Contact by Noelker).  Ryan denies that she was offered a transfer to Warren or she would have accepted it (Exh. 33: Ryan Aff. p. 16).  In the end, transfer to Warren was not permitted. VA's only justification for its decision was to repeatedly state that VA policy was to transfer the wrongdoer, not the victim (Noelker Dep. p. 151, 152, 212; Exh. 29; Exh. 23).

Transfers are not uncommon at the VA (Herman Dep. p. 81-82), and Ryan was qualified to work any of the below available jobs at several VA locations (Exh. 18; Herman Dep. p. 18):

| Vacancy Identification Number VIN | Location | Submission Deadline Dates | |
|---|---|---|---|
| 900226 | Cleveland, OH | | 6/20/2013 |
| 976303 | Ravenna, OH | | 11/4/2013 |
| 986119 | Cleveland, OH | | 12/16/2013 |
| 1040836 | Cleveland, OH | 2/7/2014 | 2/28/2014 |
| 1051951 | Painesville, OH | 2/19/2014 | 3/11/2014 |
| 1137231 | Mansfield, OH | 6/9/2014 | 6/27/2014 |
| 1183001 | Cleveland, OH | 8/5/2014 | 8/26/2014 |
| 1221445 | Mansfield, OH | 9/24/2014 | 9/29/2014 |

None of these jobs were offered to Ryan (Ryan Dep. p. 240, l. 5).

Herman's knowledge of Garrett's sexually inappropriate conduct was also noted by Ryan, McDevitt, and Jenison (Ryan Dep p. 48, l. 19 – p. 49, l. 1; Ryan Dep. p. 50, l. 7-12; McDevitt Dep. p. 193-194; p. 195, l.22 – p. 196; Exh. 4: Jenison Aff., p. 8-9).  Garrett openly engaged in sex talk and hitting many of the women's bottoms openly and regularly (Ryan Depo. pp. 98-100).  On several occasions prior to this, Garrett was confronted by supervisors for similar inappropriate behaviors (Ryan Dep. p. 48-51; Exh. 4, Jenison Aff. p. 7-8).  Garrett was verbally warned by supervisors to stop his behavior (*Id*).

Ryan reported her discomfort with Garrett's actions to her Shift Supervisors/Charge Nurses Ebony Winters, Mrs. Swails, Doug Jenison, and John  Blackstone, and requested that  a different nursing assistant be assigned to work with her. (Ryan Dep p. 31 ll. 1-6; Ryan Dep. p. 34, l. 5-14; Exh. 4: Jenison Aff. p. 7, ll. 7-22).  In fact, Ryan testified that one of the Charge Nurses told her they would discuss the matter Herman and seek her approval (Ryan Dep p. 34, l. 5 – p. 35,  l. 5).  However, nothing changed and Ryan continued to be assigned to work with Garrett (*Id*.).  Ryan took her own action to avoid Garrett by working double shifts and calling off her regular shift at times  (Exh. 3: Ryan Decl. ¶4).  Doug Jenison ("Jenison"), one of the Charge Nurses assigned to oversee the nurses on the SCU during evening shift, recalled specifically some of Garrett's comments about Ryan:

> He said that he didn't think she really had a boyfriend, that she was—she really wanted to have sex with him, and that, you know, he was going to—***he was really going to have some hard, rough sex with her.***  And he said she had a hot body and ***he was always watching her***. Yeah.

(Exh. 4: Jenison Aff. p. 7, ll. 7-22, emphasis added).

7

Ryan testified that Herman witnessed Garrett making sexual and offensive gestures and sounds during staff meetings, telling sexual jokes, and rubbing Ryan inappropriately (Ryan Depo. p. 49-51).  Garrett's behavior continued despite these verbal warnings to stop (*Id*).  Garrett also testified about Herman's knowledge of a nurse was showing her breast to him at a staff meeting (Garrett Dep. p. 102, ll. 6-12).  McDevitt, also testified that while rubbing backs of female employees at staff meetings, Garrett made suggestive noises and that it was offensive. (McDevitt Dep. p.  193-194; p. 195, l.22 – p. 196).  A video recording of Garrett clearly depicts Ryan being harassed and accosted by Garrett in the hallway within earshot of other employees and Garrett stating "They're just fucking everything up. I'm gonna straddle your legs…" (Exhs. 17 Evidence Control and Tracking Record of video recording; manually filed flash drive Exh. 17.1). Toward the end of the recording, you can hear one employee yelling at Garrett to get back to work, or words to that effect (*Id.).*

One Charge Nurse, Doug Jenison gave sworn testimony about Herman's knowledge of the sexual harassment, noting that Garrett would engage in "sexual innuendo and other types of inappropriate comments, just, you know, in front of supervisor staff, including Lisa Herman" (Exh. 4: Jenison Aff., p. 8-9).  Ryan also testified that Herman would witness this and other sexually inappropriate behavior during these staff meetings and that the behavior occurred more than once (Ryan Dep. p. 102 l. 12– 103 l. 25).  Both McDevitt and Ryan would tell Garrett to stop repeatedly, yet Garrett persisted and continued the behavior.  (McDevitt Dep. p. __; Ryan Dep p. 101, l. 11-19; p. 103, l. 20-25).

Herman admits that if she witnessed Garrett's inappropriate behavior, and he stopped the behavior for the moment, she either did not say anything, or simply "counseled" him  (Herman Dep. p. 159, l. 3).  Other times upon witnessing Garrett's inappropriate behaviors, she would tell

him to stop the behavior(Ryan Dep. p. 49, l. 21), walk away, or brush it off as "playing around" (McDevitt Dep. p. 133). A decision letter sent to Garrett regarding his suspension in 2014, explained that the VA's decision was based, in part, upon "the clarity with which [Garrett] was notified of the rules violated in committing the offense, ***including warnings about the conduct***.") (Exh. 11, p. 1 item 3).

Jenison states: "it was fairly commonplace for most of the people to say on the floor inappropriate things..***it was not taken seriously and it was just tolerated as normal…***" Id. at 8, ll. 15-22 (emphasis supplied).  McDevitt and Garrett testified that Garrett openly warned the new hires about his "flirtatious" habits and what he was like and they should tell him if they found it offensive, admitting that this was how he was. (McDevitt Dep. p. 183, ll. 15-19; Garrett Dep. pp. 100-101).  McDevitt stated that these comments were made in the presence of SCU manager, Lisa Herman. *Id*.  Desi Hale, a janitor, who was interviewed about Garrett stated "Mr. Garrett is always playing around the same way with other employees."  (Exhibit 22 – Officer Carlson investigative report).  Ryan stated it was deemed "accepted behavior" (Ryan Dep. p. 45 l. 24).

Herman was also aware of the hostile culture that existed (Jenison Aff. p. 8-9; Garrett Dep. p. 159-160;  Herman Dep. p. 79 and 119).  When questioned about the various sexually harassing behaviors that were occurring on the SCU for the 6 months prior to Ryan's March 27, 2013, report, ***Herman agreed that she should have known what was going on***:

> Q. Well, do you -- My question is, do you agree with this investigator's findings that the Agency knew or should have known of such conduct, referring to MD's conduct?
>  MS. BACCHUS: Objection. Calls for opinion.
> A. *Well, the bottom line is I am implicating myself here*. ***I should have known and I did not know any of this.***

Herman Dep p. 121, ll. 2-12 (emphasis supplied).

On August 1, 2014, the VA sent Ryan a letter offering her a position at Wade Park at the same bulding where Ryan had worked during the sexual harassment and attacks (Exh. 19). Ryan could not accept the offer because it would put her back at a facility that was proved to trigger Ryan's PTSD. Rather than being transferred to an available job, she was ultimately given a letter from the VA terminating her employment. (Exh. 20 – termination letter).

## LAW AND ARGUMENT

I.     SUMMARY JUDGMENT STANDARD

Summary judgment is only proper where "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "The burden is on the moving party to show that no genuine issue of material fact exists. The facts, and the inferences drawn from them, must be viewed in the light most favorable to the nonmoving party. The question is whether the evidence presents a sufficient disagreement to require submission to the jury" *Deleon v. Kalamazoo County Road Comm'n*, 739 F.3d 914, 917 (6th Cir. 2014) (internal quotations and citations omitted).

II.    MATERIAL FACTS EXIST TO SUPPORT THAT A PRIMA FACIE CASE EXISTS THAT RYAN WAS SUBJECTED TO A HOSTILE WORK ENVIRONMENT BY A CO-WORKER.

In order to prove that the VA is in violation of Title VII of the ADA, the Plaintiff must show that (1) Ryan was a member of a protected class, based on sex;[8] (2) Ryan was subjected to unwelcome harassment based on sex, (3)  The harassment had the effect of unreasonably interfering with Ryan's work performance and created an objectively intimidating, hostile, and offensive work environment; and (4) there exists some basis for liability on the part of the employer *Grace v. USCAR*, 521 F.3d 655, 678 (6th Cir. 2008); *Randolph v. Ohio Dep't of Youth Servs.*, 453

---

[8] The VA does not dispute that Ryan is a member of a protected class.

10

F.3d 724, 733 (6th Cir. 2006).   To establish employer liability where the harasser is a co-worker, a plaintiff must show that the employer (1) knew or should have known of the harassment and (2) failed to take prompt and appropriate corrective action. *E.E.O.C. v. Harbert Yeargin, Inc.*, 266 F.3d 498, 518 (6th Cir. 2001) (citing *Hafford v. Seidner,* 183 F.3d 506, 513 (6th Cir.1999).

The VA challenges Ryan's claims relating to hostile work environment based on sexual harassment, and whether the VA took prompt and appropriate corrective action.

A.  <u>The VA knew, or should have known, that Garrett was sexually harassing Ryan.</u>

1)  ***Direct knowledge***.

There are sufficient facts to show that the VA knew of the occurrence of sexually harassing behavior on the SCU, including that of Garrett. The fact that the VA disputes this fact shows that summary judgment on this claim is not warranted.  The VA's lead argument in this regard is that Ryan's ***formal*** report of the sexual harassment to the union office and Beth Noelker on March 27, 2013, is the "first" and only notice the VA received of Garrett's sexual harassment. (Doc. #55-1, PageID #958).  The record evidence directly refutes this.  As shown, Herman, Ryan's supervisor, along with other supervisors, had direct knowledge of Garrett's sexually harassing behaviors well before the March 27th report.  Moreover, even though Ryan did not make her formal report of particular incidents until March 27, 2013, this does not mean that *other* incidents of harassment by Garrett went unnoticed. In fact, as already stated, numerous other acts of harassment by Garrett were known by Herman and other supervisors.  In this regard, the Sixth Circuit provides that "regardless of whether the victimized employee actively complained, prong one of the defense ensures that an employer will not escape vicarious liability if it was aware of the harassment but did nothing to correct it or prevent it from occurring in the future." *Clark v. UPS, Inc.*, 400 F.3d 341, 349 (6th Cir 2005).  Since Garrett's harassing behavior continued, whether the VAs verbal

admonishments of Garrett's behavior were corrective and preventative becomes a question for the jury.

Defendant's brief overlooks the stated testimony of several witnesses that Herman and Charge Nurses, Jenison, Swails, and Blackstone were all aware of Garrett's sexually offensive conduct. To the extent that the VA was not aware, there is sufficient evidence to raise a genuine issue of material fact as to whether they should have known that Garrett's conduct was occurring.[9] And, as described in detail in the Statement of Facts (*supra*, p. 1,10), Garrett's behavior was so pervasive and open that employees viewed it as the "norm" or the "culture" on the SCU.[10]

In its brief, Defendant also argues that Charge Nurses' personal knowledge of the subject sexual harassment**,** or that reported to them by Ryan, is "not imputable to VA management for purposes of Title VII liability" (Doc #55, PageID #963). Defendant cites to *Vance v. Ball State Univ.*, 133 S. Ct. 2434 (2013), in support of its proposition. The Court in *Vance* dealt with the issue of an alleged supervisor who was sexually harassing an employee. *Id*. at 2439. Here, this Court is tasked with determining whether a supervisor's knowledge about one employee's sexually harassing behavior toward another employee, neither of whom are supervisors, is imputable to the employer. The two situations are disparate. What should guide this Court's analysis in this regard are the principles set forth in *Clark*, 400 F.3d 341 (6th Cir 2005).

In *Clark*, the Sixth Circuit considered the question of a low- to mid-level supervisors role after witnessing the sexually harassing behavior. *Id*. at 350. Like the VA, the employer in *Clark*,

---

[9] Herman's "verbal reprimands" and walking away in disgust in the face of multiple violations of VA's harassment policy, calls into question Herman's and other supervisors' knowledge as to whether they understood that Garrett's sexualized behavior violated policy, or that they did understand, and simply ignored it or tolerated the behavior as part of the "culture" on the Unit. Refer to Lisa Herman's testimony where she would not say anything (Annette's example)

[10] Defendant's statement in its brief that "none of Ryan's co-workers ever observed Garrett" grabbing and attempting to kiss Ryan is a misstatement of Ryan's testimony. (Br. P. 9, ¶3) Ryan's testimony was that she *did not know* whether they saw (Ryan Dep p. 79). As already provided, testimony of several witnesses provide many examples of Garrett engaging in sexually inappropriate conduct in front of management and other co-workers.

took the position that "these supervisors were not high enough in the company hierarchy and had

no authority to control Brock" *Id*. The Sixth Circuit opined that "in determining whether UPS

took reasonable care in preventing and promptly correcting the alleged sexual harassment in this

case, we must look not only to UPS's sexual harassment policy, as the district court did, but also

to its implementation of that policy." *Id*. at 349. In this regard, the Court evaluated whether UPS;s

sexual harassment policy *was effective in practice*. *Id*. at 350. The Court explained that "the

effectiveness of an employer's sexual harassment policy depends upon the effectiveness of those

who are designated to implement it." *Id*. The Court reasoned that because UPS's sexual harassment

policy "placed a duty on *all* supervisors and managers to report incidents of sexual harassment to

the appropriate management people...'it has itself answered the question of when it would be

deemed to have notice of the harassment.i" *Id.* (internal citations omitted). Like *Clark*, the VA

policy squarely places upon Charge Nurses the duty to report sexual harassment either to a

supervisor above them or to other management:

> *Employees at all levels* are responsible for aiding in the prevention of sexual harassment by actively safeguarding against conduct and behaviors that could be construed as sexual harassment. *Employees also have the responsibility of bringing any instance or allegation of sexual harassment to the attention of their supervisor or appropriate management official.* (Doc. #55-5, Page ID # 1102) (italicized emphasis supplied).

And, the VA directives are clear as to the role of those in supervisory roles, in this case, the Charge

Nurses:

> Management Officials, Service Chiefs and Supervisors *at all levels* are responsible for creating and ensuring a work environment free from sexual harassment by affirmatively raising the subject with staff, expressing strong disapproval, continually assessing the potential for inappropriate behaviors in the work place and assuring their ready accessibility and efforts relative to the resolution of matters of this type.

(Doc. #55-5, Page ID # 1102).

Other similar VA policies impose the same responsibilities on *all* of its employees, with a

13

*heightened duty upon those in charge.* (*See* Exhs. 21, 21.1, 21.2).

The case law and the VA's own policy dictates that once Jenison was aware of the sexual

harassment of Ryan by Garrett, he had an obligation to take immediate and appropriate action, and

did not.   As a Charge Nurse, Jenison had both a supervisory role and served as a liaison between

the employees they oversaw, and either the supervisor that floated among the buildings and floors

and the other managers, Herman and Noelker.    As Herman explained, Charge Nurses were her

equivalent counterpart on the evening shift:

> Q. Okay. So who would be the nurse manager then of the next shift?
> A. It would be the person who was in charge, in charge. Now they have assistant nurse
>    managers but, at the time, it was just the person who was designated as the ***charge
>    nurse.***  (Herman Dep. p. 20 (emphasis supplied); Herman Dep. p. 22 – 23).
>
> …….They have the responsibility to report any kind of clinical observation that went down
> the tubes ***or maybe interpersonal between*** patient and staff member, ***staff member to staff
> member***. You know, anything can happen in a hospital.
> Q. So those kinds of things were similar to the thing that you did?
> A. Yeah.  (Herman Dep. p. 24).

And regarding the role of a Charge Nurse, Herman explains:

> …***for the period of time they are in charge,*** whether it's for half an hour, 8 hours, 16 hours,
> ***they are in charge of the employees to make sure they are working and taking care of
> business***"   (Herman Dep p. 166).

And about the Charge Nurse's[11]  role as an ***informer and liaison,*** Herman testified:

> They're in charge of the employees to make sure that, you know, everybody is working.
> They are responsible to the nursing supervisor for information about staffing if there is a
> call-off or there is a problem, somebody gets hurt.  (Herman Dep p. 168).

Moreover, Defendant's representation that "shift supervisors floated throughout the hospital"

and they alone took the place of the Nurse Manager during evening and weekend shifts, is

disingenuous (Doc #55, PageID # 962).  The supervisor to which Defendant refers, floated among

---

[11] Though the VA opines that Charge Nurses are not considered "management" in the formal sense of the word, Herman, the SCU
manager, also knew of Garrett's inappropriate and harassing behaviors.

**two buildings and 8 medically complex floors,** namely: 2 psych floors, Spinal Cord Acute Care, Spinal Cord Long Term Care,  Long Terms Care, Blind Rehab, and Hospice.  (Noelker Depo 58, ).  Just the one unit, SCU (Long Term Spinal Cord Unit) was a "significant challenge" (Noelker Depo p. 48-49), and described by Herman as "the hardest thing she ever did in her life" (Herman Dep. p. 202, l. 4).

Whether the VA, via the Charge Nurses and Herman,  "exercised reasonable care is a question for the factfinder." *Clark*, 400 F.3d at 350-351.

### 2)  *Garrett's conduct toward Ryan created a hostile environment.*

Defendant's attempt to call the actions that were occurring on the floor as "innocuous" (doc #55-1, PageID # 960 ¶1) because "Garrett's conduct directed toward other employees" was not "unwelcome or considered offensive **by those employees**" (*Id*. emphasis added), is patently disingenuous.[12]  Documents published by the VA and  EEOC states that "the victim does not have to be the person harassed but could be ***anyone affected by the offensive conduct.***" (Exh. 35-EEOC fact sheet on sexual harassment).   The VA policy itself considers sexual harassment "***any*** unwelcome or unsolicited conduct is imposed on a person who regards it as offensive or undesirable." (Doc. #55-5, PageID # 1102) (emphasis added). The Defendant's characterization of the definition of "sexual harassment" is simply wrong, and it is surprising that the VA would even attempt to make this argument.

Defendant further argues that a sexual hostile environment did not exist (Doc. #55-1 PageID # 963).  To establish a hostile work environment, Ryan must show that Garrett's harassing behavior was "severe or pervasive enough to create an environment that a reasonable person would

---

[12]The Sixth Circuit commented  on this topic that when analyzing whether a hostile environment exists "This court's caselaw … makes clear that the factfinder may consider similar acts of ***harassment*** of which a plaintiff becomes aware during the course of his or her employment, ***even if the harassing acts were directed at others or occurred outside of the plaintiff's presence***. Cases from our sister circuit are in accord. *Hawkins v. Anheuser-Busch, Inc*. 517 F.3d 321 (6th Cir. 2008).

find objectively hostile, and that he or she subjectively regarded the environment as abusive." *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 333, citing *Jordan v. City of Cleveland, 464 F.3d 584, 597 (6th Cir. 2006)* ("Whether harassing conduct is sufficiently severe or pervasive to establish a hostile work environment is "quintessentially a question of fact."). "To determine whether a work environment is 'hostile' *or* 'abusive,' courts look at the totality of the circumstances." *Id.* (emphasis added) "A nonexhaustive [sic] list of factors for the court to consider include 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.*, citing *Jordan*, 464 F.3d at 597. The Sixth Circuit notes that "sexual comments and harassing acts of a continual nature are more likely to be deemed pervasive" *Id.* And further directs that "the victim's assertion that the harasser's sexual comments were 'ongoing', 'commonplace,' and 'continuing' was sufficient to survive summary judgment on the severe or pervasive test. *Id.* citing *Abeita v. Transam. Mailings, Inc.*, 159 F.3d 246 252 (6th Cir. 1998). The Sixth Circuit "has also made it clear that harassment involving 'elements of physical invasion' is more severe than harassing comments alone." *Id.* at 334 citing *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 563 (6th Cir. 1999). Here, there are material facts that Garrett's sexually harassing and assaultive behavior were **both** severe and pervasive that the issue must be submitted for jury determination.[13]

Ryan stated that Garrett's conduct was occurring for more than 6 months beginning with offensive sexual comments and escalating to physical touching (Ryan Dep. p. 52-53). Garrett's physical actions were egregious, physical, and continuous (Exhs. 1, 8, 10). Garrett's actions also

---

[13] The EEO investigator in its Final Agency Decision found that the harassing acts of Garrett were "so pervasive, intimidating and demeaning", it was clearly sexual harassment (Doc # 8-5 PageID #136).

caused Ryan to alter her work schedule, and at times work double shifts to try and avoid him (Exh. 3: Ryan Dec. ¶ 4).

Garrett's conduct further and substantially interfered with Ryan's as she could no longer return to work when Garrett's behavior escalated.  Prior to the progression to the March 27th Report, Ryan was working double shifts so that she could minimize her contact with Garrett (Exh. 3: Ryan Dec. ¶4).  This adversely affected her employment record because for every time Ryan called off a shift and worked a double shift, she was marked as "absent" for her regular shift, and it caused an accumulation of excessive "sick days" on her permanent employment record (*Id.*). After the last attack by Garrett, Ryan could not return to her  LPN job at Wade Park, losing her full pay and benefits.

### 3)   *Management should have known of Sexually Harassing behaviors.*

There are also extensive material facts that management should have known about Garrett's behavior and either failed to identify it, ignored it, or otherwise failed to address it effectively.   The testimony shows that Garrett's sexually harassing behaviors were well known among many of the employees, including supervisors, and his behavior was so open and pervasive that he and others described it as being part of the "culture" on the SCU.  Garrett's sexually harassment spanned many months, and several witnesses, as stated previously, saw his behavior. Garrett's behavior was either tolerated as being the "norm", and verbal reprimands to not cause him to cease his behavior.  These material facts support that Garrett's behavior was so pervasive and open that, *even by its own admission*, the VA should have known it was occurring (Herman Dep p. ll. 2-12, *supra* p. 11).  Whether employer knew or should have known an employee was being sexually harassed by a co-worker before the employee filed a written report with the

employer, is a question for the jury. *See McCombs v. Meijer, Inc.*, 395 F.3d 346, 353 (6th Cir. 2005)

B.  <u>The VA's response to the sexually harassing environment was unreasonable and showed a level of indifference.</u>

Once it is established that the VA knew or should have known of the hostile environment, the burden shifts to the Defendant to show that the employer "failed to take immediate and appropriate corrective measures."  *Hawkins v. Anheuser-Busch, Inc.* 517 F.3d 321, 332  (6th Cir 2008) citing *Knox v. Neaton Auto Prods. Mfg.*, 375 F.3d 451, 459 (6th Cir. 2004).  Again, sufficient facts exist to show that the verbal commands to Garrett to stop the behavior, and the subsequent transfer of him to another VA location, were neither effectual, nor was it reasonably calculated to end the harassment.

The VA's response to the sexual harassment was to either ignore it (indifference), or failed to take appropriate action against it (unreasonable response).  As shown, Garrett was given numerous verbal warnings about his behavior, yet his sexually harassing acts continued.  There is no evidence of discipline beyond verbal warnings.  This violated VA's own policy on discipline where a "reprimand" is given for the first sexual harassment offense, and subsequent violations of the harassment policy comes with "removal" penalties. (Exh. 41, Range of Penalties, p. 6, Item # 35)*.  Even Herman admitted that, under the circumstances, ***Garrett should have been removed from employment stating "…why would you keep somebody that is behaving like that***." (Herman Dep. p. 105) (referring Exh. 8) (emphasis added).  This raises a serious question as to whether the VA took reasonable actions to prevent the harassing behaviors.[14]

---

[14] Jenison's statement as to why he did not report the sexual harassment also shows the dysfunction among the supervisors on the SCU:  "it was not taken seriously and it was just tolerated as normal. So, I didn't think that there would be anything to do about it in that environment, that nothing would be done about it" (Exh. 4: Jenison Aff. p. 8).

The existence of the sexually inappropriate "culture" flies in the face of any anti-harassment policy (Exhs. 41, 42), "zero tolerance" policy of the VA (Noeker Depo. p. 106), and having "prevention of workplace harassment" as a first priority. The record facts directly contradict Defendant's assertion that the inappropriate behaviors were "properly addressed in a manner reasonably calculated to correct the behavior *and the behavior stopped*." (Doc. #55-1, PageID #952).

Transferring Garrett to a location closer to his home with full pay and benefits also shows indifference on the part of management.[15] First, the VA argues that it was effective in separating Garrett from Wade Park so that Ryan could feel comfortable coming to back to work.[16] In fact, the EEO investigator found circumstances existed that supported Ryan's fear and concern. (Exh. 24, p. 21 EEO Investigative Report) The report notes that even after Ryan's March 27th report of the egregious harassment, Garrett could "come and go [to Wade Park] as he pleased" and Ryan's "***claims that he posed a threat are not without merit***." *Id.*[17] (emphasis supplied) (see also Exh. 24, p. 30 evidencing that Garrett returned to the Wade Park facility for any number of reasons including medical care, union meetings, etc.) These facts create a jury question (See *Meijer*, 395 F.3d at 355) (where there is "legally sufficient" evidence to establish that the employer acted both indifferently and unreasonably in response, the question cannot be decided on summary judgment); see also *E.E.O.C. v. Harbert-Yeargin, Inc.*, 266 F.3d 498, 518 (6th Cir. 2001); *Blankenship v. Parke Care Ctrs., Inc.* 123 F.3d 868, 873 (6th Cir. 1997).

---

[15] It is undisputed by the VA that it had a policy of "transferring the perpetrator" (Noelker Dep pp. 186-187; Exh. 23, 2nd entry, last line).

[16] This argument is also contradicted by evidence that Ryan's mental distress was triggered each time she returned to Wade Park.

[17] This is material evidence that directly refutes the VA's assertion that the "VA's transfer halted any harassment directed toward Ryan." (Doc. #55-2, PageID # 965), and hence its reliance on *Stacy v. Shoney's Inc.*, is not controlling as the facts are distinguishable.

### 1) *VA's policy of transferring the wrongdoer was dysfunctional and unreasonable.*

The employer cannot stand behind a dysfunctional policy and use the implementation of that policy as a defense to liability. An anti-harassment policy that is "dysfunctional" or not reasonably designed and reasonably effectual can lead to liability on the part of the employer. See *Smith v. First Union*, 202 F.3d 234, 245 (4th Cir. 2000) based on principles in *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) and *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998).  The VA's policy of transferring the wrongdoer swiftly, without consideration of the critical nature of the attacks upon Ryan by Garrett, evidences a decision that was rash, thoughtless, and indifferent. Like in *First Union*, the VAs was alerted to the seriousness of the sexual attacks upon Ryan, the details of the harassment, and Ryan's fear of Garrett carrying a gun. While Ryan was fearful of returning to Wade Park and lost pay, Garrett suffered no disciplinary consequence; rather he received full pay and benefits, and was moved to a location much closer to his home. In essence, he was rewarded for the criminal conduct he perpetrated against Ryan. (Exhs. 9-10). The implementation of a policy that is dysfunctional to begin with leads to such unreasonable results.

Further evidence of unreasonable response is that it was only *after* Garrett was indicted and arrested, that the VA placed Garrett on suspension, *nearly 5 months after* he admitted to a majority of the criminal sexual acts upon Ryan.  This was *not* the swift and immediate punishment the VA would have this Court believe occurred. Moreover, Ryan suffered on multiple levels as a result of the VA's transfer of Garrett.

### III.  THERE ARE SUFFICIENT FACTS TO SUPPORT RYAN'S GENDER DISCRIMINATION CLAIM.[18]

---

[18] Defendant states that Ryan failed to exhaust administrative remedies with respect to her Retaliation Claim and her Gender Discrimination Claim.  As to both, one does not need to file a new EEO complaint or charge for acts of retaliation or discrimination that arise out of a prior charge, and in particular when the conduct was covered within the scope of the investigation which, as here, it was (Exhs. 26, 24, Doc #8-4).

Title VII makes it "an unlawful employment practice for an employer to discriminate against any individual with respect to his compensation, terms, conditions, or privilege of employment, because of such individual's sex" 42 U.S.C. § 2000e-2(a)(1).  To make out a prima facie case of gender discrimination, Plaintiff must show that she: (1) is a member of a protected group; (2) was subjected to an adverse employment decision; (3) was qualified for the position; and (4) was replaced by a person outside the protected class, or that similarly situated non-protected employees were treated more favorably. *Grace v. USCAR*, 521 F.3d 655, 677 (6th Cir. 2008), citing *Peltier v. United States*, 388 F.3d 984, 987 (6th Cir. 2004).

The Sixth Circuit has recognized that a plaintiff can offer either direct or circumstantial evidence to prove an intentional discrimination claim under Title VII.  *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 648-49 (6th Cir. 2012).

The facts that support the elements of Plaintiff's gender discrimination claim are the same as those addressed elsewhere in this brief.  For brevity, those facts will be referenced here.  Ryan did suffer adverse employment (see discussion at pages __-__).  Ryan was qualified for any one of several LPN positions (see discussion at pages __ - __).  The analysis of whether Garrett was treated more favorably than Ryan, must be determined by looking at what occurred ***at the time Ryan made the March 27th report of harassment.***  Though management had the ability to transfer ***either*** Ryan or Garrett (see discussion p. ___), they chose to transfer Garrett.  The Defendant cannot provide a plausible reason why a transfer of Garrett created a better situation overall for Ryan, as well as other employees who might be subjected to Garrett's ongoing and harassing behavior.  Had Ryan been transferred instead, it would have not only achieved the goal of keeping

Garrett away from Ryan[19], but it would have permitted Ryan to work and not be on continuous leave.  The jury should be permitted to hear evidence on the issue of why, when jobs were available and a transfer to Warren CBOC was available, a transfer of Garrett was effectuated, and not Ryan.

IV.    THE RECORD EVIDENCE IS REPLETE WITH MATERIAL FACTUAL EVIDENCE TO SUPPORT THAT THE VA DISCRIMINATED AGAINST RYAN IN VIOLATION OF THE REHABILITATION ACT.

Plaintiff's disability discrimination claims are brought pursuant to the Rehabilitation Act, 29 U.S.C.S. § 791 *et seq*.  Courts in the Sixth Circuit "review claims brought under the Rehabilitation Act as [they] would claims brought under the Americans with Disabilities Act of 1990."*Doe v. Salvation Army in U.S.*, 531 F.3d 355, 357 (6th Cir. 2008) (citing *Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 418 (6th Cir. 2004).  To establish a prima facie case of disability discrimination for failure to accommodate, Ryan  must show that: (1) she is disabled within the meaning of the Act; (2) she is otherwise qualified for the position, with or without reasonable accommodation; (3) her employer knew or had reason to know about her disability; (4) she requested an accommodation; and (5) the employer failed to provide the necessary accommodation. *Rorrer v. City of Stow*, 743 F.3d 1025, 1038 (6th Cir. 2014).  To be 'disabled' under the  Rehabilitation Act, an individual must (1) have a physical or mental impairment which 'substantially limits' him or her in at least one 'major life activity,' (2) have a record of such an impairment, or (3) be regarded as having such an impairment."  *Mahon v. Crowell*, 295 F.3d 585, 589 (6th Cir. 2002). "Major life activities" include functions such as "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching,

---

[19] Transferring Garrett did ***not*** prevent him from returning to Wade Park because employee services such as human resources, union offices were housed there, and Garrett was seen at Wade Park for these reasons and for doctor appointments. (Exh. 24, p. 21 ¶3).

lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working. 29 CFR § 1630.2(i)(1)(i).

If an individual is shown to have a qualifying disability that limits her ability to work, then the employer is required to provide a reasonable accommodation.  Under the ADA, reasonable accommodation may include "reassignment to a vacant position." 42 USC § 112111(9)(B).  Under the ADA, "if an employee is no longer qualified to return to his/her original position, then the employer must reassign the employee (absent undue hardship) to a vacant position for which s/he is qualified.  (Exh. , p. 4, note 21 ¶4).

In this case, Defendant does not dispute that Ryan was objectively qualified for the position of LPN, and only disputes that  Ryan's PTSD limits her ability to work as required under the Rehabilitation Act (Doc. #55-1, PageID #952 ¶3).  In this analysis the Sixth Circuit and Supreme Court dictates that one must look at the unique and special circumstances presented. [20]

The record evidence shows that Ryan's psychological condition not only prevented her from performing her job duties at Wade Park, but also prevented her from performing daily life functions under any circumstances.  Once cleared to resume her nursing duties, her only restriction is that she not return to the Wade Park campus since being there triggered her debilitating psychological trauma and symptoms.

---

[20] The Sixth Circuit looks at a number of factors in determining if a disability is substantially limiting in a major life activity. See *Veltri v. DFS Services LLC*, 2011 WL 3667447, *7 (S.D. Ohio 2011); citing *Bryson v. Regis Corp*., 498 F.3d 561, 575 (6th Cir. 2007); *Swanson v. Univ. of Cincinnati*, 268 F.3d 307, 316 (6th Cir 2001) ("In determining whether an impairment is temporary or substantially limiting, a court will look at the plaintiff's condition after the time of the alleged discriminatory acts."); See also *Albertson's, Inc. v. Kirkinburg*, 527 U.S. 555, 567 (1999) ("evidence that the extent of the limitation [caused by the impairment] in terms of their own experience…is substantial." 29 CFR pt. 1630, App §1630.2(j) ("The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual.").

23

A. <u>Defendant's claim that Ryan did not have a qualifying disability that substantially limited her ability to work at Wade Park is contradicted by clear record evidence.</u>

The Defendant grossly oversimplifies the nature of Ryan's disability. There is sufficient evidence in the record that the VA was aware of the mental suffering, and how that suffering prevented Ryan from functioning as a nurse at Wade Park.

Just arriving at Wade Park triggered several debilitating symptoms of Ryan's PTSD including tearful outbreaks, anxiety, and fear. In April, June, and August 2013, Ryan's treating doctor provided certification of the details of Ryan's limitations and specific symptoms Ryan was suffering due to the attacks at Wade Park (Exhs. 14-17, Exh. 3: Ryan Dec. Exh. A). An August 5, 2013, note provided to the VA explained that *returning to Wade Park would re-traumatize Ryan* due to the sexual attacks there, and in turn, would cause symptoms that would prevent her from performing nursing duties (Exh. 3: Ryan Dec. Exh. A, p. 2). And, in February 2014, Dr. DeLong provided a similar analysis and arrived at the same conclusion – that Ryan stay away from Wade Park (Exh.16.1). The VA was also aware that Ryan had legitimate fears about Garrett including her belief that he carried a gun (Exh. 1, p. 1;Exh. 24, p. 21) One investigating officer sent a memo to labor relations in March 2013, stating that Ryan was afraid of being at Wade Park (Exh. 6). Ryan was also  subjected to threats by her co-workers on the SCU (Exh. 4: Jenison Aff and Exh. 24, p. 7-ORM report). When Ryan was required to return to Wade Park for any reason, she suffered anxiety attacks, could not concentrate, was tearful, would become depressed, isolated from family, angry, and unable to take care of herself or her family. (Exh. 3, Ryan Dec ¶ 5,8).

All of Ryan's debilitating symptoms were noted in Dr. Holmer's medical certification forms (Exhs. 14-17) and medical letters Ryan would bring to the VA (Exh. 3: Ryan Dec. ¶2, Exh. A). The referenced medical documentation of Dr. Holmer was acknowledged and summarized in the Final Agency Decision noting its receipt by the VA (Doc #8-3, p. 3 ¶5). A fax sent to the VA

on 6/21/2013 (Exh. 14.2), and the "received" stamp placed on the medical certifications by the VA itself (dated September 2013) (Exh. 14.4), clearly shows that the VA received the medical documents.

Evidence also shows that, because of her anxiety, depression, tearful breakdowns and inability to concentrate while at Wade Park, Ryan's could not perform clinical nursing duties during her student clinical at Wade Park as shown by her failing grade (Exh. 3, Ryan Dec. ¶ 4,6).

Defendant argues that Ryan's ability to resume work one year later (Doc #55-1, PageID #952) shows that Ryan was not disabled and could have returned to work at Wade Park. As already shown, all the medical evidence refutes Defendant's assertion.[21]  While it is true that Ryan could work as an LPN elsewhere, ***the Defendant has offered no proof that Ryan was able to work as an LPN at Wade Park***.  If the VA does not want to accept that Ryan's mental disability prevented her from working at the Wade Park facility, then the question is one for the jury.

Defendant cites to *Shepler* to support their position that Ryan could have returned to her job at Wade Park.  That case is factually distinct.  The Court in *Shepler* found that the Plaintiff failed to show that she was limited in the major life activity of working (Doc. #55-1 pageID #970). The attack in that case was one attack, and not a series of sexual harassment and several incidents of sexual attacks.  Also, the Plaintiff in *Shepler* suffered from a temporary mental condition making it "difficult" to work.  Ryan's mental condition has triggered, and will always trigger, each time she returns to Wade Park. It is an indefinite/permanent condition.  Lastly, In *Shepler,* the employer was not presented with numerous locations for employment options. Here, the VA had numerous options in at least 9 VA facilities that were within driving distance of Ryan.

[21] Defendant erroneously states that Defendant had "no restrictions".  All of the doctors who examined or treated Ryan either strongly recommended that Ryan not work at the Wade Park facility, or stated that she ***was unable to resume her nursing duties there***.

25

Placing Ryan in another VA facility would not have caused an undue hardship.[22] Both of Ryan's managers agreed that she was an outstanding nurse, so qualifications of Ryan were not an issue.

      B.   <u>The VA failed to accommodate Ryan.</u>

The VA tries to support its position that it did not have a duty to accommodate Ryan because Ryan failed to engage in an interactive process with the VA by (1) not making a request for accommodation and (2) failing to provide medical documentation to support her request (Doc. #55-1, Page ID 972).  Under the ADA, "Individuals may request accommodation in conversation…Alternatively, an employer may ask the individual to fill out  a form or submit the request in written form, ***but the employer cannot ignore the initial request***." (Exh. 28, Enforcement Guidance, note 3) (emphasis added).  In response to a request for an accommodation, "an employer may require only the documentation that is needed to establish that a person has an ADA disability, and that the disability necessitates a reasonable accommodation."  (*Id.*, note 6).

      *1)  Numerous accommodation requests were made.*

In its brief, the Defendant relies on its claim that "Ryan did not request a reasonable accommodation until December 11, 2013." (Doc #55-1, PageID #972). This argument is quite disingenuous given the fact that by its own admission, the VA acknowledges that Ryan requested a transfer off the Wade Park Campus immediately after reporting of the sexual harassment on March 27, 2017.  (Exhs. 23 and 5, p. 1).  Under the ADA, Ryan's initial and repeated verbal requests to be transferred off Wade Park qualifies as a request for an accommodation.[23]  (*Id.*, note

---

[22] Excellent proof of this fact is that the VA admittedly had an opening at the Warren CBOC, but decided against it due to its policy of transferring the wrongdoer, not the victim (Exh. 29 – email discussing Warren job transfer).

[23]Both the Sixth Circuit and the ADA recognizes that a ***verbal*** request is sufficient to qualify as a request for an accommodation. *Gleed v. AT&T Mobility Servs, LLC*, 613 Fed. Appx. 535, 539 (6th Cir. 2015 (stating that an accommodation request can be direct or constructive, in writing or ***verbal***) (emphasis supplied).  The Court in *Gleed* found that simply notifying a supervisor was sufficient to put the employer on notice of its obligations to accommodate.

3).  The VA's argument that Ryan had to make the request in writing overlooks the ADA standards, guidelines, as well as the established law in the Sixth Circuit vis-à-vis verbal requests for accommodation.

VA personnel also acknowledges that Ryan's requests were ongoing as it stated in its letter of December 12, 2013 (Exh. 5, p. 8).  Ryan's repeated requests spanned at least 10 months, and occurred during a time that several jobs were available at several VA sites for which Ryan was qualified. Evidence of Ryan's requests includes documentation of the several *verbal and written* requests for transfer accommodation, as well as the reason the request for transfer was being made (Exhs. 3, 5, 14.1, 14.2, 14.4, 14.6, 16.1, 16.2).

Ryan also complied with her obligation to engage in the interactive process with the VA during her time of leave and awaiting her transfer accommodation.  The medical documentation that Ryan supplied to the VA whether it was for leave requests, the worker's compensation process, EEO mediation, or for any other reason Noelker requested the information, shows that Ryan engaged continually with the VA (Exh. 3: Ryan Dec. ¶2).  The medical documentation that Ryan did provide to the VA met the requirements under the ADA that (1) Ryan had an ADA disability, and (2) gave specific details why her disability necessitated a transfer accommodation.[24]  These documents received by the VA, certify the same medical information requested of Ryan again on December 12, 2013.

The requested medical documentation was provided over a period of 10 months from April 2013, through February 2014 (Exhs. 3, 5, 14.1, 14.2, 14.4, 14.6, 16.1, 16.2)  Several cases in the Northern District and Sixth Circuit have held that the type of documentation that Ryan submitted

---

[24] The VA received medical documents in April, June, July, August, September, and November 2013, and February 2014, that identified Ryan's debilitating symptoms and need to work at another VA location. (*Id*).

27

was sufficient to put the employer on notice that an accommodation is needed.[25]  Therefore, the December 12, 2013, and February 2014 requests can be questioned by a jury as being unlawful and in violation of the ADA.[26]

Once an employee notifies the employer of her need for an accommodation, the parties have an obligation to discuss reasonable accommodations in good faith. *E.g., Mobley v. Miami Valley Hosp.*, 603 Fed. Appx. 403, 414 (6th Cir. 2015). As part of this process, the employee must show that her employer refused to provide an accommodation that "seems reasonable on its face." *U.S. Airways v. Barnett*, 535 U.S. 391, 401 (2002). Once the plaintiff shows that her employer denied her a reasonable accommodation, the burden shifts to the employer to show that the accommodation would have imposed an "undue hardship." *Id.* at 402.

Ryan's request to be transferred to any one of the VA's numerous medical facilities, was reasonable.  She was qualified for these jobs, yet Ryan's request to be moved to one of these locations was not honored (Exh. 18). The VA's repetitive requests for the same medical certifications and refusing Ryan an accommodation, is material evidence that the VA itself caused a breakdown in the interactive process. It seemingly ignored its own policy that relocation ***shall*** be considered and that the responsibility is on HR to seek out such positions for the disabled worker (see Exh.25-VA Reassignment policy).

---

[25] *See Russell v. Nat'l Amusements, Inc.*, No. 3:07-cv-3216, <u>2009 WL 262494, *13</u> (N.D. Ohio Feb. 4, 2009) ("By making this request, and linking it to an impairment, Russell sufficiently requested a 'reasonable accommodation.'); see also *Johnson v. JP Morgan Chase & Co.*, 922 F. Supp. 2d 658, 667 (S.D. Ohio 2013) (quoting *Leeds v. Potter*, 249 Fed. App'x 442, 449 (6th Cir. 2007) ("Although 'an employee need not use the magic words, 'reasonable accommodation' or even 'disability,' the request does need to make it clear from the context that it is being made in order to conform with existing medical restrictions.'"); *See also Brown v. BKW Drywall Supply, Inc.*, 305 F. Supp.2d 814, 828 (S.D. Ohio 2004) ("a person alleging a disability protected by the ADA must establish that his employer had either actual or constructive notice of the disability")

[26] Under the Americans with Disabilities Act…. "an employer cannot ask for documentation when: (1) both the disability and the need for reasonable accommodation are obvious, ***or (2) the individual has already provided the employer with sufficient information to substantiate that s/he has an ADA disability and needs the reasonable accommodation requested***."  (Exh. 28, p. 4, note 8)

The ADA expressly contemplates "reassignment to a vacant position" as a reasonable accommodation. 42 U.S.C. § 12111(9)(B); *Mobley*, 603 Fed. Appx. at 411. If, however, the employer repeatedly refuses to accommodate an employee in the face of repeated requests, the employee's leaving the job can be considered an actionable constructive discharge. *Hurtt v. Int'l Servs.*, 627 Fed. Appx. 414, 421 (6th Cir. 2015).

As in *Mobley*, jobs were available at the VA's other sites.  Had the VA offered her a position at a VA location away from Wade Park, Ryan could have resumed her work. In the wake of the March 27th report by Ryan, the VA had the ability to transfer Ryan to Warren CBOC, and instead, decided to provide Garrett the transfer to Akron CBOC.

Ryan's positive performance review and Noelker's high regard for Ryan  (Exh. 27; Exh. 26, p. 4; Doc #8-3, p. 118) also supports that a transfer would not cause an undue hardship on the VA.  As stated above, approximately one year after Ryan was placed on leave, the VA ultimately offered Ryan a position back on the Wade Park Campus in the same building from which she departed in March 2013. Because the location would trigger Ryan's mental distress and other PTSD symptoms, it was impossible for Ryan to accept the job.  This action on the part of the VA was the final act that caused Ryan's adverse employment action.

V.    RYAN'S RETALIATION CLAIM IS SUPPORTED BY MATERIAL FACTS AND EVIDENCE.

The ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter …." 42 U.S.C. § 12203(a); *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014). The plaintiff bears the initial burden to establish a prima facie case of retaliation: (1) the plaintiff engaged in protected activity; (2) the employer knew of that activity; (3) the employer took an adverse action against plaintiff; and (4) there was a causal connection between the protected activity and the adverse

29

action. *Rorrer*, 743 F.3d at 1046. Establishing a prima facie case of retaliation is a "low hurdle." *Gribcheck v. Runyon*, 245 F.3d 547, 551 (6th Cir. 2001). See also (need to read this case) *Hurtt v. Int'l Servs.*, 627 Fed. Appx. 414, 422 (6th Cir. 2015). Lastly, a plaintiff may prevail on a disability-retaliation claim "even if the underlying claim of disability fails." *Bryson v. Regis Corp.*, 498 F.3d 561, 577 (6th Cir. 2007).[27]

A. <u>The VA is responsible for the retaliatory conduct of Ryan's co-workers</u>.

The evidence that everyone on the SCU, including Herman, knew of Princess Jefferson's volatile behavior, is sufficient to establish that management knew of the retaliatory conduct of Princess Jefferson. Again, Herman acknowledges that she is aware that the SCU employees are a "real clever, all of them. They could hide really well." (Herman Depo p. 161).

Again, rather than confront the situation and institute some remedial action to prevent escalation of the problem, Herman appears to look the other way. As stated previously, such lack of discipline shows a level of indifference on the part of VA management. Herman's actions were not reasonable and did not lend itself to remedying the ongoing bullying, name calling, and threatening behavior of Princess Jefferson.

B. <u>Ryan can establish that the VA retaliated against her in violation of both Title VII and the Rehabilitation Act</u>.

There is sufficient evidence to show that the VA retaliated against Ryan by (1) refusing to transfer Ryan to open job positions at another VA facility (2) offering Ryan a job that was impossible for her to accept, (3) burdening Ryan with unnecessary and improper paperwork, and (4) serving Ryan with discipline papers after Ryan reported the harassment.

---

[27] *Equal Employment Opportunity Comm'n v. Avery Dennison Corp.*, 104 F.3d 858, 860 (6th Cir.1997); see *also Williams v. Nashville Network*, 132 F.3d 1123, 1131 (6th Cir.1997). "The burden of establishing a prima facie case in a retaliation action is not onerous, but one easily met." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir.2000). "Once a prima facie case is established, the burden of producing some non-discriminatory reason falls upon the defendant." *Williams*, 132 F.3d at 1131. "If the defendant demonstrates such, the plaintiff then assumes the burden of showing that the reasons given by the defendant were a pretext for retaliation." *Id*.

Once Ryan was cleared to return to work on the condition that she not return to Wade Park, the VA refused Ryan a transfer accommodation. The only reason offered by the VA for not honoring Ryan's transfer accommodation, and instead transferring Garrett, was that it was the VA policy of transferring the wrongdoer. The previous discussions show how the VA's action favored Garrett, while punishing Ryan.

In addition to the above, Ryan received disciplinary documents in the mail some two months after she reported the incident which appeared to be disciplinary action, and portrayed Ryan in a negative light.  Ryan never saw these documents prior to getting them in the mail on May 9, 2013. (Ryan Dep p. 208, l. 10.  Both documents alleged employee misconduct or inferred inexcusable conduct.  The discipline documents are dated just weeks before Ryan's very positive employee performance review  (Exh. 27).  A jury could reasonably find that Herman's retention of the ROC and subsequent mailing to Ryan, was meant as a disciplinary measure, and a finder of fact could find that such an action was retaliatory.

The VA's request for additional duplicative paperwork in December, was also retaliatory. Lastly, Considering the VA's knowledge of Ryan's mental state and the demeaning, intimidating, and physical trauma Ryan experienced at Wade Park, a reasonable employer would understand that  Ryan's PTSD and restrictions prevented her from working at that VA location.  The offer to return to Wade Park was not only unreasonable, but can be construed as retaliatory.

## **<u>CONCLUSION</u>**

For all the reasons set forth above, Plaintiff respectfully requests that this Court DENY Defendants' Motion for Summary Judgment in its entirety, and allow this case to proceed to a jury trial.

Respectfully submitted,

s/ Elisa P. Pizzino

31

Elisa P. Pizzino (0043723)
697 West Market St., Suite 102
Akron, OH  44303
330.606.1913 (telephone)
330.376.5069 (facsimile)

*Attorney for Plaintiff Annette Ryan nka Katz*

32

## <u>CERTIFICATE OF COMPLIANCE</u>

It is hereby certified that this memorandum in opposition to summary judgment complies with the requirements set forth in Local Rule 7.1(f), and Judge Polster's Minute Entry dated August 17, 2017, and the page limits permitted by this Court.

October 12, 2017                                    s/ Elisa P. Pizzino_____
Date                                                        Attorney for Plaintiff

## <u>CERTIFICATE OF SERVICE</u>

It is hereby certified that the foregoing ***Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment*** has been served on all parties via the Court's electronic filing system.


<u>October 12, 2017</u>                                  <u>s/ Elisa P. Pizzino</u>
Date                                                           Attorney for Plaintiff