**EXH. 24**

### Investigative Report
### In the matter of the EEO Complaint of Discrimination of

| | | |
|---|---|---|
| Ms. Annette M. Ryan | ) | |
| Complainant | ) | |
| | ) | |
| | ) | |
| | ) ORM Complaint 200H-0541-2013103127 | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| Eric K. Shinseki, Secretary | ) | |
| Department of Veterans Affairs | ) | |
| 810 Vermont Avenue, N.W. | ) | |
| Washington, DC  20420 | ) | |
| Respondent | ) | |

Facility:   Louis Stokes VAMC
            Cleveland, OH

Regina E. Jackson Watts
Delany, Siegel, Zorn &Associates, Inc.
EEO Investigator
1501 Lee Highway, Suite 205
Arlington, VA  22209

### I.        INTRODUCTION

Having met all the procedural requirements, with respect to the issues specified hereinafter, this complaint was assigned for investigation on December 16, 2013.  A desk investigation was conducted from December 16, 2013 to February 28, 2014.  This report is submitted for consideration to the designated EEO Officer this 10th day of March, 2014.

### II.        BACKGROUND

Ms. Annette Ryan, hereinafter referred to as Complainant, is a Licensed Practical Nurse, GS-4, Louis Stokes VA Medical Center, Cleveland, Ohio.  Believing she had been subjected to

1

RYAN OFO-000008

discrimination and harassment, she contacted an EEO Counselor. Counseling did not result in a resolution and Complainant filed a formal complaint on August 19, 2013 (A-3, A-6).

## III.   CLAIMS AND BASES

Whether the complainant was subjected to a hostile work environment (sexual and non-sexual) based on sex (female) and reprisal (for the instant complaint) as evidence by the following events:

1. Beginning in the summer of 2012 and continuing two to three times a week up to March 21, 2013, nursing assistant, MD Garrett (MG) subjected the complainant to inappropriate touching, e-mails and comments of a sexual nature.
2. Subsequent to the complainant's report of MG and on or about March 28, 2013, the complainant's co-worker, Princess Jefferson (PJ) threatened to physically harm the complainant and was overheard to say words to the effect that the complainant "got what she deserved."
3. As of April 1, 2013 and although MG was re-located to the Akron CBOC, he poses a threat to the complainant as she could still encounter him at the VA facility where she works.
4. On May 9, 2013, the complainant received a report of contact dated October 25, 2012 for matters occurring on October 25, 2012, which she believed was due to her report of sexual harassment.
5. Since July 1, 2013, the complainant has been constructively suspended as she has been forced into a continuous Leave Without Pay (LWOP) status with earnings insufficient to cover her share of employee benefits which the complainant contends is an indirect attempt to terminate her employment.

## IV.   DOCUMENT REVIEW

Organizational Chart, Louis Stokes VAMC (C-1)

A workforce Profile, Louis Stokes VAMC (C-1) shows 43 employees. Of this total, 30 are female; 13 are male; 4 EEO activity.

With regard to leave usage by employees, documentation shows management has granted all of Complainant's requests for leave. Of 39 employees, FMLA has been granted to 9 employees (7 female, 2 male). Five employees were given sick leave restriction letters (4 female, 1 male) (C-28).

Documentation regarding employees receiving a Report of Contact was not provided. The Agency indicates the term "Report of Contact" is equivalent to supervisory notes and AFGE Local 31, Master Agreement, Article 24, Section 4-Supervisory Notes, indicates (C-33):

2

RYAN OFO-000009

A.  Individual files on each employee not approved by the Department as an official system of records will not be kept by Department officials at any level.

B.  ...If supervisor make a personal decision to keep notes on employees, the notes or files:
   1.  Must be absolutely uncirculated and cannot be reviewed by anyone else....
   2.  Must be maintained in secur fashion in order to prevent disclosure.

C.  Supervisory notes may only be used to support any action detrimental to an employee if such note(s) have been shown to the employee at the earliest available time after the entry was made and a copy provided to the employee.  Once an employee has received a copy of the supervisory note(s), the note(s) can be provided to an appropriate Department official with a legitimate need to know for the performance of their duties.

D.  The time frames for retaining supervisory notes will be up to six months, unless used in personnel action.


## V.      SUMMARY AND ANALYSIS

The witnesses provided the following testimony:

### A.      Summary

Complainant (female, EEOA subject complaint), is employed as a Licensed Practical Nurse, GS-4, Spinal Cord Unit, at the Louis Stokes VAMC, Cleveland, Ohio.  Complainant's immediate and second level supervisors were Ms. Lisa Herman (female), former Nurse Manager, and Ms. Elizabeth Noelker (female, PEEOA), Chief Nurse, Long-Term Care and Spinal Cord Injury, Nursing Service, respectively.

*Claims*

**Claim 1—Beginning in the summer of 2012 and continuing two to three times a week up to March 21, 2013, nursing assistant, MD Garrett (MG) subjected the complainant to inappropriate touching, e-mails and comments of a sexual nature**

**Complainant** states she began working at the Louis Stokes VAMC on November 7, 2011, and worked on the Spinal Cord Unit where she was sexually harassed by a co-worker--M.D. Garrett. Complainant states, initially, she and Mr. Garrett (male), were friends; however, he began sexually harassing her during the summer of 2012 as evidenced by the following.  She states: (1) Mr. Garrett told her that he would only help her with a patient if she had sex with him and she would then get someone else to assist her; (2) he held her in the linen closet where she would go to get supplies—pushing her in, shutting the door; and putting his foot against the door and began pushing himself against her and kissing her—she responded by trying to push him away; he would tell her to stop fighting him because she liked it; she was yelling for him to let her go;

00010

RYAN OFO-000010

and she then ran out; Mr. Desi Hale[1] was outside the door and asked if she was okay; she ran to the bathroom and started crying; she states Mr. Garrett "hauled" her in the closet a couple of times; however, this one incident occurred approximately one month before she came forward and made management aware of the harassment in 2013; (3) when she and Mr. Garrett were charting he would come back and talk "dirty" to her; (4) on one occasion when she was charting Mr. Garrett sat next to her licked his hands and then pressed them on/outside her pants (i.e. her groin area) and told her that he could tell she needed to be "fucked;" and she told him he was disgusting; and the more she was fighting him, the more he thought it was funny; (5) Mr. Garrett would go and see which room where she was working and always appear and corner her; (6) they (she and the employees) worked the late shift (3:00 p.m. to 12:00 a.m.) and walked out together to make sure everyone got to their cars; she would always park where employees are supposed to park and, initially, Mr. Garrett was never parked next to her; however, he would leave the shift on his break and go move his car next to hers and when she asked him why he parked next to her, he would respond because he wanted to make sure she got to her car safely; he would always park his car so that he was facing out and she always faced in, so his driver's seat was next to her driver's seat which made it easy for him to corner her; and he would on occasion corner her and try to push her in her car and talk her into letting him come to her house and she would get in her car and leave; she would try to run ahead but he would always seem to catch up with her as if it was planned; (8) Mr. Garrett would make unsolicited and lewd comments to include, "I want to 'fuck' you; I love you; I want it to 'come over you';" (9) on one occasion when she and Mr. Garrett were in the conference room and while she was sitting at the computer, Mr. Garrett pushed her hand and told her to feel his hard dick and that's what she does to him; she yanked her hand back and left the computer; (10) when she was walking Mr. Garrett would brush up against her—rubbed against her chest and said, "your nipples feel hard" (which she states she has on tape as she had her camera (i.e. phone) in her pocket); (11) Mr. Garrett came up behind her when she was charting and in the hallway—he straddled her while she was sitting in a chair, turning it around and putting his legs over hers and said he wanted to straddle her; someone called for him down the hall and he got off; she had her camera on and was taping the incident; (12) on March 21, 2013, Mr. Garrett took pictures of her which she did not know until the last day she worked and he would tell her she was wearing tight clothes and it looked like she was wearing what's called a "camel toe"; the pictures were of her butt and front  (i.e. groin area); and Mr. Garrett sent/texted the pictures to her phone and told her this was what a camel toe is; (13) he would touch her butt; tell her that he went home and masturbated to visions of her (B-1, pp. 13-27).

With regard to whether she reported the incidents to management, Complainant states she did not report Mr. Garrett until the March 21, 2013, incident as Ms. Herman and Mr. Garrett were friends and had been working together for 16 years and she did not believe she could go to Ms. Herman.  She also states Ms. Herman would "bad mouth" other employees and she felt if she said anything to Ms. Herman, Ms. Herman would tell everyone. Complainant states she did not trust Ms. Noelker as Ms. Noelker has fired employees for much less so she was fearful of losing her job and notes she is a single mom and needs her job (B-1, pp. 27-29).

---

[1] Mr. Hale could not be interviewed as he passed away.

RYAN OFO-000011

Complainant states after Mr. Garrett took the pictures of her on March 21, 2013, and she was back at the computer, Ms. Roseanne McDevitt came around the corner, saw her, and asked her what was wrong. She states she told Ms. McDevitt what happened and Ms. McDevitt then told her that Mr. Garrett was telling people Complainant was crazy; Complainant's family was crazy; not to believe anything Complainant said; and Complainant had been sleeping around with a lot of people. Complainant also states Ms. McDevitt stated that Mr. Garrett had also been harassing her. Complainant states she went home and the next day, she, Ms. McDevitt, and Ms. Laura Anderson (who went to support Complainant and Ms. McDevitt) went to the Union and the Union then contacted Ms. Noelker and then Ms. Herman and advised both of what had occurred. Complainant states she met with Ms. Noelker and showed her the pictures and the video and Ms. Noelker seemed concerned; and indicated she would tell Ms. Herman. Complainant states Ms. Herman left a message on her phone indicating she understood what happened; however, Complainant still had to return to work which Complainant states appeared to be callous and indicate she did not care (B-1, pp. 30-34)[2].

Complainant states the Union asked if Complainant could be granted a couple of weeks of AL (i.e. Administrative leave); however, Ms. Noelker indicated Complainant could only have one or two days which was granted. Complainant states she went to her doctor and her doctor indicated she was suffering from post-traumatic syndrome and severe anxiety and filled out FMLA papers and advised Complainant she was not ever to return to that Unit. Complainant states she then went to the Union and they went to see Ms. Noelker again in the beginning of April and Ms. Noelker indicated she could grant Complainant advanced sick leave; advanced AL; however, Complainant would have to pay that back when she returned to work. Complainant states she then told Ms. Noelker she was going to ask to be reassigned because she could not come back to work there and Ms. Noelker told her that Mr. Garrett had been reassigned to CBOC in Akron (B-1, pp. 34-35).

Complainant also states she reported the incident to the VA Police and she went to the Cleveland police and Mr. Garrett was arrested and indicted. Complainant states when the Federal agents interviewed Mr. Garrett he admitted to everything she had accused him of and he was escorted off the VA facility/property and then reassigned to Akron CBOC and notes he was not actually arrested until sometime in July 2013 (B-1, pp. 39-40, C-43).

**Roseann McDevitt** (female, EEOA), Licensed Practical Nurse, GS-8, WCTA, states she and Complainant were co-workers. She corroborates Complainant's testimony relative to going to the EEO Office and then going to the Union as Ms. Freeman (EEO Office) was not in her office. She states the Union contacted Ms. Noelker while they were in the Union office and informed Ms. Noelker of what happened relative to Mr. Garrett harassing Complainant. Ms. McDevitt also states the night of the incident relative to Complainant and Mr. Garrett, she was at the nurse's station and Mr. Garrett came up to her and rubbed his fingers up and down her arm and made some sexual innuendo. She states she got "pissed off" and walked away and went to the

---

[2] Complainant states she gave/showed the tapes to the police, her attorney, Ms. Herman, Ms. Noelker, Andrea Freeman (EEO), and the Federal agents as she wanted all of them to see what kind of behavior Mr. Garrett was doing.

RYAN OFO-000012

computers and Complainant came up to her and asked her what was the matter and she (McDevitt) responded she was really "pissed off" and that she had had it with all of the crap Mr. Garrett does.  Ms. McDevitt states Complainant then started telling her all the things that was going on relative to Mr. Garrett and sexual innuendos towards Complainant.  Ms. McDevitt states Mr. Garrett would also make comments to her to include:  let's get a room and screw and she would respond she was not like that and she does not date people she works with and she was not going out with him; he would ask who's going to know and she would respond, God will and he commented that's not a big deal.  Ms. McDevitt states Mr. Garrett's never stopped and when she did let him know it bothered her, he would continue and was always asking her out and if he could come to her home and rub he feet and insinuate he would like to go to bed with her and she would tell him that was never going to happen (B-3, pp. 7-9).

Ms. McDevitt states she did not make management aware of Mr. Garrett's actions until he started getting out of control when she found out he was doing similar things to Complainant. She states while she had never seen him sexually harass Complainant, he has been known to talk very sexual and crude and crass.  She states some of the employees would sit and laugh about it; however, she would leave the room/area (B-3, pp. 9-10).

With regard to the incidents relative to Mr. Garrett, Ms. McDevitt states she and Complainant went to the police station, the VA police station and filed a report with them and she was later interviewed after Mr. Garrett was walked off the floor.  Ms. McDevitt states she also later informed Ms. Herman what happened and both Ms. Noelker and Ms. Herman indicated they would take care of it.  She states shortly after reporting the incident, Ms. Freeman and someone else came to the unit and performed an in-service on sexual harassment.  She states she felt management was making her and Complainant look like the bad guys and she does not believe they were treated fairly.  Ms. McDevitt states she would go to Ms. Herman and Ms. Noelker and tell them they needed to shut the gossip down and, after about a month or so, it started to die down (B-3, pp. 12-13, 17).

With regard to whether she believes Complainant's sex was a factor in what occurred, Ms. McDevitt states she believes if Complainant had been a man, things would have been handled differently (B-3, pp. 19-20).

**Douglas Jenison** (male, prior EEOA), former Registered Nurse, states he was Complainant's co-worker and worked on the Long-Term Care and Spinal Cord Injury Unit with Complainant from October 2012 until July 2013.  He states he and Complainant worked on the same shift except when he was completing his orientation shifts.  Mr. Jenison states Complainant informed him that Mr. Garrett was sexually harassing (i.e. physical and verbal abuse) her sometime around the time she filed her complaint (he states he cannot recall when specifically).  He states Complainant stated:  (1) she was being pushed into closets and being fondled; (2) she was being grabbed on the way out to her car after the shift was over; (3) she was being touched inappropriately; and (4) Mr. Garrett forced himself on her and kissed her.  Mr. Jenison states Mr. Garrett actually made inappropriate comments of a sexual nature to him about Complainant. He states Mr. Garrett told him:  (1) he (Garrett) did not think Complainant really had a boyfriend—that she really wanted to have sex with him (Garrett); (2) he (Garrett) was going to have some hard, rough sex with her; (3) Complainant had a hot body; and (4) he was always

6

RYAN OFO-000013

watching her.  Mr. Jenison states he believes Mr. Garrett made the comments sometime around the December 2012 timeframe and he would respond to Mr. Garrett by stating he was pretty sure Complainant had a boyfriend and he (Jenison) does not think that is going to happen and he did not think Mr. Garrett's comments were appropriate things to say (B-6, pp. 6-8).

Mr. Jenison also states Mr. Garrett harassed Ms. McDevitt and made comments to him (Jenison) about Ms. McDevitt; however, not as much as the comments he made about Complainant and Mr. Garrett was mainly focused on Complainant.  He states Mr. Garrett would indicate he liked to have sex with all kinds of different women and that Ms. McDevitt's full figure was attractive (B-6, p. 10).

Mr. Jenison further states, to the best of his recollection, Mr. Garrett always parked his car in the main parking garage.  He states at the time he (Jenison) began to escort Ms. Ryan and Ms. McDevitt to their cars, he encouraged them to park in the employee parking garage which is a separate building and in a different location.  He states he does not know if Mr. Garrett changed the location of where he was parking (B-6, p. 11)

With regard to whether he ever informed management of Mr. Garrett's comments, Mr. Jenison states he did not because it was fairly commonplace for most of the employees (especially, Princess Jefferson) on the floor to say inappropriate things (i.e. comments with sexual innuendo) in front of the supervisor.  He states it was not taken seriously and was tolerated as if it was the norm; therefore, he did not think anything would have been done about it given the environment.  Mr. Jenison states he did encourage Complainant to take the matter to the police, EEO, and other things and he would be a witness for her (B-6, p. 10).

Mr. Jenison states he believes Complainant's sex was probably a factor in how management responded to her allegation of sexual harassment because there were mostly females on the floor and the nurse manager (Ms. Herman) is female and had been working with Mr. Garrett a very long time and was known to play favorites (B-6, p.11).

Mr. Jenison also states he believes Complainant was subjected to a hostile work environment after she made her allegations of sexual harassment and it was almost "cartoonish" the way the environment became so hostile towards her.  He states Ms. Jefferson made it almost impossible to have any kind of work environment suitable for Complainant by yelling at her (Complainant), calling her names, talking about Complainant behind her back, getting everyone else "riled" up against Complainant (B-6, p. 12)

**Elizabeth Noelker** (female, prior EEOA), Chief Nurse, Long-Term Care and Spinal Cord Injury (SCI), Nursing Service, states she was Complainant's second level supervisor and Ms. Lisa Herman[3], who retired January 3, 2014, is/was Complainant's immediate supervisor.  Ms. Noelker states she became aware of Complainant's involvement in EEO activity on March 28, 2013, when contacted by Ms. Andrea Freeman and Complainant.  She states Ms. Freeman and Complainant indicated Complainant alleged she was sexually harassed, abused, and assaulted by

---

[3]Ms. Herman declined to provide testimony relative to Complainant's allegations.

RYAN OFO-000014

Mr. Garrett.  She states Complainant then came to see her with a Union representative on March 28, 2013, and indicated Mr. Garrett was bullying her and that she wanted to be removed.  Ms. Noelker further states she interviewed Complainant relative to the alleged incident; offered her all the rights of the EEO process; and gave her a counselor, EAP, union representation; and provided her with a lot of emotional support during their conversation.  She states Complainant indicated she and Mr. Garrett had started off as friends while working on the second shift on the SCI long-term care and then the situation advanced as Mr. Garrett had become sexually aggressive with her during the prior six months and had pushed her into the linen closet and had made sexual advances towards her on occasion (B-2, pp. 5-7).

Ms. Noelker specifically states during the meeting with Complainant and the Union representative Complainant was tearful and indicated Mr. Garrett: (1) had pushed her into the linen closet and had made physical sexual advances towards her on occasion—attempted to kiss her five or six times (however, she could not provide dates); (2) frequently moved his van to be close to her or next to her car; (3) pinned her up against her car and kissed her with his tongue on her lips; (4) stated, "I want to straddle you" on occasion; (5) licked his fingers and told her that he needs food for –meaning her; (6) he takes his hand and puts it on him to hold his penis on occasion; (7) stated, "your nipples are so hard"; and (8) told her that she has a "camel toe" and took pictures of her front and back side, then sent them to her on her phone—Complainant showed her phone with pictures of her front and back sides.  Ms. Noelker states Complainant indicated she had recorded Mr. Garrett's voice on the phone when he stated sexually explicit things to her and she (Noelker) listened to the recording; however, it was very difficult for her to understand (B-2, pp. 10-11).

Ms. Noelker states Complainant told her that she had gone to the Cleveland police that day and she had also gone to the EEO Office and VA's police and while she is not sure, she (Noelker) believes the VA police reported it to the IG and they told her not work there.  She also states Complainant indicated Mr. Garrett bullied her and lives close to her and she was very afraid of him and cannot work because of fear and asked that she not have to work on Sunday.  Ms. Noelker states she told Complainant to call her the next day (March 29th) and she would address what she could do and again offered Complainant EAP and wrote everything down and contacted her supervisor and Bridgett Longino-Thomas, Labor Manager, and they immediately placed Mr. Garrett (the alleged perpetrator) (via VA's police escorting him off premises) on administrative leave and she also gave Complainant paid administrative leave (for four days) as she was too upset to work.  She states she subsequently honored/approved Complainant's formal requests for leave and continues to honor such (B-2, pp. 11-13).

Ms. Noelker states VA's police and the Cleveland police were both involved in the issue; the U.S. Marshall's Office came and arrested Mr. Garrett on July 11, 2013, at the CBOC (an outpatient clinic) where he had been detailed; and he has been placed on indefinite suspension until he goes to trial and findings are made. Ms. Noelker states she believes Mr. Garrett was initially placed on administrative leave for two days at which time they located a place for him to work (which Labor Relations located in Akron CBOC and is approximately 15-20 miles from Cleveland) (B-2, pp. 13-15).

RYAN OFO-000015

Ms. Noelker states her actions were not motivated by discrimination and Complainant's sex/gender were not factors in any actions she took. She states she followed policy and has helped and continues to help Complainant and took immediate action once she became aware of Complainant's allegation on March 28, 2013 (B-2, pp. 18-19).

**Claim 2—Subsequent to the complainant's report of MG and on or about March 28, 2013, the complainant's co-worker, Princess Jefferson (PJ) threatened to physically harm the complainant and was overheard to say words to the effect that the complainant "got what she deserved"**

**Complainant** states after she made her sexual harassment charges against Mr. Garrett, employees were making negative comments about her. She states Mr. Doug Jenison (male), Registered Nurse, Spinal Cord Unit, advised her of this and told her he was fearful for her and indicated Ms. Jefferson was telling other employees Complainant got what she deserved. Complainant states as soon as she found this out, she told Ms. Noelker and Ms. Herman and Ms. Herman indicated she was aware of Ms. Jefferson "bad mouthing" and she (Herman) would put a stop to it. Complainant states she does not know if Ms. Herman did or not. Complainant states she also mentioned it to Ms. Noelker and Ms. Noelker indicated they would handle it; however, she (Complainant) does not know what was done as Ms. Jefferson still works at the hospital (B-1, pp. 52-56).

Complainant also states she never had any problems with Ms. Jefferson; however, she believes management treated Ms. Jefferson differently as Ms. Jefferson, who suffers from PTSD, would not come in and use this (i.e. PTSD) as an excuse. She states Ms. Jefferson would comment that the African American patients wanted African American women to take care of them. Complainant also states Mr. John Blackstone witnessed Ms. Jefferson talking about her (B-1, p. 56; p. 61).

Complainant states she believes Ms. Jefferson's actions was harassment and she believes her sex was a factor in what occurred as she believes Ms. Jefferson was a little bit jealous as Ms. Jefferson would "hang" all over Mr. Garrett and Mr. Hale. She states she believes Ms. Jefferson was jealous of her friendship with Mr. Hale. She states she believes her race was a factor relative to Ms. Jefferson's actions (B-1, pp. 62-63).

**Ms. McDevitt** states Ms. Jefferson and other employees on the floor were talking about Complainant in a derogatory and accusatory manner (even though they did not specifically say her name). She states a couple of patients actually told her they were in contact with Mr. Garrett via the telephone and would ask if she knew what was happening with Mr. Garrett. She states she went to Ms. Herman and Ms. Noelker and advised them of the gossip and they indicated they would take care of it. Ms. McDevitt states she believes Complainant's race was a factor in Ms. Jefferson's conduct toward Complainant to a point but believes it was more personality. She states she does not believe Complainant's sex was a factor and believes Ms. Herman and Ms. Noelker had known Mr. Garrett longer and this was a factor. She also states she believes a hostile work environment was created after they made the allegations of sexual harassment against Mr. Garrett (B-3, pp. 21-26).

RYAN OFO-000016

**Mr. Jenison** states he heard Ms. Jefferson and another employee state they were going to get Complainant's and Ms. McDevitt's telephone numbers and call and harass them. He also states Ms. Jefferson stated: (1) Complainant was asking for it; (2) Complainant wanted to have sexual contact with Mr. Garrett and leading Mr. Garrett on; and (3) by filing the EEO complaint, Complainant was double crossing Mr. Garrett because it was Complainant's fault. Mr. Jenison states Ms. Jefferson and Ms. Wilhemina were very hostile and notes when Complainant did work, Ms. Jefferson confronted her and called her names (i.e. whore). He states as an RN and as a supervisor, he would often tell Ms. Jefferson that her actions, as far as what she was saying were inappropriate, and that the hostile work environment she was creating was not conducive to having constructive work being accomplished and she needed to focus on her job and not on her opinion of what happened relative to Complainant. He states he believes what he told her worked for the most part when he was there. Mr. Jenison states he did not make Ms. Herman or Ms. Noelker aware of what Ms. Jefferson was doing as Complainant told him that she and Ms. McDevitt had made them aware. Mr. Jenison also states he believes Complainant's race was a factor in Ms. Jefferson's actions as Complainant is White and Mr. Garrett is African American and almost every other female on the floor (except Ms. McDevitt) is African American. He states he believes there was some sort of underpinning (by the other employees) to Complainant's allegations against Mr. Garrett because Mr. Garrett is African American and that Complainant was messing around with Mr. Garrett and did not want to get in trouble for it and because Mr. Garrett is African American, he would get in more trouble. Mr. Jenison states he believes the employees felt some sort of camaraderie with Mr. Garrett and this added fuel to the fire (B-6, pp. 15-16).

Mr. Jenison also states he believes Complainant's sex was a factor because she is female and while most of the other employees on the floor are female, they approached Complainant, who is small in stature, with the intent to intimidate her. He states he does not believe they would have done this if Complainant was male as the employees would not have taken that aggressive personal stance with her (B-6, p. 16).

**Ms. Noelker** states Complainant never told her anything relative to what Ms. Jefferson was doing/saying about Complainant. She states prior to Ms. Herman leaving, she (Noelker) asked Ms. Herman about Complainant's allegations relative to Ms. Jefferson and Ms. Herman indicated Complainant never came to her regarding Ms. Jefferson threatening to harm her. Ms. Noelker states Ms. McDevitt had complained about Ms. Jefferson sometime around April 2nd; however, she did not specifically say Ms. Jefferson. She states Ms. McDevitt indicated there were whispers on the floor; however, Ms. McDevitt indicated she would not tell her (Noelker) what she meant and later alluded to Ms. Jefferson. Ms. Noelker states Ms. McDevitt indicated she would like to continue working but she wanted to work somewhere else (i.e. in a CBOC); however, the CBOCs are not under her jurisdiction. She also states there were no openings; however, she would provide her (McDevitt) with a letter of recommendation and help her apply. Ms. Noelker states she did give Ms. McDevitt another position (which she accepted) in the Blind Rehab, which is located on the floor below the Spinal Cord Injury Unit (B-2, pp. 20-22).

Ms. Noelker states, to her knowledge, no other employee made allegations about Mr. Garrett. She states Complainant called her on April 2, 2013, at 11:00 a.m., was very upset and indicated she was seeing a doctor. Complainant also stated she could not come back to a unit that was a

10

RYAN OFO-000017

hostile work environment as it would be too much for her to.  Complainant also stated Ms. McDevitt was also being harassed on the floor.  Ms. Noelker states she thanked Complainant for the information and immediately went to SCI and asked Ms. McDevitt to come to her office. She states she asked Ms. McDevitt if anyone was harassing her on the unit and she responded, "no" and told her that there were whispers and she then asked Ms. McDevitt what they were whispering about; however, she would not indicate anything but stated she would like to work somewhere else such as CBOC or a short stay.  Ms. Noelker states Ms. McDevitt told her the Spinal Cord Injury Unit was hard and she (Noelker) advised Ms. McDevitt she would give her a reference if she needed one and she would help her get a different job which she (Noelker) did. Ms. Noelker also states Ms. McDevitt also told her that she had spoken to Ms. Herman and Ms. Herman was an excellent Nurse Manager and thanked her (Noelker) for her attention (B-2, pp. 22-23).

Ms. Noelker states Ms. McDevitt also told her (Noelker) that she (McDevitt) had informed Complainant that Mr. Garrett approached her (McDevitt) stating he wanted to date her and she had responded by telling him she did not want to date him.  She states Ms. McDevitt also indicated:  (1) Mr. Garrett also flirted with her and stated he wanted to have sex with her to which she responded she did not do that unless she was married and Mr. Garrett said, "well, let's get married and do it"; and (2) Mr. Garrett rubbed his fingers up and down her (McDevitt's) arm. Ms. Noelker states Ms. McDevitt reported this information to Ms. Herman; however, she did not become aware of it until Ms. McDevitt came to see her in May.  She notes Ms. McDevitt came to see her in April after Complainant told her (Noelker) that Ms. McDevitt was being harassed; however, when she went to see Ms. McDevitt that day, Ms. McDevitt indicated no one on the unit was harassing her.  She notes once she became aware of Ms. McDevitt's allegations, they offered her EAP and time off; however, Ms. McDevitt wanted to continue to work and they did get her another position (B-2, pp. 23-25).

Ms. Noelker states Complainant's gender was not a factor in her actions relative to Complainant and her allegation against Ms. Jefferson and she was never made aware of Complainant's allegation that Ms. Jefferson stated Complainant "got what she deserved." She states Complainant did not speak to her nor Ms. Herman (per what Ms. Herman told her (Noelker)). She also states when Ms. McDevitt informed her "there were whispers," she instructed Ms. Herman to make sure that she talked to her staff regarding any form of harassment, which Ms. Herman did, and Ms. Freeman went over the sexual harassment policy with the staff, indicating any form of harassment would not be tolerated (B-2, pp. 25-26).

**Ms. Jefferson** states she worked on the same unit as Complainant.  Ms. Jefferson states she never threatened Complainant and never made the comment, "Complainant got what she deserved" or any similar type comment.  She also denies discussing Complainant or talking about Complainant in the presence of Mr. Jenison and notes Mr. Jenison was fired.  She states she had to provide a statement in front of the board relative to Mr. Jenison and what he did wrong.  She also states management never discussed Complainant with her (B-5, pp. 6-8).

Ms. Jefferson states Complainant and Mr. Garrett were good friends and notes one particular time, Complainant asked Mr. Garrett to follow her to the gas station because she was going to run out of gas; and on another occasion, Complainant had a panic attack or a blood pressure issue

RYAN OFO-000018

one night and Mr. Garrett went and checked on her in the Emergency Room and she thinks he made sure Complainant got home safely (B-5, pp. 11-12).

Ms. Jefferson states Complainant's sex and race were not factors in her any of her actions relative to Complainant and notes she was new to the shift (as she had started working there in May 2012) and she (Jefferson) was always working the day shift prior to May 2012 (B-5, pp. 9)

**Claim 3—As of April 1, 2013 and although MG was re-located to the Akron CBOC, he poses a threat to the complainant as she could still encounter him at the VA facility where she works**

**Complainant** states after her allegations of sexual harassment, Mr. Garrett came to the facility a couple of times (when she was not there).  She states on one occasion he came during second shift and if she had been there she would have seen him.  She states Ms. McDevitt was working and felt threatened.  Complainant states both she and Ms. McDevitt called Ms. Herman and Ms. Noelker and told them that they did not understand why he was allowed to be there and they thought Ms. Herman and Ms. Noelker was protecting them.  Complainant states they blamed Ms. McDevitt for not calling the police at the time; however, even after this incident, Mr. Garrett continued to call patients and come to the Union.  She notes on one occasion while he was at the Union, Ms. McDevitt's attorney and Ms. McDevitt ran into him at Ms. McDevitt's mediation.  Complainant states management indicated they could not be there at all times, especially on second shift, and it was up to them as employees to make the phone call to the police (B-1, pp. 64-66).

Complainant states she believes what occurred was harassing and her sex was a factor in what occurred as she does not believe Mr. Garrett would have made the accusations to a male (B-1, pp. 67-68).

**Ms. Noelker** states once they became aware of Complainant's allegations against Mr. Garrett, they removed him from the Unit and placed him in a position that was far away from the hospital so Complainant would have no contact with him and he would have no contact with her or anyone in the unit.  She states Mr. Garrett's assignment to CBOC (which began on March 28th) was going to be indefinite; however, he was subsequently suspended indefinitely (on July 8th) after being arrested by the Marshall's on July 3rd (B-2, pp. 29-30).

Ms. Noelker states Complainant never made her aware of her concerns relative to encountering Mr. Garrett and notes Complainant does not work at CBOC which is 15-20 miles from the hospital.  She also states she has no knowledge of Mr. Garrett coming back to the hospital and she cannot address whether Ms. Herman had knowledge of such; however, Ms. Herman did indicate she had heard Mr. Garrett was coming in.  She states Ms. Herman told her (Noelker) that she (Herman) contacted Mr. Garrett and told him that he was not to have any contact there (i.e. hospital) whatsoever; however, he denied coming there.  Ms. Noelker states when she was over in the administrative building (which is in another building) with Ms. McDevitt and her attorney, Mr. Garrett had an appointment with the union and the union escorted him to their office.  She states he was filing something with the Union, which she is not privy to and she was told he was

RYAN OFO-000019

there, escorted by the union.  She states he was leaving with the union when Ms. McDevitt went out on a break (B-2, pp. 32-33).

Ms. Noelker states neither Complainant's sex nor involvement in EEO activity were factors in her actions relative to Mr. Garrett's assignment and her actions were not motivated by discrimination against Complainant (B-2, pp. 33-34).

### Claim 4—On May 9, 2013, the complainant received a report of contact dated October 25, 2012 for matters occurring on October 25, 2012, which she believed was due to her report of sexual harassment

**Complainant** states Ms. Herman issued her a Report of Contact, dated October 25, 2012, which she received on May 9, 2013.  She states she does not believe the assertions in the Report of Contact are accurate and she did have emergency car repair.  With regard to whether she had been counseled/warned before being issued the Report of Contact, Complainant states everyone was warned and counseled and everyone had to sign a paper (i.e. Sick Leave Restriction).  Complainant states she does not believe the policy relative to issuing a Report of Contact was followed as the employee is supposed to sign it and made aware of it.  She notes she was not aware of it until May.  Complainant states she did question Ms. Herman about it and Ms. Herman indicated it had been issued in October; however, Complainant reiterates she did not receive it then (B-1, pp. 74-75).

Complainant states she believes her involvement in EEO activity was a factor in the issuance of the Report of Contact as they had initially made their complaint in the presence of Ms. Andrea Freeman, EEO, and Ms. Freeman was very "nasty" to her and Ms. McDevitt.  She notes Ms. Freeman tried to discourage them from filing an EEO complaint and indicated they had already made an investigation complaint with the VA police and Ms. Freeman felt if they filed and EEO complaint, they would then start another investigation.  Complainant also states Ms. Herman and Ms. Noelker were aware of her involvement in EEO activity around March 21, 2013.  With regard to whether she believes her sex was a factor, Complainant states she does not know if she can say her sex was involved; however, she believes it was sexual harassment and harassment and retaliation (B-1, pp. 76-78).

**Ms. Noelker** states Ms. Herman provided an October 23, 2013 document in which Ms. Herman indicates she sent Complainant a copy of a sick leave restriction letter, dated October 26, 2012, via UPS which Complainant had signed without documenting the date.  She also indicates she sent Complainant a pay stub rather than leave it in her mailbox.  In the note, Ms. Herman also indicates she had not given Complainant a copy of the sick leave restriction letter in person; however, she had discussed it with her; therefore, she sent it via UPS on May 13, 2013 (B-2, pp. 34-35).

Ms. Noelker also states the Report of Contact was also included in the package forwarded to Complainant and was an old Report of Contact that Ms. Herman sent to Complainant that Ms. Herman had not taken it home when she left and has nothing to do with Complainant's EEO allegations.  She notes Complainant had never taken both the leave restriction letter and Report of Contact; therefore, Ms. Herman mailed it to her home as Complainant was no longer at work.

13

RYAN OFO-000020

Ms. Noelker states a Report of Contact can be done on many things and notes a nurse manager and/or staff person can write it and you can sit down with the employee and review it and get rid of it or dispose of it and notes it can become evidence for labor management issues. She reiterates that Ms. Herman indicated Complainant had not taken either document home (i.e. leave restriction letter or Report of Contact), so they were mailed to her as Complainant had not been to work since March 28, 2013 (B-2, pp. 35-38).

With regard to whether other employees have been issued a Report of Contact during the prior two year period by Ms. Herman, Ms. Noelker states she is certain they have been as all nurse managers do this activity; however, they do not keep them on record (B-2, pp. 40).

Ms. Noelker states Complainant's sex, allegations of sexual harassment, and involvement in EEO activity were not factors in Complainant being sent the Report of Contact and her actions were not motivated by discrimination (B-2, pp. 40).

**Claim 5—Since July 1, 2013, the complainant has been constructively suspended as she has been forced into a continuous Leave Without Pay (LWOP) status with earnings insufficient to cover her share of employee benefits which the complainant contends is an indirect attempt to terminate her employment**

**Complainant** states after she made her allegation of sexual harassment, she was on FMLA and not getting paid as she did not have any leave or sick leave. She states management made her complete documents indicating/requesting Leave Without Pay (LWOP) with a beginning date of April 9, 2013 (which was until June 27, 2014). Complainant states she did not want LWOP and asked if she could participate in the Volunteer Leave Transfer Program and was approved; however, she never received any donations. Complainant states she thought management would be more sympathetic with her and honor her request to be off campus (via reassignment). She notes management would not reassign her. Complainant also states she was advised (via written documents) that she had exhausted her AL and SL accrued. She states was granted two weeks of borrowed leave (i.e. advanced leave). Complainant states Human Resources advised her she was suspended, leave without pay. She states she wanted some kind of authorized absence (B-1, pp. 79-84).

Complainant states she does not know what the policy relative to LWOP was and she does not know if it was followed relative to her. She further states she believes her sex was a factor in being placed in a LWOP status and believes the whole sexual harassment had everything to do with being placed in a LWOP status. She also thinks being placed on LWOP was retaliation (B-1, pp. 85-86).

**Ms. Noelker** states they have honored every request Complainant has made relative to leave. She states: (1) Complainant requested FMLA from April 9, 2013 to July 1, 2013, to be consecutive weeks of FMLA and her requests were approved; (2) Complainant requested 240 hours of advanced sick leave and after everything else was exhausted her request was approved; (3) Complainant requested voluntary leave transfer program which was approved; (4) on June 27th, Complainant requested more time through September 2nd, accrued AL, advanced AL 72 hours, and LWOP that was approved; and (5) September 1st through December 2nd, Complainant

14

RYAN OFO-000029

again requested discretionary LWOP which was approved.  Ms. Noelker states Complainant has been given everything they could possibly give her and notes Complainant is choosing to stay at home because there is no more leave.  Ms. Noelker states Complainant has contacted her and asked to come back to work; however, she indicated she did not want to work on SCI long-term care and she (Noelker) has offered Complainant every unit she possibly could, including two units in another building.  She states Complainant called her in September 2013 and asked if she had anything open and she told Complainant she had lots of units and that Complainant could work spinal cord injury and acute care which is in a different building; and Complainant could work in hospice which she was very interested in and stated she wanted to do that and she told Complainant she could come back at any time.  Ms. Noelker states she has offered these to Complainant on phone calls and also told Complainant she can continue to stay at home if she needs this and that she would support Complainant.  She states Complainant came in with her lawyer and accepted the hospice position (which was part of mediation); however, Complainant did not take it and she does not know why (B-2, pp. 42-43).

Ms. Noelker states Labor management advised her to continue to give Complainant discretionary LWOP because she has been advanced all the leave they can give her noting Complainant did not have much leave so she has given Complainant everything she possibly can.  Ms. Noelker states she believes Complainant has been advised of the impact/effect of LWOP relative to her employee benefits via Labor management.  Ms. Noelker states Complainant's sex and involvement in EEO activity were not factors relative to Complainant being placed in a LWOP and she did not discriminate against Complainant (B-2, pp. 44-47).

**Eric Gonzales** (male), Employee and Labor Relations Specialist, GS-201-12, Employee and Labor Relations, Human Resources Management Service, states he provides HR services as an ELR for Nursing Service relative to leave usage, disciplinary actions, awards, and he processes FMLA requests.  Mr. Gonzles states it is his understanding Complainant exhausted her entitlement to FMLA; she was granted periods of advanced leave and those leave statuses were exhausted; and at the end of that period, Complainant requested LWOP which was approved (B-4, pp. 5-7).

Mr. Gonzales states when an employee enters into a LWOP status that status results in insufficient funds to cover the employee's share of health benefits and the Employee and Labor Relations Section sends out a memorandum to the employee.  The memorandum advises the employee of their responsibility to make appropriate arrangements in the event they want to continue those benefits; or, their responsibility to terminate those benefits if they decide they no longer desire those benefits.  He states Complainant was forwarded and received a memorandum to this effect and notes the policy was followed relative to Complainant.  Mr. Gonzales states Complainant's sex and involvement in EEO activity were not factors in any of his actions.  He states he first became aware of Complainant's involvement in EEO activity on or about October 2013 upon assuming his role as the specialist assigned to Nursing Service (B-4, pp. 5, 7-8, C-47).

**B.      Analysis**

In order to establish a *prima facie* case of hostile work environment sexual harassment,

RYAN OFO-000022

Complainant must show: (1) she belongs to a protected class; (2) she was subjected to unwelcome sexual advances, requests for sexual favors, and/or other verbal or physical conduct of a sexual nature; (3) the harassment complained of was based on sex; and (3) the submission to such conduct was sufficiently severe or pervasive to create a hostile work environment altering the terms and conditions of the Complainant's employment. In cases of sexual harassment by co-workers or other non-supervisors, Complainant must show, as part of the *prima facie* case, that management failed to exercise reasonable care to prevent and correct promptly any sexually harassing behavior and she unreasonably failed to take advantage of any preventive or corrective opportunities provided to avoid harm.

With regard to Claim 1, Complainant has shown she is a member of a protected class by virtue of her sex; she has shown that she was subjected to unwelcome sexual advances, requests for sexual favors, and other verbal and physical conduct of a sexual nature; the harassment complained of was based on her sex; and the conducts was sufficiently severe and pervasive to create a hostile work environment altering the conditions of her employment. The evidence and testimony of record indicates management exercised reasonable care to prevent and correct promptly the sexually harassing behavior. Complainant testifies she went to management and once management became aware of her allegations management officials took immediate action by removing Mr. Garrett from the SCI Unit and granting Complainant administrative leave. In addition, management involved the Employee Labor Relations Office and the EEO Office and had the EEO Office conduct training focusing on harassment in the workplace.

With regard to Claims 1, 2, 3, 4, and 5, in order to establish a *prima facie* case of hostile work environment (non-sexual harassment), Complainant must present evidence that: (1) she is a member of a protected group by virtue of her sex and race; (2) she was subjected to unwelcome verbal or physical conduct, and/or an action or incident or series of actions and incidents, which a reasonable person would consider harassing; (3) the behavior to which she was subjected was sufficiently severe or pervasive to create an intimidating, hostile or offensive work environment altering the terms and conditions of her employment; (4) the harassing behavior to which she was subjected was motivated by her sex and/or race; (5) the Agency knew or should have known of such conduct; (6) the Agency failed to promptly or appropriately address her allegations of harassment; and (7) she unreasonably failed to take advantage of any preventive or corrective opportunities provided to avoid harm.

In order to establish a prima facie case of disparate treatment, Complainant must show: (1) she is a member of a protected group because of her sex/gender; (2) she was harmed by an adverse employment action; (3) similarly situated employee(s) not of Complainant's protected group were treated more favorably in similar circumstances.

With regard to Claim 1, Complainant has shown: (1) she is a member of a protected group by virtue of her sex; (2) she was subjected to unwelcome verbal or physical conduct and/or an action or series of actions and incidents, which a reasonable person would consider harassing; (3) the behavior to which she was subjected was sufficiently severe or pervasive to create an intimidating, hostile or offensive work environment altering the terms and conditions of her employment; and (4) the harassing behavior to which she was subjected was motivated by her sex. As noted above, the documentation and testimony of record indicates once management

16

RYAN OFO-000023

became aware of her allegations, they took prompt or appropriate actions address her allegations of harassment.

With regard to Claim 2, Complainant is a member of a protected group by virtue of her sex and race; she asserts was subjected to unwelcome verbal or physical conduct and/or an action or series of actions and incidents, which a reasonable person would consider harassing; the behavior to which she was subjected was sufficiently severe or pervasive to create an intimidating, hostile or offensive work environment altering the terms and conditions of her employment; and the harassing behavior to which she was subjected was motivated by her sex and race. The alleged harasser, Princess Jefferson, denies making threatening or disparaging comments about Complainant. Ms. McDevitt supports Complainant's testimony and confirms Ms. Jefferson made such comments. The testimony of record does indicate however, the Agency knew or should have known of the conduct by Princess Jefferson.

With regard to Claim 3, Complainant is: (1) a member of a protected group by virtue of her sex; and asserts (2) she was subjected to unwelcome verbal or physical conduct and/or an action or series of actions and incidents, which a reasonable person would consider harassing; (3) the behavior to which she was subjected was sufficiently severe or pervasive to create an intimidating, hostile or offensive work environment altering the terms and conditions of her employment; and (4) the harassing behavior to which she was subjected was motivated by her sex. However, the record does establish: (1) the Agency knew or should have known of such conduct; and (2) once management became aware of her allegations, management failed to promptly or appropriately address her allegations of harassment.  Testimony shows Mr. Garrett was relocated to a facility 15-20 miles from her work unit while her allegations were being investigated and until his arrest.  Upon his arrest, Mr. Garrett was placed on and remains on an indefinite suspension pending the outcome of his indictment/trial.  Complainant indicates she has been on continuous LWOP since March 28, 2013, and does not provide evidence that she has encountered Mr. Garrett.  She also indicates she does not plan to return to work and indicates Mr. Garrett's relocation to another facility "poses" a threat.  Ms. McDevitt as Ms. Noelker provide testimony of having seen Mr. Garrett on one occasion while he was meeting with the Union and being accompanied by Union officials.

With regard to Claim 4, Complainant is (1) a member of a protected group by virtue of her sex; and asserts (2) she was subjected to unwelcome verbal or physical conduct and/or an action or series of actions and incidents, which a reasonable person would consider harassing; (3) the behavior to which she was subjected was sufficiently severe or pervasive to create an intimidating, hostile or offensive work environment altering the terms and conditions of her employment; and (4) the harassing behavior to which she was subjected was motivated by her sex.  However, the record does not indicate: (1) the Agency knew or should have known of such conduct; and (2) once management became aware of her allegations, management failed to promptly or appropriately address her allegations of harassment.

In order to establish a *prima facie* case of discrimination based on reprisal, Complainant must show: (a) she is a member of a protected group because of her participation in protected EEO activity: by participating in a statutory complaint process by filing a charge, testifying, assisting,

RYAN OFO-000024

or participating in any manner in an investigation, proceeding, or hearing under the applicable employment discrimination statutes, or by opposing agency policies or practices made illegal by federal sector discrimination statutes; (b) the agency official(s) knew of Complainant's participation in protected EEO activity before he or she took the action at issue; (c) Complainant was subsequently subjected to materially adverse treatment by the agency, which in the retaliation context means that the action might have deterred a reasonable person from opposing discrimination or participating in the EEO process; and (d) whether a nexus exists between the protected activity and the adverse treatment, which may be indicated by the adverse treatment at issue following Complainant's participation in protected EEO activity closely in time or in such a manner that a retaliatory motivation may be inferred, e.g., similarly situated employees who had not engaged in protected EEO activity were treated more favorably in similar circumstances.

With regard to Claim 4, Complainant has shown she is a member of protected EEO activity as she and the Union alerted the EEO Office and her management officials (Elizabeth Noelker and Lisa Herman) relative to her allegations of sexual harassment on March 28, 2013. After becoming aware of Complainant's contact with the EEO Office and involvement in EEO activity, the agency official (Ms. Lisa Herman) forwarded Complainant a Report of Contact on May 9, 2013, for incidents occurring on October 25, 2013. Complainant's participation in protected EEO activity and receipt of the Report of Contact follow closely in time that a retaliatory motivation may be inferred. Complainant acknowledges receiving a Leave Restriction Letter in October 2012; however, she states she was never provided the Report of Contact. The allegations raised in the Report of Contact are Ms. Herman's (Nurse Manager) notes relative to Complainant calling in at approximately 2:05 p.m. on October 25, 2012, and informing Ms. Dawn Robinson, Assistant Nurse Manager, that she was having car trouble; her car was on the side of the road; and she could not come to work for the 3:30 p.m. to 12 a.m. shift and she did not know what to do. Complainant was advised to call back and speak to Ms. Herman. Complainant then called at 3 p.m. and stated the car was in the repair shop and she would be getting a ride home. Ms. Herman advised her that she would be granted 2 hours of emergency annual leave and she was to report to duty by 5:30 p.m. (Note:  a request had been made for a float after Complainant's initial call; however, it was too late for the request to be submitted). Complainant was also advised she was needed at work and could be charged AWOL for the remaining 6 hours if she did not show up by 5:30 p.m.; however, Complainant indicated she could not get to work. The following day Complainant put a note under the nurse manager's door relative to changing her schedule on October 25, 2012, to a day off and then changing other days as well as working overtime. Ms. Herman indicates Complainant wanted to negotiate and change her schedule; however, Ms. Herman advised her the scheduled tour of duty for October 25, 2012, would not be changed to a day off and she would have to produce an invoice of the emergency car repairs from the repair shop or she would be charged AWOL for the 6 hour absence. At the time, Ms. Herman indicates Complainant did not submit any documentation to support her claim of a car emergency and was charged 6 hours AWOL for the remainder of the shift on October 25, 2012 (C-5).

Complainant does not provide any supporting testimony relative to her allegation that the receipt of the Report of Contact was retaliation or harassment. While she indicates the Report of Contact was never discussed with her, she does not provide any documentation which refutes the contents of the Report of Contact which are Ms. Herman's supervisory notes for what occurred

18

RYAN OFO-000025

on October 25, 2012. Complainant does acknowledge receipt of the Leave Restriction Letter (which she signed but did not date); however, Ms. Herman's Memo to Andrea Freeman indicates Ms. Herman did not provide Complainant a copy of the Leave Restriction letter, dated October 26, 2012, at the time Complainant signed acknowledging receipt; therefore, it was sent to Complainant via UPS. Ms. Herman's memo also indicates Complainant was not given AWOL as of October 23, 2013. Ms. Herman indicates she sent the Leave Restriction Letter and Report of Contact to Complainant rather than leave them in Complainant's mailbox at WCTB as Complainant was no longer at work and she (Herman) did not want to leave. Complainant has not shown that management's action (C-5, C-7).

With regard to Claim 5, Complainant has shown: (1) she is a member of a protected group by virtue of her sex; She asserts (2) she was subjected to unwelcome verbal or physical conduct and/or an action or series of actions and incidents, which a reasonable person would consider harassing; (3) the behavior to which she was subjected was sufficiently severe or pervasive to create an intimidating, hostile or offensive work environment altering the terms and conditions of her employment; and (4) the harassing behavior to which she was subjected was motivated by her sex. However, Complainant has not shown: (1) the Agency knew or should have known of such conduct; and (2) once management became aware of her allegations, management failed to promptly or appropriately address her allegations of harassment. Complainant testifies that management has approved her requests for leave; however, she asserts she should not have to incur expenses for her employee benefits. The Agency has provided her a memorandum explaining the effects of extended LWOP on her benefits.

<u>Management's Response.</u>

Management officials may rebut a *prima facie* case of discrimination of disparate treatment and reprisal based on sex and race by articulating a legitimate, nondiscriminatory reason for the actions that occurred.

Management provides testimony indicating once they became aware of Complainant's allegations, they took immediate action by moving Complainant's alleged harasser to another building and, subsequently, suspending him indefinitely pending the outcome of an indictment trial. Management states they provided additional training to members' of Complainant's unit relative to harassment; however, they did not provide any documentation/testimony relative to any specific training/counseling provided to Princess Jefferson and Ms. Noelker indicates she was not aware of specific harassment by Ms. Jefferson. Testimony from Mr. Jenison indicates management was aware and/or should have been aware of the work environment as he reported such as did Ms. McDevitt.

Management indicated Complainant was forwarded the Report of Contact (for incidents in October 2012) in May 2013 as she had not returned to work after requesting and being granted leave in March 2013. Management notes Complainant was forwarded a copy of a Leave Restriction (which had been given to Complainant by Ms. Herman in October 2012); however, she failed to take the Leave Restriction Letter with her. Ms. Noelker states the Report of Contact was included in the package along with the Leave Restriction Letter. The incidents in the Report

RYAN OFO-000026

of Contact reference Complainant's leave usage relative to incidents occurring on October 25, 2012.

Management provides testimony and documentation indicating all of Complainant's requests for leave have been approved.  The subject matter expert provides documentation and testimony indicating that once an employee has been in a LWOP status for a specific period of time the employee has several options relative to paying his/her benefits and is informed of such as was Complainant.

Pretext

The final burden now shifts to Complainant to demonstrate that the articulated reasons for management's actions are pretext.  Complainant can show this with either direct evidence of discriminatory motive or by showing that the articulated reasons of management are unworthy of belief.

In rebuttal, with regard to Claim 1, in which Ms. Noelker states Mr. Garrett was placed on administrative leave and then suspended indefinitely, Complainant states she disagrees with this as the prosecutor informed her that Mr. Garrett is still working at the Akron CBOC and is still being paid by the VA.  Complainant also states Ms. Noelker promised her that she (Noelker) would reassign Complainant; however, when Ms. Noelker realized Complainant was filing a lawsuit, Ms. Noelker met with her (Complainant) and her attorney and indicated they were not going to bring Complainant back unless Complainant dropped her lawsuit and Complainant could not return.  Complainant also states she was granted two days of administrative leave after she made her allegations of sexual harassment (B-7, p. 4).

Testimony shows management took immediate action once they became aware of Complainant's claims of sexual harassment.

With regard to Claim 2, Complainant states Ms. Noelker was aware she and Ms. McDevitt were claiming sexual harassment against Mr. Garrett as her union representative contacted Ms. Herman.  With regard to Ms. Jefferson's assertion relative to Mr. Garrett following Complainant to the gas station, Complainant states Mr. Garrett did follow her to the gas station; however, he did not follow her home.  She also states the patients on the unit would not have come to Ms. McDevitt and the other nurses about what happened if it was not being discussed (B-7, pp. 12-13).

Testimony shows management was made aware of Complainant's claims of harassing behavior and a hostile work environment created by employees on the floor where Complainant worked (by Ms. McDevitt); however, there is no specific documentation indicating management was made aware that Complainant believed Ms. Jefferson was involved in the harassment and was responsible for helping to create a hostile environment. Complainant's witness, Mr. Jenison (who identifies himself as a Nurse supervisor), states he counseled Ms. Jefferson on her treatment of Complainant, however, he did not inform his supervisor (Ms. Herman) of Ms. Jefferson's actions. His rationale is that he did not believe it would do any good given this type of thing went on all the time in front of the Nurse Manager.  Management (to include Mr. Jenison, who admits

20

he filed an EEO complaint against his supervisors) appears to have allowed an environment fester where employees were afraid to come forward when witnessing inappropriate and harassing behavior by other employees, thus, creating a hostile work environment for Complainant. Also, the record shows management did take some action albeit minimum by having the EEO Office meet with the staff relative to the Agency's policy on harassment. The evidence does not show this was effective enough to diminish a hostile work environment and, actually, seemed to aid in creating a further hostile work environment for Complainant.

With regard to Claim 3, Complainant states Mr. Garrett was encountered on two occasions—once was when Ms. McDevitt was there with her attorney; however, Complainant states Mr. Garrett was there and no one was with him (i.e. he was not with a union official). She also states on another occasion Mr. Garrett came in when Ms. McDevitt was there and Ms. McDevitt called Complainant and told her that she did not know what to do because Mr. Garrett was on the floor talking to some patients. Complainant states this is when Ms. Herman told Ms. McDevitt if this happens again, she (McDevitt) is supposed to call the police. Complainant states the prosecutors did tell her there is no way the VA could keep Mr. Garrett off the grounds because his doctors are in the building (B-7, pp. 14-16).

Based on Complainant's and Ms. McDevitt's testimony it does not appear Mr. Garrett was present when management officials were around; therefore, management advised Ms. McDevitt to call the police if Mr. Garrett was seen on the floor. In the absence of Ms. Herman's actual testimony, it appears Ms. Herman was advising Complainant to call authorities. However, it does not appear management took precautions to limit Mr. Garrett's "comings and goings" in the hospital for reasons other than his medical visits. It appears he was essentially allowed to "come and go" as he pleased (at the hospital) until he was arrested even though he was reassigned away from the hospital (to CBOC). Complainant claims that he posed a threat are not without merit.

With regard to Claim 4, Complainant states about ten of the employees on her shift received a Letter of Restriction and it was not a write-up. She states it was just telling the employees the policies. She states the Report of Contact was not discussed with her and questions Ms. Noelker's testimony relative to Ms. Herman indicating Complainant had forgotten to take the Report of Contact. Complainant also states she received an excellent/superior performance rating and if she had received the write-up in the same month it would have been a little odd because the write-up indicates she is an irresponsible employee (B-7, pp. 19-21).

Complainant does not present any evidence that the contents of the Report of Contact are not true. Her testimony indicates she was no longer at work when she received the Report of Contact and the Leave Restriction Letter. There is no evidence that management took any type of action against Complainant relative to the Report of Contact and management's rationale that the Report of Contact was forwarded to Complainant rather than left in her mail box is more likely than not true.

With regard to Claim 5, Complainant states Ms. Noelker's assertion that she came in with her attorney and accepted the hospice position (which was part of mediation); however, Complainant later did not take the position, is not true. Complainant states Ms. Noelker indicated the only way Complainant could take the position was if she signed a document stating she would not sue

21

RYAN OFO-000028